**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN GATEWAYS<br>314 E. Highland Mall Boulevard, Suite 501<br>Austin, TX 78752;<br><br>AMICA CENTER FOR IMMIGRANT RIGHTS<br>1025 Connecticut Avenue NW, Suite 701<br>Washington, DC 20036;<br><br>DIOCESAN MIGRANT & REFUGEE<br>SERVICES (d/b/a ESTRELLA DEL PASO)<br>2400A E. Yandell Drive<br>El Paso, TX 79903;<br><br>GALVESTON-HOUSTON IMMIGRANT<br>REPRESENTATION PROJECT<br>6001 Savoy Drive, Suite 400<br>Houston, TX 77036;<br><br>IMMIGRANT LAW CENTER OF<br>MINNESOTA<br>450 N. Syndicate Street, #200<br>St. Paul, MN 55104;<br><br>IMMIGRATION SERVICES AND LEGAL<br>ADVOCACY<br>3801 Canal Street, Suite 210<br>New Orleans, LA 70119;<br><br>NATIONAL IMMIGRANT JUSTICE CENTER<br>111 W. Jackson Boulevard, Suite 800<br>Chicago, IL 60604;<br><br>PENNSYLVANIA IMMIGRATION<br>RESOURCE CENTER<br>112 Pleasant Acres Road, Suite I<br>York, PA 17402; | **Case No. 1:25-cv-01370**<br><br><br><br><br>**COMPLAINT** |

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK
7301 Federal Boulevard, Suite 300
Westminster, CO 80030,

*Plaintiffs,*

–v.–

UNITED STATES DEPARTMENT OF
JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530;

EXECUTIVE OFFICE FOR
IMMIGRATION REVIEW
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

DEPARTMENT OF HOMELAND
SECURITY
245 Murray Lane SW
Washington, DC 20528;

PAMELA BONDI, in her official
capacity as Attorney General of the
United States,
U.S. Department of Justice
950 Pennsylvania Ave. NW
Washington, DC 20530;

SIRCE E. OWEN, in her official capacity as
Acting Director of the Executive Office for
Immigration Review,
Executive Office for Immigration Review
5107 Leesburg Pike, Suite 1902
Falls Church, VA 22041;

KRISTI NOEM, in her official capacity as
Secretary of Homeland Security,
Department of Homeland Security
245 Murray Lane, SW
Washington, DC 20528,

*Defendants.*

## INTRODUCTION

1.      This case concerns Defendants' sudden and unexplained termination of a program that provided counsel, including Plaintiffs, to detained noncitizens who—by reason of mental incompetency—cannot represent themselves in removal and bond proceedings.

2.      Individuals who lack the capacity to represent themselves due to their mental disabilities face extraordinary obstacles in navigating the immigration court system. Without appointed counsel, known as a qualified representative, these obstacles are insurmountable and put due process and access to a fair hearing out of reach. With qualified representation, however, these individuals have a fighting chance to exercise their rights under the Immigration and Nationality Act (INA) to present evidence, cross-examine witnesses, and participate in a fair hearing.

3.      In April 2013, Defendant Department of Justice (DOJ), through Defendant Executive Office for Immigration Review (EOIR), collaborated with Defendant Department of Homeland Security (DHS) "to initiate a new Nationwide Policy to provide enhanced procedural protections . . . to certain unrepresented and detained respondents with serious mental disorders or conditions that may render them incompetent to represent themselves in immigration proceedings." U.S. DOJ, EOIR, National Qualified Representative Program, https://perma.cc/Z9MR-BH7C. As part of these "enhanced procedural protections," Defendant EOIR created "a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA [Board of Immigration Appeals] to be mentally incompetent to represent themselves in immigration proceedings." *Id.*

4.      This nationwide program, the National Qualified Representative Program (NQRP), has provided Qualified Representatives to detained individuals deemed mentally incompetent in immigration proceedings for over a decade.

5.      Defendant EOIR created the NQRP in the midst of class action litigation concerning access to counsel for detained individuals incompetent to represent themselves in immigration court. *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) (hereafter, *Franco*). That case resulted in the certification of a class, a permanent injunction, and a settlement implementing the decision, which together required the United States to provide qualified legal representation to detained noncitizens deemed mentally incompetent in immigration proceedings in Arizona, California, and Washington. *Id.* at *2, 20. While *Franco* addressed proceedings in these three states, the NQRP applies nationwide to both *Franco* and non-*Franco* jurisdictions.[1] But on April 25, 2025—shortly after the twelfth anniversary of the creation of the NQRP—Defendants abruptly and without reasoning terminated the portion of the NQRP that applied outside of the three *Franco* states[2]: the "Nationwide NQRP."

6.      The NQRP is critical to the rights of noncitizens deemed mentally incompetent because it makes it possible for immigration judges to appoint counsel, like Plaintiffs, to represent them. Absent the Nationwide NQRP, there is no mechanism for immigration judges to make these appointments, and Plaintiffs—nonprofit legal service providers who have spent years developing their expertise in representing this population—will be unable to provide this representation. The result will be that Plaintiffs will suffer direct financial and operational harm that will likely make

---

[1] The Nationwide NQRP—the component of the NQRP that operates outside of Arizona, Washington, and California—is also commonly referred to as the "nationwide policy."

[2] It appears that Defendants also intend to decline to renew Acacia's contract with respect to *Franco* services when it expires in July 2025. *See* ECF No. 65-2, Admin. Rec. 17, 20–23, 26, *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C.).

it impossible for them to retain dedicated staff and/or continue this line of work. They will also be unable to provide the core legal services that they seek to provide and fulfill their missions of ensuring access to counsel for particularly vulnerable individuals.

7.      On April 25, 2025, Defendant EOIR announced, in an Amendment and Statement of Work provided to the Acacia Center for Justice (the NQRP contractor that subcontracts with providers like Plaintiffs), that the NQRP would no longer be nationwide but instead would be "limited to class members covered by" the three-state injunction in *Franco*. EOIR admits that their decision immediately "*end[s] representation* funded by EOIR on these [nationwide] cases," including as to current cases where a Qualified Representative has already been assigned and is in the midst of an active representation. *See* ECF No. 65-2, Admin. Rec. 15–16, 26, *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C.). In doing so, Defendants made no reference to the professional responsibilities that apply to attorneys, which may preclude withdrawal where it would have a materially adverse impact on the client. Put differently, Defendants entirely failed to account for the impossible ethical choice Plaintiffs now face because of Defendants' actions.

8.      Even where ethical considerations and rules of professional responsibility are not implicated, Qualified Representatives are now left with an untenable choice. They could seek to withdraw from their representation and wait to see if immigration judges permit them to do so, or they could continue to provide representation without being paid for their services. The termination notice does not suggest that Defendants will contract with or otherwise procure replacement counsel, to the extent such counsel even exists. They have given no indication that they intend to continue meeting their obligations to provide counsel to immigrants deemed mentally incompetent.

