**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN GATEWAYS, *et al.*,

    *Plaintiffs,*

    –v.–

DEPARTMENT OF JUSTICE, *et al.*,

    *Defendants.*

**Case No. 1:25-cv-01370-AHA**

## <u>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR STAY PURSUANT TO 5 U.S.C. § 705</u>

# **TABLE OF CONTENTS**

BACKGROUND ............................................................................................................ 3

I.     Defendants' Creation of the NQRP ............................................................................ 3

II.    The NQRP's Role in Safeguarding the Rights of Individuals Deemed Mentally
       Incompetent ................................................................................................................. 8

III.   Defendants' Termination of the Nationwide NQRP ................................................... 9

IV.    Defendants' Termination of the Nationwide NQRP is Causing Plaintiffs Irreparable
       Harm ......................................................................................................................... 10

LEGAL STANDARD ................................................................................................... 11

ARGUMENT ................................................................................................................ 12

I.     Plaintiffs are Likely to Succeed on the Merits of Their Claims ............................... 12

       A.    The termination of the Nationwide NQRP is arbitrary and capricious. ............ 12

             1.    Defendants failed to adequately explain their decision to terminate a longstanding
                   policy and eliminate an important program. ............................................. 13

             2.    Defendants failed to consider several important aspects of the problem ..... 15

             3.    Defendants ignored weighty reliance interests. ......................................... 20

       B.    Defendants' termination of the Nationwide NQRP is contrary to the Rehabilitation
             Act. ..................................................................................................................... 22

       C.    Defendants' action violates the *Accardi* doctrine ............................................ 26

       D.    The Tucker Act does not bar this Court's jurisdiction. ..................................... 28

II.    The Termination of Nationwide NQRP Will Cause Plaintiffs Irreparable Harm, and that
       Harm Is a Sufficient Injury to Confer Standing ...................................................... 31

III.   The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief ........... 36

IV.    Nationwide Relief is Appropriate Here ..................................................................... 38

V.     Plaintiffs Should Not Be Required to Post Security ................................................. 39

CONCLUSION ............................................................................................................. 40

i

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ...................................................................................11

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  CV No. 25-00400 (AHA), CV No. 25-00402 (AHA), 2025 WL 752378 (D.D.C. Mar. 10,
  2025) .................................................................................................................. 22, 34

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir. 2008) ................................................................................ 23

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
  25 F.4th 1 (D.C. Cir. 2022) ................................................................................. 13, 18

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ................................................................................ 14

*Amica Center for Immigrant Rights v. U.S. Dep't of Justice*,
  No. 1:25-cv-00298-RDM (D.D.C.) ........................................................................... 18

*Aracely, R. v. Nielsen*,
  319 F. Supp. 3d 110 (D.D.C. 2018) .................................................................... 26, 27

*Aviel v. Gor*, --- F. Supp. 3d ----,
  No. CV 25-778 (LLA), 2025 WL 1009035 (D.D.C. Apr. 4, 2025) ......................... 40

*Battle v. FAA*,
  393 F.3d 1330 (D.C. Cir. 2005) ............................................................................... 26

*Baystate Franklin Med. Ctr. v. Azar*,
  950 F.3d 84 (D.C. Cir. 2020) ................................................................................... 12

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ................................................................................................. 29

*\*Catholic Legal Immigr. Network, Inc. v. EOIR*,
  513 F. Supp. 3d 154 (D.D.C. 2021) ...................................... 15, 17, 31, 32, 34, 35, 36, 37, 39

*Catholic Legal Immigration Network, Inc. v. EOIR*,
  CV No. 21-00094 (RJL), 2021 WL 3609986 (D.D.C. Apr. 4, 2021) ...................... 37

*Chaplaincy of Full Gospel Churches*,
  454 F.3d 290 (D.C. Cir. 2006) ................................................................................. 38

*Children's Hosp. Ass'n of Texas v. Azar*,
  933 F.3d 764 (D.C. Cir. 2019) ................................................................................. 15

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) ........................................................................ 12

*Community Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*,
  --- F. Supp. 3d ---, No. 3:25-cv-02847-AMO, 2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) . 18

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ....................................................................... 28

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................. 26

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ......................................................................................... 13

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) ....................................................................................... 20, 21

*Department of Education v. California*,
  145 S. Ct. 966 (2025) ...................................................................................... 30

*Dist. of Columbia v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 12, 37, 38

*Doe 2 v. Mattis*,
  344 F. Supp. 3d 16 (D.D.C. 2018) ................................................................... 38

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) .......................................................................... 40

*E. Bay Sanctuary Covenant v. Biden*,
  993 F.3d 640 (9th Cir. 2021) ........................................................................... 39

*E. Bay Sanctuary Covenant v. Garland*,
  994 F.3d 962 (9th Cir. 2020) ........................................................................... 38

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) .................................................................................. 13, 21

*Farrell v. Blinken*,
  4 F.4th 124 (D.C. Cir. 2021) ........................................................................... 13

*FCC v. Fox Television Stations*,
  556 U.S. 502 (2009) .................................................................................. 14, 21

*Franco-Gonzalez v. Holder*,
  No. 10-CV-02211 DMG, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) ................................... 4

*Franco-Gonzalez v. Holder,
  No. CV 10-02211 DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013).. 2, 4, 15, 16, 18, 24, 32

In re Meyers,
  120 B.R. 751 (Bankr. S.D.N.Y. 1990)................................................................. 34

Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. Nat'l Lab. Rels. Bd.,
  61 F.4th 169 (D.C. Cir. 2023) ........................................................................... 21

Jefferson v. Harris,
  285 F. Supp. 3d 173 (D.D.C. 2018) .................................................................. 26

Jicarilla Apache Nation v. U.S. Dep't of Interior,
  613 F.3d 1112 (D.C. Cir. 2010)......................................................................... 15

Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.,
  56 F.3d 279 (D.C. Cir. 1995) ............................................................................ 30

Kirwa v. U.S. Dep't of Def.,
  285 F. Supp. 3d 21 (D.D.C. 2017) .................................................................... 14

*League of Women Voters of United States v. Newby,
  838 F.3d 1 (D.C. Cir. 2016) ...................................................... 31, 33, 35, 36, 37, 38

Lee v. United States,
  582 U.S. 357 (2017)............................................................................................ 8

Mathews v. Eldridge,
  424 U.S. 319 (1976)......................................................................................... 23

Matter of M-A-M-,
  25 I. & N. Dec. 474 (BIA 2011) ...................................................................... 19

Matter of R-C-R-,
  28 I. & N. Dec. 74 (B.I.A. 2020) ..................................................................... 22

Megapulse, Inc. v. Lewis,
  672 F.2d 959 (D.C. Cir. 1982) ......................................................................... 29

Meza Morales v. Barr,
  973 F.3d 656 (7th Cir. 2020)............................................................................ 16

Michigan v. EPA,
  576 U.S. 743 (2015)......................................................................................... 15

Montilla v. INS,
  926 F.2d 162 (2d Cir. 1991) ............................................................................ 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................. 12, 13, 15, 16

*Nat. Res. Def. Council, Inc. v. Morton,*
    337 F. Supp. 167 (D.D.C. 1971) ................................................................. 40

*Nat'l Mining Ass'n v. United States Army Corps of Eng'rs,*
    145 F.3d 1399 (D.C. Cir. 1998) ................................................................. 38

*Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,*
    358 F. Supp. 3d 66 (D.D.C. 2019) ................................................................. 18

*Northwest Immigrant Rights Project v. U.S. Citizenship & Immigration Services,*
    496 F. Supp. 3d 31 (D.D.C. 2020) ................................................................. 31, 35

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.,*
    797 F.3d 1087 (D.C. Cir. 2015) ................................................................. 33

*Perry Cap. LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ................................................................. 29

*Pol'y & Rsch. v. U.S. Dep't of Health and Hum. Servs.,*
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................. 13

*Portland Cement Ass'n v. EPA,*
    665 F.3d 177 (D.C. Cir. 2011) ................................................................. 18

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.,*
    498 F. Supp. 3d 132 (D.D.C. 2020) ................................................................. 11

*Quintero v. Garland,*
    998 F.3d 612 (4th Cir. 2021) ................................................................. 22

*R.I.L-R v. Johnson,*
    80 F. Supp. 3d 164 (D.D.C. 2015) ................................................................. 37

*Reid v. Bondi,*
    132 F.4th 109 (2d Cir. 2024) ................................................................. 22

*Rodriguez v. Marin,*
    909 F.3d 252 (9th Cir. 2018) ................................................................. 23

*Simms v. D.C.,*
    872 F. Supp. 2d 90 (D.D.C. 2012) ................................................................. 40

*United States ex rel. Accardi v. Shaughnessy,*
    347 U.S. 260 (1954) ................................................................. 26

*United States v. Valdivias-Soto,*
    112 F.4th 713 (9th Cir. 2024) ................................................................ 15

*United Steel v. Mine Safety & Health Admin.,*
    925 F.3d 1279 (D.C. Cir. 2019) .............................................................. 38

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,*
    485 F. Supp. 3d 1 (D.D.C. 2020) ..................................................... 38, 39

*Widakuswara v. Lake,*
    No. 25-CV-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............... 31

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................. 36

**Statutes**

29 U.S.C. § 794 ....................................................................................... 24

5 U.S.C. § 702 ......................................................................................... 29

5 U.S.C. § 705 ......................................................................................... 12

5 U.S.C. § 706(2) ..................................................................................... 13

5 U.S.C. §§ 701 *et seq* ............................................................................. 2

8 U.S.C. § 1229a(b)(4)(B) ............................................................ 4, 16, 21, 23

**Rules**

Fed. R. Civ. P. 65(c) ............................................................................... 40

**Regulations**

8 C.F.R. § 1003.17(a)(3) .......................................................................... 35

8 C.F.R. § 1240.10(c) .............................................................................. 19

**Other Authorities**

Agreement Regarding Procedures for Notifying and Reopening Cases of *Franco* Class Members
    Who Have Received Final Orders of Removal, *Franco*, No. 10-CV-02211 (C.D. Cal. Feb. 27,
    2015), ECF No. 807-1. The injunction and settlement remain in place today ......................... 5

Decl. of Steven Lang, *Northwest Immigrant Rights Project v. Sessions*, No. 17-cv-00716-RAJ
    (W.D. Wash. June 26, 2017), ECF No. 50 ............................................ 25