9.      By terminating the NQRP outside of the three *Franco* states, EOIR has unduly burdened and interfered with existing attorney-client relationships that EOIR had previously facilitated and funded, jeopardizing the core work, missions, and funding of Plaintiffs and similar organizations. Current Qualified Representatives, including Plaintiffs, may be forced to seek to withdraw from Nationwide NQRP representations because they are not receiving payment. That is precisely what Defendants contemplate. Or Plaintiffs may try to (or be ordered to) continue representation without funding, forcing Plaintiffs to divert resources from other mission-driven programs and causing significant financial harms, including potential layoffs of staff.

10.     The termination of the Nationwide NQRP violates the Administrative Procedure Act (APA), 5 U.S.C. §§ 701, *et seq.*, in multiple ways. Defendant EOIR has offered no rationale or reasoning as to why it has suddenly refused to continue the NQRP outside of the three *Franco* states. Defendants have not considered the harm that their actions will cause to Plaintiffs, their clients, or the immigration system. They have not addressed the reliance interests at stake for Plaintiffs and other NQRP providers, which have spent years building subject-matter expertise in the complexities of representing this vulnerable population. Nor have they accounted for their legal obligations under the Rehabilitation Act or the fundamental fairness concerns that informed the creation of the Nationwide NQRP in the first place. The APA requires much more.

11.     The termination of the Nationwide NQRP further violates the *Accardi* doctrine, which requires agencies to adhere to their own regulations, policies, and procedures. EOIR has not rescinded the enhanced protection policies (adopted April 2013) that require it to provide appointed counsel to individuals deemed mentally incompetent in immigration proceedings. Nor have Defendants DHS and DOJ rescinded the regulations requiring that individuals with disabilities not be excluded from participating in, or subject to discrimination under, programs and activities that

those Defendants conduct. 6 C.F.R. § 15.30(a); 28 C.F.R. § 39.130(a). Because those regulations and policies are still in effect, Defendants must follow them and provide legal representatives to mentally incompetent individuals in immigration proceedings. Yet, without the Nationwide NQRP's network of providers, Defendants have given no indication of if or how they intend to do so.

12.    Accordingly, Plaintiffs seek declaratory and injunctive relief, enjoining Defendants from terminating the Nationwide NQRP and associated funding. Plaintiffs also seek vacatur of Defendants' decision to terminate the Nationwide NQRP.

## JURISDICTION & VENUE

13.    This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act, 5 U.S.C. § 702.

14.    The APA waives the United States's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise contrary to the law. 5 U.S.C. § 706(2)(A).

15.    The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

16.    The Court has authority to grant injunctive relief under 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

17.    Venue properly lies in the District of Columbia because a substantial part of the events giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1)(B). Defendants DOJ and DHS are headquartered in Washington, D.C., and Attorney General Bondi and Secretary Noem maintain their principal offices in Washington, D.C.

## PARTIES

### A.    PLAINTIFFS

18.    Plaintiffs are nine nonprofit organizations that have received appointments and funding from EOIR—via the primary NQRP contractor, Acacia Center for Justice—to provide legal representation to individuals deemed mentally incompetent in immigration proceedings. Plaintiffs share a mission to provide legal representation to such individuals and rely on the Nationwide NQRP (1) to identify and refer these individuals for representation, (2) for appointment to represent these individuals, and (3) for funding Plaintiffs' representations of these individuals. Collectively, Plaintiffs are currently serving as Qualified Representatives for more than 100 individuals in Nationwide NQRP cases.

19.    Plaintiff American Gateways is a nonprofit organization with its principal office in Austin, Texas. American Gateways provides legal representation, advocacy, and education services to low-income noncitizens and their families in 23 central Texas counties. Its mission is to champion the dignity and human rights of immigrants, refugees, and survivors of persecution, torture, conflict and human trafficking through exceptional immigration legal services at low or no cost, education, and advocacy. American Gateways has been a member of the NQRP provider network since at least 2018, providing representation to detained noncitizens who are adjudicated mentally incompetent to represent themselves before the immigration court in San Antonio, Texas. American Gateways is currently appointed counsel for seven individuals under the Nationwide NQRP.

20.    Plaintiff Amica Center for Immigrant Rights (Amica Center), formerly Capital Area Immigrants' Rights (CAIR) Coalition, is a nonprofit organization based in Washington, D.C. that provides legal services to immigrants. Amica Center's mission is to confront the impact that the

unjust immigration system has on its clients and communities through direct legal representation, impact litigation, education, and client-centered advocacy, which includes serving as many detained immigrants in the D.C.-Maryland-Virginia Region as possible. It has been a member of the NQRP provider network since at least 2015, providing representation to detained noncitizens who are adjudicated mentally incompetent to represent themselves before the immigration courts in Annadale, Virginia and Baltimore, Maryland. It has served as appointed counsel to more than 235 individuals pursuant to the NQRP since 2015. Amica Center is currently appointed counsel for 30 individuals under the Nationwide NQRP and six individuals under *Franco*.

21.     Plaintiff Diocesan Migrant & Refugee Services (d/b/a Estrella del Paso) is a nonprofit organization based in El Paso, Texas that provides legal services to immigrants. Its mission is to provide immigration legal services, advocacy, and community outreach to protect immigrants' rights and advance justice in the spirit of the Gospel. It is one of three nonprofit organizations in the West Texas/New Mexico region that provides direct legal representation in immigration court. Estrella del Paso has been a member of the NQRP provider network since 2014. It presently represents individuals detained in three facilities in Texas and New Mexico and in immigration courts in those States. Estrella del Paso is currently appointed counsel for six individuals under the Nationwide NQRP.

22.     Plaintiff Galveston-Houston Immigrant Representation Project (GHIRP) is a nonprofit organization based in Texas whose mission is to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need.  It presently serves individuals detained in four facilities in Texas and before immigration courts in Texas. GHIRP has been a member of the NQRP provider network since 2020. It is currently

appointed counsel for seven individuals under the Nationwide NQRP and four individuals under *Franco*.

23.    Plaintiff Immigrant Law Center of Minnesota (ILCM) is a nonprofit organization based in St. Paul, Minnesota that provides legal services to immigrants. ILCM enhances opportunities for immigrants and refugees through free immigration legal representation for low-income individuals, and through education and advocacy with diverse communities. Part of its mission is providing the highest quality of legal services to low-income immigrants and refugees, including noncitizens deemed mentally incompetent. It is currently the only nonprofit organization located in Minnesota providing NQRP representation in the State. ILCM has been a member of the NQRP provider network since January 2025. ILCM is currently appointed counsel for three individuals under the Nationwide NQRP.

24.    Plaintiff Immigration Services and Legal Advocacy (ISLA) is an organization based in New Orleans, Louisiana that provides legal services to immigrants. Its mission is to defend the rights of immigrant communities and advocate for just and humane policy.  ISLA has been a member of the NQRP provider network since 2019. It serves individuals detained in 11 facilities in Louisiana, Mississippi, Colorado, Arizona, and Kentucky, and before immigration courts in Louisiana, Colorado, and Arizona. ISLA is currently appointed counsel for nine individuals under the Nationwide NQRP and four individuals under *Franco*.