EOIR's Office of Legal Access Programs (Aug. 2016),
    https://perma.cc/K2VU-3GBD .............................................................. 15

Model Rules of Prof'l Conduct R. 1.16(b)(1) (2020) .................................................... 35

*Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court*,
    https://www.justice.gov/eoir/file/639746/dl. ........................................................... 20

Organization of the Executive Office for Immigration Review,
    84 Fed. Reg. 44537 (interim Aug. 26, 2019) ........................................................... 7

Partial Judgment and Permanent Injunction, *Franco*, 10-CV-02211,
    (C.D. Cal. Apr. 23, 2013), ECF No. 593 .................................................................. 5

Procedures for Asylum and Withholding of Removal,
    85 Fed. Reg. 81698 (Dec. 16, 2020) ................................................................. 15, 25

Recognition of Organizations and Accreditation of Non-Attorney Representatives,
    80 Fed. Reg. 59514 (proposed Oct. 1, 2015) .......................................................... 7

## INTRODUCTION

This case concerns Defendants' abrupt termination of the National Qualified Representative Program (NQRP), a program through which they provide qualified legal representation to detained individuals who cannot represent themselves in bond and removal proceedings due to serious mental or cognitive impairments. For more than 12 years, until April 25, 2025, the NQRP provided the sole means for an immigration judge to appoint counsel to represent this vulnerable population. Before the NQRP was established, there was no mechanism for appointment, in violation of mentally incompetent noncitizens' due process rights, the Immigration and Nationality Act (INA), and the Rehabilitation Act. With this termination, that is true again. Without counsel, these individuals cannot exercise their rights to participate meaningfully in a fair hearing—namely, to present evidence, make arguments, or cross-examine witnesses—as guaranteed by federal law. The consequences can be dire, and may include prolonged detention and/or removal to countries where the individuals risk persecution or torture.

Plaintiffs are nine nonprofit organizations who—until the program was terminated—were relying on the NQRP to represent around 100 individuals who had been deemed mentally incompetent by immigration judges. These organizations have spent years building up staff and expertise to represent this uniquely vulnerable population but now find themselves in an impossible situation. Defendants apparently expect Plaintiffs to withdraw from these cases and find replacement counsel, even though withdrawal will likely prejudice Plaintiffs' clients and may therefore be unethical. Moreover, there is no ready pool of replacement counsel that is prepared to take on these complex matters *pro bono*. As a result, Plaintiffs may be effectively compelled to continue representation without payment but are unlikely to be able to do so for any prolonged period, as they rely heavily on NQRP funding to make their work for this population possible.

1

In *Franco-Gonzalez v. Holder* (hereafter, *Franco*), a federal court recognized that the "provision of competent representation able to navigate the proceedings is the ***only*** means" for detained individuals deemed mentally incompetent to invoke their rights under the INA and the Rehabilitation Act to participate meaningfully in immigration proceedings. No. 10-CV-02211 DMG, 2013 WL 3674492, at *5 (C.D. Cal. Apr. 23, 2013) (emphasis added). *Franco* ultimately required Defendants to provide qualified representation to detained noncitizens deemed mentally incompetent in Arizona, California, and Washington, and consistent with that obligation, Defendants created the Nationwide NQRP to provide counsel beyond those states.

Now, without explanation, Defendants have terminated the NQRP in every state but those covered by *Franco*. Defendants acknowledge that their decision will "end representation funded by [Defendant Executive Office for Immigration Review (EOIR)]" and that counsel may have "to withdraw" and identify "replacement" counsel. Decl. of Ivano M. Ventresca, Ex. 1 (Apr. 9, 2025 email from EOIR's Acting Assistant Director for the Office of Policy to EOIR's Acting Director). Yet—in direct contravention of its policies and legal obligations—EOIR has not guaranteed that it will provide replacement counsel. In any event, it is unlikely that any such qualified counsel exists. Absent counsel, individuals who lack the capacity to represent themselves will effectively lose their rights to a fair hearing under the Due Process Clause, the INA, and the Rehabilitation Act.

Defendants' termination of the Nationwide NQRP is arbitrary and capricious, contrary to law, and in violation of Defendants' own binding policies. Defendants have offered no rationale for eliminating this longstanding program—a textbook violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* What's more, they have failed to consider the impact that their action will have on numerous affected parties, including Plaintiffs, their current and prospective clients, and immigration courts. Nor have they considered the significant reliance interests that have

accrued over the past twelve years of the program's operation. And they have ignored their legal obligations under the U.S. Constitution, the INA, and the Rehabilitation Act to ensure that individuals deemed mentally incompetent can assert their rights in immigration proceedings. That is the core of this case; not a breach of contract, but rather Defendants' unlawful action in terminating a program that provided the only means for appointing counsel to individuals who cannot represent themselves due to their mental disabilities.

Defendants' action will irreparably harm Plaintiffs, who are now practically and financially unable to complete core tasks for Nationwide NQRP clients and thus to fulfill their missions to serve this vulnerable group, despite ongoing professional obligations to do so. Plaintiffs are uniquely positioned to serve noncitizens with severe mental and cognitive disabilities, having done so for years. By terminating the Nationwide NQRP, Defendants have cut off critical funding that Plaintiffs need to represent current NQRP clients. And, without the NQRP, Plaintiffs cannot be appointed to represent such individuals in the future because there is no other procedural mechanism through which immigration judges appoint counsel.

Because Defendants' partial termination of the NQRP is improper and unlawful under the Administrative Procedure Act, this Court should grant immediate injunctive relief and/or a stay under 5 U.S.C. § 705 to preserve the status quo until a final judgment is reached in this matter.

## BACKGROUND

### I.    Defendants' Creation of the NQRP

The Department of Justice's Executive Office for Immigration Review (EOIR) created the National Qualified Representative Program (NQRP) in 2013.

It did so concurrently with litigation addressing the right to counsel for individuals who are deemed incompetent for self-representation due to serious mental health or cognitive concerns. In

the *Franco* litigation, a group of detained immigrants with mental or cognitive disabilities sued the government, alleging "that the Rehabilitation Act requires legal representation [in immigration proceedings] as a reasonable accommodation for individuals who are not competent to represent themselves by virtue of their mental disabilities." 2013 WL 3674492, at *3. The court agreed, finding "that Section 504 of the Rehabilitation Act does require the appointment of a Qualified Representative as a reasonable accommodation." *Id.*

The *Franco* decision is based on the rights guaranteed to individuals under the INA. The INA mandates that individuals have "a reasonable opportunity to examine the evidence," "present evidence," and "to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B). The *Franco* court recognized that a mentally or cognitively disabled noncitizen's "ability to exercise these rights is hindered by their mental incompetency." 2013 WL 3674492, at *5. The court therefore concluded that the "provision of competent representation able to navigate the proceedings is the *only* means by which they may invoke those rights." *Id.* (emphasis added).

To ensure that individuals with competency concerns could exercise their rights, *Franco* enjoined the government-defendants "from pursuing further immigration proceedings against [class members identified after the order] unless . . . such individuals are afforded Qualified Representatives who are willing and able to represent them during all phases of their immigration proceedings. . .whether *pro bono* or at [government] expense." 2013 WL 8115423, at *1 (C.D. Cal. Apr. 23, 2013). *Franco* covers three states—Washington, California, and Arizona. Partial Judgment and Permanent Injunction, *Franco*, No. 10-CV-02211, (C.D. Cal. Apr. 23, 2013), ECF No. 593. The government did not appeal the injunction, and it remains in place today.

*Franco* set the stage for the NQRP. On April 22, 2013, following preliminary rulings in *Franco* and one day before the *Franco* permanent injunction was issued, EOIR issued a "Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders or Conditions" (the Nationwide Policy) to all immigration judges. Ventresca Decl., Ex. 2. The stated purpose of the Nationwide Policy was "to enhance procedural protections for mentally incompetent individuals appearing in our courts." *Id.*[1]

The Nationwide Policy includes EOIR's commitment to provide qualified legal representation to individuals who are incompetent for self-representation because of their mental or cognitive conditions. *Id.* To determine which individuals require appointed counsel, the Nationwide Policy implemented procedures for competency hearings and evaluations. *Id.* If, after following those procedures, an immigration judge concluded that an unrepresented, detained noncitizen was "not mentally competent" for self-representation, EOIR would then "make available a qualified legal representative" to represent that person in removal and bond proceedings. *Id.*

As "part of the Nationwide Policy's enhanced procedural protections," EOIR "launched the National Qualified Representative Program (NQRP), a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in

---

[1] The permanent injunction in *Franco* was followed by a settlement that implemented the terms of the injunction in the three-state *Franco* region. *See* Agreement Regarding Procedures for Notifying and Reopening Cases of *Franco* Class Members Who Have Received Final Orders of Removal, *Franco*, No. 10-CV-02211 (C.D. Cal. Feb. 27, 2015), ECF No. 807-1. The injunction and settlement remain in place today.

immigration proceedings." Ventresca Decl., Ex. 3.[2] An April 2013 press release from the Department of Justice stated that "these new procedures," including the NQRP, "will provide enhanced protections to unrepresented immigration detainees with serious mental disorders or conditions that may render them mentally incompetent to represent themselves in immigration proceedings, and will facilitate the conduct of those proceedings." Ventresca Decl., Ex. 4.

EOIR has recognized that it relies on the NQRP to comply with its own policies. *See* Ventresca Decl., Ex. 5 at 62 (Acacia Contract). EOIR issued a directive implementing the NQRP in December 2013. *See* Ventresca Decl., Ex. 6 (EOIR, *Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Respondents with Mental Disorders* (Dec. 31, 2013) (hereafter, 2013 Directive). That directive explained how immigration judges should make competency determinations and reiterated that EOIR's "policy makes a qualified legal representative available" if a person is not competent for self-representation. *See id.* While qualified representatives are provided in the *Franco* states pursuant to the permanent injunction and settlement in that case, qualified representatives are provided outside of these states pursuant to EOIR's Nationwide Policy.[3]

The NQRP's benefits are clear. EOIR has pointed to NQRP as proof of an "existing agency protocol for ensuring that proceedings involving such individuals [with competency issues] are fair." Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81698, 81735 (Dec. 16,

---

[2] DOJ's webpage for the NQRP was taken down following the filing of this lawsuit. *See* Ventresca Decl., Ex. 3; U.S. Dep't of Justice, *National Qualified Representative Program (NQRP)*), https://perma.cc/AL7X-6HJS. As of this filing, the NQRP still appears in EOIR's Policy Manual. *See* EOIR Policy Manual, *1.6 – National Qualified Representative Program*, https://perma.cc/279X-SDNQ.