25.    Plaintiff National Immigrant Justice Center (NIJC) is a nonprofit organization based in Chicago, Illinois providing legal services to immigrants. NIJC's mission is to establish and defend the legal rights of immigrants regardless of background and transform the immigration system to one that affords equal opportunity for all. Consistent with that mission, NIJC focuses its work on providing legal representation to the most vulnerable members of the immigrant

community. NIJC has been a member of the NQRP provider network since the program's inception. As a regional service provider, NIJC regularly represents NQRP clients in Illinois, Wisconsin, Indiana, Kentucky, Minnesota, and other Midwestern states. It is currently appointed counsel for 19 individuals under the Nationwide NQRP and two individuals under *Franco*.

26.     Pennsylvania Immigration Resource Center (PIRC) is a nonprofit organization that provides free legal educational information and representation on immigration matters to noncitizens across the Commonwealth of Pennsylvania. Part of its mission is to provide representation and access to justice for vulnerable noncitizens. It presently represents individuals detained in two Pennsylvania facilities and before immigration courts in New Jersey, Pennsylvania, and a few other states. PIRC has been a member of the NQRP provider network since approximately 2017. PIRC is currently appointed counsel for eight individuals under the Nationwide NQRP and one individual under *Franco*.

27.     The Rocky Mountain Immigrant Advocacy Network (RMIAN) is a nonprofit organization based in Westminster, Colorado. RMIAN promotes knowledge of legal rights, provides free legal representation to people in removal proceedings, endorses the importance of universal representation, and advocates for a more humane, functional, and efficient immigration system. Part of its mission is to represent vulnerable noncitizens in immigration proceedings. RMIAN was selected to be part of the initial pilot program for the NQRP Nationwide Policy and has been representing clients through the program since its inception. It is currently appointed counsel for 15 individuals under the Nationwide NQRP and three individuals under *Franco*.

28.     Defendants' decision to terminate the Nationwide NQRP substantially burdens Plaintiffs' ability to carry out their missions to provide representation and other services to noncitizens. To fulfill their organizational missions and to continue their core work of serving these

noncitizens, Plaintiffs will have to expend considerable time, effort, and money as a result of Defendants' actions. Some will have to divert resources from other programming and/or reassign, furlough, or fire staff. Many Plaintiffs will be forced to limit or cease providing services to noncitizens deemed mentally incompetent once their resources are depleted.

       **B.**     **DEFENDANTS**

29.     Defendant Department of Justice (DOJ) is the department of the federal government that supervises the officials in EOIR that administer the Nationwide NQRP.

30.     Defendant Executive Office for Immigration Review (EOIR) is the office of DOJ that administers the Nationwide NQRP.

31.     Defendant Department of Homeland Security (DHS) is the department of the federal government that houses Immigration and Customs Enforcement (ICE), including ICE's division of Enforcement and Removal Operations (ERO), which oversees immigration detention. DHS collaborated with DOJ to create the NQRP. As part of the NQRP, DHS officials are instructed to refer individuals who demonstrate indicia of incompetency to EOIR for screening and possible inclusion in the NQRP.

32.     Defendant Pamela Bondi, the Attorney General of the United States, is sued in her official capacity. She is responsible for the administration of funds by DOJ and EOIR under NQRP.

33.     Defendant Sirce E. Owen, the Acting Director of EOIR, is sued in her official capacity. She is responsible for the administration of funds appropriated to EOIR and for the termination of the Nationwide NQRP.

34.     Defendant Kristi Noem, the Secretary of Homeland Security, is sued in her official capacity. She is responsible for overseeing DHS's obligations under the NQRP.

# STATEMENT OF FACTS

**I.    The Need for Appointed Counsel for Detained Noncitizens Deemed Mentally Incompetent in Immigration Proceedings**

35.    The INA provides that individuals facing removal proceedings before EOIR have both a constitutional and statutory right to a full and fair hearing, which includes a "reasonable opportunity . . . to present evidence," examine evidence, and cross-examine witnesses. 8 U.S.C § 1229a(b)(4); *e.g., Rusu v. INS*, 296 F.3d 316, 321–22 (4th Cir. 2002).

36.    For individuals with mental or cognitive disabilities who are not competent to represent themselves, safeguards are required to ensure a fair hearing. The INA recognizes that "[i]f it is impracticable by reason of [a noncitizen's] mental incompetency for the [noncitizen] to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the [noncitizen]." 8 U.S.C. § 1229a(b)(3).

37.    The Board of Immigration Appeals has expounded on this right, noting that "[i]n immigration proceedings, the Fifth Amendment entitles [noncitizens] to due process of law. Included in the rights that the Due Process Clause requires in removal proceedings is the right to a full and fair hearing." *Matter of M-A-M*, 25 I. & N. Dec. 474, 479 (BIA 2011) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993), *Matter of M-D-*, 23 I. & N. Dec. 540, 542 (BIA 2002) and *Landon v. Plasencia*, 459 U.S. 21, 32–33 (1982)).

38.    Studies have shown that individuals deemed mentally incompetent have serious difficulties navigating the immigration system. They may not understand the gravity or the consequences of immigration proceedings. They may make erroneous or unhelpful statements because they do not comprehend the nature of the proceedings. Similarly, these individuals are more likely to have difficulty providing consistent testimony or understanding what is being asked of them, which may impede such proceedings.

39.     Individuals with competency concerns may also be unaware of their disabilities because they have not been diagnosed in their home country. They may be similarly unaware that the existence of such conditions puts them at heightened risk of persecution and torture in their home countries, which in turn may qualify them for protection from removal based on pervasive stigma and discrimination against people with mental illness or disabilities in certain parts of the world. *See, e.g.*, *Guerra v. Barr*, 974 F.3d 909, 913–15 (9th Cir. 2020); *Temu v. Holder*, 740 F.3d 887, 890 (4th Cir. 2014); *Roye v. Att'y Gen. of the U.S.*, 693 F.3d 333, 336 (3d Cir. 2012).

40.     These issues are compounded in the immigration context, where individuals are typically interacting with the court in a foreign language, and many are indigent. And they are doubly compounded in the context of the cases covered by the Nationwide NQRP because individuals served by that program are detained at the outset of the removal process and often for its entirety. Detention can present obstacles to assembling and presenting an effective case against removal, regardless of competency. Moreover, the detention environment is particularly challenging for individuals deemed mentally incompetent, often exacerbating existing mental health symptoms.

41.     Prior to the creation of the NQRP, there was no process by which a person could receive appointed counsel because of a competency concern. During this time, there were documented cases in which the United States deported U.S. citizens with mental disabilities without providing them a full and fair opportunity to argue against such an outcome.

42.     Given these issues, while the INA only provides for a right to counsel at "no expense to the government," 8 U.S.C. §§ 1229a(b)(4)(A), 1362, the Rehabilitation Act confirms that qualified counsel is required for individuals with mental disabilities to exercise their rights under the INA, *see Franco*, 2013 WL 3674492 at *3. Section 504 of the Rehabilitation Act

provides that no "qualified individual with a disability" be "excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a).