[3] The Nationwide NQRP is also sometimes referred to as the "nationwide policy." To avoid confusion, we use the term "Nationwide NQRP" to refer to the NQRP operating outside of the *Franco* states.

2020) (citing NQRP). EOIR has also acknowledged that NQRP is "part of EOIR's Nationwide Policy regarding procedural protections for detained [noncitizens] who may have competency issues in immigration proceedings." Organization of the Executive Office for Immigration Review, 84 Fed. Reg. 44537, 45537 (interim Aug. 26, 2019); *see also* Recognition of Organizations and Accreditation of Non-Attorney Representatives, 80 Fed. Reg. 59514, 59517 n.12 (proposed Oct. 1, 2015) (recognizing that EOIR's "safeguards include the provision of a Qualified Representative" for mentally incompetent individuals in detention). Similarly, the Board of Immigration Appeals has acknowledged that a Qualified Representative can "increase the likelihood of finding a means to proceed fairly" because "even without assistance from the respondent, counsel could provide relevant objective documentation, such as background or country conditions evidence, to assist in adjudicating an application for relief." *Matter of M-J-K-*, 26 I. & N. Dec. 773, 777 (BIA 2016).

Though Defendants have recognized the need for safeguards in cases involving individuals with significant mental health concerns, *see Matter of M-A-M-*, 25 I. & N. Dec. 474 (BIA 2011), the NQRP has been the only mechanism enabling immigration judges to appoint counsel. Even if an immigration judge identifies an individual as mentally incompetent and thus unable to represent themselves, the system does not have a systematic way for that judge to appoint counsel without the NQRP. *See* Galveston-Houston Immigrant Representation Project (GHIRP) Decl. ¶ 20; National Immigrant Justice Center (NIJC) Decl. ¶ 14; Rocky Mountain Immigrant Advocacy Network (RMIAN) Decl. ¶ 30; Estrella del Paso Decl. ¶ 16; *see also Franco*, 2013 WL 3674492, at *6 ("[T]here is no statute or regulation that specifically confers Immigration Judges with the power to appoint counsel." (quoting declaration of EOIR official)).

EOIR relied on "federal staff and a contract," most recently with the Acacia Center for Justice, to carry out the NQRP prior to April 25, 2025. *See* Ventresca Decl., Ex. 3. Acacia in turn

subcontracted with 40 legal services providers, including Plaintiffs, to provide Qualified Representatives to eligible individuals under the NQRP. *See National Qualified Representative Program*, Acacia Center for Justice, https://acaciajustice.org/what-we-do/national-qualified-representative-program/.

## II.    The NQRP's Role in Safeguarding the Rights of Individuals Deemed Mentally Incompetent

For more than a decade, the NQRP has played a vital role in protecting the constitutional and statutory rights of disabled noncitizens in bond and removal proceedings. *Cf. Lee v. United States*, 582 U.S. 357, 370 (2017) (acknowledging that "[d]eportation is always a particularly severe penalty" (citations and quotation marks omitted)). From April 2013 through January 2020, over 2,000 detained noncitizens were provided representation through the NQRP. Mike Corradini, *National Qualified Representative Program*, Vera Inst. of Just., https://perma.cc/AE4B-9U6A. Many more benefited from the program and the services provided by their Qualified Representatives up until Defendants' April 25th termination order. *cf.* Robert Dinerstein Decl. ¶¶ 15–21 (describing the challenges that mentally disabled individuals have in navigating court proceedings, including difficulties "understand[ing] the nature and meaning of their rights" or even "presenting a coherent and complete narrative of events").

For example, Plaintiff National Immigrant Justice Center (NIJC) was appointed as a Qualified Representative and recently won withholding of removal for an individual who faces a clear likelihood of persecution in his home country. *See* NIJC Decl. ¶ 10. NIJC was appointed in this case before Defendants terminated the Nationwide NQRP and concluded that it could not ethically withdraw from the case despite the risk that it would not be paid for its work. *Id.* NIJC reached this conclusion because, without representation, this client would have faced prolonged detention and could have been denied protection from removal. *See id.*

8

Similarly, Plaintiff Amica Center for Immigrant Rights (Amica Center) was able to secure asylum for a client with bipolar disorder who had been subjected to involuntary hospitalization and forcible electroconvulsive therapy in his country of origin. Amica Decl. ¶¶ 19–20. Though immigration detention had caused the client's condition to deteriorate, leading to a manic episode during his final hearing, his Qualified Representative was able to present his case to the Immigration Judge and pursue appeals. *Id.* Eventually, that client obtained relief. *Id.*

These examples are common. *See* RMIAN Decl. ¶ 27; Estrella del Paso Decl. ¶ 19; GHIRP Decl. ¶¶ 23–25. As of April 25, 2025, Plaintiffs were representing around 100 individuals deemed mentally incompetent through the Nationwide NQRP.[4] Over the past 12 years, Plaintiffs have collectively represented hundreds more, enabling these individuals to meaningfully participate in the removal process by presenting evidence, making legal arguments, and examining witnesses, just as the INA, the Due Process Clause and the Rehabilitation Act all contemplate.

## III.   Defendants' Termination of the Nationwide NQRP

On April 3, 2025, Acacia received a letter ostensibly from a contracting officer at the Department of Justice terminating the NQRP. Ventresca Decl., Ex. 7. The next day, Acacia received a second letter rescinding the termination notice, stating that the earlier notice had "no legal effect" and should be "disregard[ed] . . . in its entirety." Ventresca Decl., Ex. 11.

But just days after that, on April 9, 2025, EOIR's Acting Assistant Director for the Office of Policy emailed EOIR's Acting Director (Defendant Sirce Owen) with "recommendation[s] from Office of Policy" to terminate Nationwide NQRP by "end[ing] representation funded by EOIR" and "allow[ing]" Qualified Representatives "to withdraw and facilitate finding other

---

[4] This includes a small number of "legacy" Nationwide NQRP cases—cases in which Plaintiffs were appointed as counsel under the former NQRP contractor, Vera Institute of Justice, and predate the start of Acacia's contract in 2022.

representation" for their clients. Ventresca Decl., Ex. 1. Then, on April 15, 2025, Acacia received

a notice from EOIR reflecting its intention to remove the Nationwide NQRP cases from the overall

NQRP contract, with a proposed effective date of April 28, 2025.

On April 25, 2025, days after the twelfth anniversary of the NQRP and three days before

the proposed April 28th termination date, Defendants terminated the Nationwide NQRP through

an "Amendment of Solicitation/Modification of Contract" ("the Amendment") and a revised

Statement of Work. Ventresca Decl., Exs. 8, 9. Defendants stated that the "purpose of this

modification is to **_partially terminate this order_** for the convenience of the Government" and

indicated that the Statement of Work "removes the terminated portion of the work." Ventresca

Decl., Ex. 8 (citing FAR 52.249-2) (emphasis added). The Statement of Work deleted all references

to the Nationwide NQRP and redefined the NQRP as "limited to class members covered by

*Franco*." Ventresca Decl., Ex. 9; *see* ECF No. 1, Compl. ¶¶ 75–76.[5]

## IV.   Defendants' Termination of the Nationwide NQRP is Causing Plaintiffs Irreparable Harm

The consequences of Defendants' termination of the Nationwide NQRP will be swift and

devastating. As Defendants stated, their action is intended to "end representation[s]" and lead to

withdrawals of counsel in Nationwide NQRP cases. Ventresca Decl., Ex. 1. Such a loss of

counsel—directly caused by the government—will irreparably harm individuals, like Plaintiffs

clients, who cannot represent themselves due to mental incompetency.

That irreparable harm extends to Plaintiffs as Nationwide NQRP providers. They are now

facing a serious ethical dilemma: either they can try to continue their representations of existing

---

[5] Plaintiffs understand that NQRP "legacy" cases that started before 2022—the year that Acacia became the NQRP contractor—are funded differently and that Acacia will continue providing funding for this subset of cases to the extent that it is able to do so.  *See* Amica Decl. ¶ 8 n.2 (noting that four of its thirty cases started before 2022).

clients *pro bono* for as long as possible—despite the severe hardship this will cause to their ability to do other core work and fulfill their respective missions—or they can confront the complex question of whether they can ethically withdraw from cases without causing prejudice to their clients. If Plaintiffs attempt to withdraw and are permitted to do so (which is not a given), the direct result will be harm to Plaintiffs' respective missions because their clients cannot meaningfully represent themselves and are unlikely to secure new counsel. *See* Amica Center Decl. ¶¶ 30, 32, 34; GHIRP Decl. ¶¶ 29, 30; NIJC Decl. ¶¶ 8–10, 12; RMIAN Decl. ¶ 32; Immigration Services and Legal Advocacy (ISLA) Decl. ¶¶ 7, 25.

Plaintiffs will also struggle to fulfill their respective missions insofar as they will be unable to represent and advise additional individuals with mental disabilities in immigration court, because immigration judges will not be able to appoint them as counsel. Amica Center Decl. ¶ 26; Immigrant Law Center of Minnesota (ILCM) Decl. ¶ 18; American Gateways Decl. ¶¶ 13, 18; ISLA Decl. ¶ 20. Indeed, Plaintiffs understand that, as of this filing, there are individuals whom judges have determined require appointed counsel for competency reasons or who have upcoming competency hearings, but who will not be appointed counsel because of the termination of the program. Amica Center Decl. ¶ 27; NIJC Decl. ¶ 15; RMIAN Decl. ¶ 15; ILCM Decl. ¶ 12.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 137 (D.D.C. 2020) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). "A preliminary injunction may

be granted based on less formal procedures and on less extensive evidence than in a trial on the merits." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).

Section 705 of the APA authorizes a court reviewing an agency action to "issue all necessary and appropriate process to postpone the effective date of [the] agency action or to preserve status or rights pending conclusion of the review proceedings" "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts evaluate a motion for a stay under Section 705 by considering the same four-factor test governing issuance of a preliminary injunction. *See, e.g.*, *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020). Plaintiffs have satisfied all four factors.