43.    DOJ and DHS regulations implement this statutory requirement, stating: "No qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30(a) (DHS); 28 C.F.R. § 39.130(a) (DOJ) (similar).

44.    The obligation for the government to provide qualified representation to these individuals in immigration proceedings was at the heart of the *Franco* litigation. The *Franco* court held that "Section 504 of the Rehabilitation Act does require the appointment of a Qualified Representative as a reasonable accommodation" for detained individuals with mental disabilities in immigration proceedings because they "are not competent to represent themselves by virtue of their mental disabilities." *Franco*, 2013 WL 3674492 at *3; *see also Franco-Gonzalez v. Holder*, 767 F. Supp. 2d 1034, 1058 (C.D. Cal. 2010) (finding that "a Qualified Representative would be a reasonable accommodation" for the plaintiffs).

45.    *Franco* relied on the rights guaranteed by the Rehabilitation Act and the INA's promise of full and fair proceedings, including the rights to "examine the evidence," to "present evidence," and to "cross-examine witnesses." 8 U.S.C. § 1229a(b)(4)(B). The court reasoned that, for individuals who cannot represent themselves due to mental incompetence, their "ability to exercise these rights is hindered by their mental incompetency, and the provision of competent

representation able to navigate the proceedings is ***the only means*** by which they may invoke those rights." *Franco*, 2013 WL 3674492, at *5 (emphasis added).

46.    As a result, the court in *Franco* issued a permanent injunction, requiring the government to appoint Qualified Representatives to the class of detained, mentally disabled immigrants in Arizona, California and Washington. For individuals identified as part of the class, the government was "enjoined from pursuing further immigration proceedings against [those individuals] unless, within 60 days of their having been identified by an Immigration Judge as a [class] member, such individuals are afforded Qualified Representatives . . . ." *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013). Following the court's decision, the defendants in that case entered into a settlement agreement regarding the implementation of the court's order. *Franco*, No. 2:10-cv-02211, Dkt. 807-1 (Feb. 27, 2015). The injunction and settlement remain in place today.

## II.    The Creation and Implementation of the NQRP

47.    One day before the court issued its summary judgment ruling in *Franco*, Defendants announced the creation of the NQRP.

48.    On April 22, 2013, EOIR's Chief Immigration Judge Brian O'Leary issued a policy to all immigration judges entitled "Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders or Conditions" (the Nationwide Policy).[3] This policy acknowledged that immigration judges "who have had unrepresented detained [noncitizens] with serious mental disorders or conditions appear in [their] courtrooms . . . are more than aware of the many unique challenges encountered in conducting removal

---

[3] *See also* U.S. DOJ, Press Release, *Department of Justice and the Department of Homeland Security Announce Safeguards for Unrepresented Immigration Detainees with Serious Mental Disorders or Conditions*, https://perma.cc/99KS-7MN5.

proceedings involving such individuals." Accordingly, the policy announced "a number of enhancements" designed "to enable Immigration Judges to more efficiently and effectively carry out their adjudicatory duties" in cases involving detained individuals "with serious mental disorders or condition[s]."

49.    The enhancements provided for by the policy included competency hearings and mental competency examinations to be conducted or ordered by immigration judges.

50.    The purpose of these measures was "to enhance procedural protections for mentally incompetent individuals appearing in our courts." The enhancements included instructions for competency hearings and provided that, where an unrepresented detained noncitizen was "not mentally competent" to represent themselves, EOIR would appoint "a qualified legal representative to represent the [noncitizen] in all future detained removal and/or bond proceedings."

51.    Following the establishment of the Nationwide Policy, Defendant EOIR issued a directive titled "Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Respondents with Mental Disorders" (2013 Directive) in December 2013. This directive instructed that, pursuant to the Nationwide Policy, EOIR "make[] a qualified legal representative available in removal and custody redetermination proceedings if it is determined that a respondent with a serious mental disorder or condition is detained, unrepresented, and incompetent to represent him- or herself."

52.    The 2013 Directive reiterated that EOIR "is committed to identifying detained unrepresented respondents in immigration custody who are not competent to represent themselves in removal and custody redetermination proceedings." Moreover, the directive added that "EOIR will not proceed in the case of any detained unrepresented respondent determined to be

incompetent to represent him- or herself in a removal or custody redetermination proceeding until appropriate procedural protections and safeguards are in place."

53.    The 2013 Directive instructed immigration judges on how to make competency determinations. Individuals are competent, according to the directive, if they have a "1. rational and factual understanding of: a. the nature and object of the proceeding; b. the privilege of representation, including but not limited to, the ability to consult with a representative if one is present; c. the right to present, examine, and object to evidence; d. the right to cross-examine witnesses; and e. the right to appeal," as well as "2. reasonable ability to: a. make decisions about asserting and waiving rights; b. respond to the allegations and charges in the proceeding; and c. present information and respond to questions relevant to eligibility for relief." In short, to be competent the individual "must be able to meaningfully participate in the proceeding and perform the functions necessary for self-representation."

54.    Individuals are incompetent for self-representation, by contrast, if they are "unable because of a mental disorder to perform any of the functions listed in the definition of competence to represent oneself." *Id.*

55.    While an individual is presumed to be competent, that presumption "to represent oneself is rebutted if an Immigration Judge finds, by a preponderance of the evidence, that the respondent is unable because of a mental disorder to perform any of the functions listed in the definition of competence to represent oneself." *Id.*

56.    ICE also issued instructions for the implementation of the NQRP. On April 22, 2013, the Director of ICE issued a memorandum that "direct[ed] that procedures be in place to ensure that . . . detainees who may be mentally incompetent to represent themselves in removal proceedings . . . are identified, that relevant information about them is provided to the immigration

court so that an immigration judge (IJ) can rule on their competency and, where appropriate, that such [noncitizens] are provided with access to new procedures."[4]

57.    In subsequent years, Defendants have recognized that "[t]he fundamental goals of the NQRP are increased efficiency and fairness in immigration proceedings."[5]

58.    Defendants have further recognized the importance of the NQRP in rulemakings. In a 2020 rulemaking (during the first Trump administration), EOIR cited to the NQRP as part of the "existing agency protocol for ensuring that proceedings involving such individuals [with competency issues] are fair." Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81698, 81735 (Dec. 16, 2020) (Final Rule).

59.    EOIR has also acknowledged in rulemaking (again, during President Trump's first term) that the NQRP is "part of EOIR's Nationwide Policy regarding procedural protections for detained [noncitizens] who may have competency issues in immigration proceedings." Organization of the Executive Office for Immigration Review, 84 Fed. Reg. 44537, 44537 (Aug. 26, 2019) (Interim Rule); *see also* Recognition of Organizations and Accreditation of Non-Attorney Representatives, 80 Fed. Reg. 59514, 59516 n.12 (Oct. 1, 2015) (Proposed Rule) (recognizing that EOIR's "safeguards include the provision of a Qualified Representative to any unrepresented detainee found mentally incompetent to represent him- or herself in immigration proceedings").