## ARGUMENT

### I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims

Under the APA, courts must vacate agency action that is arbitrary, capricious, or contrary to law. *See* 5 U.S.C. § 706(2). Plaintiffs are likely to succeed on their claims that Defendants' termination of the Nationwide NQRP is arbitrary and capricious, contrary to law, and a violation of the *Accardi* doctrine.

### A.    The termination of the Nationwide NQRP is arbitrary and capricious.

Defendants' termination of the Nationwide NQRP is arbitrary and capricious because, in that this action, they "failed to consider an important aspect of the problem," "examine the relevant data," or "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 89 (D.C. Cir. 2020) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (cleaned up). Defendants have failed across the board, resulting in several independent bases for this Court to find that their action is arbitrary and capricious.

**1. Defendants failed to adequately explain their decision to terminate a longstanding policy and eliminate an important program.**

An "agency must 'disclose the basis' of its action" so as "to permit meaningful judicial review" under the APA. *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). This requirement "is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785.

Defendants have offered ***no*** rationale for their decision to terminate the Nationwide NQRP. Instead, on April 25, 2025, Acacia received the Amendment terminating part of its prior contract for the NQRP. Ventresca Decl., Ex. 8. Accompanying that document was a redlined "Statement of Work" in which Defendants simply crossed out all references to the Nationwide NQRP and "limited" the NQRP "to class members covered by *Franco*." *See* Ventresca Decl., Ex. 9. It also deleted the definition of the NQRP as a "nationwide" program. *Id.* In the Amendment, Defendants stated that these changes were for "convenience." Ventresca Decl., Ex. 8. But that does not constitute an explanation at all, much less the sort of "satisfactory explanation" that binding precedent demands. *See, e.g.*, *State Farm*, 463 U.S. at 43; *Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 25 F.4th 1, 5 (D.C. Cir. 2022) (change in course insufficiently reasoned); *Farrell v. Blinken*, 4 F.4th 124, 137 (D.C. Cir. 2021) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action.'" (citation omitted)). Rather, it is policymaking via tracked changes. Defendants' "unmistakable and inexplicable silence at the time" they terminated the Nationwide NQRP makes it "quite easy" to conclude that their action violated the APA. *Pol'y & Rsch. v. U.S. Dep't of Health and Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018).

The government's obligation to adequately explain the basis for its actions is all the more important when an agency uproots a longstanding policy or program. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (affording no deference and rejecting an agency decision that

provided "barely any explanation" for a policy change that departed from its longstanding position); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) ("[W]e have long held that an agency may not depart from a prior policy *sub silentio*." (cleaned up)). But in cancelling the Nationwide NQRP, Defendants "decide[d] to depart from decade[]-long past practices and official policies" without offering a reasoned explanation, thus violating a "central principle of administrative law." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923.

The purpose of the NQRP is to enhance procedural protections for individuals who are incompetent for self-representation and to facilitate the progress of immigration proceedings. Ventresca Decl., Exs. 2, 4, 6. Over the past 12 years, it has unquestionably protected the rights of many individuals who otherwise would have had no way to meaningfully participate in their removal or bond proceedings, while simultaneously improving the efficiency and fairness of the immigration system. *See* EOIR's Office of Legal Access Programs (Aug. 2016) https://perma.cc/K2VU-3GBD (recognizing that "[t]he fundamental goals of the NQRP are increased efficiency and fairness in immigration proceedings"); Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81698, 81735 (Dec. 16, 2020) (Final Rule) (citing to the NQRP as part of the "existing agency protocol for ensuring that proceedings involving such individuals [with competency issues] are fair"); *see also* Amica Center Decl. ¶ 6; GHIRP ¶ 16; NIJC Decl. ¶ 14, RMIAN Decl. ¶ 31.

But now, with no pretense of justification, Defendants have decided to terminate the Nationwide NQRP, a critical component of EOIR's Nationwide Policy. Defendants do not, because they cannot, "show that there are good reasons" for ending this program. *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 21, 39 (D.D.C. 2017) (citing *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). The "unexplained inconsistency with [Defendants'] earlier position renders" their

termination of the Nationwide NQRP "arbitrary and capricious." *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019).

### 2. Defendants failed to consider several important aspects of the problem.

Defendants also failed to consider many "important aspect[s] of the problem" when they terminated the Nationwide NQRP. *See State Farm*, 463 U.S. at 43; *Catholic Legal Immigr. Network, Inc. v. EOIR*, 513 F. Supp. 3d 154, 173 (D.D.C. 2021) ("*CLINIC*"); *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decision") (emphasis in original).

***Failure to Consider Legal Obligations.*** First, Defendants failed to consider or address their legal obligations to impacted noncitizens under the INA, the Constitution, and the Rehabilitation Act. The right to counsel is among the "crucial procedural protections that are necessary for removal proceedings to meet the essential standards of fairness." *United States v. Valdivias-Soto*, 112 F.4th 713, 722 (9th Cir. 2024) (cleaned up) (citation omitted). That right to counsel becomes indispensable when it is the "only means" to ensure that individuals can participate in their own cases. *Franco*, 2013 WL 3674492, at *5. But Defendants did not acknowledge the rights of Plaintiffs' clients under the INA to meaningfully participate in their court proceedings. 8 U.S.C. § 1229a(b)(4)(B). They also ignored that the Rehabilitation Act requires the provision of counsel to mentally incompetent individuals in immigration proceedings. *Franco*, 2013 WL 3674492, at *1, *5. Indeed, they even failed to consider that the Nationwide NQRP is necessary to comply with the permanent injunction in *Franco*, as the Nationwide NQRP ordinarily provides ongoing representation when a person covered by *Franco* is released from custody and moves to a different part of the country. Defendants cannot permissibly ignore these duties. *See Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010) ("[W]e have never approved an

15

agency's decision to completely ignore relevant precedent."). That failure renders their action arbitrary and capricious.

   ***Failure to Consider the Impact on Impacted Noncitizens.*** Relatedly, Defendants did not consider or address the impact of their action on individuals in immigration proceedings who cannot represent themselves. Before the NQRP was established, there was no designated means for an immigration judge to appoint counsel for a person who could not participate in the removal process due to severe mental health and competency concerns. As a result, these individuals languished in immigration detention because judges could not move their cases forward. *See Franco*, 2013 WL 3674492, at *15 (finding that *Franco* plaintiffs "languished in prolonged detention as a result of the immigration court system's failure to accommodate their mental disabilities or provide the opportunity for a bond hearing"). They also failed to seek relief from removal even when they qualified for it, resulting in their removal without having had a fair hearing, often to places where they faced persecution or torture.[6] Now, Defendants have abruptly reverted to that standard, without addressing or even acknowledging the fairness considerations implicated by their actions. Fairness to litigants is an essential component of any judicial system, making it an "important aspect of the problem" that Defendants needed to address. *State Farm*, 463 U.S. at 43; *see also Meza Morales v. Barr*, 973 F.3d 656, 665 (7th Cir. 2020) ("[C]ases must be disposed of fairly, and granting a noncitizen the opportunity to pursue relief to which she is entitled may be appropriate and necessary for a fair disposition.").

---

[6] *See* Human Rights Watch, *Deportation by Default: Mental Disability, Unfair Hearings, and Indefinite Detention in the US Immigration System* (July 25, 2010) https://perma.cc/Z9ED-H6VR ("Human Rights Watch research suggests that even US citizens, particularly those with mental disabilities, have ended up in ICE custody, and that an unknown number of legal permanent residents (LPRs) and asylum seekers with a lawful basis for remaining in the United States may have been unfairly deported from the country because their mental disabilities made it impossible for them to effectively present their claims in court.").

***Failure to Consider Harm to Plaintiffs and other Qualified Representatives.*** Defendants also did not acknowledge the harm they have inflicted on Plaintiffs, who face ethical dilemmas in continuing representations without funding, who are now unable to be appointed as counsel without the NQRP, and who now are confronted with severe challenges in providing services to individuals who are mentally incompetent.

*CLINIC* is instructive. There, Judge Mehta entered a preliminary injunction where a EOIR rule imposed new filing fees on noncitizens. *CLINIC*, 513 F. Supp. 3d at 159. He concluded that EOIR "acted arbitrarily and capriciously by disregarding the Final Rule's impact on legal service providers and their capacity to provide legal services to persons subject to removal." *Id.*

If the failure to consider the impacts of higher filing fees on legal service providers is arbitrary agency action, then there should be no question that Defendants acted arbitrarily by ignoring the obvious and severe impacts of their action on Plaintiffs. Indeed, Defendants appear to have ignored multiple harms to Plaintiffs and other Qualified Representatives. Defendants' action will interfere with existing attorney-client relationships between Plaintiffs and their vulnerable clients by forcing attorneys to endure significant financial difficulty and perhaps even cease representing the clients they are mission-bound to serve. *See* RMIAN Decl. ¶ 19 (describing the "catch-22 scenario" the organization faces due to Defendants' action). Defendants know that they are exposing Plaintiffs to this problem but fail to grapple with it. Ventresca Decl., Ex. 1 (EOIR email stating that termination will "end" current representations in the Nationwide NQRP cases).

Defendants instead assume that Plaintiffs will be able to "facilitate" new representations for these individuals. *Id.* But this assumption is contrary to evidence before them showing that it will be extremely difficult, if not impossible, for Plaintiffs to identify or secure replacement counsel. *See* Amica Center Decl. ¶ 32 (explaining that its attempts to place NQRP cases with *pro*

*bono* attorneys have been largely unsuccessful due to the complex and resource-intensive nature of such cases); Dinerstein Decl. ¶ 26 ("Because of the challenges inherent in representing an individual with diminished capacity, lawyers are often reluctant to take on such cases without special training or support resources."). Defendants never addressed how Plaintiffs would procure replacement counsel, and they have not acknowledged or grappled with previous agency conclusions that reliance on a different *pro bono* model to provide counsel in these cases was not feasible. *See Franco*, 2013 WL 3674492, at *6 (noting "EOIR claims that it has found 'relatively scarce capacity among pro bono providers to fill very limited roles'"). Their failure to account for this issue or to grapple with their past assertions to the contrary is arbitrary and capricious. *See, e.g.*, *Am. Fed'n of Gov't Emps.*, 25 F.4th at 5 (court is "not bound by the [agency]'s conclusory and counterintuitive assertions . . . especially when the record contains no factual basis"); *Nat'l Women's L. Ctr. v. Off. of Mgmt. & Budget,* 358 F. Supp. 3d 66, 90 (D.D.C. 2019) ("Courts 'do not defer to an agency's conclusory or unsupported suppositions.'") (citation omitted).