60.    The Board of Immigration Appeals has likewise acknowledged the role of Qualified Representatives in cases involving respondents deemed mentally incompetent. *See, e.g.*, *Matter of*

---

[4] U.S. Immigration and Customs Enforcement, *Civil Immigration Detention: Guidance for New Identification and Information-Sharing Procedures Related to Unrepresented Detainees With Serious Mental Disorders or Conditions*, (Apr. 22, 2013), https://perma.cc/T7FX-3QNY.
[5] EOIR's Office of Legal Access Programs (Aug. 2016) https://perma.cc/K2VU-3GBD.

*M-J-K-*, 26 I. & N. Dec. 773, 777 (BIA 2016) (describing how Qualified Representatives can "increase[] the likelihood of finding a means to proceed fairly" where individual deemed mentally incompetent was unable to fully participate in proceedings); *see id.* (noting that "even without assistance from the respondent, counsel could provide relevant objective documentation, such as background or country conditions evidence, to assist in adjudicating an application for relief").

61.    And, as EOIR has acknowledged in its contracts, "[t]he purpose of the NQRP is to ensure EOIR's compliance with the . . . *Franco* Orders and to carry out EOIR's commitment under the Nationwide Policy." *See* ECF No. 65-3, Admin. Rec. 103, *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C.). Accordingly, "[i]f a finding of incompetency is made, EOIR must arrange for the provision of a Qualified Representative within stated timeframes." *Id.*

62.    Prior to the creation of the NQRP, immigration judges had no mechanism to refer individuals deemed mentally incompetent to counsel or to appoint representation. And it was difficult for attorneys to represent individuals who were mentally incompetent because, due to those individuals' impairments, it was usually practically impossible for attorneys to establish an attorney-client relationship. Defendants' April 25th actions have returned the immigration system to this untenable situation.

63.    Now, without the Nationwide NQRP's systematized referral system and in light of Defendants' termination of other immigration programs, the task of identifying and serving detained noncitizens with competency concerns will become much more onerous for Plaintiffs, assuming it is possible at all. As a result, it is increasingly likely that individuals with mental disabilities will be deprived of their right to a fair hearing and potentially removed from the United States despite qualifying for relief from removal.

**III.    Defendants' Implementation of the NQRP**

64.    Since its inception, EOIR has implemented the NQRP through a contractor.  As of June 1, 2022, the Acacia Center for Justice (Acacia) has been the contractor for the NQRP.

65.    Acacia, in turn, subcontracts with approximately 40 legal services providers, including Plaintiffs, whose staff utilize specialized skills and experience in providing legal counsel to detained noncitizens deemed mentally incompetent. Consistent with the nationwide scope of the NQRP, those providers operate in over 20 states, with several providers providing services in numerous states and immigration courts to ensure nationwide coverage.

66.    Defendants have historically provided Acacia with statements of work that defined the NQRP consistent with the Nationwide Policy, the 2013 Directive, and EOIR's published description of the NQRP.  Before April 25, 2025, the operative Statement of Work defined the NQRP as a "nationwide program" and "the scope of NQRP services extends to all NQRP Respondents nationwide."

67.    "NQRP Respondents," under this prior Statement of Work, included both individuals covered by *Franco* and "individuals who have been found incompetent by an immigration judge or the BIA pursuant to EOIR's Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Noncitizens with Serious Mental Disorders or Conditions."

68.    Under the NQRP contract, EOIR provides funding to Acacia, which disburses those funds to service providers, including Plaintiffs. Service providers work with Acacia to forecast how many cases they can take on in a given year and to estimate annual payments based on that forecast. Plaintiffs and other providers then bill Acacia and receive payment based on actual work done.

**IV.     Defendants' Unlawful Termination of the Nationwide NQRP**

69.     On January 24, 2025, following the President's issuance of an executive order titled "Protecting the American People Against Invasion," internal EOIR emails confirmed that Defendants would continue providing the NQRP nationwide.

70.     But a little over two months later, Defendants abruptly changed course. On April 3, 2025, Acacia received an unusual letter—on DOJ letterhead signed by a DOJ employee—purporting to terminate funding for the NQRP, including *Franco* and Nationwide cases. Shortly thereafter, however, Acacia received a second letter rescinding the April 3rd termination notice, stating that the earlier notice had "no legal effect" and should be "disregard[ed] . . . in its entirety."

71.     Just days later, Defendants resumed internal discussions about terminating the Nationwide NQRP.  On April 9, 2025, the EOIR's Acting Assistant Director for the Office of Policy emailed EOIR's Acting Director, Defendant Sirce E. Owen, with "recommendation[s] from Office of Policy." *See* ECF No. 65-2, Admin. Rec. 15–16, *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C.). As to the NQRP, the email recommended a "[r]eduction in scope to not include Nationwide Policy cases." *Id.* This reduction in scope would "end representation funded by EOIR" and "allow" Plaintiffs and other Qualified Representatives "to withdraw and facilitate finding other representation (not funded by the Government) for these individuals." *Id.* Simply put, Defendants *knew* that termination of the Nationwide NQRP would burden and likely terminate existing relationships between Plaintiffs and their clients.

72.     On information and belief, Defendants' decision-making about the termination of the Nationwide NQRP did not take into account their ongoing obligations and commitments to provide Qualified Representatives to all detained individuals deemed mentally incompetent in immigration proceedings or involve consideration of an alternative plan to do so. In fact, while

EOIR apparently intends to engage in "procurement activity to meet obligations under [the] permanent injunction in *Franco*"—which applies to only Arizona, California, and Washington— it has made no similar commitments outside of the three *Franco* states. *Id.*

73.    On or about April 15, 2025, Acacia received a notice from EOIR reflecting an intention to remove the Nationwide NQRP cases from the overall NQRP contract, with a proposed effective date of April 28, 2025. Defendants asked that Acacia submit a new proposal limiting the program to *Franco* cases only.

74.    On April 25, 2025—three days before the notice of April 15 indicated—Defendants terminated funding for the Nationwide NQRP and narrowed the NQRP to cover only the three *Franco* states. By terminating this funding, Defendants terminated the Nationwide NQRP. Defendants stated this unilateral decision was made for "convenience." No reason or justification was given beyond this. In the revised Statement of Work simultaneously provided to Acacia, Defendants deleted any references to the Nationwide NQRP and stated that the program is now "limited to class members covered by *Franco*."

75.    Defendants' redline of the Statement of Work illustrates that the NQRP is no longer a "nationwide program":

> The NQRP is a ~~nationwide~~ program limited to class members covered by *Franco*.~~and the scope of NQRP services extends to all NQRP Respondents nationwide as implemented under section II.E., below.~~

76.    This Statement of Work further removed any suggestion that the NQRP might apply nationwide:

C. **EOIR's Nationwide Policy**

    1) NQRP Respondents also include individuals who have been found incompetent by an immigration judge or the BIA pursuant to EOIR's Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Noncitizens with Serious Mental Disorders or Conditions.

77.    As of this filing, Defendant EOIR's website still states that the NQRP is "a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in immigration proceedings."