To the extent that Defendants are suggesting that Plaintiffs will instead identify replacement *funding* to pay existing counsel, that presumption is misplaced given the steps that Defendants have recently taken to disrupt funding streams for other crucial services that Plaintiffs and other immigrant service providers. *See, e.g.*, *Community Legal Servs. in East Palo Alto v. U.S. Dep't of Health and Human Servs.*, --- F. Supp. 3d ----, No. 3:25-cv-02847-AMO, 2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) (granting PI); *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C.). When an agency "bas[es] its decision on a premise the agency itself has already planned to disrupt" that decision is arbitrary and capricious. *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011). Defendants' contemporaneous termination of other funding streams for nonprofits that serve immigrants, including Plaintiffs, has

made the possibility that Plaintiffs could absorb these cases and staff them with other funding all the more remote.

**_Failure to Consider Harm to the Courts._** Defendants have also failed to consider the ramifications of terminating the Nationwide NQRP for immigration courts. "Immigration Judges may not accept an admission of removability from an unrepresented respondent who is incompetent and unaccompanied." _Matter of M-A-M-_, 25 I. & N. Dec. 474, 478 (BIA 2011) (citing 8 C.F.R. § 1240.10(c)). Without appointed qualified representation, the adjudication of these cases becomes much more cumbersome and inefficient, Amica Center Decl. ¶¶ 6–7; GHIRP ¶ 16; NIJC Decl. ¶ 14, Pennsylvania Immigration Resource Center (PIRC) Decl. ¶ 21; RMIAN Decl. ¶ 31; Dinerstein Decl. ¶¶ 21, 23, burdening already stressed and backlogged immigration courts. Just two years ago, EOIR acknowledged that "[i]mproved legal access improves efficiencies in court, which could help address the immigration caseload, working to mitigate the current backlog while also improving and increasing fairness in the process." Ventresca Decl., Ex. 10 at 38. But Defendants chose to ignore this fact when terminating the Nationwide NQRP. In the absence of a centralized appointment mechanism, it is now more difficult—and in some cases will be impossible—for service providers to identify and locate detained individuals exhibiting indicia of mental incompetency, much less provide them with legal representation. _See_ Amica Center Decl. ¶ 26; GHIRP ¶ 19; ILCM Decl. ¶ 13; ISLA Decl. ¶ 12.[7]

Each of these important considerations is apparent from any meaningful investigation of the impact of terminating the Nationwide Policy. Yet, Defendants provided no reasoned analysis

---

[7] EOIR's notice of appearance form confirms that there are two situations in which attorneys can appear in immigration court: either "at the request of[] the party" or because "EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity." _Notice of Entry of Appearance as Attorney or Representative Before the Immigration Court_, https://www.justice.gov/eoir/file/639746/dl.

justifying this undue and extreme burden on Plaintiffs and their clients. Nor have Defendants committed to ordering the appointment of *pro bono* counsel if current counsel must withdraw (assuming *arguendo* that such *pro bono* counsel exists). Their failure to address the many problems with Defendants' decision to terminate the Nationwide NQRP is arbitrary and capricious.

### 3.  Defendants ignored weighty reliance interests.

Given that the Nationwide NQRP existed for over a decade, Defendants were "required to assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 32–33 (2020). When terminating an existing policy or program, like the Nationwide NQRP, an agency must "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account" and thus should consider "alternatives that are within the ambit of the existing policy." *Id.* at 30 (cleaned up) (citations and quotation marks omitted). "It would be arbitrary and capricious to ignore such matters." *Id.*

But ignoring those interests is just what Defendants have done here. Any cursory inquiry would have revealed substantial reliance interests engendered by the Nationwide NQRP, including those of Plaintiffs and their clients. The reliance interests here are not only monetary but also concern a foundational principle of our legal system—the attorney-client relationship. Despite knowing that their action would force Plaintiffs, nonprofit legal service provides, to either provide representation without payment or to consider withdrawing as counsel for individuals unable to represent themselves (only with court approval) Defendants did not provide any explanation for their action. ECF No. 1, Compl. ¶¶ 71, 74, 78; GHIRP Decl. ¶ 8; ILCM Decl. ¶ 8; ISLA ¶ 8; RMIAN Decl. ¶¶ 11, 19. Nor have they seemingly considered any lawful alternatives to a

wholesale termination of the Nationwide NQRP that would leave this vital attorney-client relationship intact. *See* Ventresca Decl., Ex. 1.

The reliance interests of Plaintiffs' clients are also critical. These individuals cannot meaningfully participate in their removal proceedings without a qualified representative. They rely on the continuation of the NQRP so that their counsel, like Plaintiffs, can "invoke" their rights to present favorable evidence and challenge the government's case for removal. *Franco*, 2013 WL 3674492, at *5 (citing 8 U.S.C. § 1229a(b)(4)(B); *see* Amica Center Decl. ¶¶ 16–18; GHIRP Decl. ¶¶ 21–22; ILCM Decl. ¶¶ 20–22. Moreover, Plaintiffs and noncitizens alike rely on the framework established under the Nationwide NQRP to connect them with one another. *See* NIJC Decl. ¶ 8. Without the NQRP appointment mechanism, Plaintiffs will be hampered in their ability to identify the individuals they seek to serve, as well as impaired in their ability to form an attorney-client relationship with such individuals given these potential clients have reduced mental and cognitive capacity. *See* Amica Decl. ¶ 26; GHIRP ¶ 19.

Defendants' disregard for the substantial reliance interests of Plaintiffs and their clients is a violation of the APA. *See Regents*, 591 U.S. at 32 (affirming that the government's termination of the Deferred Action for Childhood Arrivals (DACA) program was arbitrary and capricious, noting that the government "may determine . . . that other interests and policy concerns outweigh any reliance interests. Making that difficult decision was the agency's job, but the agency failed to do it"); *Encino Motorcars*, 579 U.S. at 212 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (noting that longstanding agency positions may have "'engendered serious reliance interests that must be taken into account'"); *Int'l Org. of Masters, Mates & Pilots, ILA, AFL-CIO v. Nat'l Lab. Rels. Bd*., 61 F.4th 169, 180 (D.C. Cir. 2023) (holding agency action arbitrary and capricious where it "adopted its new rule with no regard for the parties' reliance

interests"). Because "nothing in the record suggested that Defendants considered and had a rational reason for disregarding the massive reliance interests of" Plaintiffs, their clients, and the immigration system, Defendants' action cannot stand. *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, CV No. 25-00400 (AHA), CV No. 25-00402 (AHA), 2025 WL 752378, at *10 (D.D.C. Mar. 10, 2025).

### B.    Defendants' termination of the Nationwide NQRP is contrary to the Rehabilitation Act.

Defendants' action violates the APA because they are contrary to the Rehabilitation Act, as their termination of the Nationwide NQRP will "end representation funded by EOIR." Ventresca Decl., Ex. 1. That action removes the only avenue for individuals who cannot represent themselves to be appointed counsel in immigration proceedings, and may force some Plaintiffs to move to withdraw (if they can) from existing cases once their resources are depleted, with no guarantee of replacement counsel. *See* Amica Center Decl. ¶ 28; NIJC Decl. ¶ 18; GHIRP Decl. ¶¶ 29, 30; ISLA Decl. ¶¶ 23, 25; PIRC Decl. ¶¶ 12, 17, 21. Absent qualified counsel, Plaintiffs' clients cannot exercise the rights guaranteed to them by the INA and due process. They are thus excluded from meaningful participation in their immigration proceedings by reason of their disabilities. *See* Amica Center Decl. ¶¶ 16–18; GHIRP Decl. ¶¶ 21–22; ILCM Decl. ¶¶ 20–22.

"A noncitizen is 'entitled to a full and fair removal hearing under both the INA and the Due Process Clause of the Fifth Amendment.'" *Reid v. Bondi,* 132 F.4th 109, 121 (2d Cir. 2024) (citing *Matter of R-C-R-*, 28 I. & N. Dec. 74, 77 (B.I.A. 2020)) (cleaned up). There is an "inextricable connection between due process and the statutory protections provided in the [INA]." *Quintero v. Garland*, 998 F.3d 612, 624 n.11 (4th Cir. 2021) ("[T]he purpose of the procedural protections provided in the Immigration and Nationality Act and related regulations . . . is to ensure that a noncitizen respondent receives a meaningful hearing in accordance with the requirements of

22

procedural due process." (cleaned up)). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Rodriguez v. Marin*, 909 F.3d 252, 255–56 (9th Cir. 2018) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). To fulfill that requirement, the INA provides that individuals in removal proceedings "shall have a reasonable opportunity to examine the evidence against the [noncitizen], to present evidence on the [noncitizen]'s own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B).

Separately, Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or ***under any program or activity conducted by any Executive agency*** or by the United States Postal Service.

29 U.S.C. § 794 (emphasis added).

To establish a violation of the Rehabilitation Act, individuals "must show that (1) they are disabled . . . , (2) they are otherwise qualified, (3) they were excluded from, denied the benefit of, or subject to discrimination under any program or activity, and (4) the program or activity is carried out by a federal executive agency or with federal funds." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1266 (D.C. Cir. 2008). The "defendant may assert as an affirmative defense to liability that accommodating the plaintiffs' disabilities would constitute an undue burden." *Id.*

All four requirements are satisfied here. As to prongs one, two, and four, immigration judges have already found that Plaintiffs' current clients are incompetent for self-representation due to serious mental health or cognitive conditions. For any prospective clients, Defendants obligations to appoint counsel would only arise ***after*** an immigration judge made a finding as to

23

competency that required such action.[8] As to prong three, noncitizens with serious mental or cognitive disabilities, including Plaintiffs' current and future clients, are "excluded from, denied the benefit of, or subject to discrimination" in exercising their rights in their removal and bond proceedings without appointed counsel. *Id.* As in *Franco*, Plaintiffs' clients' "ability to exercise these rights is hindered by their mental incompetency." 2013 WL 3674492, at *3. Even EOIR has previously understood that the NQRP is part of the "agency protocol for ensuring that proceedings involving such individuals are fair." 85 Fed. Reg. 81698, 81735. Without the Nationwide NQRP and the continued appointment of Qualified Representatives, proceedings adjudicating the rights of mentally incompetent individuals cannot be fair.