78.    Defendants have not publicly provided any substantive explanation or justification for terminating the Nationwide NQRP.

79.    On information and belief, Defendants have no plans to continue the Nationwide NQRP or otherwise provide legal representation for individuals deemed mentally incompetent in immigration proceedings outside of those in states covered by the *Franco* injunction.

80.    Indeed, on information and belief, Defendants stopped referring cases to Acacia for the appointment of counsel under the Nationwide NQRP weeks before officially terminating the program. For example, on April 9, an immigration judge in Virginia found an individual to be incompetent and determined that appointment of counsel was appropriate. Plaintiff Amica Center is the designated NQRP service provider for this region and routinely receives notifications of appointment within days after a finding of incompetence. But Amica Center has still not been appointed to represent this individual. On April 21, 2025, Amica Center discovered that a second individual had been found incompetent and referred to EOIR for the appointment of counsel. Amica Center has not received its appointment in that case either.

81.    Likewise, on April 25, 2025, an immigration judge in Chicago determined that an individual was mentally incompetent and ordered that a Qualified Representative be appointed to represent him. Plaintiff NIJC, the sole NQRP provider for Chicago, had flagged the case to EOIR and ICE's Office of the Principal Legal Advisor. Yet NIJC has not received an appointment to date.

82.    On information and belief, it appears that, as recently as April 29, 2025, some immigration judges were not even aware that the Nationwide NQRP had been terminated. On that date, for instance, a Colorado immigration judge ordered that counsel be provided for a noncitizen deemed mentally incompetent and informed that individual that he would receive an attorney within the next few weeks.

## V.    Defendants' Actions Irreparably Harm Plaintiffs and Their Clients

83.    Terminating the Nationwide NQRP will have—indeed, has already begun to have—devastating and irreparable consequences for Plaintiffs, their clients, and other detained, unrepresented noncitizens deemed mentally incompetent.

84.    From April 2013 through January 2020, over 2000 detained noncitizens with "serious mental illness" were provided representation through the NQRP. Across the nine Plaintiff organizations, Qualified Representatives are currently serving over 100 people as part of the Nationwide NQRP.

85.    As Qualified Representatives, Plaintiffs provide crucial services to their NQRP clients, some of whom have experienced horrendous abuse, discrimination, torture, abandonment, traumatic brain injury, and/or persecution related to (as a cause or consequence of) their mental disabilities. NQRP clients often cannot understand the nature and import of their removal or bond proceedings due to their impairments. Qualified Representatives are thus necessary to ensure that

these clients have meaningful hearings that comply with the requirements of the INA and due process.

86.    A Qualified Representative from Amica Center, for example, was able to secure asylum for a client with bipolar disorder, who had been subjected to involuntary electroconvulsive therapy in his home country. Despite the fact that the client's condition in detention deteriorated to the point that the client experienced a manic episode during his Individual Hearing, his Qualified Representative was able to present his case successfully to the immigration judge, who found that the client's experience had been "particularly severe and barbaric." Through the assistance of a Qualified Representative, a client of Plaintiff ISLA who suffered from severe schizophrenia was similarly able to apply for relief and reconnect with family members for the first time in months.

87.    However, those representations, and more, are now in jeopardy. This is an immediate problem for Plaintiffs. For example, Plaintiffs NIJC, ILCM, RMIAN, and American Gateways have had hearings for appointed NQRP clients after April 25, 2025, but before the date of this filing. All of these organizations continued to represent their clients at those hearings based on the conclusion that withdrawing at the eleventh hour would be unethical and would cause serious harm to the clients and their cases. As things stand, none of these organizations will be paid for this critical work. Plaintiffs ILCM, NIJC, Estrella del Paso, American Gateways, GHIRP, and PIRC have hearings or deadlines scheduled in NQRP cases in the next month. In the next two months, Plaintiffs Amica and ISLA have eight and (about) five hearings scheduled in NQRP cases, respectively.

88.    A core element of Plaintiffs' respective missions is to provide specialized counsel to some of the most vulnerable noncitizens in immigration proceedings. This includes noncitizens who, by virtue of their mental incompetence, cannot represent themselves. Absent the Nationwide

NQRP, however, Plaintiffs will not have the same ability to serve this population for a number of reasons.

89.     First, without the Nationwide NQRP, Plaintiffs will have no mechanism for receiving appointments for individuals deemed mentally incompetent.

90.     Second, Plaintiffs will not be paid for their work for this population, at least not without identifying other sources of funding for such work—a tall order even in the best of circumstances, now made even more difficult as Defendants have also terminated other federally-funded programs through which Plaintiffs provide legal services. This means that, in addition to finding funding to pay for attorneys for these cases, Plaintiffs and other Qualified Representatives would have to procure funding for expert witnesses, mental health evaluations, and translation services, all of which have historically been funded through the Nationwide NQRP.

91.     Without NQRP funding, Plaintiffs will face difficult decisions. NQRP representations are extremely time- and resource-intensive undertakings, often requiring the hiring of translators, mental health and medical experts, country condition experts, and investigators. Constrained by their professional ethical obligations, Plaintiffs will likely try to maintain (for as long as possible) existing representations even without funding—to the extent it is feasible. But that will cause financial losses for Plaintiffs, which will only be exacerbated by other concurrent cuts to federally-funded legal services programs provided by these same organizations to unaccompanied immigrant children and *pro se* adults who are navigating the immigration court system. *See Community Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, No. 3:25-cv-02847-AMO (N.D. Cal.); *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM, (D.D.C.). For Plaintiff Amica Center, for instance, losing the majority

of its NQRP funding—which comprises approximately 12% of its annual operating budget, and 15–20% of the budget for its Detained Adult Program—will be devastating.

92.     To continue this work without Nationwide NQRP funding, Plaintiffs must divert resources from other programs and will need to tap into discretionary or reserve funding, to the extent that such funds exist. But other recent changes in federal funding for Plaintiffs will make doing so more challenging. For example, Plaintiff PIRC has already been forced to lay off or furlough staff due to related funding cuts, indicating that its available discretionary funding has likely already been allocated. It will simply not be possible for Plaintiffs to cover the necessary expenses, which include translation and other critical services, to pursue their Nationwide NQRP clients' cases for very long, if at all.  This will have serious and immediate consequences for Plaintiffs' ability to represent their clients effectively.

93.     As time goes on, this combined loss of funding will likely cause some Plaintiffs to have to furlough, reassign, and/or lay off experienced staff with irreplaceable NQRP expertise. For Plaintiff Amica Center, the termination of the Nationwide NQRP and associated funding will likely require the organization to lay off ten staff members who provide NQRP services to clients covered by both the Nationwide NQRP and *Franco*. Plaintiff PIRC had to furlough five employees (of an eleven-person team) as of May 2, 2025, in part due to the termination of the Nationwide NQRP.

94.     The result of this loss of staff will be devastating, particularly given the extensive training and work that members of the NQRP network have put into developing the expertise required for representing individuals with serious competency concerns in immigration proceedings. Part of that expertise involves understanding how to develop and maintain a bond of trust between the attorney and the client, which is a uniquely difficult task where the client is

mentally incompetent. This loss of expertise will not be recoverable, as staff will be forced to find other means of earning their livelihoods.