As *Franco* held, appointing qualified representatives is a necessary and reasonable accommodation for disabled, detained noncitizens in removal and bond proceedings. 2013 WL 3674492, at *3–4 ("[T]he Court finds that Section 504 of the Rehabilitation Act does require the appointment of a Qualified Representative as a reasonable accommodation."). The "provision of competent representation able to navigate the proceedings is the ***only*** means by which [detained individuals deemed mentally incompetent] may invoke" their rights under the INA to present evidence and challenge the government's case for removal. *Id.* at *5 (emphasis added); *see also* Dinerstein Decl. ¶ 13 ("[I]t would be extremely difficult, if not impossible for a person with mental disabilities to navigate and engage meaningfully in any legal proceeding—especially including immigration proceedings—without the assistance of counsel."); *id.* ¶¶ 15–21. Accordingly, the government is ***required*** to appoint a Qualified Representative for eligible individuals under the Rehabilitation Act. *Franco*, 2013 WL 3674492, at *5.

---

[8] The Nationwide Policy provides that EOIR must provide counsel only after an individual is found to be mentally incompetent by an immigration judge. Ventresca Decl., Exs. 2, 6.

This reasonable accommodation is not an undue burden, as it would simply require the continuation of a program that the government created and has run for over a decade and would reflect the agency's responsibilities under the law. *See* Ventresca Decl., Exs. 2, 4; *see also* Decl. of Steven Lang, *Northwest Immigrant Rights Project v. Sessions*, No. 17-cv-00716-RAJ (W.D. Wash. June 26, 2017), ECF No. 50 (Program Director of EOIR Office of Legal Access Programs) ("The NQRP followed a federal district court ruling, *Franco-Gonzalez v. Holder,* . . . which found that the Rehabilitation Act required the appointment of a qualified representative to detainees determined to be incompetent to represent themselves due to a serious mental disorder or defect."). Through their creation and operation of the NQRP, Defendants have recognized that the sole method to comply with both the INA and the Rehabilitation Act is to appoint qualified representatives to all noncitizens in ICE detention who are incompetent for purposes of self-representation due to a serious mental health concern, which they have done through the NQRP for twelve years. Tellingly, Defendants have terminated the Nationwide NQRP while continuing the NQRP for those in *Franco* states, recognizing that they are bound by *Franco*'s determination that qualified representatives are required by law under the Rehabilitation Act.

Despite this compelling precedent, Defendants have chosen, without warning or explanation, to terminate the Nationwide NQRP and stop the appointment of qualified representatives in non-*Franco* jurisdictions. *See* Ventresca Decl., Exs. 8, 9. They suggest that current representations may "end" but have not committed to appointing or otherwise providing counsel, instead relying on Plaintiffs to "facilitate finding representation." Ventresca Decl., Ex. 1. Their action plainly contravenes the Rehabilitation Act's requirements.

## C.    Defendants' action violates the *Accardi* doctrine.

Defendants' termination of the Nationwide NQRP is arbitrary and capricious for the additional reason that it violates the binding agency policies and procedures as outlined in the Nationwide Policy and subsequent implementing directives, which are still operational.

Under the *Accardi* doctrine,[9] "agency actions may be arbitrary and capricious when they do not comply with binding internal policies governing the rights of individuals." *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 150 (D.D.C. 2018); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336 (D.D.C. 2018) (finding that "agencies may not violate their own rules and regulations to the prejudice of others" (quoting *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005))). The doctrine "is not limited to rules attaining the status of formal regulation," and "can be applied to internal agency guidance" that constrains agency discretion, like the Nationwide Policy. *Damus*, 313 F. Supp. 3d at 336 (citing *Montilla v. INS*, 926 F.2d 162, 167 (2d Cir. 1991)). A plaintiff must show prejudice resulting from the government's violation to prevail on an *Accardi* claim. *Jefferson v. Harris*, 285 F. Supp. 3d 173, 185 (D.D.C. 2018).

*Damus* is instructive. There, the plaintiffs alleged that ICE was failing to comply with an internal "parole directive," which "set[] out a series of procedures [the agency] must undertake to determine whether a given asylum-seeker should be granted parole." *Damus*, 313 F. Supp. 3d at 324. The court concluded that the directive was the type of binding norm or policy that fell "squarely within the ambit of those agency actions to which the doctrine may attach," and that ICE had violated the *Accardi* doctrine in failing to abide by it. *Id.* at 337–38.

---

[9] The doctrine stems from the Supreme Court's decision in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266 (1954) *superseded by statute on other grounds*.

Like the parole directive in *Damus*, the Nationwide Policy and implementing directive are binding policies that "establish a set of minimum protections" for detained noncitizens who are unable to represent themselves in removal proceedings for competency reasons. The "minimum protections" outlined in the Nationwide Policy include the provision of appointed legal representation. *Damus*, 313 F. Supp. 3d at 337; Ventresca Decl., Ex. 2. In rescinding the Nationwide NQRP, Defendants here have violated the Nationwide Policy's command that EOIR must "make available a qualified legal representative" to any noncitizen adjudged mentally incompetent and detained in ICE custody. Ventresca Decl., Exs. 2, 6. By its own terms, the appointment of counsel is a ***mandatory*** part of the "system" of enhanced procedural protections that Defendants established to safeguard the rights of individuals who are incompetent for self-representation. Ventresca Decl., Ex. 2; *see generally Aracely, R.*, 319 F. Supp. 3d at 153 (directive was "binding" for the purposes of *Accardi* where it "identifie[d] specific factors and procedural requirements governing the deprivation of Plaintiffs' liberty, a decision over which they have very little control").

Yet, with no publicly announced plan—and on information and belief, no plan at all—to provide Qualified Representatives by other means, Defendants have terminated the Nationwide NQRP. They officially terminated Acacia's contract with respect to the Nationwide NQRP on April 25, 2025, Ventresca Decl., Exs. 8, 9, and internal email communications make plain Defendants' intention for Plaintiffs to withdraw from any ongoing Nationwide representations, Ventresca Decl., Ex. 1. In addition, Acacia and Plaintiffs have not received a referral for NQRP representation outside of the *Franco* states since April 4, 2025, *see* ILCM Decl. ¶ 11, though Plaintiffs are aware of multiple individuals for whom immigration judges made referrals for appointed counsel on or after that date, *see* RMIAN Decl. ¶ 15; Amica Center Decl. ¶ 27; NIJC Decl. ¶ 15.

This failure to abide by the Nationwide Policy's directive has prejudiced Plaintiffs and their clients, as well as other noncitizens who will require, but no longer have access to, appointed counsel due to their competency limitations. Plaintiffs depend on the Nationwide NQRP to fund and facilitate their representation of eligible noncitizens in removal proceedings. *See* GHIRP Decl. ¶14 (explaining that an expert witness who had been supporting an NQRP client's case is unable to confirm whether she will testify *pro bono* after the funding loss); *see also* Amica Center Decl. ¶ 28; Estrella del Paso ¶¶ 15, 26; ISLA ¶¶ 15, 23; PIRC Decl. ¶¶ 12–13. Its termination will cause severe financial hardship for Plaintiffs and may force some Plaintiffs to limit new representations or consider withdrawing from existing Nationwide NQRP cases (if allowed to do so). This will leave Plaintiffs' clients and other individuals incompetent to represent themselves without the appointed counsel to which they are entitled under the Nationwide Policy. *See, e.g.*, Amica Center Decl. ¶ 28; GHIRP Decl. ¶¶ 29–30; ILCM Decl. ¶¶ 28–29; ISLA Decl. ¶¶ 23, 25; PIRC Decl. ¶¶ 12, 17, 21. Defendants should be enjoined from violating their own policies under *Accardi*.

### D.     The Tucker Act does not bar this Court's jurisdiction.

The Administrative Procedure Act (APA) waives sovereign immunity for claims against the United States "'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105–06 (D.C. Cir. 2022) (citing 5 U.S.C. § 702). The APA does not apply where another statute "grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702.

The Court should reject any argument by Defendants that the Tucker Act divests it of jurisdiction over Plaintiffs' claims. This case is not a contract case, but rather an APA case about the unlawful termination of a program that provides a mechanism to appoint counsel to individuals who cannot represent themselves due to mental disabilities.

The D.C. Circuit has time and again "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967–68 (D.C. Cir. 1982)). To determine "whether an action is in 'its essence' contractual," courts must "examine 'the source of the rights upon which the plaintiff bases its claims' and 'the type of relief sought (or appropriate).'" *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017). Both the legal sources of Plaintiffs' claims and the relief requested demonstrate that the "essence" of this action is not contractual.

First, the sources of rights giving rise to this action are the APA, the Constitution, the INA, the Rehabilitation Act, and Defendants' own policies. Defendants are required to continue the Nationwide NQRP under the Rehabilitation Act. At the least, Defendants are required under the APA to engage in reasoned decision making before they terminate a longstanding nationwide policy. They likewise have a duty to follow their own policies, which have not been rescinded and which commit EOIR to providing qualified representation to individuals who cannot represent themselves by reason of mental incompetence. Plaintiffs' claims arise from Defendants' violation of these legal obligations—not from a contract dispute.

Second, Plaintiffs seek an injunction, a declaration, a stay, and/or vacatur to stop Defendants from unlawfully terminating the Nationwide NQRP—not to vindicate contractual rights or obtain money damages. *See* ECF No. 1, Compl. at 37–38. As such, the Court of Claims lacks jurisdiction here. *See Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief.").