95.    Plaintiffs may also be forced to limit the services they provide and will be unable to serve as many NQRP clients (if any) and other clients across the immigration representation programs that they offer. Decreased NQRP staffing will also result in increased caseloads for any remaining staff, limiting the time and resources they can dedicate to each client.

96.    The loss or reassignment of experienced and knowledgeable staff will harm Plaintiffs' ability to provide services to noncitizens deemed mentally incompetent in removal proceedings—a key part of Plaintiffs' respective missions. Further, if Plaintiffs cannot maintain staffing levels and the financial resources necessary to handle their current caseloads, they may be ultimately forced to move to withdraw from cases, interrupting Plaintiffs' core legal services and frustrating their missions to provide these critical services to a vulnerable population.

97.    And because withdrawal requires court approval (which is not always granted), Plaintiffs may be required to continue with their representations of Nationwide NQRP clients despite this financial hardship. Withdrawal motions before the Board of Immigration Appeals, for instance, are typically ruled on at the same time as the merits, meaning that Qualified Representatives will still be required to brief their cases before being permitted to withdraw officially from the representation, making withdrawal functionally impossible.

98.    Defendants not only know that they are causing this harm, but they intend it. Defendants acknowledge that their decision will "end representation" and require Plaintiffs "to withdraw" from cases. ECF No. 65-2, Admin. Rec. 15–16, *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM, (D.D.C.). Defendants imagine a world where Plaintiffs could "facilitate finding representation" for their former clients, *id.*, but they offer no

answer to where Plaintiffs might find such representation, particularly given that traditional *pro bono* models (involving representation by attorneys at large firms under the mentorship of nonprofit organizations) have not been effective for this population precisely because of the competency concerns that these clients present. And it is virtually impossible that Plaintiffs' clients could procure replacement counsel, if such counsel exists, on their own. In addition to their competency limitations (which can lead to hospitalization or segregation within the detention center), these clients are often detained in remote locations, indigent, and not fluent in English.

99.    Moreover, even if it were possible for Plaintiffs' clients to procure qualified replacement counsel (it is not), it would be supremely inefficient to substitute counsel in these complex, fact-specific, and legally nuanced matters. By way of example, NIJC is currently preparing for a final hearing (set for June 5, 2025) in a case that has been with the organization for nearly seven years and has involved multiple appeals to the Board of Immigration Appeals. The replacement of counsel would unquestionably delay resolution of this case, as it would for many others.

100.    Plaintiffs' clients are significantly harmed by the uncertainty they now face, as Plaintiffs may be forced to withdraw from ongoing representations and/or have less time and resources to dedicate to their cases. The Nationwide NQRP cases that Plaintiffs took on in reliance on funding from Defendants are complex. Their clients will be severely harmed if they are no longer represented by Plaintiffs and are not appointed qualified replacement counsel to represent them in ongoing immigration proceedings. These individuals are wholly reliant on their representatives, like Plaintiffs, to protect their rights under the INA—a fact that underlies the *Franco* court's ruling. The resulting removal proceedings will be fundamentally unfair, in violation of their due process rights and their rights under the Rehabilitation Act and the INA.

101.    Plaintiffs' prospective Nationwide NQRP clients will also be irreparably harmed by Defendants termination of the program. Without the Nationwide NQRP, these individuals will not have appointed counsel to represent them in their removal or bond proceedings. Indeed, there is no indication that Defendants intend to enact any new mechanism to provide these individuals the necessary safeguard of appointed counsel that is required under the Rehabilitation Act. And as noted above, it is highly improbable that such individuals could procure counsel if counsel is not appointed to them. Their mental incompetence, alone, presents a substantial obstacle in this regard. When combined with the facts that these individuals are often detained in remote locations and lack financial and social resources, the obstacles become insurmountable.

102.    As history shows, the results will be devastating. Before the NQRP, mentally incompetent individuals who were U.S. citizens were wrongly deported because they did not have access to counsel and were therefore effectively unable to prove their citizenship. Others languished in immigration detention for years on end because there was no mechanism to provide them with a meaningful hearing process. In some cases, individuals with mental disabilities were forced to proceed *pro se* and faced removal to countries where they risked persecution and torture, without a fair process to assess their eligibility for protection from that fate.

103.    Finally, while Defendants terminated the Nationwide NQRP for their supposed "convenience," it is highly unlikely that this change will offer any such benefit. Qualified Representatives facilitate their clients' cases, ensuring that clients understand the proceedings and can engage meaningfully in the adjudicative process. This in turn facilitates the immigration judges' work, saving judges from repeatedly trying (and failing) to create fair proceedings for *pro se*, detained, and mentally incompetent individuals while knowing that such a task is not possible. Without Qualified Representatives, simple matters of case management (like setting deadlines) or

pleadings can require multiple hearings, especially when the noncitizen in question is hospitalized—a common situation in NQRP cases. Unsurprisingly, immigration judges often express gratitude to Plaintiffs' attorneys for their representation of NQRP clients. Defendants' actions will make it more difficult for judges to resolve these complex and difficult matters, contributing to the ever-growing backlog of immigration cases.

104.    Defendants' actions will likewise jeopardize the services provided under the NQRP for clients from *Franco* jurisdictions as well. That is because Defendants have an obligation to provide ongoing representation to these individuals even if they are released from detention and relocate to other states. Defendants' actions will dismantle the network of providers available for appointment for *Franco* clients who move to other parts of the country.

**CLAIMS FOR RELIEF**

**Count 1 – Administrative Procedure Act (APA)**
**Arbitrary and Capricious Agency Action**

105.    Plaintiffs incorporate by reference paragraphs 1 to 104.

106.    The APA authorizes the Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' termination of the Nationwide NQRP is arbitrary and capricious.

107.    Defendants gave no reason whatsoever for their actions other than "convenience." That is not an explanation for why the NQRP no longer applies nationwide, especially as terminating representations for ongoing cases is likely to cause significant disruption and hardship within the immigration system.

108.    Defendants also failed to provide Plaintiffs and the public with a reasoned justification for the reversal of a longstanding policy. The Nationwide NQRP has existed for over a decade, but Defendants "decide[d] to depart from decades[]-long past practices and official

32

policies" without offering a reasoned explanation for that change, thus violating a "central principle of administrative law." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

109.    Defendants have also "entirely failed to consider [] important aspect[s] of the problem" by failing to consider the impact to Plaintiffs, their clients and prospective clients, and the immigration courts. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

110.    For example, Defendants offered no evidence that they considered: (a) their legal obligations under the INA, the Rehabilitation Act, and the Due Process Clause to noncitizens deemed incompetent, (b) the harms that will result for those individuals, (c) the harms that will befall Plaintiffs and other Qualified Representatives, or (d) the adverse impact on the immigration courts. There is no evidence that Defendants considered that, without the Nationwide NQRP, impacted noncitizens will lose access to counsel, be unable to exercise their rights to a fair hearing, and suffer adverse consequences, which may include prolonged detention and improper removal to countries where they face persecution or torture.