An injunction or declaration prohibiting the termination of the Nationwide NQRP under these circumstances would not offer any direct contractual benefits to Plaintiffs, who do not have a direct contractual relationship with Defendants related to the NQRP. Indeed, the NQRP provides "direct non-monetary" benefits to Plaintiffs and their current and future clients, instituting a system of referrals and appointments by which Plaintiffs can continue referring individuals with competency concerns for evaluation and receiving appointments to represent these individuals. *See Kidwell v. Dep't of Army, Bd. for Correction of Mil. Recs.*, 56 F.3d 279, 285 (D.C. Cir. 1995). It would also enable Plaintiffs to avoid, at least temporarily, the bind they currently face between continuing existing representations to their detriment or attempting to withdraw (if permissible) from some of those cases despite their missions to serve these vulnerable clients. *See* RMIAN Decl. ¶ 19; Amica Center Decl. ¶¶ 25, 34.

The recent decision in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam) does not change the analysis. That case involved a dispute between the federal government and its contractors (various States) over continued grant awards. Unlike in *California*, the remedy available to Plaintiffs in the Court of Federal Claims—monetary damages—would be insufficient to redress the harm wrought by Defendants' termination of the Nationwide NQRP. A critical component of the NQRP is the mechanism that allows immigration judges to assess competency concerns and, where appropriate, to appoint counsel. But without the Nationwide NQRP, that appointment process is now no longer available. It is that harm—which goes beyond funding—for which Plaintiffs seek relief and that can be remedied through an injunction. Such an injunction here would require continuation of the program, not "specific performance of the . . . agreements— a quintessentially contractual remedy." *Widakuswara v. Lake*, No. 25-CV-5144, 2025 WL

1288817, at *4 (D.C. Cir. May 3, 2025). The payment of money damages would not revive the Nationwide NQRP or redress the harms that Defendants have caused to Plaintiffs and their clients.

## II.    The Termination of Nationwide NQRP Will Cause Plaintiffs Irreparable Harm, and that Harm Is a Sufficient Injury to Confer Standing

Plaintiffs will continue to experience irreparable harm absent prompt injunctive relief. Irreparable harm is harm that is (1) "certain and great," "actual and not theoretical," and "imminent" such that there is a "clear and present need for equitable relief," and (2) "beyond remediation." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016). Such harm occurs "if the actions taken by the defendant have perceptibly impaired the organization's programs." *Id.* at 8 (cleaned up). This harm also confers standing.[10]

Defendants' termination of the Nationwide NQRP has caused and will continue to cause Plaintiffs and their clients' irreparable harm. Defendants' action "will lead to decreased representation . . . in immigration proceedings" and such "harm is irreparable to both Plaintiffs and the immigrant populations they represent." *CLINIC*, 513 F. Supp. 3d at 175–76. Indeed, Defendants themselves understand that their action will result in existing legal representations to "end" with current counsel needing to "withdraw." Ventresca Decl., Ex. 1.

*Northwest Immigrant Rights Project v. U.S. Citizenship & Immigration Services* is instructive here. 496 F. Supp. 3d 31, 79–80 (D.D.C. 2020) (citations omitted). There, the court found that the plaintiffs—organizations providing legal services to immigrants—would be irreparably injured by a rule that would have required certain asylum applicants to pay application fees while reducing the availability of fee waivers. *Id.* In so concluding, the court stressed that the

---

[10] Plaintiffs are experiencing actual harms, which are traceable to the termination of the Nationwide NQRP and can be redressed by vacating or enjoining the termination—which would, among other things, allow for the continued appointment of funded counsel in these cases. This satisfies the elements of standing. *See People for the Ethical Treatment of Animals (PETA) v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

new rule, if instituted, would limit the number of clients the organizations could serve, thereby "interfere[ing] with" the plaintiffs' "ability to provide essential services to their clients and/or members—in some cases irretrievably so." *Id.* at 79.

The issue in question here is graver than an increased fee; it is the right of mentally disabled immigrants, who cannot represent themselves, to qualified representation—the "only means" by which they can have access to the full and fair hearing promised under the INA. *Franco*, 2013 WL 3674492 at *5. The termination of the Nationwide NQRP is having "an 'immediate effect on' Plaintiffs' 'ability to serve their [existing] clients' and take on new clients." *CLINIC*, 513 F. Supp. 3d at 175 (citation omitted). First, the termination of the Nationwide NQRP "perceptibly impairs" Plaintiffs' core work and represents an irreparable injury independent of funding that Plaintiffs receive. *Id.* That is because the NQRP represented the only mechanism for immigration courts to appoint counsel. *Franco*, 2013 WL 3674492, at *6 ("[T]here is no statute or regulation that specifically confers Immigration Judges with the power to appoint counsel." (quoting declaration of EOIR official)). At this point, any attempt by Plaintiffs to identify individuals with limited competency without the NQRP's systematic referral mechanism and to continue to provide these representations will be very onerous, if not impossible. *See* NIJC Decl. ¶¶ 6, 14; Amica Center Decl. ¶¶ 25–26; American Gateways Decl. ¶ 13; Estrella del Paso Decl. ¶ 11; RMIAN Decl. ¶ 16. This harm exists ***irrespective*** of funding because—without the Nationwide NQRP—courts will not be able to order that counsel be appointed and, as a result, Plaintiffs will be unable to take on those clients.

Second, the financial injury Plaintiffs are facing further demonstrates their irreparable harm. At least one Plaintiff has already furloughed employees in part because of the termination of the Nationwide NQRP. *See* PIRC Decl. ¶¶ 13, 22. Plaintiffs who rely on NQRP-related funding

and resources for translation and interpretation services, for instance, may soon be unable to communicate effectively with some of their clients. *See* Amica Center Decl. ¶ 15 ("Amica Center relies on the availability of interpretation and translation services paid for by NQRP" for clients who speak neither English nor Spanish); ILCM Decl. ¶ 17 (same). In addition, many of these cases require forensic and country-conditions expert testimony, which will now be unfunded. *See* NIJC Decl. ¶ 17; Amica Center Decl. ¶ 14. Having appointed Plaintiffs to represent individuals through the NQRP, Defendants are now denying Plaintiffs the funds necessary to provide these legal services, "inhibit[ing]" Plaintiffs' "daily operations." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015).

Third, even where Plaintiffs are able to continue serving this population in a reduced capacity, doing so will require a substantial diversion of resources from other core aspects of their work. *See League of Women Voters*, 838 F.3d at 9 (holding that where "new obstacles unquestionably make it more difficult for the [plaintiff organizations] to accomplish their primary mission . . . , they provide injury for purposes both of standing and irreparable harm"); *see also PETA*, 797 F.3d at 1100 ("concrete and demonstrable injury to [an] organization's activities"—with the "consequent drain on the organization's resources"—constitutes "far more than simply a setback to the organization's abstract social interests" and thus suffices for standing). For example, American Gateways has explained that to fulfill their mission and ethical obligations, they will "continue to represent these [Nationwide NQRP] individuals and will divert other funding to do so." American Gateways Decl. ¶ 15; *see* GHIRP Decl. ¶ 28 ("In order to comply with our client obligations, we have had to utilize operating expenses that were set aside for other purposes because we are not able to halt legal representation on a moment's notice."); NIJC Decl. ¶ 10 (Qualified Representative went forward with a hearing on April 28, 2025—three days after the

33

termination—for Nationwide NQRP client's application because "[w]ithdrawing from that case would have severely prejudiced the client"); ILCM Decl. ¶ 16 ("ILCM had to proceed with a previously scheduled hearing on May 1, 2025, for an individual appointed a QR, without federal funding."); *see also* RMIAN Decl. ¶ 19 (explaining that "continu[ing] to engage in unpaid zealous advocacy of our NQRP clients for a discrete period of time" will require the organization to "drain our financial reserves to accomplish the work").

Finally, as it relates to Plaintiffs' existing cases, Plaintiffs are being perceptibly and irreparably harmed by the ethical bind that Defendants have created for them. Defendants seem to expect that Plaintiffs will withdraw from prior appointments. But this assumes that Plaintiffs *could* withdraw—a flawed assumption given that attorney "remains the practitioner of record unless an immigration judge permits withdrawal." 8 C.F.R. § 1003.17(a)(3). Judges may not allow Plaintiffs to withdraw, since doing so would leave them unable to hold fair hearings, which in turn would prejudice the clients. Rules of professional responsibility often require attorneys to demonstrate that withdrawal will not cause a materially adverse harm to the client's interests, *see, e.g.*, N.Y. Code of Prof'l Responsibility D.R. 2–110(C)(1); Model Rules of Prof'l Conduct R. 1.16(b)(1) (2020), a difficult, if not impossible, showing in this context, *see* Amica Center Decl. ¶ 30; American Gateways Decl. ¶ 15; Estrella del Paso Decl. ¶ 15. Further, "nonpayment of fees alone is insufficient cause for the withdrawal of counsel." *In re Meyers*, 120 B.R. 751, 752 (Bankr. S.D.N.Y. 1990).

Together, these financial and operational effects are sufficient to show irreparable harm to Plaintiffs. *See CLINIC*, 513 F. Supp. 3d at 175 (finding irreparable harm where the government's actions would "have an immediate effect on Plaintiffs' ability to serve their existing clients and take on new clients" (cleaned up)); *AIDS Vaccine*, 2025 WL 752378, at *18 (finding irreparable

34

harm where the government's actions would cause "immense financial harm" and "force" the plaintiffs "to significantly cut down on staff or otherwise reduce core operations"). They are also just the "the type of 'substantial, tangible costs' that are cognizable for purposes of organizational standing." *Nw. Immigrant Rts. Project*, 496 F. Supp. 3d at 48.

The harm resulting from Defendants' termination of the Nationwide NQRP will be beyond remediation without prompt injunctive and declaratory relief. Even if the Nationwide NQRP were reinstated at some unknown point in the future, this would make little difference to those Plaintiffs that will be forced to limit services and proceed without funding in the intervening time, and who are likely to lose staff that has spent years developing expertise to represent this vulnerable population. *See* American Gateways Decl. ¶ 15; PIRC Decl. ¶¶ 12–13, 22; Amica Center Decl. ¶¶ 25, 28–29; RMIAN Decl. ¶ 19; NIJC Decl. ¶¶ 9–11; *cf.* Dinerstein Decl. ¶ 27 (explaining that "it is critical for individuals with mental disabilities to be represented by counsel who understand how to best engage with and serve this vulnerable population"). The irreparable harm will likewise have already come to pass for the mentally incompetent noncitizens who will be deprived of appointed counsel, and thus of their right to a fair hearing, during its lapse. *See* Amica Center Decl. ¶ 27; NIJC Decl. ¶ 15; RMIAN Decl. ¶ 15. Absent immediate injunctive relief "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9 (citation omitted).