111.    As to the harms that Plaintiffs face directly, Defendants failed to consider numerous factors. For example, Defendants failed to consider the impossible ethical dilemma Plaintiffs are now experiencing as they balance their need to withdraw from cases for which they are not being paid against the resulting harms to their clients if the latter are left without counsel.

112.    Next, in their conclusion that Nationwide NQRP providers will simply identify new qualified counsel for their clients, Defendants failed to consider that no such counsel likely exists. That is partially because of the unique difficulties of representing individuals deemed mentally

incompetent and partially because of Defendants' own actions to strip funding for other *pro se* and legal services support programs that they have historically funded.

113.    Defendants likewise appear not to have considered the impact of their actions on ability of individuals who cannot adequately represent themselves to obtain a fair hearing. This harm results not only from the loss of funding but also from the elimination or lapse of the Nationwide NQRP's referral and appointment mechanism. Without the referrals and given Defendants' cuts to numerous other immigration programs, the process of identifying these individuals and providing representation—core work which is central to Plaintiffs' missions—will become more onerous for Plaintiffs, if not impossible.

114.    In short, in the available public materials, Defendants did not consider how their actions will frustrate Plaintiffs' core work of providing legal assistance to individuals who cannot represent themselves, nor the fact that Plaintiffs cannot be appointed to represent individuals deemed mentally incompetent without the Nationwide NQRP.

115.    Defendants likewise failed to account for Plaintiffs' reliance interests. Plaintiffs have spent more than a decade developing considerable expertise and hiring dedicated staff to provide legal representation to this especially vulnerable population. The loss of Nationwide NQRP funding will erode this expertise and likely lead to a loss of staff, whose experience cannot be recovered for the foreseeable future.

**Count 2 – Administrative Procedure Act**
**Contrary to Immigration and Nationality Act, Rehabilitation Act, and Due Process**

116.    Plaintiffs incorporate by reference paragraphs 1 to 104.

117.    "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Rodriguez v. Marin*, 909 F.3d 252, 255–56 (9th Cir. 2018) (internal citation omitted). Likewise, under the INA, individuals in immigration proceedings

have the right to examine the evidence, present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4)(B); *see also Reid v. Garland*, 120 F.4th 1127, 1140 (2d Cir. 2024) ("A noncitizen is 'entitled to a full and fair removal hearing under both the INA and the Due Process Clause of the Fifth Amendment.'" (citing *Matter of R-C-R-*, 28 I. & N. Dec. 74, 77 (B.I.A. 2020) (cleaned up)). Individuals who are not competent to represent themselves cannot exercise their statutory and constitutional rights.

118.    Defendants' termination of the Nationwide NQRP—with the express understanding that current counsel may need "to withdraw" and without guaranteeing replacement counsel for individuals who cannot represent themselves—is contrary to the INA's requirement that individuals have the right to participate in fair hearings.

119.    The termination of the Nationwide NQRP violates Section 504 of the Rehabilitation Act, which provides that disabled individuals may not "be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under *any program or activity conducted by any Executive agency*." 29 U.S.C. § 794 (emphasis added).

120.    To establish a violation of the Rehabilitation Act, individuals "must show that (1) they are disabled . . . , (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under any program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008).

121.    Plaintiffs' clients are mentally incompetent, they cannot meaningfully participate in immigration proceedings and exercise their rights to a fair hearing without assistance because

of their competency concerns, and the immigration proceedings at issue are carried out by a federal agency with federal funds.

122.    Without an appointed Qualified Representative, Plaintiffs' clients are "excluded from, denied the benefit of, or subject to discrimination" in their removal proceedings. *See Franco*, 2013 WL 3674492, at *5 ("[T]he provision of competent representation able to navigate the proceedings is the only means by which [incompetent detainees] may invoke" their rights under the INA to present evidence and challenge the government's case for removal.).

123.    The continuation of the Nationwide NQRP would not be an undue burden on Defendants because the NQRP is an established program already in place that they have implemented for over a decade.

### Count 3 – Administrative Procedure Act
### Violation of the *Accardi* Doctrine

124.    Plaintiffs incorporate by reference paragraphs 1 to 104.

125.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

126.    Defendants' decision to terminate the Nationwide NQRP violates the APA under the *Accardi* doctrine because agencies must adhere to their own policies and regulations, and the failure to do so violates the APA. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*.

127.    Defendants have not rescinded the Nationwide Policy or any other policies that require EOIR to provide qualified representatives to detained individuals deemed mentally incompetent in immigration proceedings.

128.    Defendants have explained that the purpose of the Nationwide Policy is to provide procedural protections to detained individuals found to be mentally incompetent in immigration proceedings.

129.    Defendants have also not rescinded their own regulations implementing the Rehabilitation Act's requirement that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from the participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30(a); 28 C.F.R. § 39.130(a) (similar).

130.    In terminating the Nationwide NQRP, Defendants have stated that they intended to "end representation funded by EOIR," and they have offered no indication that they would continue to meet their obligations via other services providers.

131.    As a result, Defendants have violated their own binding policies and regulations.

## PRAYER FOR RELIEF

Plaintiffs request that this Court:

1.    Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law." 5 U.S.C. § 706.

2.    Set aside Defendants' actions that violate the APA, including all attempts and orders to terminate, pause, cease, discontinue, or impede the Nationwide NQRP.

3.    Enjoin Defendants and their agents from taking any action to terminate, pause, cease, discontinue, or impede the continued operation of the Nationwide NQRP.

4.    Enjoin Defendants and their agents nationwide from ceasing or refusing to appoint Qualified Representatives pursuant to the Nationwide NQRP.

5. Enjoin Defendants and their agents nationwide from withholding or refusing to expend funds as necessary to continue the Nationwide NQRP.

6. Vacate any materials or orders that have implemented the termination of the Nationwide NQRP.

7. Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

8. Award any other relief the Court deems necessary.

Respectfully submitted,

Date: May 5, 2025

s/ Keren Zwick
Keren Zwick (D.D.C Bar No. IL0055)
Mark Feldman (C.A. Bar No. 302629)*
Mary Georgevich (M.N. Bar No. 0399950)*
Charles Roth (N.Y. Bar No. 2839041)*
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Phone: 312.660.1364
Email: kzwick@immigrantjustice.org
mfeldman@immigrantjustice.org
mgeorgevich@immigrantjustice.org
croth@immigrantjustice.org

s/ Ivano Ventresca
Ivano Ventresca (D.C. Bar No. 1045769)
Monica F. Sharma (D.C. Bar No. 90013922)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Phone: 202.778.1842
Email: iventresca@zuckerman.com
msharma@zuckerman.com

s/ Adina Appelbaum
Adina Appelbaum (D.C. Bar No. 1026331)
F. Evan Benz (N.C. Bar. No 49077)*
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Phone: 202.331.3320
Email: adina@amicacenter.org
evan@amicacenter.org

*Pro hac vice forthcoming