In short, the "cumulative impact" of the Nationwide NQRP's cancellation is the "decreased representation of [detained noncitizens with mental or cognitive disabilities] in immigration proceedings," *CLINIC*, 513 F. Supp. 3d at 175–76—an activity core to Plaintiffs' missions, *see, e.g.*, Amica Center Decl. ¶ 40; GHIRP Decl. ¶ 32; ILCM Decl, ¶ 30; ISLA Decl. ¶ 26; Estrella del Paso Decl. ¶ 27; PIRC Decl. ¶ 23. The unavoidable, imminent (and intended) result of Defendants' action is that mentally disabled noncitizens in most states will no longer have a Qualified

Represented appointed to represent them in removal or bond proceedings—representation they are legally entitled to under the Rehabilitation Act. "Such harm is irreparable to both Plaintiffs and the immigrant populations they represent." *CLINIC*, 513 F. Supp. 3d at 175–76.

## III.    The Balance of Equities and the Public Interest Strongly Favor Injunctive Relief

The balance of equities and public interest here unambiguously favor injunctive relief. In considering these factors, which merge in cases against the government, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).

First, Plaintiffs' high likelihood of success on their claims "is a strong indicator that a preliminary injunction would serve the public interest." *See League of Women Voters*, 838 F.3d at 12. As demonstrated above, Plaintiffs will face immeasurable, immediate, and irreparable harm if the Nationwide NQRP is not restored. Absent an injunction or stay, Plaintiffs will be unable to take on new Nationwide NQRP clients and will be significantly impaired in their ability to represent existing clients. *See* ILCM Decl. ¶¶ 28–29; RMIAN Decl. ¶ 30, ISLA Decl. ¶¶ 13, 16, 24.

Second, the public has a significant interest in ensuring efficient, fair immigration proceedings that comply with the laws of this country. Defendants have acknowledged that enhanced protections for individuals with mental disabilities improve the efficiency of these proceedings by allowing judges to proceed in cases where they otherwise might have been unable to do so. *See* Ventresca Decl., Ex. 2 (explaining that providing Qualified Representatives would "enable Immigration Judges to more efficiently and effectively carry out their adjudicatory duties" in cases involving detained individuals "with serious mental disorders or conditions").

Third, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.*; *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) ("[A]s courts in this District have recognized, '[t]he public interest is served when administrative agencies comply with their obligations under the APA.'" (citation omitted)). As Defendants' cancellation of the Nationwide NQRP violates the APA in numerous ways, a preliminary injunction requiring them to fulfill their constitutional and statutory obligations best serves the public interest.

Finally, courts in this district have found that the "equities weigh sharply in favor of preliminary relief" in cases where the government's "only [alleged] harm is that it will be required to keep in place" an existing policy, or program "while judicial review . . . runs its course." *U.S. Dep't of Agric.*, 444 F. Supp. 3d at 45; *see also R.I.L-R*, 80 F. Supp. 3d at 191 ("The Government 'cannot suffer harm from an injunction that merely ends an unlawful practice.'" (citation omitted)). EOIR has operated the NQRP successfully for 12 years and is still operating it in *Franco* states. *See* Ventresca Decl., Exs. 4, 8, 9. Defendants will suffer no substantial injury if required to continue administering the program nationally as well (through pre-existing funding, contracts, and infrastructure) for the duration of this litigation. *See Catholic Legal Immigr. Network, Inc. v. EOIR*, CV No. 21-00094 (RJL), 2021 WL 3609986, at *3 (D.D.C. Apr. 4, 2021) (holding that "returning to the *status quo ante*—immigration procedures which have been in operation for years prior to the multitude of changes enacted by the Rule—will best balance the equities at stake and serve the public interest"). On the contrary, "it is far from clear that Defendants would benefit from a decision that would permit [the Nationwide NQRP to be terminated], only to be set aside months from now." *CLINIC*, 513 F. Supp. 3d at 177 (citation and internal quotation marks omitted). "The

equities and public interest therefore favor entry of injunctive relief." *Id.*; *League of Women Voters*, 838 F.3d at 12 (balance of equities favors injunctive relief where "a preliminary injunction will 'not substantially injure other interested parties'" (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

## IV.    Nationwide Relief is Appropriate Here

"The D.C. Circuit has confirmed that the 'broad discretion' district courts enjoy when awarding equitable relief includes the authority to issue nationwide injunctions." *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 61 (D.D.C. 2020) (citing *Nat'l Mining Ass'n v. United States Army Corps of Eng'rs*, 145 F.3d 1399, 1408–09 (D.C. Cir. 1998)); *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 23 (D.D.C. 2018) ("[T]he D.C. Circuit [has] upheld the use of systemwide injunctions when the circumstances warrant them." (citing same)). Indeed, the "ordinary practice" in APA cases "is to vacate unlawful agency action" in its entirety. *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)); *see also Nat'l Mining Ass'n*, 145 F.3d at 1409 (noting that where "the 'agency action'" is of "broad applicability," a plaintiff "may obtain 'programmatic' relief that affects the rights of parties not before the court").

A nationwide injunction is necessary in this case "to provide complete relief to the plaintiffs for the 'violation established'"—Defendants' unlawful termination of the Nationwide NQRP. *U.S. Dep't of Agric.*, 444 F. Supp. 3d at 49. Where the government "interferes with plaintiffs' organizational missions and causes them to lose funding," as here, "'[c]omplete relief' . . . must remedy both harms." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 986 (9th Cir. 2020).

As its name suggests, the Nationwide NQRP is a ***national*** immigration program. Plaintiffs currently serve clients in more than a dozen states, and some can receive appointments from other

regions. *See, e.g.*, NIJC Decl. ¶ 3; ISLA Decl. ¶ 10. For that reason, a national injunction is necessary to provide meaningful relief to Plaintiffs and "similarly situated" organizations "across the country" that will experience "comparable harms" due to its termination. *Whitman-Walker Clinic*, 485 F. Supp. 3d at 63 (finding that "to the extent that similarly situated" organizations "across the country" would experience "comparable harms" due to agency action, "nationwide relief becomes all the more appropriate"). "[T]he financial, programmatic, and operational injuries" that will befall Plaintiffs, detailed above, are not "unique to them," but will affect equally all providers providing NQRP services in non-*Franco* states. *Id.* A nationwide injunction is the only effective remedy in such a case.

In addition, a nationwide injunction is appropriate because "there is an important 'need for uniformity in immigration policy.'" *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (citation omitted); *accord CLINIC*, 513 F. Supp. 3d at 178 ("[A] nationwide injunction is proper here because the court finds that the Final Rule is substantially likely to violate the APA and the injunction concerns the nation's immigration policies.").

In the alternative, Plaintiffs seek to stay Defendants' actions, "to prevent irreparable injury" and "to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. It is well established that courts are authorized to "postpone the effective date of an agency action." *Id.* For the same reasons discussed above, a stay of Defendants' unlawful termination of the Nationwide NQRP—at the very least—is warranted here. And because the NQRP is a national program, administered through a single contractor, a stay should, and would, have national effect.

## V.    Plaintiffs Should Not Be Required to Post Security

Pursuant to Federal Rule of Civil Procedure 65(c), courts "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Courts in this Circuit have found the Rule 'vests broad discretion in the district court to determine the appropriate amount of an injunction bond,' including the discretion to require no bond at all." *Simms v. D.C.*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012) (quoting *DSE, Inc. v. United States,* 169 F.3d 21, 33 (D.C. Cir. 1999)) (alteration omitted). Courts decline to require a bond where doing so would "contravene the interests of justice." *Aviel v. Gor*, --- F. Supp. 3d ----, No. CV 25-778 (LLA), 2025 WL 1009035, at *12 n.7 (D.D.C. Apr. 4, 2025) appeal filed *Aviel v. Gor,* No. 25-5105 (D.C. Cir. Apr. 7, 2025).

Plaintiffs have described at length the financial hardship that has resulted from Defendants termination of the Nationwide NQRP. *See, e.g.*, Amica Center Decl. ¶¶ 29, 33, 38; PIRC Decl. ¶¶ 13, 22; ISLA Decl. ¶ 24. Forcing Plaintiffs to post a bond here "would have the effect of denying the plaintiffs their right to judicial review" and would not serve the interests of justice. *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases). This Court should order no bond or set the bond amount at $0.

## <u>CONCLUSION</u>

Defendants' termination of the Nationwide Policy is arbitrary, capricious, and contrary to the Rehabilitation Act and Defendants' own policies. Their action has caused, and will continue to cause, Plaintiffs and their clients irreparable harm. This Court should grant immediate provisional relief, either in the form of a preliminary injunction or a stay under 5 U.S.C. § 705, ordering Defendants to continue operating the Nationwide NQRP and preserving the status quo during the pendency of this case.

Respectfully submitted,

Date: May 7, 2025

s/ Keren Zwick
Keren Zwick (D.D.C Bar No. IL0055)
Mark Feldman (C.A. Bar No. 302629)*
Mary Georgevich (M.N. Bar No. 0399950)*
Charles Roth (N.Y. Bar No. 2839041)*
**NATIONAL IMMIGRANT JUSTICE CENTER**
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Phone: 312.660.1364
Email: kzwick@immigrantjustice.org
mfeldman@immigrantjustice.org
mgeorgevich@immigrantjustice.org
croth@immigrantjustice.org

s/ Ivano Ventresca
Ivano Ventresca (D.C. Bar No. 1045769)
Monica F. Sharma (D.C. Bar No. 90013922)
**ZUCKERMAN SPAEDER LLP**
2100 L Street NW, Suite 400
Washington, DC 20037
Phone: 202.778.1842
Email: iventresca@zuckerman.com
msharma@zuckerman.com

s/ Adina Appelbaum
Adina Appelbaum (D.C. Bar No. 1026331)
F. Evan Benz (N.C. Bar. No 49077)*
**AMICA CENTER FOR IMMIGRANT RIGHTS**
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Phone: 202.331.3320
Email: adina@amicacenter.org
evan@amicacenter.org

*Attorneys for Plaintiffs*

**Pro hac vice* forthcoming

41