**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

AMERICAN GATEWAYS *et al.*,

*Plaintiffs,*

–v.–

**Case No. 1:25-cv-01370-AHA**

DEPARTMENT OF JUSTICE, *et al.*,
*Defendants.*

## DECLARATION OF IVANO M. VENTRESCA

1. I am a partner in the law firm of Zuckerman Spaeder LLP and a member of the Bar of this Court. I am one of the counsel of record in the above-captioned action representing the Plaintiffs. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction or Stay in the above-captioned case.

2. Attached as Exhibit 1 is a true and correct copy of selected documents filed by the United States as part of the administrative record in *Amica Center for Immigrants Rights v. DOJ*, No. 1:25-cv-00298-RDM, Dkt. 65-2 (D.D.C.).

3. Attached as Exhibit 2 is a true and correct copy of the Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders or Conditions, issued April 22, 2013.

4. Attached as Exhibit 3 is a true and correct copy of the Executive Office for Immigration Review's "National Qualified Representative Program (NQRP)" website, previously available at https://www.justice.gov/eoir/national-qualified-representative-program-nqrp, as of May 5, 2025. As of May 7, 2025, that link is no longer active, but the website can be viewed here, https://perma.cc/M47G-BV89.

5. Attached as Exhibit 4 is a true and correct copy of a Department of Justice press release from April 22, 2013, titled *Department Of Justice And The Department Of Homeland Security Announce Safeguards For Unrepresented Immigration Detainees With Serious Mental Disorders Or Conditions*, available at https://perma.cc/99KS-7MN5.

6. Attached as Exhibit 5 is a true and correct copy of the Amendment of Solicitation/Modification of Contract, effective April 19, 2024, filed as part of the administrative record in *Amica Center for Immigrants Rights v. DOJ*, No. 1:25-cv-00298-RDM, Dkt. 65-3 (D.D.C.).

7. Attached as Exhibit 6 is a true and correct copy of EOIR's *Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Respondents with Mental Disorders*, issued December 31, 2013.

8. Attached as Exhibit 7 is a true and correct redacted copy of a letter dated April 3, 2025, from the Department of Justice to the Acacia Center for Justice.

9. Attached as Exhibit 8 is a true and correct redacted copy of the Amendment of Solicitation/Modification of Contract dated April 25, 2025 from the U.S. Department of Justice, Procurement Services Staff.

10. Attached as Exhibit 9 is a true and correct copy of a revised Statement of Work dated accompanying the Amendment of Solicitation/Modification of Contract (Exhibit 8).

11. Attached as Exhibit 10 is a true and correct copy of a 2023 budget request from the Executive Office of Immigration Review.

12. Attached as Exhibit 11 is a true and correct redacted copy of a letter dated April 4, 2025 from the Department of Justice to the Acacia Center for Justice.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 7th day of May, 2025.

Ivano M. Ventresca

# EXHIBIT 1

| | |
|---|---|
| **From:** | Gorman, Stephanie (EOIR) |
| **To:** | Owen, Sirce E. (EOIR) |
| **Subject:** | Acacia Wind-Down Recommendation |
| **Date:** | Wednesday, April 9, 2025 9:00:53 AM |

Director Owen,

Please see recommendation from Office of Policy.

---

*Please note that for all terminations, termination fees may apply.*

**Legal Orientation Program / Legal Orientation Program for Custodians of Unaccompanied Alien Children**
- 15JPSS23F00000154
- LOP: Three-day notice to terminate services for LOP pursuant to Amica Center for Immigrant Rights et al v. United States Department of Justice et al, 1:25-cv-00298-RDM.
- LOPC: 30-day notice terminate services for LOPC to allow EOIR to continue to meet statutory obligations outlined in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (Pub. L. 110-457). Going forward, obligations would be met under a federalized program.

**Immigration Court Helpdesk**
- 15JPSS22F00000701
- Three-day notice of termination pursuant to the Amica Center for Immigrant Rights et al v. United States Department of Justice et al, 1:25-cv-00298-RDM.

**Counsel for Children Initiative**
- 15JPSS22F00000700
- 60-day wind down period to end representation funded by EOIR on these cases which will allow for representatives to withdraw and facilitate finding other representation (not funded by the Government) for these individuals.

**Family Group Legal Orientation Program**
- 15JPSS22F00000699
- Three-day notice of termination pursuant to the Amica Center for Immigrant Rights et al v. United States Department of Justice et al, 1:25-cv-00298-RDM.
- Note: This needs to be communicated to DHS.

**Legal Access Services for Reunified Families**
- 15JPSS24F00000418
- Do not renew – expires on April 30, 2025
  - Recommend offering federal positions (not to exceed 1 or 2 year) funded by settlement funds currently at EOIR.

**National Qualified Representative Program**
- 15JPSS22F00000704
- No termination – request to finish current task order year which ends on July 31, 2025. This is a little less than 120 days and allows for procurement activity to meet obligations under permanent injunction in *Franco*.

Reduction in scope to not include Nationwide Policy cases. For those 60 days to end representation funded by EOIR on these cases which will allow for representatives to withdraw and facilitate finding other representation (not funded by the Government) for these individuals.

*Stephanie E. Gorman*
Assistant Director (Acting), Office of Policy
U.S. Dept. of Justice/Executive Office for Immigration Review
Mobile: ███████████



ATTORNEY WORK PRODUCT. This communication and its contents, including any attachments, are pre-decisional and prepared in anticipation of litigation, and are subject to the Deliberative Process privilege, Attorney Work Product privilege, and/or the Attorney-Client privilege pursuant to 5 USC 552(b)(5).

# EXHIBIT 2



**U.S. Department of Justice**

Executive Office for Immigration Review

*Office of the Chief Immigration Judge*

*5107 Leesburg Pike, Suite 2600*
*Falls Church, Virginia 22041*

April 22, 2013

| | |
|---|---|
| **MEMORANDUM TO:** | All Immigration Judges |
| **FROM:** | Brian M. O'Leary     *[signature]*<br>Chief Immigration Judge |
| **SUBJECT:** | Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders <u>or Conditions</u> |

For those of you who have had unrepresented detained aliens with serious mental disorders or conditions appear in your courtrooms, you are more than aware of the many unique challenges encountered in conducting removal proceedings involving such individuals. Accordingly, in order to enable Immigration Judges to more efficiently and effectively carry out their adjudicatory duties when confronted with such cases and to enhance procedural protections for mentally incompetent individuals appearing in our courts, today we are announcing, together with the Department of Homeland Security (DHS), a number of enhancements throughout the immigration removal and detention system.

Specifically, we will today begin implementation of a system that will accomplish the following:

- **Competency Hearings.** When it comes to your attention through documentation, medical records, or other evidence that an unrepresented detained alien appearing before you may have a serious mental disorder or condition that may render him or her incompetent to represent him- or herself in removal proceedings, you will conduct a competency hearing.

- **Mental Competency Examinations.** If, at the conclusion of competency hearing(s), you are unable to make a determination of whether the alien is competent to represent him- or herself in removal proceedings based on the evidence presented, you will now be able to order an independent mental competency examination and the production of a psychiatric or psychological report. EOIR will be administering a system that works with DHS to

1

procure such independent examinations and reports. While Immigration Judges shall retain their discretion to determine whether or not a detained alien is competent to represent him- or herself, the independent competency evaluation will serve as a useful tool in assisting with that determination.

- **Availability of Qualified Representatives.** If, at the conclusion of competency hearing(s), you find that the unrepresented detained alien is not mentally competent to represent him- or herself, and the alien does not at that point otherwise have legal representation, EOIR will make available a qualified legal representative to represent the alien in all future detained removal and/or bond proceedings.

- **Bond Hearings.** In addition, any unrepresented detained aliens who were initially identified as having a serious mental disorder or condition that may render them incompetent to represent themselves and who have been held in detention by DHS for six months or longer will be afforded a bond hearing.

More detailed information will be provided as it becomes available. We expect these new procedures will be fully operational by the end of 2013.

2

EXHIBIT 3



# National Qualified Representative Program (NQRP)

In April 2013, EOIR collaborated with the Department of Homeland Security's Immigration and Customs Enforcement (ICE) agency to initiate a new Nationwide Policy to provide enhanced procedural protections, including competency inquiries, mental health examinations, and bond hearings to certain unrepresented and detained respondents with serious mental disorders or conditions that may render them incompetent to represent themselves in immigration proceedings.

At the same time, and as part of the Nationwide Policy's enhanced procedural protections, EOIR also launched the National Qualified Representative Program (NQRP), a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in immigration proceedings.

EOIR carries out the NQRP through effort of federal staff and a contract.

For more information on EOIR's programs and initiatives, please send an email to:
PAO.EOIR@usdoj.gov

Return to Office of Legal Access Programs Home Page

*Updated February 18, 2020*

✉ **Executive Office for Immigration Review**

5107 Leesburg Pike
Falls Church, VA 22041

📞 Phone: 703-305-0289

EXHIBIT 4



# Department Of Justice And The Department Of Homeland Security Announce Safeguards For Unrepresented Immigration Detainees With Serious Mental Disorders Or Conditions

Monday, April 22, 2013

**For Immediate Release**

Executive Office for Immigration Review

WASHINGTON -- The Department of Justice (DOJ) and the Department of Homeland Security (DHS) will issue today a new nationwide policy for unrepresented immigration detainees with serious mental disorders or conditions that may render them mentally incompetent to represent themselves in immigration proceedings.

The policy entails implementation of new procedural protections, including: conducting screening for serious mental disorders or conditions when individuals held for removal proceedings enter a U.S. Immigration and Customs Enforcement Health Service Corps (IHSC)-staffed immigration detention facility; working with non-IHSC-staffed immigration detention facilities to identify detainees with serious mental disorders or conditions in those facilities; the availability of competency hearings and independent psychiatric or psychological examinations; procedures that will make available qualified representatives to detainees who are deemed

5/5/25, 9:16 PM        Executive Office for Immigration Review | Department Of Justice And The Department Of Homeland Security Announce Safeguards …

Case 1:25-cv-01370-AHA        Document 8-2        Filed 05/07/25        Page 15 of 182

mentally incompetent to represent themselves in immigration proceedings; and bond hearings for detainees who were identified as having a serious mental disorder or condition that may render them mentally incompetent to represent themselves and have been held in immigration detention for at least six months.

If verifiable documentation, medical records or other forms of evidence provide indication of mental incompetency, Immigration Judges will convene a competency hearing to determine whether the detainee is competent to represent himself or herself in immigration proceedings. When an Immigration Judge is unable to make a determination of mental competency based upon evidence already presented, the Immigration Judge will be authorized to order an independent examination and psychiatric or psychological report. The competency examinations will be administered through a program run by the DOJ Executive Office for Immigration Review (EOIR) and performed by an independent medical professional.

EOIR will make available a qualified representative to unrepresented detainees who are deemed mentally incompetent to represent themselves in immigration proceedings. Additionally, detainees who were identified as having a serious mental disorder or condition that may render them mentally incompetent to represent themselves and who have been held in immigration detention for at least six months will also be afforded a bond hearing.

DOJ and DHS believe these new procedures will provide enhanced protections to unrepresented immigration detainees with serious mental disorders or conditions that may render them mentally incompetent to represent themselves in immigration proceedings, and will facilitate the conduct of those proceedings. The Government expects these new procedures to be fully operational on a national basis by the end of 2013.

*Updated July 15, 2015*

**Component**

[Executive Office for Immigration Review](#)

# Related Content

5/5/25, 9:16 PM
Executive Office for Immigration Review | Department Of Justice And The Department Of Homeland Security Announce Safeguards …

Case 1:25-cv-01370-AHA    Document 8-2    Filed 05/07/25    Page 16 of 182

**VIDEO**

## Introduction to Immigration Court

April 12, 2022

**PRESS RELEASE**

## EOIR Warns of Scammers Spoofing Agency Phone Number

June 3, 2021

**PRESS RELEASE**

## DHS and DOJ Announce Dedicated Docket Process for More Efficient Immigration Hearings

May 28, 2021



**Executive Office for Immigration Review**

5107 Leesburg Pike

Falls Church, VA 22041

Phone: 703-305-0289

EXHIBIT 5

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | 1. CONTRACT ID CODE 15JPSS22D00000013 | PAGE 1 | OF | PAGES 18 |
|---|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NUMBER P00002 | 3. EFFECTIVE DATE 04/19/2024 | 4. REQUISITION/PURCHASE REQUISITION NUMBER | 5. PROJECT NUMBER (If applicable) |
|---|---|---|---|

| 6. ISSUED BY                                CODE   15JPSS | 7. ADMINISTERED BY (If other than Item 6)   CODE |
|---|---|
| U.S. Department of Justice<br>Procurement Services Staff, OBD<br>145 N St., NE, 8E.300<br>Washington, DC 20530 | |

| 8. NAME AND ADDRESS OF CONTRACTOR (Number, street, country, state and ZIP Code) | (X) | 9A. AMENDMENT OF SOLICITATION NUMBER |
|---|---|---|
| ACACIA CENTER FOR JUSTICE<br>1025 CONNECTICUT AVE NW STE 1000A # 1008<br>WASHINGTON, DC 20036-5417<br><br>UEI: CAJ4W5QGNKK9<br>DUNS: 118493024 | | 9B. DATED (SEE ITEM 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NUMBER<br>15JPSS22D00000013 |
| CODE | FACILITY CODE | 10B. DATED (SEE ITEM 13)<br>09/01/2022 |

### 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or electronic communication which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or electronic communication, provided each letter or electronic communication makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (If required)

See Line Item Detail

### 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
### IT MODIFIES THE CONTRACT/ORDER NUMBER AS DESCRIBED IN ITEM 14.

| CHECK ONE | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NUMBER IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ☐ is not, ☒ is required to sign this document and return __1__ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION (Organized by UCF section headings, including solicitation/contract subject matter where feasible.)

The purpose of this modification is to incorporate clause DOJ-05 into this IDIQ and to update the points of contact for both Acacia and EOIR in sections G.1.2 and G.2 of the IDIQ. See the attached documents for details  All other terms and conditions remain unchanged.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) |
|---|---|
| Leah Prestamo, General Counsel | Markus T Gaines<br>Contracting Officer |
| 15B. CONTRACTOR/OFFEROR<br><br>(Signature of person authorized to sign) | 15C. DATE SIGNED<br>7/2/24 | 16B. UNITED STATES OF AMERICA<br>By _Markus T. Gaines_<br>(Signature of Contracting Officer)<br>Digitally signed by MARKUS GAINES<br>Date: 2024.07.02 13:57:50 | 16C. DATE SIGNED<br>7/2/2024 |

| Previous edition unusable | STANDARD FORM 30 (REV. 11/2016)<br>Prescribed by GSA FAR (48 CFR) 53.243 |
|---|---|

## Section B - Supplies or Services and Prices/Costs

EOIR Legal Access, Orientation, and Representation Services.

Time and Materials

## SCHEDULE OF SUPPLIES/SERVICES

CONTINUATION SHEET

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | MATERIAL COSTS | TRAVEL COSTS | AMOUNT |
|---|---|---|---|---|---|---|---|
| 0001 | Base Period<br>PSC: R418<br>**Line Period of Performance:** 09/01/2022 - 08/31/2023<br>Base Period | Previous : 1<br>Change: 0<br>Current : 1 | LT | Previous: $250,000,000.00000<br>Change: $0.00000<br>Current: $250,000,000.00000 | $0.00 | $0.00 | Previous: $250,000,000.00<br>Change: $0.00<br>Current: $250,000,000.00 |

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | MATERIAL COSTS | TRAVEL COSTS | AMOUNT |
|---|---|---|---|---|---|---|---|
| 0002 | Option Period 1<br>PSC: R418<br>**Line Period of Performance:** 09/01/2023 - 08/31/2024<br>Exercised Option | Previous : 1<br>Change: 0<br>Current : 1 | LT | Previous: $0.00000<br>Change: $0.00000<br>Current: $0.00000 | $0.00 | $0.00 | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | MATERIAL COSTS | TRAVEL COSTS | AMOUNT |
|---|---|---|---|---|---|---|---|
| 0003 | Option Period 2<br>PSC: R418<br>**Line Period of Performance:** 09/01/2024 - 08/31/2025<br>Unexercised Option | Previous : 0<br>Change: 0<br>Current : 0 | LT | Previous: $0.00000<br>Change: $0.00000<br>Current: $0.00000 | $0.00 | $0.00 | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | MATERIAL COSTS | TRAVEL COSTS | AMOUNT |
|---|---|---|---|---|---|---|---|

Admin. Rec.43

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | MATERIAL COSTS | TRAVEL COSTS | AMOUNT |
|---|---|---|---|---|---|---|---|
| 0004 | Option Period 3<br>PSC: R418<br>**Line Period of Performance:** 09/01/2025 - 08/31/2026<br>Unexercised Option | Previous : 0<br>Change: 0<br>Current : 0 | LT | Previous:<br>$0.00000<br>Change:<br>$0.00000<br>Current:<br>$0.00000 | $0.00 | $0.00 | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |
| 0005 | Option Period 4<br>PSC: R418<br>**Line Period of Performance:** 09/01/2026 - 08/31/2027<br>Unexercised Option | Previous : 0<br>Change: 0<br>Current : 0 | LT | Previous:<br>$0.00000<br>Change:<br>$0.00000<br>Current:<br>$0.00000 | $0.00 | $0.00 | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |

| | |
|---|---|
| **Base Total:** | Original: $250,000,000.00<br>Change: $0.00<br>Current: $250,000,000.00 |
| **Exercised Options Total:** | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |
| **Unexercised Options Total:** | Previous: $0.00<br>Change: $0.00<br>Current: $0.00 |
| **Base and Options Total:** | Previous:<br>$250,000,000.00<br>Change: $0.00<br>Current: $250,000,000.00 |

Admin. Rec.44

## SECTION B – SUPPLIES OR SERVICES AND PRICES/COSTS

**B.1    General**

(a)  The services to be performed under this contract are legal access, orientation, and representation services for the Executive Office for Immigration Review (EOIR).  All requirements will be fulfilled on an indefinite-delivery, indefinite-quantity (IDIQ) task order basis.

(b)  The contract will include a one (1) year base period and four (4) option periods as described in the table below.  See Section F.1 for complete contract term and option information.

Contract Term

| | | | |
|---|---|---|---|
| Base Period | 09/01/22 | thru | 08/31/23 |
| Option Period 1 | 09/01/23 | thru | 08/31/24 |
| Option Period 2 | 09/01/24 | thru | 08/31/25 |
| Option Period 3 | 09/01/25 | thru | 08/31/26 |
| Option Period 4 | 09/01/26 | thru | 08/31/27 |

(c)  Because the continuing provision of support services is essential to continuity of the program, it is critical that the phase-in of contractor personnel and the assumption of ongoing tasks is accomplished in a well-planned, orderly and efficient manner.

(d)  The performance of all work under this contract shall be initiated by the issuance of task orders by the Contracting Officer as discussed in Sections C.5.1 and H.2.  Task orders may be issued on a firm-fixed price, labor-hour, or time-and-materials basis, or any combination thereof.

**B.2    Minimum and Maximum Amounts**

(a)  The Government will order a minimum amount of **$50,000.00** under this contract.  The Government will have the entire term of the contract (to include all options) to fulfill the contract minimum. The specific contract line item numbers (CLINs) and quantities will be identified in the task order(s) issued under this contract.  The exercise of the renewal options (see Section F.2) does not re-establish the contract minimum.  During the life of this contract, the Government may order items in any quantity up to the maximum amount specified in paragraph (b) below.  If the minimum amount has not been ordered, the Government will exercise the option for the next year.

(b)  There are no maximum quantities or amounts for each individual CLIN, task order, or contract period.  The maximum aggregate amount of all task orders issued under the contract shall not exceed **$250,000,000.00** for the entire term of this contract, including all options which may be exercised.

**B.3    Pricing Tables**

(a)  All prices are fixed unit prices that include direct labor, fringe benefits, applicable indirect costs, and profit necessary to provide the services specified in the contract and/or task order.  All contract unit prices and multipliers (applied to other direct cost items) shall be as specified in the pricing tables contained in Attachments (1.1) through (1.6).  Additional pricing tables may be added throughout the duration of the contract, as applicable, as support for other legal access, orientation, and representation programs are needed.

2

(b) The following definitions apply to the applicable pricing table(s) contained in Attachments (1.1) through (1.6):

(1) <u>Loaded Hourly Rate</u>. All loaded hourly rates shall be all inclusive of direct labor, local travel expenses, fringe benefits, applicable indirect costs, and any profit necessary for each labor category. The loaded hourly rates set forth in the pricing tables shall be the rates charged for services (excluding the National Qualified Representative Program (NQRP) and Counsel for Children Initiative (CCI)) performed under the contract and/or task order. The contractor may discount the loaded hourly rates at the task order level.

(2) <u>Multiplier</u>. The factor to be applied against the actual cost of any Other Direct Cost (ODC) item to cover administrative handling expenses. The multiplier is to be applied against the actual cost of an ODC for which reimbursement has been authorized. The billable amount shall be limited to the actual cost plus the amount resulting from the application of the appropriate multiplier identified in the table (e.g., actual cost of item is $100.00, and multiplier for the CLIN is 1.02, the total billable amount is $102.00). For subcontracted items/services, the multiplier shall only be applied one time. For example, a subcontractor might be required to travel. It is not permissible for the subcontractor to apply a markup to the travel costs in billing the prime contractor, and then for the prime contractor to apply another markup when billing the Government. The multiplier may only be applied once, and must be applied to the original cost of the item.

(3) <u>CCI Case Assignment</u>. All rates shall be all inclusive of direct labor, all travel expenses (excluding training and site visit travel costs), other direct costs, fringe benefits, applicable indirect costs, and any profit necessary to provide the level of service specified in the contract and/or task order.

(4) <u>Franco NQRP Case Representation</u>. All rates shall be inclusive of direct labor, all travel expenses (excluding training and site visit travel costs), other direct costs, fringe benefits, applicable indirect costs, and any profit necessary to provide the level of service specified in the contract and/or task order.

(5) <u>Nationwide Policy NQRP Case Representation</u>. All rates shall be inclusive of direct labor, all travel expenses (excluding training and site visit travel costs), other direct costs, fringe benefits, applicable indirect costs, and any profit necessary to provide the level of services specified in the contract and/or task order.

(c) <u>Long-Distance Travel</u>. All reimbursable long-distance travel shall be approved in advance by the Contracting Officer's Representative (COR). Reimbursement for actual (approved) travel costs incurred during the performance of support services shall be in accordance with Part 31 of the Federal Acquisition Regulations. Travel requirements under this contract shall be met using the most economical form of transportation available. If economy class transportation is not available, the Contractor must submit (to the COR) a request for advance approval to utilize higher class travel. All travel should be scheduled sufficiently in advance to be able to take advantage of offered discount rates. Individual travel authorization letters may be provided to the Contractor (for all Contractor personnel who are required to travel) which may allow Contractor personnel to receive Government rates when on long distance travel. The Department encourages advance airfare purchases to take advantage of supersaver discounts. If the trip is canceled or travel dates are changed due to the Government's actions, the Government will, absent special circumstances, pay airline cancellation charges or airline charges for changes in the travel dates.

3

## SECTION C – DESCRIPTION/SPECIFICATIONS/WORK STATEMENT

### C.1    Introduction

EOIR has a requirement for the following non- personal services for noncitizens who are, or may be, placed in immigration proceedings before EOIR's Immigration Courts and the Board of Immigration Appeals:

(a) Legal orientation programs for detained and non-detained noncitizen adults and for the custodians of Unaccompanied Children (UC);

(b) Immigration court helpdesk programs for non-detained individuals;

(c) Direct legal representation programs for certain noncitizen children and detained adults; and

(d) Other legal access, orientation, and representation programs.

### C.2    Background

(a) EOIR was established in January 1983. Under delegated authority of the Attorney General of the United States, EOIR administers and interprets federal immigration laws and regulations through the conduct of immigration court proceedings, appellate reviews, and administrative hearings in individual cases. EOIR carries out these responsibilities through its three main components:

(1) The Office of the Chief Immigration Judge (OCIJ), which oversees all the immigration courts and their proceedings throughout the United States;

(2) The Board of Immigration Appeals (BIA), which hears appeals of decisions made in individual cases by Immigration Judges, District Directors of the Department of Homeland Security (DHS), or other immigration officials; and

(3) The Office of the Chief Administrative Hearing Officer (OCAHO), which resolves cases concerning employer sanctions, document fraud, and immigration-related employment discrimination.

(b) The Office of the Chief Immigration Judge oversees and directs the activities of immigration courts throughout the United States. Immigration courts operate in federal buildings, private buildings, correctional institutions, and DHS-operated and/or DHS-contracted detention centers and other facilities. Immigration judges conduct immigration hearings at these courts to resolve various immigration matters.

(c) There are various types of immigration proceedings before the court, including *inter alia* reviews of credible and reasonable fear determinations.  However, the vast majority are removal proceedings, which include Master Calendar and Individual Hearings. In Master Calendar hearings, Immigration Judges are required to ensure that noncitizens have a clear understanding of the charges against them, their procedural rights during the hearing process, and their options for relief. In

4

addition, Immigration Judges attempt to provide adequate time for noncitizens to assemble facts, documents, and witnesses which may be helpful in their pursuit of relief from removal at their Individual Hearings. As a result, the additional time required by pro se noncitizens often places a great burden on the court's dockets and reduces the efficiency of the Master Calendar hearing process. For unaccompanied children, EOIR previously carried out the Baltimore Representation Initiative for Unaccompanied Children as well as the Remote Access Initiative in multiple areas of the U.S. Southeast. In FY 2021, EOIR launched the Counsel for Children Initiative (CCI) which provides representation to certain qualified children.

(d) In FY 2016, with specific funding from Congress, EOIR launched the Immigration Court Helpdesk (ICH) Program to serve non-detained noncitizens in immigration court proceedings. The primary purpose of the ICH is to orient non-detained noncitizens appearing before the immigration court on the removal hearing process and to inform them about possible remedies and legal resources. In 2021, EOIR launched the Family Group Legal Orientation (FGLOP) Program to serve certain family groups, released from ICE custody on ATD (Alternative to Detention), whose cases are placed on an immigration court's Dedicated Docket.

Attachment (2) provides a list of current sites where the different programs exist. This list is provided for informational purposes and does not restrict the Government from requiring services be performed at additional sites during performance of the contract.

## C.3    Project Management Support

### C.3.1   General

(a) The Contractor shall provide all management, administration, staffing, planning, scheduling, etc., for all items and services required by the contract and individual task orders. Project management support activities include, but are not limited to, all activities associated with overall prime/subcontract/task order management (e.g., key personnel costs and administrative support staff providing contract level, subcontract level, or task order level support (e.g., invoicing, reporting, oversight, etc.)) and will be recovered through fixed unit prices contained within Attachment (1.0) for labor associated with project management support and on a firm-fixed price or time-and-materials basis for applicable other direct costs associated with project management support.

(b) The Contractor is solely responsible for supervising all of its employees and the duties described below:

(1) Recruiting, hiring, training, and professional development of personnel.
(2) Providing effective supervision of all contractor employees.
(3) Monitoring service problems and keeping the COR and designated Government officials informed of project status and problem resolution.
(4) Providing monthly and ad hoc or other periodic reports (when requested by the Government) status and financial reports to the Government in an agreed upon format.
(5) Ensuring that deliverables are supplied to the Government, as defined in Section C.3.3.
(6) Ensuring that all personnel comply with the security requirements outlined in this contract.

5

**C.3.2   Staffing**

(a)  The Contractor shall provide trained, experienced staff to perform the work specified under individual orders issued against this contract.  The Contractor shall continuously monitor, manage, and control the work to ensure it is successfully accomplished. The Contractor shall make its best effort to retain staff members who have gained experience on this contract, and to minimize staff turnover. The Contractor shall ensure that all personnel who perform under this contract meet the security requirements of Section H.4.

(b)  The Government reserves the right to review the qualifications of all staff (to include subcontractor staff) selected to work on any given task order before assignment. During the period of performance associated with any task order under this contract, the Contractor shall submit resumes for any individuals being added to the contract staff (not including subcontractor staff) or replacing a member of the contract staff (not including subcontractor staff). These individuals must be fully qualified for the relevant position. Resumes shall be pre-screened through the Contractor prior to submission for Government review. Each resume shall include past employment positions and a brief description of the experiences, dates, and names of one or more references, including addresses and telephone numbers where available.

(c)  The Government reserves the right to request the Contractor to reassign contractor and/or subcontractor personnel whose services are no longer required by the Government for such reasons as quality of performance, changes in project requirements, etc. An official request for such a reassignment will be provided to the Contractor in writing by the Administrative Contracting Officer (ACO).

**C.3.3   Deliverables**

(a)  All reports required under this contract shall be delivered to the COR as shown below. This list of reports is not exhaustive; additional reports shall be delivered as required by the COR.

(b)   Generally, the Contractor's format for all documentation deliverables should be acceptable subject to review by the Government.

(c)  The Contractor shall attend any briefings, other meetings, and/or on-the-job training provided by the Government. Briefings are normally held during normal working hours.

**C.3.3.1 Management Plan**

The Contractor shall implement, and update during contract performance, the Management Plan delineated in the Contractor's proposal for the legal access, orientation, and representation services. The Contractor's Management Plan shall, at a minimum, address the following:

(1) Lay out the organization and infrastructure the Contractor has in place to manage the day-to-day operations necessary to meet the contract requirements, including the Contractor's chain of command, points of contact, problem notification procedures and problem response times, problem escalation procedures, and any other processes or procedures the Contractor has in

6

place to facilitate performance;

(2) Establish a schedule for completion of all required tasks;

(3) Emphasize a "team" approach between the Contractor and subcontractors carrying out the programs at the local level, with the Contractor serving as leader of such team.

### C.3.3.2 Program Operation Plan

(a) Program Operation Plan (POP). The Contractor, in consultation with the COR, shall provide a POP for each program carried out by a subcontractor at a local program site prior to the start of operation at each program site, or within a time frame agreed upon by the parties if the particular program site is a new addition to the task order. The POP shall include:

**Legal Orientation Programs:**

(1) Start date (if different from task order start date);

(2) Structure and schedule of group and individual orientations/sessions;

(3) Structure and schedule of self-help workshops;

(4) Structure and schedule of any "post release" services if applicable;

(5) Pro Bono Plan;

(6) Narrative overview of site operations; and

(7) Proposed local management plan, to include staffing and supervision along with labor categories and hours.

**Legal Representation Programs:**

(1) Start date (if different from task order start date);

(2) Proposed plan to implement a system whereby cases are accepted for legal representation as early in immigration proceedings as feasible, and in a manner not based on potential eligibility for relief from removal, consistent with the terms of this contract;

(3) Proposed capacity and/or plan for determining ongoing capacity of contract attorneys; and

(4) Proposed operation plan.

(b) Implementation. The Contractor shall coordinate with the COR and on-site representatives to implement the programs at each detention site, location, or designated contract site, as they apply to each program. "On-site representatives" may include officials and federal

7

government contractors from the DHS, EOIR, or other individuals deemed necessary by the COR. The Contractor shall coordinate with these representatives for the scheduling of legal orientation presentations, the use of facilities, the exchange of information on noncitizens served, and other reasons related to the performance of services.

    (c)  Site Monitoring and Evaluations. Applicable to the legal orientation programs only, the Contractor shall perform an annual evaluation of each program site.  Site visits should be in-person but may be conducted remotely in consultation with the Government, as specified in each individual task order, and shall include at a minimum: i) collection and review of data evaluating the level and quality of services provided, and ii) the impact of such services on the goals of the program to determine the performance of each local program site.  The Government will participate in these program site visits at its discretion.

    (d)  Monthly Conference Calls. For each program, the Contractor shall facilitate a monthly conference call with the Contractor's local program providers and the Government, and at any time that the Contractor or Government deem it necessary.

## C.3.3.3  Quarterly Progress Report

The Contractor shall submit a quarterly program management progress report to the COR. The first quarterly progress report shall be delivered electronically to the COR by the 15th calendar day of the fifth month of contract performance with all subsequent progress reports to be provided in three-month increments.  The quarterly reports shall discuss at a minimum:

(1) Summary of activities that were performed and/or occurred during the previous quarter to include, but not be limited to, a description of the effort and cost.

(2) Results of site evaluations for any site inspections conducted within the previous quarter;

(3) The progress to date on any new programs compared with the plan and time schedule;

(4) Any information which the Contractor believes would impact the time schedule for major actions.

(5) For the legal orientation programs: The number of group and individual orientations made and self-help workshops conducted over the past quarter and cumulatively; the number of noncitizens served (by attending a group orientation, individual orientation and self-help workshop) over the past quarter and cumulatively; the number of pro bono referrals made over the past quarter and cumulatively; and other data as deemed necessary by the Government;

(6) For the legal representation programs: the number of noncitizens represented over the past quarter and cumulatively; and other data as deemed necessary by the Government.

(7) For the immigration court helpdesk programs: The number of group and individual

8

sessions provided and self-help workshops conducted over the past quarter and cumulatively; the number of noncitizens served (by attending a group session, individual session, and self-help workshop) over the past quarter and cumulatively; the number of pro bono referrals made over the past quarter and cumulatively; and other data as deemed necessary by the Government.

### C.3.3.4  Other Deliverables

Other deliverables will be specified in individual task orders and may include, but are not limited to:

(1) Legal Orientation Programs Training – The Contractor shall provide training for all essential participants in the legal orientation programs, including Contractor presenters and key management staff. The Contractor shall also provide training to Government-contracted personnel (e.g. DHS-contracted staff, HHS-contracted caseworkers and field coordinators) and other Government representatives as determined by the COR. This training may be provided through any or all of the following means:

   (A) Legal orientation programs Training Manuals – When training manuals are produced, they shall be updated as needed.

   (B) Annual Conference - to include all essential staff.

   (C) Local On-Site Training Programs (OSTP) – for new presenters and key management staff.

   (D) Conference calls, webinars, or other remote learning methods can be used to supplement other training methods.

(2) Written and/or Recorded Legal Orientation Materials –The Contractor shall develop appropriate written and/or recorded legal orientation materials in accordance with Government guidance.  These materials must be approved by the Government prior to distribution and use.

(3) The Contractor shall make available to the public on the internet all relevant self-help legal materials currently in use by the sites and relevant written training conference materials.

(4) Program Evaluation Reports – The Contractor shall provide Program Evaluation Reports for each program on a quarterly and/or annual basis as determined by each task order's period of performance. The Program Evaluation Reports shall include a detailed description of services performed and provide recommendations on the use of outcome information for continuous improvement of each program. The evaluation of program outcomes shall include analysis on how the particular program task order as well as each program task order site has met the stated goals (see Attachment (3)) of the program.

9

(5) Facilitate monthly conference calls between the Government, the Contractor and the subcontractors, as specified in each respective task order, to discuss local program performance.

## C.4    Scope of Work

The Contractor shall furnish all personnel, materials, support, and management necessary to provide legal access, orientation, and representation services to noncitizens who are, or may be placed, in immigration proceedings before EOIR's Immigration Courts and the Board of Immigration Appeals.

## C.5    General Work Requirements

### C.5.1    Task Orders

Legal access, orientation, and representation services will be initiated through issuance of individual task orders for these services. The Legal Access Programs (LAP) work to improve access to legal information and to increase rates of representation for noncitizens appearing before the immigration courts and the BIA. LAP program services to be performed under this contract include, but are not limited to, the following:

### C.5.1.1 Legal Orientation Program for Detained Adults (LOP)

The Contractor shall implement and oversee legal orientation programs for detained adult noncitizens who are, or may be placed, in immigration proceedings before EOIR's Immigration Courts and the Board of Immigration Appeals at sites designated by the COR. As specified in each task order issued against this contract, the Contractor shall furnish the services at each site cited in Attachment (2). The services to be performed include, but are not limited to, the following: group orientations; individual orientations; self-help workshops; Friend of the Court services; development of Pro Bono Plans; and other services as deemed necessary by the COR. The services shall be performed by on-site presenters, who must either be a licensed attorney or DOJ Accredited Representative with full accreditation, or a legal assistant/paralegal, law student, law school graduate, or other trained volunteer working under the direct supervision of such licensed attorneys or DOJ Accredited Representatives with full accreditation. Limited temporary exceptions may be approved in the discretion of the COR. Specific requirements to satisfy program needs will be defined in individual task orders.

### C.5.1.2 Legal Orientation Program for Custodians of Unaccompanied Children (LOPC)

The Contractor shall implement and oversee legal orientation programs for custodians of unaccompanied - children (LOPC). Under the LOPC, the Contractor shall provide legal orientation presentations for custodians of an Unaccompanied Child ("UAC') (as defined by Section 462 of the Homeland Security Act of 2002). A "custodian" is an individual seeking custody of a UC in the care of the Department of Health and Human Services (HHS), or an individual who already has custody of a child who was formerly a UC in HHS care. The LOPC will address the custodians' responsibilities to ensure, as best as possible, the UC's appearance at all Immigration Court hearings, and to protect the UC from mistreatment, exploitation and trafficking. As specified in each task order issued against this contract, the Contractor shall furnish the services at each site cited in Attachment (2). The services to be

10

performed include, but are not limited to, the following: group and/or individual orientations; self-help workshops; Friend of the Court services; development of Pro Bono Referral Plans; and other services as deemed necessary by the COR.  The services shall be performed by on-site presenters, who must either be a licensed attorney or DOJ Accredited Representative, or a legal assistant/paralegal, law student, law school graduate, or other trained volunteer working under the direct supervision of such licensed attorneys or Accredited Representatives.  Specific requirements to satisfy program needs will be defined in individual task orders.

### C.5.1.3  Immigration Court Helpdesk Program (ICH)

The Contractor shall implement and oversee immigration court helpdesks (ICH) at immigration court locations determined by the COR to orient non-detained noncitizens who appear or may appear before certain immigration courts on the removal hearing process and to inform non-detained noncitizens about possible remedies and legal resources. As specified in each task order issued against this contract, the Contractor shall furnish the services at each site cited in Attachment (2).  The services to be performed include, but are not limited to, the following: group sessions; individual sessions; self-help workshops; Friend of the Court services; development of Pro Bono Referral Plans; and other services as deemed necessary by the COR.  The services shall be performed by on-site presenters, who must either be a licensed attorney or DOJ Accredited Representative, or a legal assistant/paralegal, law student, law school graduate, or other trained volunteer working under the direct supervision of such licensed attorneys or Accredited Representatives.  Specific requirements to satisfy program needs will be defined in individual task orders.

### C.5.1.4  Family Group Legal Orientation Program (FGLOP)

The Contractor shall implement and oversee legal orientation sessions to family groups who have or may have cases scheduled on EOIR's "Dedicated Dockets" in designated sites.  As specified in each task order issued against this contract, the Contractor shall furnish the services at each site cited in Attachment (2).  The services to be performed include, but are not limited to, the following: single-family and multi-family group orientations; self-help workshops; Friend of the Court services; assistance in referring cases to pro bono representatives; and other services as deemed necessary by the COR.  Specific requirements to satisfy program needs will be defined in individual task orders.

### C.5.1.5  National Qualified Representative Program (NQRP)

The Contractor shall implement and oversee legal representation and other related services to certain unrepresented adults, such as those in custody of the Department of Homeland Security ("DHS") who are in immigration proceedings and who are determined by the Government to be incompetent to represent themselves in their immigration proceedings.  The services to be performed include, but are not limited to, the following:

(a)  The Contractor shall provide legal representation via provision of a Qualified Representative, defined as a licensed attorney, a law student or law graduate directly supervised by a licensed attorney, or a DOJ Accredited Representative with full accreditation, as set forth in 8 C.F.R. §1292.1;

    (b) The Contractor shall provide other related services reasonably necessary to complete the immigration proceedings listed in the Statement of Work and/or a "release plan" when the adult is released from DHS custody; and

    (c) The Contractor shall provide other services as deemed necessary by the COR. Specific requirements to satisfy program needs will be defined in individual task orders.

## C.5.1.6 Counsel for Children Initiative (CCI)

The Contractor shall implement and oversee legal representation and other related services to certain children in removal and other specified immigration proceedings before specific EOIR Immigration Courts throughout the United States (as identified by the COR). As specified in each task order issued against this contract, the Contractor shall furnish the services at each site cited in Attachment (2). The services to be performed include, but are not limited to, the following: legal representation to certain children in removal before specific EOIR Immigration Courts throughout the United States (as identified by the Government) and in other specified immigration proceedings; and other services as deemed necessary by the COR. Specific requirements to satisfy program needs will be defined in individual task order(s).

## C.6 Quality Control

The Contractor shall perform quality control pursuant to the Quality Assurance Plan originally submitted in its pre-award proposal. The Contractor's Quality Assurance Plan shall provide a detailed description of the quality assurance measures employed to meet all of the requirements of this contract. The Contractor shall maintain and update its Quality Assurance Plan as necessary; however, any changes to the plan must be approved by the COR before being implemented.

## C.7 Phase-In

The continuing provision of legal access, orientation, and representation services specified herein is essential to continuity of the programs. Therefore, it is critical that the transition from the current operation to a new contract be accomplished in a well-planned, orderly and efficient manner. The Contractor shall be responsible for the phase-in of Contractor personnel and the assumption of ongoing tasks utilizing the Transition Plan provided by the Contractor in its proposal. Phase-in activities shall include, but not be limited to, placement of any necessary subcontracts, mobilization of staff and other resources, obtaining necessary clearances, execution of the Confidentiality Agreement included as Attachment (4), and any other activities required to put the Contractor in a position to perform this scope of work.

## C.8 Phase-Out

At the conclusion of the contract, the functions performed under the contract and any task order issued against it may convert to an in-house Government operation or may be awarded through another contractual instrument. In either case, the Contractor may be required to assist in the phase-out of this contract. The price and terms of the assistance required will be negotiated separately.

## SECTION D – PACKAGING AND MARKING

**D.1**     **Payment of Postage and Fees**

All postage and fees related to submitting information to the Contracting Officer or the Contracting Officer's Representative (COR) shall be paid by the Contractor.

**D.2**     **Preservation, Packaging, and Marking**

(a)  All information submitted to the Contracting Officer or the COR shall include the contract number.

(b)  Unless otherwise specified, all material shall be preserved, packaged, and packed in accordance with normal commercial practices to insure acceptance by common carrier and safe arrival at destination.

13

## SECTION E – INSPECTION AND ACCEPTANCE

**E.1**     **Inspection and Acceptance**

(a)  Inspection and acceptance of supplies and services to be furnished under individual task orders will be performed at the place of performance or destination, by the COR or her/his designated representative, in accordance with FAR 52.246-2, 52.246-4, or 52.246-6, as applicable.  Inspection will consist of an examination of the deliverable(s) and/or services for (1) compliance with the statement of work and/or other task order specific requirements, (2) thoroughness with respect to scope or content, and (3) quality with respect to the standards set forth in Section C or the individual task order.

(b)  The Government shall have 30 calendar days from receipt of each invoice to inspect and accept items delivered/work performed under the task order.  Rejected work and/or comments on all deliverables will be provided to the Contractor by the COR.

(c)  The Contractor shall be responsible for replacement or corrections to the work or deliverables as necessary to meet the standards of acceptance identified in the contract and the task order.  The cost to replace or correct nonconforming work or deliverables shall be borne as specified in the appropriate Section E.2 clause or as specified in the task order.

**E.2**     **Clauses Incorporated by Reference**

| Clause Number | Title |
|---|---|
| 52.246-2 | Inspection of Supplies – Fixed Price (AUG 1996) |
| 52.246-4 | Inspection of Services – Fixed Price (AUG 1996) |
| 52.246-6 | Inspection – Time and Material and Labor Hours (MAY 2001) |
| 52.246-16 | Responsibility for Supplies (APR 1984) |

14

## SECTION F – DELIVERIES OR PERFORMANCE

### F.1     Term of the Contract

The period of performance of the contract shall commence on September 1, 2022 and end on August 31, 2023.  Four (4) additional option periods of twelve (12) months may be exercised at the discretion of the Government.

### F.1.1    Option to Extend Term of Contract (FAR 52.217-9) (MAR 2000)

(a)  This contract may be extended, at the unilateral option of the Government, upon the same terms and conditions stated herein for a period of one (1) year or fractions thereof.  To exercise the option to extend the term of the contract, the Contracting Officer will issue a written modification prior to the expiration of the applicable term period.  The Government will endeavor to provide a preliminary written notice of its intent to exercise the option; however, the lack of such written notice will not in any way lessen the Government's unilateral right to extend the contract pursuant to this clause.  If such a preliminary notice is provided, it shall not be construed as an exercise of the option nor will it bind the Government to exercise the option.

(b)  If the Government exercises this option, the extended contract shall be considered to include this option clause.

(c)  The total duration of this contract, including the exercise of any options under this clause, shall not exceed 60 months.

### F.1.2    Option to Extend Services (FAR 52.217-8) (NOV 1999)

The Government may require continued performance of any services within the limits and at the rates specified in the contract.  These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor.  The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed six (6) months.  The Contracting Officer may exercise the option by written notice to the Contractor within the term of the contract.

### F.2     Place of Performance

A large percentage of the work under this contract will be performed at immigration courts throughout the United States.  Immigration courts are located in federal buildings, private buildings, correctional institutions, and DHS-operated and/or contracted detention centers and other facilities.  However, the exact location(s) will be specified in the individual task orders.

### F.3     Notice to the Government of Delays

In the event the Contractor encounters difficulty in meeting performance requirements or anticipates difficulty in complying with the work order schedule or completion date, or whenever the Contractor has knowledge that any actual or potential situation is delaying or threatens to delay the timely

15

performance of this contract, the Contractor shall immediately notify the Contracting Officer and the COR, in writing, giving pertinent details; provided, however, that this data shall be informational only in character and that this provision shall not be construed as a waiver by the Government of any delivery schedule or date, or any rights or remedies provided by law or under this contract.

**F.4    Observance of Legal Holidays/Federal Non-Work Days**

(a)  The Contractor must establish a standard holiday schedule that exactly coincides with the Government's schedule for employees working on Government site.  Holidays observed are listed below. Holidays and other non-work days are not billable unless work is requested by the Government and performed on these days.  The following is a list of Government holidays:

1.  New Year's Day;
2.  Martin Luther King Jr. Day;
3.  Presidents' Day;
4.  Memorial Day;
5.  Juneteenth National Independence Day;
6.  Independence Day;
7.  Labor Day;
8.  Columbus Day;
9.  Veterans Day;
10. Thanksgiving Day;
11. Christmas Day; and
12. Inauguration Day (every fourth year) in Washington DC metro area

(b)  No work shall be performed by Contractor personnel on Government facilities on Federal holidays or other non-work days without prior written approval of the Contracting Officer.  Work performed on holidays, weekends or other non-work days shall be billable at the "normal" unit prices.

(c)  There are certain types of irregularly occurring circumstances that prompt the Government to close its offices where Contractor personnel are working, either on a national or local basis (i.e., bomb threats, inclement weather, environmental conditions, death of a national figure or funding lapses).  In general, the Contractor will follow the same guidelines as Federal employees in the Washington, D.C. area regarding closure of the Government.  See OPM's website, http://www.opm.gov, and Operating Status, which will show the daily status if Federal Government Washington, D.C. offices are open/closed, or if opening on a late arrival basis.  When a Government closure is announced prior to the start of any workday, the Government is not obligated to pay the Contractor for that particular day.  When a Government closure is announced after the start of the workday, the Contractor will be paid for a full eight hours for all labor category positions filled at the start of the day, after the COR's coordination with the ACO.  If a "late arrival" notice is announced, the Contractor will be paid minus the time designated in the late arrival notification.  For instance, if

16

the late arrival notification states a two hour delay, then two hours would be deducted from a full eight hours.

(d)  During a Government closure, some Contractor employees may be designated as essential and will be required to work.  The determination as to which employees (or positions) are considered essential will be made by the COR in consultation with the IDIQ Program Manager.

**F.5**    <u>**Clauses Incorporated by Reference**</u>

| Clause Number | Title |
|---|---|
| 52.242-15 | Stop-Work Order (AUG 1989) |
| 52.242-17 | Government Delay of Work (APR 1984) |
| 52.247-34 | F.O.B. Destination (NOV 1991) |

17

## SECTION G – CONTRACT ADMINISTRATION DATA

**G.1    Responsibilities for Contract Administration**

**G.1.1    Contracting Officer (CO)**

(a)  The Contracting Officer has the overall responsibility for the administration of this contract. The Contracting Officer alone, without delegation, is authorized to take actions on behalf of the Government to amend, modify or deviate from the contract terms, conditions, requirements, specifications, details and/or delivery schedules.  However, the Contracting Officer may delegate certain other responsibilities to their authorized representative.

(b)  This contract will be administered by:



(c)  Written communications shall  refer to the contract number and shall be mailed to the above address.

**G.1.2    Contracting Officer's Representative (COR)**

(a)  Upon award, a Contracting Officer's Representative (COR) will be designated to coordinate the technical aspects of this contract and inspect items/services furnished hereunder; however, the COR shall not be authorized to change any terms and conditions of the contract, including price.

(b)  The performance of work required herein shall be subject to the technical direction of the cognizant COR or their designee with respect to technical matters pertaining hereto.  As used herein, "Technical Direction" is direction to the Contractor that fills in details, suggests possible lines of inquiry, or otherwise supplements the scope of work.  "Technical Direction" must be confined to the general scope of work set forth herein and shall not constitute a new assignment, nor supersede or modify any other Clause of this contract.  To be valid, technical direction:

(1)  must be issued in writing consistent with the general scope of work set forth in the contract;

(2)  shall not change the expressed terms, conditions, or specifications incorporated into this contract; and

18

      (3)  shall not constitute a basis for extension to the contract delivery schedule or contract price.

  (c)  The COR is authorized to:

     (1)  Act as liaison and to coordinate contractor/government activities;

     (2)  Arrange for and coordinate the use of government resources (personnel, space, documents, etc.);

     (3)  Provide technical guidance in the performance of the contract; and

     (4)  Receive, review and approve (but not reject or deny) progress reports, selected invoices and final reports or other functions of a technical nature.

  (e)  The COR has the responsibility to inspect all deliverables and authorization to certify (but not reject or deny) invoices for payment in accordance with Section G.5.  The authority to reject or deny performance and associated invoice payment is expressly reserved for the Contracting Officer.

  (f)  The COR does not have the authority to alter the Contractor's obligations under the contract; direct changes that fall within the purview of the clause entitled "Changes" and/or modify any of the expressed terms, conditions, specifications, or price of the contract.  If as a result of technical discussions, it is desirable to alter/change contractual obligations or the Specification/Work Statement, the Contracting Officer shall issue such changes in writing and signed.

  (g)  The COR assigned cognizance of this contract is:



  (h)  A copy of certain written communications shall be concurrently mailed or otherwise furnished to the Contracting Officer at the address set forth in Clause G.1.1.

### G.1.3  Security Programs Manager

  (a)  Upon contract award, a Security Programs Manager (SPM) will be designated to coordinate those aspects of this contract which pertain to obtaining and maintaining security clearances at the appropriate levels for contractor personnel performing hereunder.

(b)  During the pre-award phase of this contract, the SPM is responsible for performing the following duties:

(1)  Provide the Contracting Officer with the appropriate contractor personnel security screening requirements (including waiver requirements, if appropriate) and background investigations (BI) requirements for obtaining services of non-Federal employees under the resultant contract and orders.

(2)  Determine the risk level for each contractor position.  The risk level must be based on an overall assessment of the damage that an untrustworthy contractor could cause to the efficiency or the integrity of Departmental operations.  The SPM shall provide this information to the Contracting Officer for inclusion in the resultant contract.

(3)  Certify that the personnel security requirements of the contract are adequate to ensure the security of Departmental operations, information and personnel.  The SPM shall provide this written certification to the Contracting Officer prior to release of the Request for Proposals.

(c)  The SPM for this contract is:



(d)  The personnel security requirements of this contract are set forth in Section H.4 of the contract.

(e)  Following award of this contract, the SPM shall ensure that the personnel security requirements set forth herein are followed.  In addition, the SPM shall comply with the supplemental guidelines provided by the Contracting Officer.

**G.2    Contractor Representative(s)**

(a)  The Contractor's Representative(s) to be contacted for all contract administration matters.



20

(b)  The Contractor's Representative(s) shall be responsible for all contract administration issues and shall act as the central point of contact with the Government for all such issues.  The representative(s) shall have full authority to act for the contractor in all contractual matters.

## G.3    Payment

### G.3.1    General Invoice Requirements

(a)  The Contractor shall render invoices not more frequently than monthly, in an original only (i.e., one copy only) to the COR at the address listed in Section G.1.2.  To constitute a proper invoice, the following information and/or attached documentation shall be included with the invoice (as applicable):

> (1)  Name and address of the Contractor
> (2)  Invoice date
> (3)  Contract number
> (4)  Task order number
> (5)  CLIN number and description, quantity, unit price and extended total for the period covered (see also paragraph (b) below)
> (6)  Shipping and payment terms
> (7)  Name and address of Contractor official to whom payment is to be sent (must be the same as that in the contract or in a proper notice of assignment)
> (8)  Taxpayer Identification Number
> (9)  DUNS Number

(b)  In addition to the invoice requirements listed in paragraph (a) above, each invoice shall include (as applicable):

> (1)  For task orders with labor hour costs, actual direct labor hours expended by each individual (fractional parts of an hour shall be rounded to the nearest one-half (1/2) hour or lesser fraction in computing the amount payable) multiplied by the appropriate unit price (hourly rate) from the applicable CLIN.

> (2)  Itemization of all actual ODCs being claimed in accordance with Part 31 of the FAR with supporting documentation as requested by the COR. The appropriate multiplier (administrative handling charge) from the pricing table shall be included.

> (3)  Total cost for each CLIN category shall be shown as a whole dollar/cent value. Computations that equal a fractional value of a cent shall be rounded up or down accordingly to the nearest whole cent (.005 or less round down).

(c)  The COR will certify the hours worked, ODC items (if any), and satisfactory completion of all work and services billed.  Negative inspection results will be reported immediately to the Contractor and Contracting Officer.

21

(d)  Each program Statement of Work may include additional invoice requirements.

(e) Payment will be made on a monthly basis in accordance with the clause entitled "Payments under Time-and-Materials and Labor-Hour Contracts" (see Section I.2, Clause 52.232-7).  Please note that the Contractor must submit all invoices to the address in Section G.1.2.

## G.3.2   Interest on Overdue Payments

(a)  The FAR clause entitled "Prompt Payment" (see Section I.2, Clause 52.232-25) is applicable to payment under this contract and requires interest on overdue payment and improperly taken discounts. Determinations of interest due will be made in accordance with the provisions of the prompt payment clause as modified by paragraph (b) below.

(b)  Subdivision (a)(5)(i) of the Prompt Payment clause is  modified to specify the following period for constructive acceptance by the Government:  The Government agrees to inspect and determine the acceptability of services rendered in accordance with Section E.1 of this contract.  For the purpose of determining the due date for payment and for no other purpose, acceptance will be deemed to occur on the last day of the above stated inspection period.  However, the Contractor is not entitled to payment of contract amounts or interest unless and until actual acceptance occurs.  If the services are deficient, the provisions of this clause will apply to the date the Contractor corrects the deficiencies in services.

Admin. Rec.65

## SECTION H – SPECIAL CONTRACT REQUIREMENTS

**H.1     Contract Type**

This is a fixed unit price, indefinite-delivery, indefinite-quantity contract.  Individual orders may be issued on a firm-fixed price, time-and-materials, or labor-hour basis, or any combination thereof.

**H.2     Ordering**

**H.2.1   General**

(a) Services to be furnished under this contract shall be ordered or confirmed by the placement of an order by the Contracting Officer as set forth in this Section.  Such orders may be issued anytime during the term of this contract (see Section F.1).  All orders will be issued in writing.  All orders are subject to the terms and conditions of this contract.  In the event of a conflict between an order and this contract, the contract shall control.

(b) Only the Justice Management Division, Procurement Services Staff, is authorized to place orders directly with the Contractor.

(c) There are no minimum or maximum dollar amount limitations for individual orders placed under this contract.  The maximum aggregate amount of all orders placed under this contract is specified in Section B.2.

(d) Any order issued during the effective period of this contract and not completed within that period shall be completed by the Contractor within the time specified in the order.  In no event shall the completion date for any order extend beyond one year after the expiration date of the contract.  In such instances, the contract shall govern the Contractor's and Government's rights and obligations with respect to that order to the same extent as if the order were completed during the contract's effective period; provided that the Contractor shall not be required to make any deliveries under this contract after the final period of performance specified in the order.

(e) Orders may be issued for a one year period of multiple years.  For any order issued for a one year period involving a requirement that remains active beyond one year, the Contracting Officer may either issue a new order at the end of the order period or extend the performance of the order via contract modification.

(f) Request for Task Order Proposal.  When a requirement within the scope of work for this contract is identified, the Contracting Officer will transmit to the Contractor a Request for Task Order Proposal (RFTOP).  By the date specified in the RFTOP, the Contractor shall deliver to the Contracting Officer a written proposal that provides the technical and pricing information required by the RFTOP. The Government will review the proposal and comment as necessary.

**H.2.2   Order Content**

Each order issued under this contract will include the following information as applicable:

23

(1)      Contract number and order number;
(2)      Date of the order;
(3)      Program name and title/description;
(4)      Description of the work to be performed;
(5)      Work schedule, period of performance or required completion date;
(6)      Place of delivery or performance;
(7)      Reporting requirements and deliverables;
(8)      CLIN number and description, quantity, unit price and extended total;
(9)      Firm fixed price to complete the requirements and/or the ceiling price for those tasks to be performed on a not-to-exceed or time-and-materials or labor-hour basis;
(10)    Security requirements; and
(11)    Accounting and appropriation data.

## H.3    Prohibition against Soliciting and Performing Personal Services

(a)  The performance of personal services under this contract is strictly prohibited.

(b)  Personal service contracting is described in Section 37.104 of the Federal Acquisition Regulations (FAR).  There are a number of factors, when taken individually or collectively, which may constitute personal services.  Each contract arrangement must be judged in light of its own facts and circumstances, but the question relative to personal services is:  Will the Government exercise relatively continuous supervision and control over the contractor personnel performing this contract?

(c)  The Government and the Contractor understand and agree that the support services to be delivered under this contract are non-personal services in nature; that is, no employer-employee relationships exist or will exist under the contract between the Government and the Contractor or between the Government and the Contractor's employees.

(d)  Contractor personnel under this contract shall not:

(1) Be placed in a position where they are appointed or employed by a Federal employee, or are under the supervision, direction, or evaluation of a Federal employee.

(2) Be placed in a Federal staff or policy making position.

(3) Be placed in a position of supervision, direction, or evaluation over DOJ personnel, or personnel of other contractors, or become a part of a government organization.

(e)  Employee Relationship

(1) The services to be performed under this contract do not require the contractor or its employees to exercise personal judgment and discretion on behalf of the Government.

(2) Rules, regulations, direction, and requirements which are issued by DOJ management under their responsibility for good order, administration, and security are applicable to all personnel who enter a Government installation.  This is not to be construed or interpreted

24

to establish any degree of Government control which is inconsistent with a non-personal services contract.

(3) The Contractor shall immediately advise the Contracting Officer if the Contractor or its employees are directed by any Government employee to perform work that the Contractor believes constitutes personal services.

(f)  The Contractor shall appoint a Quality Assurance (QA) Manager who will be the contractor's authorized representative for technical and administrative performance of all services required hereunder. The QA Manager shall provide the single point of contact through which all contractor/government communications, work, and technical direction shall flow.  The QA Manager shall receive and execute, on behalf of the Contractor, such technical direction as the COR may issue within the terms and conditions of the contract.  All administrative support of contractor technical personnel required to fulfill the tasks assigned under this contract shall be the responsibility of the contractor.

## H.4    Personnel Security Requirements for Contractor Employees (NOV 2021); (Alt. I) – Classified Information – Cleared Contractors

Work performed under this contract will involve any one or more of the following: access to DOJ Information, which may include Controlled Unclassified Information (CUI), i.e., unclassified, sensitive DOJ information, and/or access to DOJ Information Technology (IT) systems, and/or unescorted access to DOJ space or facilities.  Contractor employees will occupy Public Trust Positions, unless clause alternates are applied.

_____(Check if applicable) Access to/safeguarding of classified information will be required. Alternate I sections also apply

### H.4.1    General Requirements

(a)(1) All references to "contract(or) personnel" and "contract(or) employee" in this clause means all individuals, without limitation, to include individuals employed by the contractor, team member, subcontractor, consultant, and/or independent contractor, who will have access to information of the Department of Justice (DOJ) or information that is within the custody and control of the DOJ, access to DOJ IT systems, and/or unescorted access to DOJ facilities/space in connection with the performance of this contract.  "Employment" as used herein does not create nor imply an employer/employee relationship between the DOJ and contractor employees.

*(Alt. I) [The following is added to the clause]: (2) Additionally, work performed under this contract will involve access to classified information [National Security Information (NSI)].*

(b)(1) The type of security investigation required for each contractor employee will be governed by the type and risk level of information made available to the contractor employee.  The contractor will not be permitted to commence performance under this contract until a sufficient number of its personnel, as determined by the Security Programs Manager (SPM), in consultation with the Contracting Officer's Representative if one is appointed, have received the requisite security approval.

25

*(Alt. I) [The following is added to the Clause]: (2) All contractor employees requiring access to classified information will be processed by Defense Counterintelligence and Security Agency (DCSA) in accordance with the National Industrial Security Program (NISP). The contractor will not be permitted to commence performance under this contract until a sufficient number of its personnel, as determined by the SPM in consultation with the Contracting Officer's Representative (COR) if one is appointed, have received the requisite NSI Clearance.*

(c) Except where specifically noted otherwise, the federal government will be responsible for the cost and conduct of the investigation.

(d) The contractor shall ensure that no contractor employee commences performance prior to receipt of a written authorization from the contracting officer, COR, or the SPM that performance by the respective contractor employee is authorized.

(e) The data and other information to which the contractor may have access as a result of this contract is the property of, and/or within the custody and control of, the Department, and its disclosure to third parties is governed by various statutes and regulations, the violation of which may subject the discloser to criminal penalties.

(f) The Contractor is responsible for verifying that all non-U.S. citizens performing work under this contract are legally authorized to work in the United States.

**H.4.2**  *Removed*

**H.4.3**  __Background Investigation Requirements.__ A National Crime Information Center (NCIC) check will be performed on every individual providing services under this contract.  The NCIC check provides information regarding criminal history.  Information provided in this check, or lack thereof, will be used to determine the individual's fitness to perform work under this contract.

**H.4.4**  __Background Investigation Process__

(a) The contractor will be required to submit to the COR the full name, date of birth and social security number of each individual being considered for work under this contract.  Upon award, the contractor will be provided with the format required for this submission.

(b) The SPM will notify the COR of their final fitness determination.

(c) The COR will notify the contractor of the results of the NCIC check, including any individual who is found ineligible to perform work under the contract.  For any individual found ineligible to perform work under the contract on a Department contract, the contractor shall propose a replacement.

**H.4.5**  *Removed*

Admin. Rec.69

**H.4.6   Employee Reporting Requirements**

(a) All contractor employees must sign the DOJ *Self-Reporting Requirements for All Contractor Personnel* statement acknowledging and accepting the DOJ requirement that they immediately self-report certain information.  The COR will provide the Self-Reporting statement, a list of reportable information and the form for reporting, to the contractor employee before commencing work under the contract.

(b) The COR and SPM will review the written report and documentation and make a determination regarding continued fitness to work under a DOJ contract.

**H.4.7   Replacement Personnel**

(a) The contractor shall make every effort to avoid costs to the government for security investigations for replacement of contractor employees, and in so doing shall ensure that otherwise satisfactorily performing and physically able contractor employees remain in contract performance for the duration of the contract.  The contractor shall take all necessary steps to ensure that contractor personnel who are selected for assignment to this contract are professionally qualified and personally reliable, of reputable background and sound character, and able to meet all other requirements stipulated in the contract.

(b) The fact that the government performs security investigations shall not in any manner relieve the contractor of its responsibility to ensure that all contract personnel are reliable and of reputable background and sound character.  Should a security investigation conducted by the government and/or a contractor's self-report or failure to self-report render ineligible a contractor employee, the contracting officer will determine whether the contractor has violated this clause.  The contracting officer may direct the contractor, at its own expense, to remove and replace any contractor personnel who fails to comply with or violates applicable requirements of this contract.  Such action may be taken at the government's direction without prejudice to its rights under any other provision of this contract, including termination for default, and the contractor may be held liable, at a minimum, for all reasonable and necessary costs incurred by the government to (i) provide coverage (performance) through assignment of individuals employed by the government or third parties in those cases where absence of contractor personnel would cause either a security threat or DOJ program disruption and (ii) conduct security investigations in excess of those which would otherwise be required.

(c) Nothing in this clause shall require the contractor to bear costs involved in the conduct of security investigations for replacement of a contractor employee who separates from the contractor of his/her own accord, is incapacitated, or is deceased.

(d) The contractor shall comply with the terms and conditions set forth under this clause and assumes all liability for failure to comply.  The rights and remedies conferred upon the government by this clause are in addition to all and other rights and remedies pursuant to the contract and as established by law.

27

*In reference to the following clause, Section H.5 titled 'Security of Department Information and Systems', be advised that the phone number to report a security incident has changed (refer to f. titled 'Information System Security Breach or Incident', paragraphs 2. and 3.b.). The number to call to report an incident is 202-357-7000 and the email address is JSOC@usdoj.gov. The timeframes for reporting an incident remain unchanged and you are still required to notify the Contracting Officer and COR of the incident.*

## H.5    Security of Department Information and Systems

a. Applicability to Contractors and Subcontractors

This clause applies to all contractors and subcontractors, including cloud service providers ("CSPs"), and personnel of contractors, subcontractors, and CSPs (hereinafter collectively, "Contractor") that may access, collect, store, process, maintain, use, share, retrieve, disseminate, transmit, or dispose of DOJ Information within 180 days after contract award. It establishes and implements specific DOJ requirements applicable to this Contract. The requirements established herein are in addition to those required by the Federal Acquisition Regulation ("FAR"), including FAR 11.002(g) and 52.239-1, the Privacy Act of 1974, and any other applicable laws, mandates, Procurement Guidance Documents, and Executive Orders pertaining to the development and operation of Information Systems and the protection of Government Information. This clause does not alter or diminish any existing rights, obligation or liability under any other civil and/or criminal law, rule, regulation or mandate.

b. General Definitions

1. Information means any communication or representation of knowledge such as facts, data, or opinions, in any form or medium, including textual, numerical, graphic, cartographic, narrative, or audiovisual. Information includes information in an electronic format that allows it be stored, retrieved or transmitted, also referred to as "data," and "personally identifiable information" ("PII"), regardless of form.

2. Personally Identifiable Information (or PII) means any information about an individual maintained by an agency, including, but not limited to, information related to education, financial transactions, medical history, and criminal or employment history and information, which can be used to distinguish or trace an individual's identity, such as his or her name, social security number, date and place of birth, mother's maiden name, biometric records, etc., including any other personal information which is linked or linkable to an individual.

3. DOJ Information means any Information that is owned, produced, controlled, protected by, or otherwise within the custody or responsibility of the DOJ, including, without limitation, Information related to DOJ programs or personnel. It includes, without limitation, Information (1) provided by or generated for the DOJ, (2) managed or acquired by the Contractor for the DOJ in connection with the performance of the contract, and/or (3) acquired in order to perform the contract.

4. Information System means any resources, or set of resources organized for accessing, collecting, storing, processing, maintaining, using, sharing, retrieving, disseminating, transmitting, or disposing of (hereinafter collectively, "processing, storing, or transmitting") Information.

28

5. Covered Information System means any information system used for, involved with, or allowing, the processing, storing, or transmitting of DOJ Information.

c. Confidentiality and Non-disclosure of DOJ Information

1. Preliminary and final deliverables and all associated working papers and material generated by the Contractor containing DOJ Information are the property of the U.S. Government and must be submitted to the Contracting Officer ("CO") or the CO's Representative ("COR") at the conclusion of the contract. The U.S. Government has unlimited data rights to all such deliverables and associated working papers and materials in accordance with FAR 52.227-14.

2. All documents produced in the performance of this contract containing DOJ Information are the property of the U.S. Government and Contractor shall neither reproduce nor release to any third-party at any time, including during or at expiration or termination of the contract without the prior written permission of the CO.

3. Any DOJ information made available to the Contractor under this contract shall be used only for the purpose of performance of this contract and shall not be divulged or made known in any manner to any persons except as may be necessary in the performance of this contract. In performance of this contract, the Contractor assumes responsibility for the protection of the confidentiality of any and all DOJ Information processed, stored, or transmitted by the Contractor. When requested by the CO (typically no more than annually), the Contractor shall provide a report to the CO identifying, to the best of the Contractor's knowledge and belief, the type, amount, and level of sensitivity of the DOJ Information processed, stored, or transmitted under the Contract, including an estimate of the number of individuals for whom PII has been processed, stored or transmitted under the Contract and whether such information includes social security numbers (in whole or in part).

d. Compliance with Information Technology Security Policies, Procedures and Requirements

1. For all Covered Information Systems, the Contractor shall comply with all security requirements, including but not limited to the regulations and guidance found in the Federal Information Security Management Act of 2014 ("FISMA"), Privacy Act of 1974, E-Government Act of 2002, National Institute of Standards and Technology ("NIST") Special Publications ("SP"), including NIST SP 800-37, 800-53, and 800-60 Volumes I and II, Federal Information Processing Standards ("FIPS") Publications 140-2, 199, and 200, OMB Memoranda, Federal Risk and Authorization Management Program ("FedRAMP"), DOJ IT Security Standards, including DOJ Order 0904, as amended. These requirements include but are not limited to:

a. Limiting access to DOJ Information and Covered Information Systems to authorized users and to transactions and functions that authorized users are permitted to exercise;

b. Providing security awareness training including, but not limited to, recognizing and reporting potential indicators of insider threats to users and managers of DOJ Information and Covered Information Systems;

29

c.  Creating, protecting, and retaining Covered Information System audit records, reports, and supporting documentation to enable reviewing, monitoring, analysis, investigation, reconstruction, and reporting of unlawful, unauthorized, or inappropriate activity related to such Covered Information Systems and/or DOJ Information;

d.  Maintaining authorizations to operate any Covered Information System;

e.  Performing continuous monitoring on all Covered Information Systems;

f.  Establishing and maintaining baseline configurations and inventories of Covered Information Systems, including hardware, software, firmware, and documentation, throughout the Information System Development Lifecycle, and establishing and enforcing security configuration settings for IT products employed in Information Systems;

g.  Ensuring appropriate contingency planning has been performed, including DOJ Information and Covered Information System backups;

h.  Identifying Covered Information System users, processes acting on behalf of users, or devices, and authenticating and verifying the identities of such users, processes, or devices, using multifactor authentication or HSPD-12 compliant authentication methods where required;

i.  Establishing an operational incident handling capability for Covered Information Systems that includes adequate preparation, detection, analysis, containment, recovery, and user response activities, and tracking, documenting, and reporting incidents to appropriate officials and authorities within the Contractor's organization and the DOJ;

j.  Performing periodic and timely maintenance on Covered Information Systems, and providing effective controls on tools, techniques, mechanisms, and personnel used to conduct such maintenance;

k.  Protecting Covered Information System media containing DOJ Information, including paper, digital and electronic media; limiting access to DOJ Information to authorized users; and sanitizing or destroying Covered Information System media containing DOJ Information before disposal, release or reuse of such media;

l.  Limiting physical access to Covered Information Systems, equipment, and physical facilities housing such Covered Information Systems to authorized U.S. citizens unless a waiver has been granted by the Contracting Officer ("CO"), and protecting the physical facilities and support infrastructure for such Information Systems;

m.  Screening individuals prior to authorizing access to Covered Information Systems to ensure compliance with DOJ Security standards;

n.  Assessing the risk to DOJ Information in Covered Information Systems periodically,

30

including scanning for vulnerabilities and remediating such vulnerabilities in accordance with DOJ policy and ensuring the timely removal of assets no longer supported by the Contractor;

o.  Assessing the security controls of Covered Information Systems periodically to determine if the controls are effective in their application, developing and implementing plans of action designed to correct deficiencies and eliminate or reduce vulnerabilities in such Information Systems, and monitoring security controls on an ongoing basis to ensure the continued effectiveness of the controls;

p.  Monitoring, controlling, and protecting information transmitted or received by Covered Information Systems at the external boundaries and key internal boundaries of such Information Systems, and employing architectural designs, software development techniques, and systems engineering principles that promote effective security; and

q.  Identifying, reporting, and correcting Covered Information System security flaws in a timely manner, providing protection from malicious code at appropriate locations, monitoring security alerts and advisories and taking appropriate action in response.

2.  The Contractor shall not process, store, or transmit DOJ Information using a Covered Information System without first obtaining an Authority to Operate ("ATO") for each Covered Information System. The ATO shall be signed by the Authorizing Official for the DOJ component responsible for maintaining the security, confidentiality, integrity, and availability of the DOJ Information under this contract. The DOJ standards and requirements for obtaining an ATO may be found at DOJ Order 0904, as amended. (For Cloud Computing Systems, see Section V, below.)

3.  The Contractor shall ensure that no non-U.S. citizen accesses or assists in the development, operation, management, or maintenance of any DOJ Information System, unless a waiver has been granted by the DOJ Component Head (or his or her designee) responsible for the DOJ Information System, the DOJ Chief Information Officer, and the DOJ Security Officer.

4.  When requested by the DOJ CO or COR, or other DOJ official as described below, in connection with the DOJ's efforts to ensure compliance with security requirements and to maintain and safeguard against threats and hazards to the security, confidentiality, integrity, and availability of DOJ Information, the Contractor shall provide the DOJ, including the Office of Inspector General ("OIG") and Federal law enforcement components, (1) access to any and all information and records, including electronic information, regarding a Covered Information System, and (2) physical access to Contractor's facilities, installations, systems, operations, documents, records, and databases. Such access may include independent validation testing of controls, system penetration testing, and FISMA data reviews by the DOJ or agents acting on behalf of the DOJ, and such access shall be provided within 72 hours of the request. Additionally, the Contractor shall cooperate with the DOJ's efforts to ensure, maintain, and safeguard the security, confidentiality, integrity, and availability of DOJ Information.

5.  The use of Contractor-owned laptops or other portable digital or electronic media to process or store DOJ Information covered by this clause is prohibited until the Contractor provides a letter to the DOJ CO, and obtains the CO's approval, certifying compliance with the following

31

requirements:

    a. Media must be encrypted using a NIST FIPS 140-2 approved product;

    b. The Contractor must develop and implement a process to ensure that security and other applications software is kept up-to-date;

    c. Where applicable, media must utilize antivirus software and a host-based firewall mechanism;

    d. The Contractor must log all computer-readable data extracts from databases holding DOJ Information and verify that each extract including such data has been erased within 90 days of extraction or that its use is still required. All DOJ Information is sensitive information unless specifically designated as non-sensitive by the DOJ; and,

    e. A Rules of Behavior ("ROB") form must be signed by users. These rules must address, at a minimum, authorized and official use, prohibition against unauthorized users and use, and the protection of DOJ Information. The form also must notify the user that he or she has no reasonable expectation of privacy regarding any communications transmitted through or data stored on Contractor-owned laptops or other portable digital or electronic media.

6. Contractor-owned removable media containing DOJ Information shall not be removed from DOJ facilities without prior approval of the DOJ CO or COR.

7. When no longer needed, all media must be processed (sanitized, degaussed, or destroyed) in accordance with DOJ security requirements.

8. The Contractor must keep an accurate inventory of digital or electronic media used in the performance of DOJ contracts.

9. The Contractor must remove all DOJ Information from Contractor media and return all such information to the DOJ within 15 days of the expiration or termination of the contract, unless otherwise extended by the CO, or waived (in part or whole) by the CO, and all such information shall be returned to the DOJ in a format and form acceptable to the DOJ. The removal and return of all DOJ Information must be accomplished in accordance with DOJ IT Security Standard requirements, and an official of the Contractor shall provide a written certification certifying the removal and return of all such information to the CO within 15 days of the removal and return of all DOJ Information.

10. DOJ, at its discretion, may suspend the Contractor's access to any DOJ Information, or terminate the contract, when DOJ suspects that the Contractor has failed to comply with any security requirement, or in the event of an Information System Security Incident (see Section V.E. below), where the Department determines that either event gives cause for such action. The suspension of access to DOJ Information may last until such time as the DOJ, in its sole discretion, determines

that the situation giving rise to such action has been corrected or no longer exists. The Contractor understands that any suspension or termination in accordance with this provision shall be at no cost to the DOJ, and that upon request by the CO, the Contractor must immediately return all DOJ Information to the DOJ, as well as any media upon which DOJ Information resides, at the Contractor's expense.

e. Cloud Computing

1. Cloud computing means an Information System having the essential characteristics described in NIST SP 800-145, *The NIST Definition of Cloud Computing.* For the sake of this provision and clause, Cloud Computing includes Software as a Service, Platform as a Service, and Infrastructure as a Service, and deployment in a Private Cloud, Community Cloud, Public Cloud, or Hybrid Cloud.

2. Contractor may not utilize the Cloud system of any CSP unless:

   a. The Cloud system and CSP have been evaluated and approved by a 3PAO certified under FedRAMP and Contractor has provided the most current Security Assessment Report ("SAR") to the DOJ CO for consideration as part of Contractor's overall System Security Plan, and any subsequent SARs within 30 days of issuance, and has received an ATO from the Authorizing Official for the DOJ component responsible for maintaining the security confidentiality, integrity, and availability of the DOJ Information under contract; or,

   b. If not certified under FedRAMP, the Cloud System and CSP have received an ATO signed by the Authorizing Official for the DOJ component responsible for maintaining the security, confidentiality, integrity, and availability of the DOJ Information under the contract.

3. The Contractor must ensure that the CSP allows the DOJ to access and retrieve any DOJ Information processed, stored or transmitted in a Cloud system under this Contract within a reasonable time of any such request, but in no event less than 48 hours from the request. To ensure that the DOJ can fully and appropriately search and retrieve DOJ Information from the Cloud system, access shall include any schemas, meta-data, and other associated data artifacts.

f. Information System Security Breach or Incident

1. Definitions

   a. Confirmed Security Breach (hereinafter, "Confirmed Breach") means any confirmed unauthorized exposure, loss of control, compromise, exfiltration, manipulation, disclosure, acquisition, or accessing of any Covered Information System or any DOJ Information accessed by, retrievable from, processed by, stored on, or transmitted within, to or from any such system.

   b. Potential Security Breach (hereinafter, "Potential Breach") means any suspected, but unconfirmed, Covered Information System Security Breach.

33

    c.  Security Incident means any Confirmed or Potential Covered Information System Security Breach.

2.  **Confirmed Breach.** Contractor shall immediately (and in no event later than within 1 hour of discovery) report any Confirmed Breach to the DOJ CO and the CO's Representative ("COR"). If the Confirmed Breach occurs outside of regular business hours and/or neither the DOJ CO nor the COR can be reached, Contractor must call DOJ-CERT at 1-866-US4-CERT (1-866-874-2378) immediately (and in no event later than within 1 hour of discovery of the Confirmed Breach), and shall notify the CO and COR as soon as practicable.

3.  **Potential Breach.**

    a.  The Contractor shall report any Potential Breach within 72 hours of detection to the DOJ CO and the COR, *unless* the Contractor has (a) completed its investigation of the Potential Breach in accordance with its own internal policies and procedures for identification, investigation and mitigation of Security Incidents and (b) determined that there has been no Confirmed Breach.

    b.  If the Contractor has not made a determination within 72 hours of detection of the Potential Breach whether a Confirmed Breach has occurred, the Contractor shall report the Potential Breach to the DOJ CO and COR within one (1) hour (i.e., 73 hours from detection of the Potential Breach). If the time by which to report the Potential Breach occurs outside of regular business hours and/or neither the DOJ CO nor the COR can be reached, Contractor must call the DOJ Computer Emergency Readiness Team (DOJ-CERT) at 1-866-US4-CERT (1-866-874-2378) within one hour (i.e., 73 hours from detection of the Potential Breach) and contact the DOJ CO and COR as soon as practicable.

4.  Any report submitted in accordance with paragraphs (B) and (C), above, shall identify (1) both the Information Systems and DOJ Information involved or at risk, including the type, amount, and level of sensitivity of the DOJ Information and, if the DOJ Information contains PII, the estimated number of unique instances of PII, (2) all steps and processes being undertaken by Contractor to minimize, remedy, and/or investigate the Security Incident, (3) any and all other information as required by the US-CERT Federal Incident Notification Guidelines, including the functional impact, information impact, impact to recoverability, threat vector, mitigation details, and all available incident details; and (4) any other information specifically requested by the DOJ. Contractor shall continue to provide written updates to the DOJ CO regarding the status of the Security Incident at least every three (3) calendar days until informed otherwise by the DOJ CO.

5.  All determinations regarding whether and when to notify individuals and/or federal agencies potentially affected by a Security Incident will be made by DOJ senior officials or the DOJ Core Management Team at DOJ's discretion.

6.  Upon notification of a Security Incident in accordance with this section, Contractor must provide to DOJ full access to any affected or potentially affected facility and/or Information System, including access by the DOJ OIG and Federal law enforcement organizations, and undertake any

34

and all response actions DOJ determines are required to ensure the protection of DOJ Information, including providing all requested images, log files, and event information to facilitate rapid resolution of any Security Incident.

7.  DOJ, at its sole discretion, may obtain, and Contractor will permit, the assistance of other federal agencies and/or third party contractors or firms to aid in response activities related to any Security Incident. Additionally, DOJ, at its sole discretion, may require Contractor to retain, at Contractor's expense, a Third Party Assessing Organization (3PAO), acceptable to DOJ, with expertise in incident response, compromise assessment, and federal security control requirements, to conduct a thorough vulnerability and security assessment of all affected Information Systems.

8.  Response activities related to any Security Incident undertaken by DOJ, including activities undertaken by Contractor, other federal agencies, and any third-party contractors or firms at the request or direction of DOJ, may include inspections, investigations, forensic reviews, data analyses and processing, and final determinations of responsibility for the Security Incident and/or liability for any additional response activities. Contractor shall be responsible for all costs and related resource allocations required for all such response activities related to any Security Incident, including the cost of any penetration testing.

g. Personally Identifiable Information Notification Requirement

Contractor certifies that it has a security policy in place that contains procedures to promptly notify any individual whose Personally Identifiable Information ("PII") was, or is reasonably determined by DOJ to have been, compromised. Any notification shall be coordinated with the DOJ CO and shall not proceed until the DOJ has made a determination that notification would not impede a law enforcement investigation or jeopardize national security. The method and content of any notification by Contractor shall be coordinated with, and subject to the approval of, DOJ. Contractor shall be responsible for taking corrective action consistent with DOJ Data Breach Notification Procedures and as directed by the DOJ CO, including all costs and expenses associated with such corrective action, which may include providing credit monitoring to any individuals whose PII was actually or potentially compromised.

h. Pass-through of Security Requirements to Subcontractors and CSPs

The requirements set forth in the preceding paragraphs of this clause apply to all subcontractors and CSPs who perform work in connection with this Contract, including any CSP providing services for any other CSP under this Contract, and Contractor shall flow down this clause to all subcontractors and CSPs performing under this contract. Any breach by any subcontractor or CSP of any of the provisions set forth in this clause will be attributed to Contractor.

## H.6    **Confidentiality of Data**

(a)  Duplication or disclosure of the data and other information to which the Contractor will have access as a result of this contract is prohibited, unless authorized by the Contracting Officer or as required for performance of this contract.  This provision does not apply to data or other information obtained from individuals served under this contract for purposes of referral to potential pro bono counsel.  The terms "Contractor" and "contract employee" in this clause include all entities and individuals that will perform under this contract requiring access to sensitive unclassified information, including the Contractor, team

35

member, subcontractor, consultant, and/or independent contractor. It is understood that throughout performance of this contract, the Contractor will have access to confidential data which is either the sole property of the Department of Justice or is the sole property of other than the contracting parties. The Contractor agrees to maintain the confidentiality of all data to which access may be gained throughout performance of this contract, whether title thereto vests in the Department of Justice or otherwise. The Contractor agrees not to disclose or divulge any such information except to persons who:

> Have a DOJ security clearance,
> Have signed the Confidentiality Agreement, and
> Have a need to know.

This limitation specifically applies to the contractor's management chain, or personnel who have access to sensitive unclassified information.

(b)  The Contractor agrees to not disclose said data, any interpretations and/or translations thereof, or data derivative there from, to unauthorized parties in contravention of these provisions, without the prior written approval of the Contracting Officer or the party in which title thereto is wholly vested.  The Contractor may be held responsible for any violations of confidentiality.

(c)  The Contractor agrees that upon termination of the contract, he has no property or possessory right to any of the correspondence, files or materials, of whatever kind and description, or any copies or duplicates of such, whether developed/prepared by him or furnished by the technical office in connection with the performance of this contract; and that, upon demand, the Contractor will surrender immediately to the COR such items, matters, materials, and copies, except where protected by Institutional Review Board (IRB) restrictions, attorney/client privilege and other applicable laws, or where the information is collected from an individual with their consent or where made public pursuant to Section C.3.3.4(3).

(d)  All contract employees who will have access to sensitive unclassified information will be asked to sign a Confidentiality Agreement (Attachment (4)).  It is the responsibility of the Contractor to assure that such Agreements have been signed before access to sensitive unclassified information is permitted.

## H.7    **Document Management**

(a)  Upon request, all working documents in either electronic or printed form shall be provided to the COR at the time of contract completion or termination except where protected by Institutional Review Board (IRB) restrictions, attorney/client privilege and other applicable laws, or where the information is collected from an individual with his/her consent. After the completion or termination of the contract, the Contractor shall archive material relating to project management records such as accounting and billing reports, and time sheets in accordance with Federal record and privacy requirements. The Contractor may archive other project documents and materials, including the deliverables.  However, these documents shall not be disclosed to other parties or be used for any other purpose without the written permission of the COR.

(b) The Contractor shall be responsible for protecting all project documents (including archived documents and materials), either in electronic or printed form, consistent with the overall sensitivity of

36

their respective content.

## H.8    Proprietary Rights – Government Furnished Data and Materials

The DOJ shall retain all rights and privileges, including those of patent and copyright, to all Government furnished data. The Contractor shall neither retain nor reproduce for private or commercial use any data or other materials furnished under this contract other than as is necessary to perform its obligations under the contract. The Contractor agrees not to assert any rights at common law or in equity or establish any claim to statutory copyright in such data. These rights are not exclusive and are in addition to any other rights and remedies to which the Government is otherwise entitled in the contract.

## H.9    Restrictions on Data Produced Under this Contract

(a) The Government shall have unlimited rights, as delineated in FAR Clause 52.227-14, "Rights in Data – General", which is hereby incorporated by reference, in all computer software, documentation, and other data developed by the Contractor under this contract.

(b) The Government shall have restricted rights, as delineated in Alternate III of FAR Clause 52.227-14, Rights in Data - General, in all restricted computer software furnished by the Contractor under this contract.

(c) The Contractor agrees that upon termination of this contract, whether with or without cause, it may have no property or possessory right to any of the correspondence, files, or materials of whatever kind or description, or any copies or duplicates of such, whether developed or prepared by the Contractor or furnished to the Contractor by the Government in connection with the performance of this contract; and that upon demand, the contractor shall surrender immediately to the Government such items, matters, materials, and copies.

## H.10    Section 508 Accessibility

Section 508 of the Rehabilitation Act of 1973 requires that Federal agencies' electronic and information technology (EIT) is accessible to people with disabilities. The Federal Acquisition Regulations (FAR) Final Rule for Section 508 can be found at www.section508.gov. The Federal Electronic and Information Technology Accessibility Standards (36 CFR 1194) are incorporated into and made a part of this contract. These standards may be found at the Section 508 standards page within the website, above.  The Contractor must comply with these standards in performing under this contract.

## H.11    Continuing Contract Performance During a Pandemic Influenza or Other National Emergency

(a) During a pandemic or other emergency we understand that our contractor workforce will experience the same high levels of absenteeism as our federal employees.  Although the Excusable Delays and Termination for Default clauses used in government contracts list epidemics and quarantine restrictions among the reasons to excuse delays in contract performance, we expect our contractors to

37

make a reasonable effort to keep performance at an acceptable level during emergency periods.

(b) The Office of Personnel Management (OPM) has provided guidance to federal managers and employees on the kinds of actions to be taken to ensure the continuity of operations during emergency periods. This guidance is also applicable to our contract workforce. Contractors are expected to have reasonable policies in place for continuing work performance, particularly those performing mission critical services, during a pandemic influenza or other emergency situation.

(c) The types of actions a federal contractor should reasonably take to help ensure performance are:

> • Encourage employees to get inoculations or follow other preventive measures as advised by the public health service.

> • Contractors should cross-train workers as backup for all positions performing critical services. This is particularly important for work such as guard services where telework is not an option.

> • Implement telework to the greatest extent possible in the workgroup so systems are in place to support successful remote work in an emergency.

> • Communicate expectations to all employees regarding their roles and responsibilities in relation to remote work in the event of a pandemic health crisis or other emergency.

> • Establish communication processes to notify employees of activation of this plan.

> • Integrate pandemic health crisis response expectations into telework agreements.

> • With the employee, assess requirements for working at home (supplies and equipment needed for an extended telework period). Security concerns should be considered in making equipment choices; agencies or contractors may wish to avoid use of employees' personal computers and provide them with PCs or laptops as appropriate.

> • Determine how all employees who may telework will communicate with one another and with management to accomplish work.

> • Practice telework regularly to ensure effectiveness.

> • Make it clear that in emergency situations, employees must perform all duties assigned by management, even if they are outside usual or customary duties.

> • Identify how time and attendance will be maintained.

(d) It is the Contractor's responsibility to advise the government contracting officer if they anticipate not being able to perform and to work with the Department to fill gaps as necessary. This means direct communication with the contracting officer or in their absence, another responsible person in the contracting office via telephone or email messages acknowledging the Contractors notification. The incumbent Contractor is responsible for assisting the Department in estimating the adverse impacts of nonperformance and to work diligently with the Department to develop a strategy for maintaining the continuity of operations.

(e) The Department does reserve the right in such emergency situations to use federal employees, employees of other agencies, contract support from other existing contractors, or to enter into new contracts for critical support services. Any new contracting efforts would be acquired following the guidance in the Office of Federal Procurement Policy issuance "Emergency Acquisitions", May, 2007 and Subpart 18.2, Emergency Acquisition Flexibilities, of the Federal Acquisition Regulations.

## H.12    Organizational Conflict of Interest

(a) The Contractor warrants that, to the best of its knowledge and belief, and except as otherwise set forth in this contract, it does not have any organizational conflict of interest as defined in paragraph B below.

(b) The term "organizational conflict of interest" means a situation where a Contractor has interests, either due to its other activities or its relationships with other organizations, which place it in a position that may be unsatisfactory or unfavorable (i) from the Department's standpoint in being able to secure impartial, technically sound, objective assistance and advice from the Contractor, or in securing the advantages of adequate competition in its procurement; or (ii) from industry's standpoint in that unfair competitive advantages may accrue to the Contractor in question.

(c) The Contractor agrees that, if after award it discovers an organizational conflict of interest with respect to this contract, it shall make an immediate and full disclosure in writing to the Contracting Officer who shall include a description of the action which the Contractor has taken or proposes to take to avoid, eliminate or neutralize the conflict. The Government may, however, terminate the contract for the convenience of the Government if it would be in the best interests of the Government.

(d) In the event that the Contractor was aware of organizational conflict of interest prior to the establishment of this contract and intentionally did not disclose the conflict to the Contracting Officer, the Government may terminate the contract at no cost to the Government.

## H.13    Department's Policy on Domestic Violence, Sexual Assault and Stalking

(a) It is the Department's policy to enhance workplace awareness of and safety for victims of domestic violence, sexual assault, and stalking. This policy is summarized in DOJ Policy Statement 1200.2 (Policy Statement), available in full for public viewing at https://www.justice.gov/sites/default/files/ovw/legacy/2013/12/19/federal-workplacee-responses-to-domesticviolence-sexualassault-stalking.pdf. Contractor agrees, upon contract award, to provide notice of this Policy Statement, including at a minimum the above-listed URL, to all of Contractor's employees and employees of subcontractors who will be assigned to work on Department premises.

(b) Point of Contact for Victims of Domestic Violence, Sexual Assault, and Stalking.  Upon contract award, the Department will notify contractor of the name and contact information for the Point of Contact for Victims of domestic violence, sexual assault, and stalking for the component or components where contractor will be performing.  The Contractor agrees to inform its employees and employees of subcontractors who will be assigned to work on Department premises of the name and contact information for the Victim Point of Contact.

## H.14   Electronic Signatures

(a) The Department of Justice is committed to doing business in the most efficient and effective way possible, and to facilitate paperless processes. In furtherance of this goal, the Contracting Officer may apply their digital signature to procurement documents in the Portable Document Format (PDF) through the use of their government issued Personal Identity Verification (PIV) Card with a valid public key certificate. A digital signature made with these certificates is evidence that a specific individual signed the electronic record and that it was not altered. The recipient of a signed document can rely on the digital signature as evidence for a third party that the signature was generated by the claimed signer.

(b) For procurement documents that require a signature from a representative of the contractor, the contractor may utilize manual or electronic signature. Should the contractor utilize an electronic signature, by returning the document with an electronic symbol affixed to the appropriate signature block, the contractor representative signing on behalf of the contractor certifies that:

    (1)   Electronic Form of Signature: The contractor representative has knowingly adopted, applied or affixed an electronic symbol to the document;

    (2)   Intent to Sign: The contractor representative has applied an electronic symbol with the intent to legally bind the contractor;

    (3)   Association of Signature to Record: the contractor representative's signature is attached to the electronic record being signed;

    (4)   Identification and Authentication of Signer: The contractor has a means to identify and authenticate a particular person as the signer; and

    (5)   Integrity of Signed Record: The contractor can attest to the integrity of the signed record between the time of signature and the returned record to the Government.

(c) This clause applies to this document and subsequent documents (e.g., modifications, task/delivery orders) associated with this action.

## H.15   Key Personnel

(a)  The key personnel to be assigned to perform hereunder are as follows:

15JPSS22D00000013                Legal Access, Orientation, and Representation Services for EOIR



(b)  The personnel specified in this clause of this contract are considered to be essential to the work the Contractor agrees to perform hereunder.  Prior to diverting any of the specified individuals to other programs, or replacing any of them for any reason, the Contractor shall notify the Contracting Officer reasonably in advance and shall submit justification, including proposed substitutions or replacements, in sufficient detail to permit the Contracting Officer to evaluate the impact on the work the Contractor is obligated to perform hereunder.  The Contractor shall not replace any of the key personnel hereinafter named to work on this contract without the written consent of the Contracting Officer.  The list of key personnel set forth above may be amended from time to time during the course of the contract to add or delete personnel, as appropriate.

41

## SECTION I – CONTRACT CLAUSES

### I.1    Clauses Incorporated by Reference (FAR 52.252-2) (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text.  Upon request, the Contracting Officer will make their full text available.  Also, the full text of a clause may be accessed electronically at this/these address(es):

http://www.acquisition.gov/far/

### I.2    Clauses Incorporated by Reference

| Clause Number | Title |
|---|---|
| 52.202-1 | Definitions (JUN 2020) |
| 52.203-3 | Gratuities (APR 1984) |
| 52.203-5 | Covenant Against Contingent Fees (MAY 2014) |
| 52.203-6 | Restrictions on Subcontractor Sales to the Government  (JUN 2020) |
| 52.203-7 | Anti-Kickback Procedures (JUN 2020) |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (MAY 2014) |
| 52.203-10 | Price or Fee Adjustment for Illegal or Improper Activity (MAY 2014) |
| 52.203-12 | Limitations on Payments to Influence Certain Federal Transactions (JUN 2020) |
| 52.203-13 | Contractor Code of Business Ethics and Conduct (OCT 2015) |
| 52.203-16 | Preventing Personal Conflicts of Interest (DEC 2011) |
| 52.203-17 | Contractor Employee Whistleblower Rights and Requirement To Inform Employees of Whistleblower Rights (APR 2014) |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper  (MAY 2011) |
| 52.204-9 | Personal Identity Verification of Contractor Personnel (JAN 2011) |
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards (JUN 2020) |
| 52.204-13 | System for Award Management Maintenance (OCT 2018) |
| 52.204-15 | Service Contract Reporting Requirements for Indefinite-Delivery Contracts (OCT 2016) |
| 52.204-16 | Commercial and Government Entity Code Reporting (AUG 2020) |
| 52.204-17 | Ownership or Control of Offeror (AUG 2020) |

42

| Clause Number | Title |
|---|---|
| 52.204-18 | Commercial and Government Entity Code Maintenance (AUG 2020) |
| 52.204-19 | Incorporation by Reference of Representations and Certifications (DEC 2014) |
| 52.204-22 | Alternative Line Item Proposal (JAN 2017) |
| 52.204-25 | Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (NOV 2021) |
| 52.209-6 | Protecting the Government's Interest when Subcontracting with Contractor's Debarred, Suspended, or Proposed for Debarment (NOV 2021) |
| 52.209-9 | Updates of Publicly Available Information Regarding Responsibility Matters (OCT 2018) |
| 52.209-10 | Prohibition on Contracting With Inverted Domestic Corporations (NOV 2015) |
| 52.215-2 | Audit and Records—Negotiation (JUN 2020) |
| 52.215-8 | Order of Precedence — Uniform Contract Format (OCT 1997) |
| 52.215-11 | Price Reduction for Defective Cost or Pricing Data-Modifications (JUN 2020) |
| 52.215-13 | Subcontractor Certified Cost or Pricing Data — Modifications (JUN 2020) |
| 52.215-14 | Integrity of Unit Prices (NOV 2021) |
| 52.215-21 | Requirements for Cost or Pricing Data or Information Other Than Cost or Pricing Data-Modifications (NOV 2021) |
| 52.216-18 | Ordering (AUG 2020) Note: See Section H.2 for fill-ins |
| 52.216-19 | Order Limitations (OCT 1995) Note: See Section H.2 for fill-ins |
| 52.216-22 | Indefinite Quantity (OCT 1995)        Note: See Section H.2 for fill-ins |
| 52.217-8 | Option to Extend Services (NOV 1999)        Note: See Section F.3 for fill-ins |
| 52.217-9 | Option to Extend the Term of the Contract (MAR 2000)        Note: See Section F.2 for fill-ins |
| 52.219-4 | Notice of Price Evaluation for HUBZone Small Business Concerns (SEP 2021) |
| 52.219-8 | Utilization of Small Business Concerns (OCT 2018) |
| 52.219-9 | Small Business Subcontracting Plan (NOV 2021) |
| 52.219-16 | Liquidated Damages—Subcontracting Plan (SEP 2021) |
| 52.219-28 | Post-Award Small Business Program Representation (SEP 2021) |
| 52.222-3 | Convict Labor (JUN 2003) |
| 52.222-19 | Child Labor - Cooperation with Authorities and Remedies (JAN 2022) |
| 52.222-21 | Prohibition of Segregated Facilities (APR 2015) |
| 52.222-26 | Equal Opportunity (SEP 2016) |

| Clause Number | Title |
|---|---|
| 52.222-35 | Equal Opportunity for Veterans (JUN 2020) |
| 52.222-36 | Equal Opportunity for Workers with Disabilities  (JUN 2020) |
| 52.222-37 | Employment Reports on Veterans (JUN 2020) |
| 52.222-38 | Compliance with Veteran's Employment Reporting Requirements (FEB 2016) |
| 52.222-40 | Notification of Employee Rights Under the National Labor Relations Act (DEC 2010) |
| 52.222-50 | Combating Trafficking in Persons (NOV 2021) |
| 52.222-54 | Employment Eligibility Verification (NOV 2021) |
| 52.223-5 | Pollution Prevention and Right-to-Know Information (MAY 2011) |
| 52.223-6 | Drug-Free Workplace (MAY 2001) |
| 52.223-10 | Waste Reduction Program (MAY 2011) |
| 52.223-18 | Encouraging Contractor Policies to Ban Text Messaging While Driving (JUN 2020) |
| 52.224-1 | Privacy Act Notification (APR 1984) |
| 52.224-2 | Privacy Act (APR 1984) |
| 52.224-3 | Privacy Training (JAN 2017) |
| 52.225-13 | Restrictions on Certain Foreign Purchases (FEB 2021) |
| 52.225-20 | Prohibition on Conducting Restricted Business Operations in Sudan-Certification (AUG 2009) |
| 52.225-25 | Prohibition on Contracting With Entities Engaging in Certain Activities or Transactions Relating to Iran-Representation and Certifications (JUN 2020) |
| 52.227-1 | Authorization and Consent (JUN 2020) |
| 52.227-2 | Notice and Assistance Regarding Patent and Copyright Infringement (JUN 2020) |
| 52.227-14 | Rights in Data–General (MAY 2014) (ALT III) |
| 52.227-19 | Commercial Computer Software License (DEC 2007) |
| 52.229-3 | Federal, State, and Local Taxes (FEB 2013) |
| 52.230-2 | Cost Accounting Standards (JUN 2020) |
| 52.232-1 | Payments (APR 1984)<br>Note: Applies to orders issued on a firm-fixed price basis. |
| 52.232-7 | Payments Under Time-and-Material and Labor-Hour Contracts (NOV 2021)<br>Note: Applies to orders issued on a Time & Material or Labor Hour basis |
| 52.232-8 | Discounts for Prompt Payment (FEB 2002) |

44

| Clause Number | Title |
|---|---|
| 52.232-11 | Extras (APR 1984) |
| 52.232-17 | Interest (MAY 2014) |
| 52.232-23 | Assignment of Claims (MAY 2014) |
| 52.232-25 | Prompt Payment (JAN 2017) |
| 52.232-33 | Payment by Electronic Funds Transfer — System for Award Management (OCT 2018) |
| 52.232-39 | Unenforceability of Unauthorized Obligations (JUN 2013) |
| 52.232-40 | Providing Accelerated Payments to Small Business Subcontractors (NOV 2021) |
| 52.233-1 | Disputes (MAY 2014) |
| 52.233-3 | Protest After Award (AUG 1996) |
| 52.233-4 | Applicable Law for Breach of Contract Claim (OCT 2004) |
| 52.237-3 | Continuity of Services (JAN 1991) |
| 52.239-1 | Privacy or Security Safeguards (AUG 1996) |
| 52.242-3 | Penalties for Unallowable Costs (SEP 2021) |
| 52.242-13 | Bankruptcy (JUL 1995) |
| 52.243-1 | Changes — Fixed-Price (AUG 1987) (ALT I) |
| 52.243-3 | Changes — Time-and-Materials or Labor-Hours (SEP 2000) |
| 52.244-2 | Subcontracts (JUN 2020) |
| 52.244-6 | Subcontracts for Commercial Products and Commercial Services (JAN 2022) |
| 52.245-9 | Use and Charges (APR 2012) |
| 52.246-25 | Limitation of Liability — Services (FEB 1997) |
| 52.248-1 | Value Engineering (JUN 2020) |
| 52.249-2 | Termination for Convenience of the Government (Fixed Price) (APR 2012) |
| 52.249-6 | Termination (Cost-Reimbursement) (Basic and Alternate IV) (MAY 2004) |
| 52.249-8 | Default (Fixed-Price Supply and Service) (APR 1984) |
| 52.249-14 | Excusable Delays (APR 1984) |
| 52.253-1 | Computer Generated Forms (JAN 1991) |

## I.3     Clauses Incorporated by Full Text

### I.3.1     Whistleblower Information Distribution (Oct 2021)

Within 30 days of contract award, the contractor and its subcontractors must distribute the "Whistleblower Information for Employees of DOJ Contractors, Subcontractors, Grantees, or Sub-Grantees or Personal Services Contractors" ("Whistleblower Information") document to their employees performing work in support of the products and services delivered under this contract (https://oig.justice.gov/sites/default/files/2020-04/NDAA-brochure.pdf). By agreeing to the terms and conditions of this contract, the prime contractor acknowledges receipt of this requirement, in accordance with 41 U.S.C. § 4712 and FAR 3.908 & 52.203-17, and commits to distribution. Within 45 days of award, the contractor must provide confirmation to the contracting officer verifying that it has distributed the whistleblower information as required.

### I.3.2     FAR 52.223-99, Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors

Ensuring Adequate COVID-19 Safety Protocols for Federal Contractors (Oct 2021) (Deviation)

(a) *Definition*. As used in this clause -

*United States or its outlying areas* means—

(1) The fifty States;

(2) The District of Columbia;

(3) The commonwealths of Puerto Rico and the Northern Mariana Islands;

(4) The territories of American Samoa, Guam, and the United States Virgin Islands; and

(5) The minor outlying islands of Baker Island, Howland Island, Jarvis Island, Johnston Atoll, Kingman Reef, Midway Islands, Navassa Island, Palmyra Atoll, and Wake Atoll.

(b) *Authority.* This clause implements Executive Order 14042, Ensuring Adequate COVID Safety Protocols for Federal Contractors, dated September 9, 2021 (published in the Federal Register on September 14, 2021, 86 FR 50985).

(c) *Compliance.* The Contractor shall comply with all guidance, including guidance conveyed through Frequently Asked Questions, as amended during the performance of this contract, for contractor or subcontractor workplace locations published by the Safer Federal Workforce Task Force (Task Force Guidance) at https://www.saferfederalworkforce.gov/contractors/.

(d) *Subcontracts*. The Contractor shall include the substance of this clause, including this paragraph (d), in subcontracts at any tier that exceed the simplified acquisition threshold, as defined in

46

Federal Acquisition Regulation 2.101 on the date of subcontract award, and are for services, including construction, performed in whole or in part within the United States or its outlying areas.

### I.3.3    Contractor Privacy Requirements (JAN 2022)

(a)  Underline: Limiting Access to Privacy Act and Other Sensitive Information

*(1) Privacy Act Information*

In accordance with FAR 52.224-1 Privacy Act Notification (APR 1984) and FAR 52.224-2 Privacy Act (APR 1984), if this contract requires Contractor personnel to have access to information protected by the Privacy Act of 1974, the Contractor is advised that the relevant DOJ system of records notices (SORNs) applicable to this Privacy Act information may be found at https://www.justice.gov/opcl/doj-systems-records.[1] Applicable SORNs published by other agencies may be accessed through those agencies' websites or by searching the Federal Digital System (FDsys) available at http://www.gpo.gov/fdsys/. SORNs may be updated at any time.

*(2) Prohibition on Performing Work Outside a Government Facility/Network/Equipment*

Except where use of Contractor networks, IT, other equipment, or Workplace as a Service (WaaS) is specifically authorized within this contract, the Contractor shall perform all tasks on authorized Government networks, using Government-furnished IT and other equipment and/or WaaS and Government information shall remain within the confines of authorized Government networks at all times. Any handling of Government information on Contractor networks or IT must be approved by the Senior Component Official for Privacy of the component entering into this contract. Except where remote work is specifically authorized within this contract, the Contractor shall perform all tasks described in this document at authorized Government facilities; the Contractor is prohibited from performing these tasks at or removing Government-furnished information to any other facility; and Government information shall remain within the confines of authorized Government facilities at all times. Contractors may only access classified materials on government furnished equipment in authorized government owned facilities regardless of remote work authorizations.

*(3) Prior Approval Required to Hire Subcontractors*

The Contractor is required to obtain the Contracting Officer's approval prior to engaging in any contractual relationship (Subcontractor) in support of this contract requiring the disclosure of information, documentary material and/or records generated under or relating to this contract. The Contractor (and any Subcontractor) is required to abide by Government and Agency guidance for protecting sensitive and proprietary information.

*(4) Separation Checklist for Contractor Employees*

---

[1] "[T]he term 'record' means any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular

47

assigned to the individual, such as a finger or voice print or a photograph." 5 U.S.C. § 552a(a)(4). "[T]he term 'system of records' means a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." 5 U.S.C. § 552a(a)(5).

The Contractor shall complete and submit an appropriate separation checklist to the Contracting Officer before any employee or Subcontractor employee terminates working on the contract. The Contractor must submit the separation checklist on or before the last day of employment or work on the contract. The separation checklist must verify: (1) return of any Government-furnished equipment; (2) return or proper disposition of personally identifiable information (PII)[2], in paper or electronic form, in the custody of the employee or Subcontractor employee including the sanitization of data on any computer systems or media as appropriate; and (3) termination of any technological access to the Contractor's facilities or systems that would permit the terminated employee's access to PII or other sensitive information.

In the event of adverse job actions resulting in the dismissal of a Contractor or Subcontractor employee before the separation checklist can be completed, the Prime Contractor must notify the Contracting Officer within 24 hours and confirm receipt of the notification. In the case the Contractor is unable to notify the Contracting Officer, then the Contractor should notify the Contract Officer's Representative (COR).

Contractors must complete the separation checklist with the Contracting Officer or COR by returning all Government-furnished property including, but not limited to, computer equipment, media, credentials and passports, smart cards, mobile devices, Personal Identity Verification (PIV) cards, calling cards, and keys and terminating access to all user accounts and systems. Unless the Contracting Officer requests otherwise, the relevant IDIQ Program Manager or other Key Personnel designated by the Contracting Officer or COR may facilitate the return of equipment.

(b)        <u>Privacy Training, Safeguarding, and Remediation</u>

*(1)   Required Security and Privacy Training for Contractors*

The Contractor must ensure that all employees take appropriate privacy training, including Subcontractors who have access to PII as well as the creation, use, dissemination and/or destruction of PII at the outset of the employee's work on the contract and every year thereafter. Training must include procedures on how to properly handle PII, including heightened security requirements for the transporting or transmission of sensitive PII, and reporting requirements for a suspected breach or loss of PII. These courses, along with more information about DOJ security and training requirements for Contractors, are available at <u>https://www.justice.gov/jmd/learndoj.</u> The <u>Federal Information Security Modernization Act of 2014 (FISMA)</u> requires all individuals accessing DOJ information to complete training on records management, cybersecurity awareness, and information system privacy awareness. Contractor employees are required to sign the "Privacy Rules of

---

[2] As stated in FAR 52.224-3 and Office of Management and Budget (OMB) Circular A-130, Managing Federal Information as a Strategic Resource (2016), "'personally identifiable information' means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual." Regarding "sensitive PII," "[t]he sensitivity level of the PII will depend on the context, including the purpose for which the PII is created, collected, used, processed, stored, maintained,

48

disseminated, disclosed, or disposed. For example, the sensitivity level of a list of individuals' names may depend on the source of the information, the other information associated with the list, the intended use of the information, the ways in which the information will be processed and shared, and the ability to access the information." OMB Circular A-130, at App. II-2.

Behavior," acknowledging and agreeing to abide by privacy law, policy, and certain privacy safeguards, prior to accessing DOJ information. These Rules of Behavior are made available to all new users of DOJ's computer network and to trainees at the conclusion of DOJ-OPCL-CS-0005.

The Contractor should maintain copies of certificates as a record of compliance and must submit an email notification annually to the COR verifying that all employees working under this contract have completed the required privacy and cybersecurity training.

*(2) Safeguarding PII Requirements*

Contractor employees must comply with DOJ Order 0904 and other guidance published to the publicly-available Office of Privacy and Civil Liberties (OPCL) Resources page[3] relating to the safeguarding of PII, including the use of additional controls to safeguard sensitive PII (e.g., the encryption of sensitive PII). This requirement flows down from the Prime Contractor to all Subcontractors and lower tiered subcontracts.

*(3) Non-Disclosure Agreement Requirement*

Prior to commencing work, all Contractor personnel that may have access to PII or other sensitive information shall be required to sign a Non-Disclosure Agreement (NDA) and the DOJ IT Rules of Behavior. The Non-Disclosure Agreement:

a) prohibits the Contractor from retaining or divulging any PII or other sensitive information, or derivatives therefrom, furnished by the Government or to which they may otherwise come in contact as a result of their performance of work under the contract/task order that is otherwise not publicly available, whether or not such information has been reduced to writing; and

b) requires the Contractor to report any loss of control, compromise, unauthorized disclosure, or unauthorized acquisition of PII or other sensitive information to the component-level or headquarters Security Operations Center within one (1) hour of discovery.

The Contractor should maintain signed copies of the NDA for all employees as a record of compliance. The Contractor should also provide copies of each employee's signed NDA to the Contracting Officer before the employee may commence work under the contract/task order.

*(4) Prohibition on Use of PII in Vendor Billing and Administrative Records*
The Contractor's invoicing, billing, and other financial or administrative records or databases is not authorized to regularly store or include any sensitive PII or other confidential government information that is created, obtained, or provided during the performance of the contract without the written permission of the Senior Component Official for Privacy (SCOP). It is acceptable to list the names, titles and contact information for the Contracting Officer, COR, or other personnel associated with the administration of the contract in the invoices as needed.

49

³ The DOJ OPCL Resources page is available at https://www.justice.gov/opcl/resources.

(5) *Reporting Actual or Suspected Data Breach*

Contractors must report any actual or suspected breach of PII within one (1) hour of discovery.[4] A "breach" is an incident or occurrence that involves the loss of control, compromise, unauthorized disclosure, unauthorized acquisition, or any similar occurrence where: (1) a person other than an authorized user accesses or potentially accesses PII or (2) an authorized user accesses or potentially accesses PII for an other than authorized purpose. The report of a breach must be made to DOJ. The Contractor must cooperate with DOJ's inquiry into the incident and efforts to minimize risks to DOJ or individuals, including remediating any harm to potential victims.

a) The Contractor must develop and maintain an internal process by which its employees and Subcontractors are trained to identify and report the breach, consistent with DOJ Instruction 0900.00.01[5], Reporting and Response Procedures for a Breach of Personally Identifiable Information.

b) The Contractor must report any such breach by its employees or Subcontractors to the DOJ Security Operations Center (dojcert@usdoj.gov, 202-357-7000); Component-level Security Operations Center and Component-level Management Team, where appropriate; the COR; and the Contracting Officer within one (1) hour of the initial discovery.

c) The Contractor must provide a written report to the DOJ Security Operations Center (dojcert@usdoj.gov, 202-357-7000) within 24 hours of discovery of the breach by its employees or Subcontractors. The report must contain the following information:

    i. Narrative or detailed description of the events surrounding the suspected loss or compromise of information.[6] Date, time, and location of the incident.
    ii. Amount, type, and sensitivity of information that may have been lost or compromised, accessed without authorization, etc.
    iii. Contractor's assessment of the likelihood that the information was compromised or lost and the reasons behind the assessment.[7]
    iv. Names and classification of person(s) involved, including victim, Contractor employee/Subcontractor and any witnesses.
    v. Cause of the incident and whether the company's security plan was followed and, if

---

[4] As stated in DOJ Instruction 0900, "Contractors must notify the Contracting Officer, the Contracting Officer's Representative, and JSOC (or component-level SOC) within 1 hour of discovering any incidents, including breaches, consistent with this Instruction, guidance issued by the CPCLO, NIST standards and guidelines, and the US-CERT notification guidelines."

[5] https://www.justice.gov/file/4336/download

[6] As stated in DOJ Instruction 0900, the description should include the type of information that constitutes PII; purpose for which PII is collected, maintained, and used; extent to which PII identifies a peculiarly vulnerable population; the determination of whether the information was properly encrypted or rendered partially or completely inaccessible by other means; format of PII (e.g., whether PII was structured or unstructured); length of time PII was exposed; any evidence confirming that PII is being misused or that it was never accessed.

15JPSS22D00000013               Legal Access, Orientation, and Representation Services for EOIR

---

[7] As stated in DOJ Instruction 0900, the report should include the nature of the cyber threat (*e.g.*, Advanced Persistent Threat, Zero Day Threat, data exfiltration) for cyber incidents.

                 not, which specific provisions were not followed.[8]

      vi.    Actions that have been or will be taken to minimize damage and/or mitigate further compromise.

      vii.   Recommendations to prevent similar situations in the future, including whether the security plan needs to be modified in any way and whether additional training may be required.

    d)   The Contractor shall provide full access and cooperation for all activities determined by the Government to be required to ensure an effective incident response, including providing all requested images, log files, and event information to facilitate rapid resolution of sensitive information incidents.

    e)   At the Government's discretion, Contractor employees or Subcontractor employees may be identified as no longer eligible to access PII or to work on that contract based on their actions related to the loss or compromise of PII.

*(6) Victim Remediation*

    At DOJ's request, the Contractor is responsible for notifying victims and providing victim remediation services in the event of a breach of PII held by the Contractor, its agents, or its Subcontractors, under this contract. Victim remediation services shall include at least 18 months of credit monitoring and, for serious or large incidents as determined by the Government, call center help desk services for the individuals whose PII was lost or compromised. When DOJ requests notification, the Department Chief Privacy and Civil Liberties Officer and SCOP will direct the Contractor on the method and content of such notification to be sent to individuals whose PII was breached.  By performing this work, the Contractor agrees to full cooperation in the event of a breach. The Contractor should be self-insured to the extent necessary to handle any reasonably foreseeable breach, with another source of income, to fully cover the costs of breach response, including but not limited to victim remediation.

    (c)   Government Records Training, Ownership, and Management

*(1) Records Management Training and Compliance*

    a)   The Contractor must ensure that all employees and Subcontractors that have access to PII as well as to those involved in the creation, use, dissemination and/or destruction of PII take the *DOJ Records and Information Training for New Employees (RIM)* training course or another training approved by the Contracting Officer or COR. This training will be provided at the outset of the Subcontractor's/employee's work on the contract and every year thereafter. The Contractor shall maintain copies of certificates as a record of compliance and must submit an email notification annually to the COR verifying that all employees working under this contract have completed the required records management training.

---

[8] As stated in DOJ Instruction 0900, the report should include analysis on whether the data is accessible, usable, and

Admin. Rec.94

intentionally targeted.

    b)   The Contractor agrees to comply with Federal and Agency records management policies, including those policies associated with the safeguarding of records containing PII and those covered by the Privacy Act of 1974. These policies include the preservation of all records created or received regardless of format, mode of transmission, or state of completion.

*(2) Records Creation, Ownership, and Disposition*

    a)   The Contractor shall not create or maintain any records not specifically tied to or authorized by the contract using Government IT equipment and/or Government records or that contain Government Agency information. The Contractor shall certify, in writing, the appropriate disposition or return of all Government information at the conclusion of the contract or at a time otherwise specified in the contract. In accordance with 36 CFR 1222.32, the Contractor shall maintain and manage all Federal records created in the course of performing the contract in accordance with Federal law.  Records may not be removed from the legal custody of DOJ or destroyed except in accordance with the provisions of the agency records schedules.

    b)   Except as stated in the Performance Work Statement and, where applicable, the Contractor's Commercial License Agreement, the Government Agency owns the rights to all electronic information (electronic data, electronic information systems or electronic databases and all supporting documentation and associated metadata created as part of this contract. All deliverables (including all data and records) under the contract are the property of the U.S. Government and may be considered federal records, for which the Agency shall have unlimited rights to use, dispose of, or disclose such data contained therein. The Contractor must deliver sufficient technical documentation with all data deliverables to permit the agency to use the data.

    c)   The Contractor shall not retain, use, sell, disseminate, or dispose of any government data/records or deliverables without the express written permission of the Contracting Officer or Contracting Officer's Representative. The Agency and its contractors are responsible for preventing the alienation or unauthorized destruction of records, including all forms of mutilation. Willful and unlawful destruction, damage or alienation of Federal records is subject to the fines and penalties imposed by 18 U.S.C. § 2701. Records may not be removed from the legal custody of the Agency or destroyed without regard to the provisions of the Agency records schedules.

    (d)   <u>Data Privacy and Oversight</u>

*(1) Restrictions on Testing or Training Using Real Data Containing PII*

The use of real data containing PII from any source for testing or training purposes is generally prohibited. The Contractor shall use synthetic or de-identified real data for testing or training whenever feasible.

Admin. Rec.95

(2) *Requirements for Contractor IT Systems Hosting Government Data*

The Contractor is required to obtain an Authority To Operate (ATO) for any IT environment owned or controlled by the Contractor or any Subcontractor on which Government data shall reside for the purposes of IT system development, design, data migration, testing, training, maintenance, use, or disposal.

(3) *Requirement to Support Privacy Compliance*

a) If this contract requires the development, maintenance or administration of information technology[9], the Contractor shall support the completion of the Initial Privacy Assessment (IPA) document, if requested by Department personnel.  An IPA is the first step in a process to identify potential privacy issues and mitigate privacy risks. The IPA asks basic questions to help components assess whether additional privacy protections may be needed in designing or implementing a project[10] to mitigate privacy risks, and whether compliance work may be needed. Upon review of the IPA, the OPCL determines whether a Privacy Impact Assessment (PIA) document and/or SORN, or modifications thereto, are required. The Contractor shall provide adequate support to complete the applicable risk assessment and PIA document in a timely manner, and shall ensure that project management plans and schedules include the IPA, PIA, and SORN (to the extent required) as milestones. Additional information on the privacy compliance process at DOJ, including IPAs, PIAs, and SORNs, is located on the DOJ OPCL website (https://dojnet.doj.gov/privacy/), including DOJ Order 0601, Privacy and Civil Liberties. The Privacy Impact Assessment Guidance and Template outline the requirements and format for the PIA.

b) If the contract involves an IT system build or substantial development or changes to an IT system that may require privacy risk assessment and documentation, the Contractor shall provide adequate support to DOJ to ensure DOJ can complete any required assessment, and IPA, PIA, SORN, or other supporting documentation to support privacy compliance. The Contractor shall work with personnel from the program office, OPCL, the Office of the Chief Information Officer (OCIO), and the Office of Records Management and Policy to ensure that the privacy assessments and documentation are kept on schedule, that the

---

[9] As defined in 40 U.S.C. § 11101, the term "information technology" means any equipment or interconnected system or subsystem of equipment, used in the automatic acquisition, storage, analysis, evaluation, manipulation, management, movement, control, display, switching, interchange, transmission, or reception of data or information by the executive agency, if the equipment is used by the executive agency directly or is used by a contractor under a contract with the executive agency that requires the use (i) of that equipment or (ii) of that equipment to a significant extent in the performance of a service or the furnishing of a product; includes computers, ancillary equipment (including imaging peripherals, input, output, and storage devices necessary for security and surveillance), peripheral equipment designed to be controlled by the central processing unit of a computer, software, firmware and similar procedures, services (including support services), and related resources; but does not include any equipment acquired by a federal contractor incidental to a federal contract.

[10] In this instance, the term "project" is used to scope the activities (e.g., creating, collecting, using, processing, storing, maintaining, disseminating, disclosing, or disposing of information) covered by an IPA. A project is intended to be technology-neutral, and may include an information system, a digital service, an information technology, a combination thereof, or some other activity that may create potential privacy issues or privacy risks that would benefit from an IPA. The scope of a project covered by an IPA is discretionary, but components should work with their SCOP and OPCL.

answers to questions in the documents are thorough and complete, and that questions asked by the OPCL and other offices are answered in a timely fashion. The Contractor must ensure the completion of required PIAs, documentation of privacy controls consistent with federal law and standards, e.g. NIST 800-53, Rev. 5; and compliance with the Privacy Act of 1974, E-Government Act of 2002, Federal Information Security Modernization Act of 2014, and key OMB guidelines, e.g., OMB Circular A-130.

## SECTION J – LIST OF ATTACHMENTS

Attachment (1.0) Pricing Table for Project Management Support
Attachment (1.1) Pricing Table for LOP
Attachment (1.2) Pricing Table for LOPC
Attachment (1.3) Pricing Table for ICH
Attachment (1.4) Pricing Table for FGLOP
Attachment (1.5) Pricing Table for NQRP
Attachment (1.6) Pricing Table for CCI
Attachment (2) List of Program Sites
Attachment (3) Legal Access Program Goals
Attachment (4) Confidentiality Agreement
Attachment (5) Subcontracting Plan
Attachment (6) Labor Categories

Admin. Rec.98

## Program Sites
### (The sites listed are current as of March 2022)

**Legal Orientation Program for Detained Adults (LOP) Detention Facilities:**

1. Adelanto ICE Processing Center, Adelanto, California (including Desert View Annex);
2. Berks County Residential Center, Leesport, Pennsylvania;
3. Broward Transitional Center, Pompano Beach, Florida;
4. Caroline Detention Facility, Bowling Green, Virginia;
5. Central Arizona Florence Correctional Complex, Florence, Arizona;
6. Clinton County Correctional Facility, McElhattan, Pennsylvania
7. Denver Contract Detention Facility, Aurora, Colorado;
8. Dorchester County Detention Center, Cambridge, Maryland;
9. El Paso Service Processing Center, El Paso, Texas;
10. El Valle Detention Facility; Raymondville, Texas
11. Elizabeth Detention Center, Elizabeth, New Jersey;
12. Eloy Detention Center, Eloy, Arizona;
13. Florence Service Processing Center, Florence, Arizona;
14. Folkston ICE Processing Center, Folkston, Georgia;
15. Houston Contract Detention Facility, Houston, Texas;
16. IAH Secure Adult Detention Facility ("Polk"); Livingston, Texas;
17. Immigration Centers of America - Farmville, Farmville, Virginia;
18. Jackson Parish Correctional Center, Jonesboro, Louisiana;
19. Joe Corley Detention Facility, Conroe, Texas;
20. Karnes County Residential Center, Karnes City, Texas;
21. Krome Service Processing Center, Miami, Florida;
22. La Palma Correctional Center, Eloy, Arizona;
23. LaSalle ICE Processing Center, Jena, Louisiana;
24. Montgomery Processing Center; Conroe, Texas;
25. Moshannon Valley Correctional Center; Philipsburg, Pennsylvania;
26. Northwest Detention Center, Tacoma, Washington;
27. Otay Mesa Detention Center, San Diego, California;
28. Otero County Processing Center, Chaparral, New Mexico;
29. Pine Prairie ICE Processing Center, Pine Prairie, Louisiana;
30. Port Isabel Service Processing Center, Los Fresnos, Texas;
31. Prairieland Detention Center, Alvarado, Texas;
32. Richwood Correctional Center, Richwood, Louisiana;
33. South Louisiana ICE Processing Center, Basile, Louisiana;
34. South Texas Detention Complex, Pearsall, Texas;
35. Stewart Detention Center, Lumpkin, Georgia;
36. T. Don Hutto Residential Center, Taylor, Texas; and
37. Winn Correctional Center, Winnfield, Louisiana

Admin. Rec.99

**Legal Orientation Program for Custodians of Unaccompanied Children (LOPC) Sites:**

1. Atlanta, Georgia
2. Baltimore, Maryland
3. Boston, Massachusetts
4. Charlotte, North Carolina
5. Dallas, Texas
6. Harlingen, Texas
7. Houston, Texas
8. Long Island, New York
9. Los Angeles, California
10. Memphis, Tennessee
11. Miami, Florida
12. New York, New York
13. Newark, New Jersey
14. San Francisco California
15. Washington, District of Columbia

**Immigration Court Helpdesk (ICH) Sites:**

1. New York Immigration Court (to include Federal Plaza, Varick, and 290 Broadway)
2. Los Angeles Immigration Court (to include Olive Street, Van Nuys, and 300 North)
3. San Antonio Immigration Court
4. Laredo Immigration Hearing Facility
5. Harlingen Immigration Court
6. Brownsville Immigration Hearing Facility
7. Chicago Immigration Court
8. Miami Immigration Court
9. Boston Immigration Court
10. Denver Immigration Court
11. Detroit Immigration Court
12. El Paso Immigration Court
13. Newark Immigration Court
14. San Diego Immigration Court
15. San Francisco Immigration Court
16. Seattle Immigration Court

Admin. Rec.100

**Family Group Legal Orientation Program (FGLOP) Sites:**

1. Boston, Massachusetts
2. Denver, Colorado
3. Detroit, Michigan
4. El Paso, Texas
5. Los Angeles, California
6. Miami, Florida
7. Newark, New Jersey
8. New York, New York
9. San Diego, California
10. San Francisco, California
11. Seattle, Washington

**Counsel for Children Initiative (CCI) Sites:**

Children receiving services under the CCI must be in proceedings in the immigration court jurisdictions noted below.

1. Atlanta, Georgia
2. Houston, Texas
3. Los Angeles, California
4. San Francisco, California
5. New York, New York
6. San Diego, California
7. Seattle, Washington
8. Portland, Oregon
9. Newark, New Jersey
10. New Orleans, Louisiana
11. Chicago, Illinois
12. Memphis, Tennessee
13. San Antonio, Texas
14. Santa Ana, California

**National Qualified Representative Program (NQRP):**

The NQRP is a nationwide program designed to provide services at all Immigration and Customs Enforcement (ICE) detention facilities where individuals are held for more than 72 hours.

3

## Legal Access Program Goals

1. **Legal Orientation Program (for Detained Adults) (LOP)**

   In 2002, EOIR launched the Legal Orientation Program (LOP) to provide legal orientation services to adults who are in EOIR removal proceedings and in the custody of the Department of Homeland Security (DHS, legacy INS). The purpose of this program is to provide detained adults with information about the immigration court process, their legal options, and their legal obligations. Services are offered in several formats: group orientation presentations providing broad overviews and basic information; individual orientations involving one-on-one meetings (generally following a group orientation); and pro se workshops which are small classes offering specific self-help guidance for adults who will appear in their proceedings pro se. As resources allow, the LOP assists in the referrals of pro bono attorneys to detained adults who are unable to proceed pro se or whose cases may benefit from the assistance of legal representation.

2. **Legal Orientation Program for Custodians of Unaccompanied Children (LOPC)**

   In 2010, EOIR launched the Legal Orientation Program for Custodians of Unaccompanied Children (LOPC) to provide legal orientation presentations to the adult caregivers (custodians) of unaccompanied children in EOIR removal proceedings. The purpose of this program is to inform the children's custodians of their responsibilities in ensuring the child's appearance at all immigration proceedings, and protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The LOPC informs custodians of immigration court processes, and of the forms of relief available to children in removal proceedings. As resources allow, the LOPC assists interested custodians in locating pro bono counsel for the children in their care. EOIR works with the Department of Health and Human Services, Office of Refugee Resettlement, and non-government partners to carry out this program nationally.

3. **Immigration Court Helpdesk (ICH)**

   In 2016, EOIR established the Immigration Court Helpdesk (ICH) to improve the efficiency and effectiveness of immigration court proceedings, particularly in the immigration courts with the largest overall backlog of cases. The purpose of this program is to provide non-detained individuals in immigration court proceedings with information about court processes and their responsibilities and rights under the immigration laws. By providing services in high-volume courts, the ICH aims to increase court efficiency by preparing individuals for the court process and educating individuals about the forms of relief available to them. ICH provides group information sessions, which provide broad overviews of and basic information about the legal process. The ICH also offers individual information sessions involving one-on-one meetings where individuals can ask questions about the immigration laws and about what to expect as they pursue their cases before the immigration court. Services also include self-help workshops, which are small classes during which participants can prepare and practice for the proceedings in which they will appear pro se. As resources allow, the ICH assists in the referrals of pro bono attorneys in cases that may benefit from the assistance of legal representation.

4. **Family Group Legal Orientation Program (FGLOP)**

   In September 2021, EOIR launched the Family Group Legal Orientation Program (FGLOP). The purpose of the FGLOP is to provide legal orientation sessions to family groups with cases scheduled on EOIR's "Dedicated Dockets" in designated cities. Participants receive information about various

agencies' practices and procedures, and available legal options. Presentations are offered in several formats, including multi-family group sessions, which provides general information about available forms of relief and preparing for a hearing. The FGLOP also offers single-family group orientations limited to a particular family and only those families who do not have legal representation. The FGLOP may also provide supplemental services, including follow-up orientations, self-help workshops for pro se participates, Friend of the Court (FOC) services, and assistance in referring cases to pro bono representatives.

## 5. National Qualified Representative Program (NQRP)

Since 2013, EOIR has administered the National Qualified Representative Program (NQRP) in response to the Orders issued in *Franco-Gonzales v. Holder*, CV 10-02211 (Partial Judgment and Permanent Injunction (C.D. Cal. R. April 23, 2013); Order Further Implementing This Court's Permanent Injunction (C.D. Cal. R. Oct. 29, 2014)). These Orders require EOIR to provide certain safeguards and protections to class members identified as having a serious mental disorder or condition that may render them incompetent to represent themselves in immigration proceedings.

Coinciding with this, in 2013, EOIR's Office of the Chief Immigration Judge (OCIJ) announced a "Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Noncitizens with Serious Mental Disorders or Conditions" ("Nationwide Policy"). Under this Policy, EOIR is committed to identifying detained, unrepresented individuals who may not be mentally competent to represent themselves in immigration proceedings, and who are not *Franco* class members.

The purpose of the NQRP is to ensure EOIR's compliance with the above-referenced *Franco* Orders and to carry out EOIR's commitment under the Nationwide Policy. Under both, an immigration judge must conduct a judicial competency inquiry (JCI) of certain detained, unrepresented respondents to determine whether they are competent to represent themselves in immigration proceedings. If there is insufficient evidence to determine competency, the immigration judge must order a Forensic Competency Evaluation (FCE) at the conclusion of the JCI to assist in determining competency. A Mental Health Professional (MHP) must conduct the FCE, and comply with applicable reporting requirements. If a finding of incompetency is made, EOIR must arrange for the provision of a Qualified Representative within stated timeframes.

## 6. Counsel for Children Initiative (CCI)

In August 2021, EOIR piloted a new representation initiative called the Counsel for Children Initiative (CCI). The purpose of the CCI is to increase the effective and efficient adjudication of immigration proceedings involving certain designated children who have crossed the U.S. border without a parent or legal guardian by providing representation to these children in their immigration proceedings. The CCI will also help to identify children who have been victims of human trafficking or abuse and, as appropriate, refer them to support services. CCI representatives will accept cases regardless of the child's potential eligibility for legal relief (i.e. a universal representation model).

2

**Attachment (4)**

## U.S. DEPARTMENT OF JUSTICE

## CONFIDENTIALITY AGREEMENT FOR
## CONTRACTOR EMPLOYEES

I.  I, _____, do solemnly swear (or affirm) that I understand the high standards of trustworthiness and integrity required of me with regard to materials and information which may come to my attention in connection with Government Contract _____while I am an employee of _____.

II.  Except as necessary in the performance of my duties under this contract, I will not:

    A.  Reveal, divulge, or publicize any matters dealt with under this contract.

    B.  Disseminate any oral or written information obtained as a result of execution of this contract or performance of work hereunder.

    C.  Remove any document from the place of performance of this contract, except as approved in advance by the Contracting Officer's Representative (COR).

In addition, I have read and will abide by the provisions of the Security Requirements clause of the above referenced contract.

I further swear (or affirm) that I understand the provisions of Section II A, B, and C above are fully applicable during my employment with _____ on this contract, and continue to apply without any time limitation, including the time after my employment on the contract is terminated.

III.  As a contractor employee on this contract, I understand that the Government may remove any computer access privileges for unauthorized, negligent, or willful actions.

IV.  As a contractor employee on this contract, I understand that all materials provided by the Government, including any copies, notes, or working papers derived or produced therefrom, are the property of the Government.  If required to do so by the Contracting Officer or COR, I will promptly surrender such materials and derived copies, notes, or working papers that are in my custody or control.  I understand that my failure to surrender such materials promptly, or my conversion of such materials to a use not called for by the contract (e.g., delivery of a document, or a copy thereof, or notes containing information taken from the document, to someone not working on this contract), may be a violation of 18 U.S.C. 641 (theft of government property) and may subject me to fines (up to $10,000) and imprisonment (up to 10 years).

V.  In accordance with contract provisions, the Government may formally modify or change this Agreement in those instances in which the courts (e.g., grand jury investigations), statutory requirements (e.g., civil or criminal investigative demands), or specific circumstances dictate such a modification or change.

VI.  These provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, right, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General of a

1

violation of any law, rule or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling.

_____     _____
Signature                                               Date

## Description of Labor Categories

The Contractor shall be paid in accordance with the fixed loaded hourly rates as shown in the pricing table(s) for the specified categories of labor based on the number of actual hours incurred in the performance of work specified.

**Position Title:**  Program Director/Senior Attorney
**Education/Qualifications:**  J.D. Degree and Licensed to Practice in the United States **_and/or_** minimum of five (5) years of experience working in the immigration field.
**Functional Responsibilities:**  Senior-level staff ultimately responsible for contractual compliance, budgeting, contracting, programmatic oversight and supervision.  Engages in high-level stakeholder relations.  Provides mentorship, training, and supervision to legal staff based on their familiarity with the demanding nature of the work as well as structural and pragmatic limitations.  Actively participates in legal service provider network events, and maintains collaborative relationships with other stakeholders, including relevant government agencies and pro bono attorneys.

**Position Title:**  Attorney/DOJ Accredited Representative
**Education/Qualifications:**  J.D. Degree and Licensed to Practice in the United States **_and/or_** DOJ Accredited Representative with Full Accreditation.
**Functional Responsibilities:**  Thoroughly trained, experienced, and culturally competent attorneys/DOJ Accredited Representatives directly provide legal services, including group and individual orientations. Supervises other legal staff in the delivery of services.  Develops written and recorded legal orientation materials.

**Position Title:**  Paralegal/Legal Assistant
**Education/Qualifications:**  Associate's Degree **_and/or_** minimum of two (2) years of relevant experience.
**Functional Responsibilities:**  Supports participants and ensures holistic, person-centered services.  May also provide legal services under the supervision of an attorney/DOJ Accredited Representative with full accreditation.  Develops written and recorded legal orientation materials with the approval of attorney/DOJ Accredited Representative with full accreditation.

**Position Title:**  Administrative Staff
**Education/Qualifications:**  High School Diploma or GED is preferable.
**Functional Responsibilities:**  Assists in tracking hearings, case deadlines, and timelines, as well as provides administrative support.  Supports in managing schedules, ensuring efficient and effective use of resources; conducts all necessary data entry for reporting purposes; collects and retrieves necessary documents and maintains program records and data.

# SECTION 1   DOJ-05 Security of Department Information and Systems
## (OCT 2023)

## I.   Applicability to Contractors and Subcontractors

Section 2839.102 of the Justice Acquisition Regulation (JAR), (48 C.F.R. § 2839.102), applies to this contract. Accordingly, all contractors are obligated to comply with all applicable DOJ security policies, directives, or guidance documents, including the security requirements in the provisions in this contract clause. This contract clause applies to all contractors and subcontractors, including cloud service providers ("CSPs"), and personnel of the contractors and subcontractors (hereinafter collectively, "Contractor") that may access, collect, store, process, maintain, use, share, retrieve, disseminate, transmit, or dispose of DOJ Information.  The security requirements set forth herein are in addition to those required by the Federal Acquisition Regulation ("FAR"), and any other applicable laws, mandates, contract clauses, DOJ policies, directives or guidance documents and Executive Orders pertaining to the development and operation of Information Systems and/or the protection of Government Information. This clause does not alter or diminish any existing rights, obligations, or liability under any other civil and/or criminal law, rule, regulation, or mandate.

## II.   General Definitions

The following general definitions apply to this clause. Specific definitions also apply as set forth in other paragraphs.

A.   **Authorization to Operate** ("ATO"), as defined in National Institute of Standards and Technology ("NIST") Special Publication ("SP") 800-37 Revision 2, is the official management decision given by a senior Federal official or officials to authorize operation of an information system and to explicitly accept the risk to agency operations (including mission, functions, image, or reputation), agency assets, individuals, other organizations, and the Nation based on the implementation of an agreed-upon set of security and privacy controls.

B.   **Cloud Computing**, as defined in DOJ Order 0904 Cybersecurity Program, is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction. This cloud model is composed of five essential characteristics, three service models, and four deployment models in accordance with NIST SP 800-145.

C.   **Covered Contract** is any contract, order or other agreement under which the contractor, or a subcontractor at any tier, including a cloud service provider, may access, collect, store, process, maintain, use, share, retrieve, disseminate, transmit, or dispose of DOJ Information (as defined below) in the course of providing a product or service to the Department, with the exception of acquisitions under the micro-purchase threshold.

D.   **Covered Information System** means any information system used for, involved with, or allowing, the processing, storing, or transmitting of DOJ Information under a Covered Contract.

E.   **Data** means recorded information, regardless of form or the media on which it may be recorded. The term includes technical data, computer software, and personally identifiable information (PII) (defined below). The term does not include information incidental to contract administration, such as financial, administrative, cost or pricing, or management information.

F.   **DOJ Information**, as defined in DOJ Order 0904, means any Information that is

owned, produced, controlled, protected by, or otherwise within the custody or responsibility of the DOJ, including, without limitation, information related to DOJ programs or personnel. It includes, without limitation, Information (1) provided by or generated for the DOJ, (2) managed or acquired by the Contractor for the DOJ in connection with the performance of the contract, and/or (3) acquired to perform the contract.

G.    **Information,** as defined in DOJ Order 0904, is any communication or representation of knowledge such as facts, data, or opinions, in any form or medium, including textual, numerical, graphic, cartographic, narrative, or audiovisual. This includes any communication or representation of knowledge in an electronic format that allows it to be stored, retrieved, or transmitted.

H.    **Information System**, means a discrete set of information resources organized for the collection, processing, maintenance, use, sharing, dissemination, or disposition of information (44 U.S.C. 3502(8)).

I.    **Personally Identifiable Information ("PII")**, as defined in the FAR 24.101, means information that can be used to distinguish or trace an individual's identity, either alone or when combined with other information that is linked or linkable to a specific individual. It includes but is not limited to common data elements such as names, addresses, dates of birth, and places of employment, to identity documents, Social Security numbers or other government- issued identifiers, precise location information, medical history, and biometric records. This definition covers all PII that is created by or becomes available to the contractor, including its employees, subcontractors, or affiliates, as a result of performing under this contract. PII, as supplementally defined in DOJ Order 0904, also includes information about an individual maintained by an agency, including, but not limited to, information related to education, financial transactions, medical history, and criminal or employment history and information, which can be used to distinguish or trace an individual's identity.

J.    **Private Cloud**, as defined in NIST SP 800-145, is the deployment model for cloud infrastructure provisioned for exclusive use by a single organization comprising multiple consumers (e.g., business units). It may be owned, managed, and operated by the organization, a third party, or some combination of them, and it may exist on or off premises.

K.    **Security Breach** means any security incident (as defined below) that directly relates to the loss of control, compromise, exfiltration, manipulation, unauthorized disclosure, unauthorized acquisition, unauthorized exposure or unauthorized access or any similar occurrence of any Covered Information System or any DOJ Information or any PII accessed by, retrievable from, processed by, stored on, or transmitted within, to or from any such system. This includes incidents where (1) a person other than an authorized user accesses or potentially accesses PII or DOJ Information or (2) an authorized user accesses or potentially accesses PII or DOJ Information for an unauthorized purpose.

      a.  **Potential Security Breach** (hereinafter, "Potential Breach") means any suspected, but unconfirmed security breach (as defined above).

      b.  **Confirmed Security Breach** (hereinafter, "Confirmed Breach") means any confirmed security breach (as defined above).

L.    **Security Incident** means any occurrence that (1) may actually or imminently jeopardize, without lawful authority, the availability, integrity, authentication, confidentiality, or non-repudiation of DOJ Information or a Covered Information System; or (2) may constitute a

violation or imminent threat of violation of law, security policies, security procedures, or acceptable use policies.

     a. **Potential Security Incident** means any suspected, but unconfirmed security incident (as defined above).

     b. **Confirmed Security Incident** means any confirmed security incident (as defined above).

M.    **Vulnerability,** as defined in DOJ Vulnerability Management Plan, and the OCIO Information Security Management Procedure, means a weakness or flaw discovered in the design of a system that, when exploited, may result in a loss of confidentially, integrity, or availability of DOJ Information or an Information System.

## III.   Confidentiality and Non-Disclosure of DOJ Information

A.    Preliminary and final contract deliverables and all associated working papers and material generated by the Contractor developed using DOJ Information, product, source code, and/or methods of operations, are the property of the U.S. Government and must be submitted to the Contracting Officer ("CO") or the CO's Representative ("COR") at the conclusion of the contract. The U.S. Government has unlimited data rights to all such deliverables and associated working papers and materials in accordance with FAR 52.227-14 (Rights in Data-General). The Contractor will define a method of monitoring the development activity to include any activity associated with DOJ Information, product, source code, and methods of operations. The data rights and development details shall be defined within the Contract.

If the Contractor intends to utilize its existing data, for which it has a patent or copyright, to develop a contract deliverable, it is incumbent upon the Contractor to negotiate with the CO the proper FAR Part 27 clauses in the contract to protect its existing data.

B.    Pursuant to FAR 52.227-14(d)(2), all documents and data produced in the performance of this contract containing DOJ Information, product code, source code, and/or methods of operations are the property of the U.S. Government and, without the prior written permission of the CO, the Contractor shall neither reproduce nor release such information to any third-party at any time, including during performance or following expiration and/or termination of the contract.

C.    Any DOJ Information made available to the Contractor under this contract shall be used only for the purpose of performance of this contract and shall not be divulged or made known in any manner to any persons except as may be necessary in the performance of this contract. In performance of this contract, the Contractor assumes responsibility for the protection of the confidentiality of all DOJ Information processed, stored, or transmitted by the Contractor. The Contractor shall comply with information security responsibilities and duties throughout the contract and after expiration/termination as appropriate per contract close-out activities. When requested by the CO (typically no more than annually), the Contractor shall provide a report to the CO identifying, to the best of the Contractor's knowledge and belief, the type, amount, and level of sensitivity of the DOJ Information processed, stored, or transmitted under the Contract, including an estimate of the number of individuals for whom PII has been processed, stored or transmitted under the Contract and whether such information includes social security numbers (in whole or in part).

Admin. Rec.109

## IV. Compliance with Information Technology Security Policies, Procedures and Requirements

A.    For all Covered Information Systems, in addition to any other applicable requirements, as set forth in Part I, the Contractor shall comply with the security requirements of the Federal Information Security Modernization Act of 2014 ("FISMA"), Privacy Act of 1974, E-Government Act of 2002, National Institute of Standards and Technology ("NIST") Special Publications ("SP"), including NIST SP 800-37, 800-53, and 800-60 Volumes I and II, Federal Information Processing Standards ("FIPS") Publications 140-2, 199, and 200, Federal Risk and Authorization Management Program ("FedRAMP"), DOJ IT Security Standards as amended, and OMB Memoranda relating to the security of information and/or Federal Information Systems.

B.    In addition, for all Covered Information Systems, the Contractor shall comply with the following requirements, which are listed here only to highlight certain specific applicable requirements from one of the sources identified in the first paragraph of this Section. This is not an exhaustive list of all such requirements with which the Contractor is obligated to comply, and the omission of a requirement from this list should not be construed as negating the materiality of that requirement.   These requirements and those in the authorities in the prior paragraph should be read together.

1.    Limiting access to DOJ Information and Covered Information Systems to authorized users and to transactions and functions that authorized users are permitted to exercise.

2.    Providing security awareness training at least annually to all Contractor employees and contractors involved with the Covered Contract.  Such training shall include, but not be limited to, recognizing and reporting potential indicators of insider threats to users and managers of DOJ Information and Covered Information Systems.

3.    Creating, protecting, and retaining, in accordance with applicable requirements but in any event at least until the expiration of the contract, Covered Information System audit records, reports, and supporting documentation to enable reviewing, monitoring, analysis, investigation, reconstruction, and reporting of unlawful, unauthorized, or inappropriate activity related to such Covered Information Systems and/or DOJ Information.

4.    Maintaining authorizations to operate any Covered Information System.

5.    Performing continuous monitoring on all Covered Information Systems, to include but not be limited to, collecting, reviewing, and analyzing appropriate logs and timely investigating security alerts and potential security incidents.

6.    Establishing and maintaining baseline configurations and current inventories of Covered Information Systems, including hardware, software, firmware, and documentation, throughout the Information System Development Lifecycle, and establishing and enforcing security configuration settings for IT products employed in Covered Information Systems.

7.    Ensuring appropriate contingency planning has been performed, including DOJ Information and Covered Information System backups.

8.    Identifying Covered Information System users, processes acting on behalf of users, or devices, and authenticating and verifying the identities of such users, processes, or devices, using multifactor authentication or HSPD-12 compliant authentication methods as defined by NIST 800-63-3, *Digital Identity Guidelines* or current revision.

9.    Establishing and maintaining an operational incident handling capability for Covered Information Systems that includes adequate and timely development, logging, detection, analysis, containment, recovery, and user response activities,

and tracking, documenting, and timely reporting incidents to appropriate officials and authorities within the Contractor's organization and the DOJ.

10. Performing periodic and timely maintenance on Covered Information Systems, and providing effective controls on tools, techniques, mechanisms, and personnel used to conduct such maintenance.

11. Protecting Covered Information System media containing DOJ Information, including paper, digital and electronic media, and DOJ assets under Contractor control; protecting them from environmental impacts, access, and equipment positioning requirements defined; limiting access to DOJ Information to authorized users; and sanitizing or destroying Covered Information System media containing DOJ Information before disposal, release or reuse of such media.

12. Limiting physical access to Covered Information Systems, equipment, and physical facilities housing such Covered Information Systems to authorized personnel according to DOJ 03.

13. Screening individuals prior to authorizing access to Covered Information Systems to ensure compliance with DOJ Security standards including personnel background checks.

14. Continuously assessing the risk to DOJ Information in Covered Information Systems, including scanning and remediating vulnerabilities, or implementing appropriate mitigation in accordance with DOJ policy, and ensuring the timely removal of assets no longer supported by the Contractor.

15. Continuously monitoring the application of security controls of Covered Information Systems, assessing the efficacy of such controls, and developing and implementing plans of action designed to correct deficiencies and eliminate or reduce vulnerabilities in such Covered Information Systems.

16. Monitoring, controlling, and protecting information transmitted or received by Covered Information Systems at the external boundaries and key internal boundaries of such Covered Information Systems, and employing architectural designs, software development techniques, and systems engineering principles that promote effective security.

17. Identifying, reporting, and correcting Covered Information System security flaws in a timely manner, providing protection from malicious code at appropriate locations, monitoring security alerts and advisories and taking appropriate and timely action in response.

18. Ensuring return of Government Furnished Equipment ("GFE") and/or PIV card assets within 10 business days of notification for end of use (contract end, staff change, etc.).

19. Complying with rights in data (FAR 52.227-14) as to the development, management, and protection of DOJ Information.

20. Reporting on risks or known issues impacting DOJ Services (staffing, hardware, process, changes, etc.) through the Contractor's CO or COR, DOJ Service Owner ("SO"), and Government Technical Manager ("GTM") including risk mitigation activities.

21. Reporting through the Contractor's CO or COR on any projected or planned changes in corporate ownership, covered information system design, and/or any technical changes that could impact the confidentiality, integrity or availability of DOJ Information, data, or systems. Changes to system design must be updated through the authorization process per NIST SP 800-37 Revision 2, Step 6 ('Continuous Monitoring') or current NIST revision.

22. When, as part of operating within the DOJ environment, the Contractor's covered information system is subject to review, audit, or assessment by third parties,

facilitating DOJ access to information system resources, facilities, personnel, and documentation in a timely manner as required by the auditors. Should a third- party organization conduct a review of any Covered Information System, the Contractor must provide a copy of the report to DOJ, through the CO and COR.

23.    Completing an attestation that meets OMB Memorandum M-22-18 for software procurements following the template attestation form developed by NIST. The attestation form must be returned to the CO and COR for sharing with the component Chief Information Officer (CIO).

24.    Reporting on outages impacting DOJ Services through the Contractor's CO, COR, and DOJ Service Owner (SO) to include event and mitigation details.

C.    The Contractor shall not process, store, or transmit DOJ Information using a Covered Information System without first obtaining an ATO for each Covered Information System. The ATO shall be signed by the Authorizing Official for the DOJ component responsible for maintaining the security, confidentiality, integrity, and availability of the DOJ Information under this contract. (For Cloud Computing Systems, see Section V, below.)

D.    **Deferred to the terms and conditions agreed upon in the original IDIQ under section II PERSONNEL SECURITY REQUIREMENTS FOR CONTRACTOR EMPLOYEES (ALT. I) – CLASSIFIED INFORMATION – CLEARED CONTRACTORS.**

E.    When requested by the DOJ CO or COR as described below, the Contractor shall provide DOJ, including the Office of Inspector General ("OIG") and Federal law enforcement components, (1) access to any and all information and records, including electronic information, regarding a Covered Information System, and (2) physical access to the Contractor's facilities, installations, systems, operations, documents, records, and databases. Such access may include independent validation testing of controls, system penetration testing, and FISMA data reviews by DOJ or agents acting on behalf of DOJ, and such access shall be provided within 72 hours of the request. Additionally, the Contractor shall cooperate with DOJ's efforts to ensure, maintain, and safeguard the security, confidentiality, integrity, and availability of DOJ Information.

F.    The use of Contractor-owned laptops or other portable digital or electronic media to process or store DOJ Information covered by this clause or access a Covered Information System is prohibited unless the CO approves it in writing after the Contractor has provided a letter certifying compliance with the following requirements. For any requirements which include the use or storage of PII, the Senior Component Official for Privacy must also approve. Any additional requirements set forth for the use or storage of PII under DOJ-02, Contractor Privacy Requirements, are in addition to, not superseded by, the requirements set forth here.

1.    Media must be encrypted using a NIST FIPS 140-2 approved product.

2.    The Contractor must develop and implement a process to ensure that security and other applications software is kept up to date.

3.    Where applicable, media must utilize antivirus software and a host-based firewall mechanism.

4.    The Contractor must log all computer-readable data extracts from databases holding DOJ Information and verify that each extract including such data has been erased within 90 days of extraction or that its use is still required. All DOJ Information should be treated by the Contractor as sensitive information unless specifically designated as non-sensitive by the DOJ.

5.    A Rules of Behavior (ROB) form must be signed and acknowledged annually by users. These rules must address, at a minimum, authorized, and official use,

prohibition against unauthorized users and use, and the protection of DOJ Information. The form also must notify the users that they have no reasonable expectation of privacy regarding any communications transmitted through or data stored on Contractor-owned laptops or other portable digital or electronic media.

6.      Cybersecurity Awareness Training (CSAT) shall be provided annually by Contractor for all users of Covered Information System. This training must be submitted to, and approved by, the CO or COR in advance of being provided to users. Users must complete and acknowledge having received CSAT each year. At a minimum, CSAT provided by contractors must include:

   a. Insider Threat Detection and Reporting – Importance of detecting, methodologies, indicators, and reporting
   b. Privacy Awareness – Privacy Act and PII
   c. General Cybersecurity – Information security, trends in advance persistent threats, social engineering/phishing, appropriate use, mobile devices, remote access, basic security best practices

G.      Contractors shall not store DOJ information on Contractor-owned removable IT (e.g., media such as a thumb drive or external hard drive) unless expressly authorized in writing by the DOJ CO or COR in the performance of their contract.

H.      When no longer needed, all media must be processed (sanitized, degaussed, or destroyed) in accordance with NIST SP 900-88, *Guidelines for Media Sanitization*.

I.      The Contractor must keep an accurate inventory of digital or electronic media used in the performance of DOJ contracts.

J.      The Contractor must remove all DOJ Information from Contractor media and return all such information to the DOJ within 10 days of the expiration or termination of the contract, unless otherwise extended by the CO, or waived (in part or whole) by the CO, and all such information shall be returned in a format and form acceptable to DOJ. The Contractor shall provide a written certification certifying the removal and return of all such information to the CO within 10 business days of the removal and return of all DOJ Information.

K.      DOJ, at its discretion, may suspend the Contractor's access to any DOJ Information, or terminate the contract, when DOJ suspects that the Contractor has failed to comply with any security requirement, or in the event of an Information System Security Incident or Security Breach (see definitions above), where the Department determines that either event gives cause for such action. The suspension of access to DOJ Information may last until such time as DOJ, in its sole discretion, determines that the situation giving rise to such action has been corrected or no longer exists. Any termination action taken because of the Contractor's suspected failure to comply with any security requirement will be conducted in accordance with the applicable termination clause governing the awarded contract. The Contractor understands that any suspension or termination in accordance with this provision shall be at no cost to DOJ, and that upon request by the CO, the Contractor must immediately return all DOJ Information to DOJ, as well as any media upon which DOJ Information resides, at the Contractor's expense.  The Contractor must comply with FAR 52.227-14 (Rights in Data), FAR 52.245-1 (Government

Property), DOJ 2400.3A Chapter 1 (component property procedures), and FAR 4.804-5(a)(6) (Procedures for closing out contract files).

## V.   Cloud Computing

A.   The Contractor may not utilize the Cloud system of any Cloud Service Provider (CSP) unless:

    1.   All of the following has occurred: (a) the Cloud system and CSP have been evaluated by a Third Party Assessing Organization ("3PAO") certified under FedRAMP; (b) the Cloud system received FedRAMP authorization; (c) the Contractor has provided the most current System Security Plan ("SSP") and Security Assessment Report ("SAR") to the DOJ CO for consideration, and provides any subsequent SSPs and SARs within 30 days of issuance; and, (d) the Authorizing Official for the DOJ component responsible for maintaining the security confidentiality, integrity, and availability of the DOJ Information under the Covered Contract has issued an ATO; or,

    2.   In cases where the CSP or its offering is not FedRAMP authorized, the COR approves utilization of the Cloud System after the CSP has worked with the authorizing official, the DOJ OCIO, and the FedRAMP Program Management Office to determine that the CSP is likely to seek and receive Agency/FedRAMP authorization within 1 year, or DOJ has authorized use as a Private Cloud or Contractor Owned, Contractor Operated system.

B.   The Contractor must ensure that the CSP allows DOJ to access and retrieve any DOJ Information processed, stored, or transmitted in a Cloud system under this Contract within a reasonable time of any such request, but in no event less than 48 hours from the request. To ensure that the DOJ can fully and appropriately search and retrieve DOJ Information from the Cloud system, access shall include any schemas, meta-data, and other associated data artifacts.

C.   The Contractor must ensure that the CSP provides access and information to support and enable DOJ's cloud security posture management, to include the current inventory of security management configuration data for services and information to confirm the Contractor has been monitoring accounts for compliance with security requirements. The DOJ Justice Security Operations Center (JSOC) must be able to access logs and events to investigate potential security breaches and perform security posture assessments associated with the Security Audit Identity Credential Access Management (ICAM) policies.

D.   The Contractor must ensure that the CSP provides evidence of annual recertification of privileged user access management.

E.   A Supply Chain Risk Management (SCRM) review is mandatory for specified acquisitions in accordance with established process in EO 14028 and NIST SP 800-161, *Cybersecurity Supply Chain Risk Management Practices for Systems*

Admin. Rec.114

*and Organizations*, or superseding document. All vendor products and solutions to be used on DOJ national security systems, enterprise-wide systems, or new FIPS-199 High and Moderate systems for the purpose of accessing, collecting, storing, processing, maintaining, using, sharing, retrieving, disseminating, transmitting, or disposing of DOJ Information must be submitted to DOJ OCIO for a Supply Chain Risk Management review prior to contract award or ATO signature. Changes in corporate ownership or structure shall be reported to the CO for referral to SCRM. The Contractor shall notify the CO of any confirmed Supply Chain compromise affecting the Contractor's products or services within 1 hour of discovery.

_____ The following SCRM requirements for acquisition of systems, hardware, or software which will be used in systems that are mission critical or process sensitive data apply to this award. **(CO check as appropriate in coordination with the Program Manager and/or System Owner)**

1. The Contractor shall develop and deliver a SCRM Plan. The SCRM Plan shall meet the format described in NIST SP 800-161, Appendix E. The SCRM plan shall address the following security controls from NIST SP 800-53 Rev 5: SR-2, SR-3, SR-4, SR-5, SR-6, SR-7, SR-8, SR-9, SR-10, and SR-11. Equivalent ISO 27000 series controls may be used if they are mapped to the NIST control(s).
2. The Contractor shall implement the required security controls as documented in the SCRM Plan. The requirements of the SCRM plan shall flow down to all subcontractors. Evidence of the certification and compliance is required.
3. The Contractor shall provide evidence of compliance with the documented SCRM Plan. **(CO select which applies)**
   _____ Self-assessment by a contractor security team
   _____ External assessment by an independent auditor

## VI. Information System Security Incident or Security

   A. <u>Confirmed Security Incident</u>. The Contractor shall immediately (and in no event later than 1 hour of discovery) report any Confirmed Security Incident to the DOJ CO and COR. If the Confirmed Security Incident occurs outside of regular business hours and/or neither the DOJ CO nor the COR can be reached, the Contractor must call JSOC at 1-202-357-7000 immediately (and in no event later than within 1 hour of discovery of the Confirmed Security Incident) and shall notify the CO and COR as soon as practicable.

   B. <u>Potential Security Incident.</u>
   1. If the Contractor suspects that DOJ information has been potentially disclosed or impacted, the Contractor shall promptly investigate to determine if a Security Incident has occurred. If the Contractor has not determined within 24 hours (i.e., 24 hours from detection of potential security incident and/or security breach) whether the Potential Security Incident was in fact a Security Incident, then it must immediately report

the Potential Security Incident to the DOJ CO and the COR. If the time by which to report the Potential Security Incident occurs outside of regular business hours and/or neither the DOJ CO nor the COR can be reached, the Contractor must call or e-mail the JSOC Team at 1-202-357-7000 or JSOC@USDOJ.GOV and contact the DOJ CO and COR as soon as practicable. If the contract involves PII, the Contractor must comply with the notification requirements of DOJ-02 and Executive Order M-17-12 (Memorandum on Preparing for and Responding to a Breach of Personally Identifiable Information), Contractor Privacy Requirements, Section B.5, for an actual or suspected Security Incident.

2.      The Contractor must limit sharing of Security Incident details to only those individuals involved in responding to the potential Security Incident. Any provisions of the Covered Contract regarding the citizenship or location of individuals working on the Covered Contract apply equally to individuals involved in responding to any potential Security Incidents. The Contractor may request assistance from the JSOC for advice, incident response, or FBI coordination. The Contractor must provide weekly updates to CO, COR and JSOC during the course of a Security Incident investigation.

C.      Any report submitted in accordance with paragraphs (B) and (C), above, shall identify:

1.      Both the Covered Information Systems and DOJ Information involved or at risk, including the type, amount, and level of sensitivity of the DOJ Information and, if the DOJ Information contains PII, the estimated number of unique instances of PII.

2.      All steps and processes being undertaken by the Contractor to minimize, remedy, and/or investigate the Security Incident.

3.      Any and all other information as required by the CISA Federal Incident Notification Guidelines, including the functional impact, information impact, impact to recoverability, threat vector, mitigation details, and all available incident details; and

The Contractor may request assistance from the JSOC Team for advice, incident response, or FBI coordination, and must provide weekly updates to CO, COR, and JSOC during the course of an Incident investigation.

D.      Except as otherwise required by Federal, State and local laws, executive orders, rules and regulations, all determinations regarding whether and when to notify other individuals and/or federal agencies potentially affected by a Security Incident will be made by DOJ senior officials, the DOJ Core Management Team, or the COR at DOJ's discretion.

E.      The Contractor must provide to DOJ full access to any facility and/or Covered Information System affected or potentially affected by any potential or confirmed Security Incident, including access by the DOJ OIG and federal law enforcement organizations, and undertake any and all response actions DOJ determines are required to ensure the protection of

Admin. Rec.116

DOJ Information, including providing all requested images, log files, and event information to facilitate rapid resolution of any Security Incident.

F.      DOJ, at its sole discretion, may obtain, and the Contractor will permit, the assistance of other federal agencies and/or third-party contractors or firms to aid in response activities related to any potential or confirmed Security Incident. Additionally, DOJ, at its sole discretion, may require the Contractor to retain, at the Contractor's expense, a 3PAO acceptable to DOJ, with expertise in incident response, compromise assessment, and federal security control requirements, to conduct a thorough vulnerability and security assessment of all affected Covered Information Systems.

G.      Response activities related to any Security Incident undertaken by DOJ, including activities undertaken by the Contractor, other federal agencies, and any third-party contractors or firms at the request or direction of DOJ, may include inspections, investigations, forensic reviews, data analyses and processing, and final determinations of responsibility for the Security Incident and/or liability for any additional response activities. The Contractor shall be  responsible for all costs and related resource allocations required for all such response activities related to any Security Incident, including the cost of any penetration testing.

## VII. Pass-Through of Security Requirements to Subcontractors and CSPs

A.      The requirements set forth in the preceding paragraphs of this clause apply to all subcontractors and CSPs who perform work in connection with the contract, including any CSP providing services for any other CSP under the contract, and the Contractor shall flow down this clause to all subcontractors and CSPs performing under this contract. Any breach by any subcontractor or CSP of any of the provisions set forth in this clause will be attributed to the Contractor.

(End of Clause)

EXHIBIT 6

**Phase I of Plan to Provide Enhanced Procedural Protections
to Unrepresented Detained Respondents with Mental Disorders[1]**

## I. Foundational Principles

Commitment to Screen and Provide Protections

The Executive Office for Immigration Review ("EOIR") is committed to identifying detained unrepresented respondents in immigration custody who are not competent to represent themselves in removal and custody redetermination proceedings.

EOIR will not proceed in the case of any detained unrepresented respondent determined to be incompetent to represent him- or herself in a removal or custody redetermination proceeding until appropriate procedural protections and safeguards are in place.

## II. Determinations to Be Made by Immigration Judges[2]

A. Background

In *Matter of M-A-M-*, 25 I&N Dec. 474 (BIA 2011), the Board of Immigration Appeals held that for an alien to be competent to participate in an immigration proceeding, he or she must have a rational and factual understanding of the nature and object of the proceeding and a reasonable opportunity to exercise the core rights and privileges afforded by law. *Id.* at 479.

On April 22, 2013, the Office of the Chief Immigration Judge announced a "Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders or Conditions." This policy makes a qualified legal representative available in removal and custody redetermination proceedings if it is determined that a respondent with a serious mental disorder or condition is detained, unrepresented, and incompetent to represent him- or herself.

Accordingly, for a detained, unrepresented respondent with a serious mental disorder or condition to be considered competent to represent him- or herself in a removal or custody redetermination proceeding, he or she must be able to meaningfully

---

[1] EOIR announced its nationwide plan to provide enhanced procedural protections to unrepresented, detained respondents on April 22, 2013. On August 15, 2013, EOIR began Phase I of its nationwide plan, in order to test aspects of the plan. This document constitutes EOIR's final guidance for Phase I of its nationwide plan. Based on observations made during Phase I, EOIR may issue revised guidance in conjunction with further roll-out of the plan.

[2] This guidance sets forth principles by which Immigration Judges should assess competency within the context of EOIR's nationwide plan to provide enhanced procedural protections to unrepresented, detained respondents with mental disorders. As part of its ongoing commitment to provide such protections, EOIR also intends to issue a Notice of Proposed Rulemaking on this subject and, upon receipt and review of public comment, a Final Rule.

participate in the proceeding and perform the functions necessary for self-representation.

B. Competence to Represent Oneself

Immigration Judges should utilize the following guidance to determine if a respondent is competent to represent him- or herself:

A respondent is competent to represent him- or herself in a removal or custody redetermination proceeding if he or she has a:

1. rational and factual understanding of:
    a. the nature and object of the proceeding;
    b. the privilege of representation, including but not limited to, the ability to consult with a representative if one is present;
    c. the right to present, examine, and object to evidence;
    d. the right to cross-examine witnesses; and
    e. the right to appeal.

2. reasonable ability to:
    a. make decisions about asserting and waiving rights;
    b. respond to the allegations and charges in the proceeding; and
    c. present information and respond to questions relevant to eligibility for relief.

A respondent is incompetent to represent him- or herself in a removal or custody redetermination proceeding if he or she is unable because of a mental disorder to perform any of the functions listed in the definition of competence to represent oneself.  "Mental disorder" (including Intellectual Disability) is defined as a significant impairment of the cognitive, emotional, or behavioral functioning of a person that substantially interferes with the ability to meet the ordinary demands of living.

C. Presumption of Competence

A respondent is presumed to be competent to represent him- or herself in a removal and custody redetermination proceeding.  *See, e.g.*, *M-A-M-*, 25 I&N Dec. at 479.

The presumption of competence to represent oneself is rebutted if an Immigration Judge finds, by a preponderance of the evidence, that the respondent is unable because of a mental disorder to perform any of the functions listed in the definition of competence to represent oneself.

D. Provision of a Qualified Legal Representative

EOIR will provide a qualified legal representative to any detained, unrepresented alien in a removal or custody redetermination proceeding found to be incompetent to represent him- or herself.

## III. Process to Identify & Determine Issues of Competence

There are three stages to screen for and decide issues of competence:

1. Detecting indicia – The judge remains attentive to any behaviors or other indicators that the respondent may have a mental disorder limiting his or her ability to represent him- or herself. Where there is a "bona fide doubt" about respondent's competence to represent him- or herself, the judge should move to stage 2 and conduct a judicial inquiry.

2. Conducting a judicial inquiry – The judge asks a series of questions to determine whether there is "reasonable cause" to believe that the respondent may be incompetent to represent him- or herself. At the conclusion of the judicial inquiry, the judge may find that the respondent is competent or incompetent to represent him- or herself. Alternatively, if there is reasonable cause to believe the respondent may be incompetent to represent him- or herself, but the evidence is not sufficient to rebut the presumption of competence, the judge should move to stage 3 and conduct a more in-depth hearing on the issue of competence.

3. Conducting a competency review – The judge conducts an evidentiary hearing to determine whether the presumption of competence has been rebutted.

## IV. Detection of Indicia

Competence is the ability to perform a function demanded in a particular situation at the defined level. Competence is neither a status nor a state. Competence cannot be observed. Rather, one may observe behavioral signs or indicia that a person may lack the ability to perform a task or function required in a particular situation.

Immigration Judges must be vigilant at all times for indicia of a mental disorder that significantly impairs the respondent's ability to perform the functions listed in the definition of competence.

A. Examples of Indicia

Indicia of a mental disorder that can impair competence or reflect impaired competence include, but are not limited to:

Past or current evidence of interventions related to mental disorder—for example:

- Outpatient mental health treatment
- Psychiatric hospitalization
- Interventions for self-injurious behavior or suicide attempts
- Limited academic achievement
- Currently receiving mental health treatment

Current manifestations of behavior suggesting mental disorder—for example:

- Poor memory
- Poor attention/concentration
- Confused or disorganized thinking
- Paranoid thinking (unreasonable fears)
- Grandiose thinking (overestimating own ability)
- Seeing or hearing things not present
- Serious depression or anxiety
- Poor intellectual functioning
- Irrational behavior or speech in court
- Lack of responsiveness in court

B. Sources of Indicia

Indicia of the respondent's cognitive, emotional, or behavioral functioning may come from any reliable source including, but not limited to: family members, friends, legal service providers, health care providers, social service providers, caseworkers, clergy, detention personnel, or other collateral informants or third parties knowledgeable about the respondent.

C. Form of Indicia

Indicia of incompetence may appear in any form including, but not limited to, observed behaviors; letters; government, legal, educational, employment, or health care records; or other verbal or written accounts.

D. Timing of Indicia

Because competence is fluid and may change over time, indicia of incompetence may appear and must be considered throughout all stages of the proceeding.

E. <u>Communication by the Department of Homeland Security (DHS) of Indicia to the Court</u>

<u>Role of DHS v. EOIR Examinations</u>

DHS serves a custodial and prosecutorial role in immigration proceedings. EOIR serves as an impartial adjudicator in immigration proceedings.

In its custodial role, the Department of Homeland Security may, upon taking an individual into custody, perform a physical and mental health examination of the individual. The purpose of this examination is, in part, to ensure that the detained individual does not pose a danger to self or others and to address appropriate treatment during detention. The purpose of this examination is not to determine whether the detained individual is competent to represent him- or herself in an immigration proceeding. In fact, not all individuals detained by DHS are detained for the purpose of instituting an immigration proceeding.

The DHS intake examination may nonetheless reveal information relevant to understanding the respondent's cognitive, emotional, and behavioral functioning. DHS has an obligation to provide the court with relevant materials in its possession that would inform the court about the respondent's mental competency. *M-A-M-*, 25 I&N Dec. at 480.

The examination to inform the court's determination of the competence of the respondent will be prepared at the request of the court rather than during the custodial intake by DHS. This is because the judge is in a better position to inform the mental health professional in the referral for examination about the nature and object of the proceeding and the reasons why the court questions the competence of the respondent. Additionally, a competence examination prepared by an agent of the court is likely to have greater evidentiary weight and avoid potential conflicts of interest than a report prepared by an agent of the prosecuting component of the government. The process for an Immigration Judge to refer the respondent for a competency examination is set forth below.

## V. Judicial Inquiry

A. <u>When to Conduct a Judicial Inquiry</u>

Where the evidence of record results in a "bona fide doubt" about the respondent's competency to represent him- or herself, the judge should conduct a judicial inquiry. A "bona fide doubt" exists if there is "substantial evidence of incompetence." Evidence suggestive of a "bona fide doubt" includes, but is not limited to, respondent's demeanor before the court, irrational behavior, and available health evaluations. *See, e.g., Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir. 1997) (internal citations omitted).

B.  Purpose of the Judicial Inquiry

The purpose of the judicial inquiry is to gather information so the judge can make an informed decision whether the respondent's competency is at issue and a more in-depth competency review is necessary.

C.  Process for Conducting a Judicial Inquiry

The judge begins the judicial inquiry by explaining to the respondent the purpose and process for conducting the judicial inquiry.  The judge then proceeds to ask the respondent questions designed to shed light on the respondent's ability to represent him- or herself and his or her cognitive, emotional, and behavioral functioning.  An explanation of the process for conducting a judicial inquiry with a sample advisal and suggested questions is contained in Appendix A.  When performing the judicial inquiry, it is important that the judge note for the record any relevant non-verbal as well as verbal response to the questions.

D.  Possible Outcomes of the Judicial Inquiry

There are three possible outcomes of the judicial inquiry:

- Respondent is competent - There is no reasonable cause to believe that the respondent is suffering from a mental disorder that impairs his or her ability to perform the functions listed in the definition of competence to represent him- or herself.  In such case, the presumption that the respondent is competent is not rebutted and the court can proceed without any additional safeguards or protections.

- Respondent is incompetent - A preponderance of the evidence establishes that the respondent is not competent to represent him- or herself in the proceeding.  In such case, the judge will find the presumption of competence has been rebutted, request provision of a qualified representative, and ensure appropriate safeguards and protections are put in place.

- Insufficient evidence to decide if respondent is competent - The evidence is not sufficient to rebut the presumption of competence but the judge has "reasonable cause" to believe that the respondent is suffering from a mental disorder that impairs his or her ability to represent him- or herself.  In such cases, the judge should conduct a hearing to gather additional evidence needed to determine whether the respondent is competent.

## VI. Competency Review

### A. When to Conduct a More In-Depth Competency Review

Where, at the conclusion of the judicial inquiry, the judge has "reasonable cause" to believe that the respondent is suffering from a mental disorder but needs additional evidence to determine whether the presumption of competence is rebutted, the judge will schedule a hearing to collect and review evidence of competency. It is at this stage that the judge will consider whether to refer the respondent for a mental health examination to inform the court's decision on competency.

### B. Procedural Rules

A determination of competence to represent oneself encompasses issues of law and fact that are addressed, along with all other issues of law and fact, in the context of the immigration proceeding. No additional hearing type or separate record of proceeding will be generated.

## VII. System of Referral for a Mental Health Examination

### A. When to Refer a Respondent for a Mental Health Examination

The Immigration Judge is not required to refer the respondent for a mental health examination. However, the judge is required to consider whether a referral is necessary.

A referral for a mental health examination is appropriate where the judge is unable to determine, based upon existing evidence of record, whether the respondent is competent to represent him- or herself.

### B. Process to Refer Respondent for a Mental Health Examination

To refer the respondent for a mental health examination, the judge should complete the mental health examination referral found in Appendix B.

The referral provides the mental health professional with information, if available, about the nature and object of the proceeding, including the type of proceeding, the projected length of the hearings, the anticipated complexity of issues, the allegations and charges against the respondent, and potential forms of relief. The referral provides the mental health professional with information relating to respondent's current cognitive, emotional, and behavioral functioning such as the behavioral observations, statements, or other information that caused the judge to question the ability of the respondent to perform as required in the proceeding.

The referral also provides background and administrative information to the mental health professional, including the name of the respondent, alien registration number, language spoken, apparent country of origin, place of detention, next court date or other deadline for the examination or report, and the name of the judge.

The referral should also include the name of a contact the mental health professional can speak with, if any, who may be knowledgeable about the respondent's past or current cognitive, emotional, and behavioral functioning.

The referral should also be accompanied by other documents, records, or information relevant to the competence of the respondent.

C. Use of an Interpreter in the Mental Health Examination

Where it is indicated in the mental health examination referral that the language the respondent speaks and understands best is a language other than English and the mental health professional is not fluent in the respondent's language, the Language Services Unit of the Office of the Chief Immigration Judge should be notified so that arrangements can be made to secure the services of a qualified interpreter for the mental health examination.

D. Qualifications of Examining Professionals

Upon receipt of the mental health examination referral, EOIR will procure the services of a qualified mental health professional.

At a minimum, mental health professionals assigned to serve as examiners for purposes of immigration proceedings must:

- be licensed to practice psychology or medicine in the jurisdiction where the examination will be conducted;

- have specialty training in psychiatry, clinical psychology, or counseling psychology;

- have completed an EOIR-approved training in conducting mental health examinations of respondents in immigration proceedings; and

- be able to document successful completion of a minimum of 100 hours of approved continuing education in conducting forensic examinations.

Whenever feasible, psychologists and psychiatrists appointed to conduct mental health examinations shall:

- be certified by the American Board of Psychiatry and Neurology (with added qualifications in forensic psychiatry) or the American Board of Forensic Psychology or other comparable organization; or

- have experience and completed training on conducting competence examinations.

Other relevant considerations when assigning a mental health professional in immigration proceedings include the quantity and level of training completed by the mental health professional, experience conducting competency examinations (especially experience conducting examinations of respondents in immigration proceedings), the complexity of examination required, the mental health professional's familiarity with and knowledge of the respondent's language, culture and possible disorder(s), and other factors relevant to the case at hand.

Mental health professionals should use structured and standardized assessment tools and methods whenever possible. Any tools or methods used must be reliable and valid, taking into consideration the respondent's background and culture.

Mental health professionals meeting the above qualifications presumptively qualify as having expertise in conducting an examination of a respondent's competence to represent him- or herself in an immigration proceeding.

E. <u>EOIR-Approved Training of Mental Health Professionals</u>

The EOIR-approved training program required to be qualified to conduct mental health examinations in immigration proceedings will cover:

- introduction to immigration law and procedure;

- determinations of competence in immigration proceedings;

- conducting mental health evaluations for immigration proceedings;

- report writing for the immigration court;

- ethics and professionalism;

- working with a foreign language interpreter; and

- cultural competence in forensic examinations.

Any mental health professional conducting an examination by tele-health or other electronic technology shall also have completed training in conducting an examination via that modality.

F.  Role of the Mental Health Professional v. Role of the Judge

The role of the mental health professional is to identify and describe for the court any cognitive, emotional, or behavioral impairments the respondent has and their effects, if any, on the respondent's ability to perform the functions required to be competent to represent him- or herself in an immigration proceeding.

The role of the Immigration Judge is to determine whether any limitations on the respondent to perform the functions as reported by the mental health professional and established by any other relevant evidence of record fall with the defined range of ability (*i.e.*, rationally able to… , factually able to…, or reasonably able to…) necessary to represent him- or herself.

G.  Fiduciary Duty and Notification of the Mental Health Professional

The purpose of the mental health examination ordered by the immigration court is to provide information to the court about the mental health of the respondent so the court can make an informed decision about the respondent's competence to represent him- or herself.  The purpose of the mental health professional is not to treat or assist the respondent.  Although the examining mental health professional may owe the respondent some legal duties, the fiduciary duty of the mental health professional is owed to the court.  No relationship or privilege exists or is created between the respondent and the examining mental health professional assigned to conduct the examination by the immigration court.

There is no requirement that the examining mental health professional obtain informed consent from the respondent when the examination has been ordered by the court.  The mental health professional, however, must notify the respondent of the purpose of the mental health examination, the examination procedure to be utilized, the lack of privilege and confidentiality between the mental health professional and the respondent, possible uses of the examination report, how information obtained during the examination and the report may be shared, and any other matter required by professional or ethical rules of behavior.

Any record, report, or work product prepared by the examining mental health professional belongs to the immigration court.  There is no right or privilege of privacy or confidentiality between the examining mental health professional and the respondent.  A mental health professional assigned by the court shall be deemed a court witness whether called by the court or either party, and may be examined as such by either party.

H.  Refusal of the Respondent to Cooperate in the Mental Health Examination

Where the respondent refuses to cooperate in or attend the mental health examination ordered by the court, the examining mental health professional shall use any available data or information to assess the competency of the respondent to represent him- or herself and, to the extent possible, prepare the report ordered by the court.  The examining mental health professional can rely on information such as personal observation of the respondent, health care records, information provided by family, friends, or others familiar with the respondent, information from detention personnel, educational records, court records, records of law enforcement agencies, or any other information relevant to the respondent's ability to represent him- or herself and assist a qualified representative if one is provided.

I.  Format of the Examination

The mental health examination should be conducted in person in the facility where the respondent is detained unless there is a medical, administrative, or security justification for not doing so.

Subject to reasonable security and administrative considerations, the mental health examination must be conducted in a location such as a pro bono room or room designated for detainees to meet with legal counsel that provides, as determined by the mental health professional, a sufficient degree of uninterrupted quiet and privacy to conduct the examination.  The examining mental health professional and respondent should have access to a table and two chairs. Where possible, common visitation and consultation areas and areas with glass or other dividers separating the respondent from the mental health professional should be avoided.

In rare circumstances, for instance where no qualified mental health professional can be located near the place of respondent's detention, an immediate examination is needed, or a distant examining mental health professional with special skill or knowledge is required, the examination may be conducted using tele-health technology.  In the event that tele-health technologies are employed, the resolution of electronic images must be medically appropriate as determined by the mental health professional performing the examination.

Examining mental health professionals must comply with the laws regulating his or her profession in the jurisdiction in which the examination is performed and any other professional or ethical obligations that apply.

J.  Scope of the Examination

Upon assignment by the court, the mental health professional shall examine the respondent's cognitive, emotional, and behavioral functioning and competence to represent him- or herself, as specified by the court in its order appointing the mental health professional to evaluate the respondent.

1. Assessment of Respondent's Cognitive, Emotional, and Behavioral Functioning

   When conducting the evaluation the mental health professional shall assess:

   a. relevant aspects of the respondent's social, educational, vocational, medical, and mental health histories, and other histories if necessary; and

   b. the respondent's presentation and behavior during the evaluation, including reported or observed signs or symptoms of a mental disorder and the respondent's response style (*i.e.*, approach to the evaluation).

2. Assessment of Respondent's Competence

   When conducting the evaluation, the mental health professional shall consider factors related to the issue of whether the respondent meets the criteria for competence in an immigration proceeding (*i.e.*, whether the respondent has present ability to represent him- or herself).

   In considering the issue of competence, the mental health professional shall assess all of the following:

   a. Respondent's rational and factual understanding of:

      1) the nature and object of the proceeding, including its adversarial nature;
      2) the allegations and charge(s);
      3) possible outcomes of the proceeding; and
      4) the roles of participants in the proceeding.

   b. Respondent's rational and factual understanding of:

      1) the privilege of representation, including but not limited to, the ability to consult with a representative if one is present;
      2) the right to present, examine, and object to evidence;
      3) the right to cross-examine witnesses; and
      4) the right to appeal.

   c. Respondent's ability to:

      1) make decisions about asserting and waiving rights;
      2) respond to the allegations and charges in the proceeding; and
      3) present information and respond to questions relevant to eligibility for relief.

   d. Any other factors the mental health professional deems relevant to the respondent's competence to represent him- or herself.

If the mental health professional will recommend that the respondent be adjudicated incompetent to represent him- or herself, the mental health professional shall:

> 1)  identify the impairments and mental disorder that are the cause of the incompetence; and
>
> 2)  assess the respondent's ability to:
>
> > a)  make a rational decision about being represented by counsel; and
> > b)  assist counsel.

K.  <u>Payment for Services Rendered</u>

The examining mental health professional will receive a flat rate to conduct the mental health examination and prepare a report of the examination for submission to the immigration court.

No other fees, costs or expenses will be reimbursed, including but not limited to: costs incurred for travel, parking, or testimony; fees associated with administration of tests; or costs of instruments.

L.  <u>Report Standards</u>

The examining mental health professional must file with the court a written report summarizing the evaluation with copies for the respondent and the attorney for the Government.

In the written report, the mental health professional must:

1.  identify the specific matters referred for evaluation;

2.  list any evaluation procedures, techniques, and tests used in the examination;

3.  list all sources of information considered by the mental health professional;

4.  describe relevant aspects of the respondent's social, educational, vocational, medical, and mental health histories, and other factors as necessary;

5.  describe the respondent's presentation and behavior during the evaluation (including reports or exhibition of signs or symptoms of mental disorder) and response style;

6.  provide opinions on each issue referred for evaluation and identify any issues about which the mental health professional could not give an opinion;

7.  provide a factual basis for any opinions offered in the report; and

8. identify the mental disorder that is the cause of the incompetence (if indicated).

M. Quality Control of Reports

The first time that a mental health professional is assigned by EOIR to conduct a competency evaluation, he or she must submit a copy of his or her report of examination to the point of contact designated by EOIR.  The report will be reviewed to ensure that the examination and report comply with the directives of the agency.

Payment for services rendered by a mental health professional will not be released until the report of the mental health professional is received by the immigration court and deemed acceptable by the Immigration Judge.

Where the report of the examination fails to address matters required by the order of the court, payment for services rendered by the mental health professional may be withheld and the mental health professional may be ordered to supplement the report as necessary or appear in court without additional remuneration to provide information missing from the report.

N. Use of the Report of the Mental Health Examination

Upon receipt of the mental health examination report, the Immigration Judge will schedule a hearing to address the contents of the report, resolve the issue of competency, and determine whether additional safeguards or protections are necessary.

The Immigration Judge shall weigh the totality of the evidence including, but not limited to, the report summarizing the mental health evaluation, and the Immigration Judge shall determine whether the presumption that the respondent is competent to represent him- or herself has been rebutted by a preponderance of the evidence.

O. Protection of Mental Health Information

"Mental Health Information" includes any information expressly contained in or directly obtained from a request for a mental competence review, an Immigration Court's administrative inquiry into mental competence, a portion of a hearing in which mental competence is addressed, a mental health examination of an alien, and a report of such examination.

Except as otherwise noted below, Mental Health Information shall only be used to determine an alien's mental competency to participate or represent oneself in an immigration proceeding, and may not be used to establish the truth of allegations or charges against the alien, or to establish ineligibility for relief.

The paragraph above shall not apply to DHS' use of Mental Health Information if such information is independently submitted by, obtained by, or in the possession of DHS. If a respondent uses Mental Health Information in any proceeding for any purpose other than to inform his or her mental competency to participate in an immigration proceeding, the paragraph above shall not apply, and disclosure and use of the Mental Health Information shall be governed by rules of evidence and procedures applicable in immigration proceedings. If the alien uses a part of a document or report, DHS may request the production of any other portion of that document or report. Such request shall be granted at the Immigration Judge's discretion upon consideration of all relevant factors.

## VIII.  Procedural Protections & Safeguards

A.  Obligation to Prescribe Appropriate Safeguards and Protections

Where the Immigration Judge finds the respondent is not competent to represent him- or herself in an immigration proceeding, the Immigration Judge shall consider the totality of the facts and circumstances and prescribe appropriate safeguards and protections to ensure the fundamental fairness of the immigration proceeding.

B.  Provision of a Qualified Representative

EOIR will provide a qualified representative to an unrepresented, detained respondent where the judge has found the respondent incompetent to represent him- or herself.

The court should consider the examining mental health professional's assessment of the respondent's ability to consult with and assist counsel when deciding whether provision of a qualified representative is an effective safeguard and protection in a case.

C.  Waiver of Counsel

As the provision of a qualified representative is a safeguard or protection deemed necessary by the court to guarantee the fairness of the proceeding rather than pursuant to a legal right owed to the respondent, the respondent does not have the right to waive the presence of the qualified representative.

D.  Refusal to Cooperate with the Qualified Representative

The refusal of a respondent who has been determined by the mental health professional to be able to consult with and assist counsel, to cooperate with the qualified representative provided by the court, does not negate the efforts of the government to provide an appropriate safeguard or protection.

## IX. Format of IJ Decision

A. On the Record

All portions of an immigration proceeding addressing the issue of competence must be on the record.

B. Decision of the Judge

The Immigration Judge must articulate the rationale for his or her decision regarding the competency of the respondent to represent him- or herself. The decision should set forth all findings of fact and conclusions of law, and give the reasoning and analyses therefor. Specifically, the decision should discuss the presence of indicia of incompetence, the results of the judicial inquiry and the basis for any finding that there was or was not reasonable cause to believe competence was in issue, and the evidence offered in the competency review hearing, and ultimately whether the evidence was or was not sufficient to rebut the presumption of competence.

Where the Immigration Judge determines that the respondent is not competent to represent him- or herself, the decision should discuss the function required in the definition of competence that the respondent was found unable to perform, the safeguards and protections considered, the appropriateness and adequacy of any safeguards provided, and articulate the reasoning.

## X. Tracking Cases

Data Entry

As soon as is reasonably practicable, the database used to track cases pending before the immigration court shall be amended to track the following events and dates:

- Indicia – whether the judge found indicia resulting in a "bona fide doubt" that respondent has a mental disorder impairing his or her ability to represent him- or herself in an immigration proceeding and the date of such finding.
- Judicial inquiry – the date the judicial inquiry was conducted and whether the judge found "reasonable cause" to believe the respondent has a mental disorder impairing his or her ability to perform the functions listed in the definition of competence to represent him- or herself.
- Mental Health Examination – whether the respondent was referred for a mental health examination and, if so, the date of the referral.
- Competence Determination – whether the judge found the respondent competent or incompetent to represent him- or herself and the date of such finding.
- Qualified Representative – whether a qualified representative was provided and, if so, the date of the assignment.

## XI.  Impact on Franco v. Holder

Nothing in this document is intended to negate or alter the obligations of EOIR under the orders of the Court in *Franco v. Holder*.

## Process for Conducting a Judicial Inquiry

**I. Purpose of the Judicial Inquiry** - The purpose of the judicial inquiry is to determine whether respondent's competence is in issue and a more in-depth competency review is warranted.

**II. Mandatory Advisals** – The judicial inquiry should generally occur after explaining to the respondent the nature and purpose of the proceeding and providing the advisals required in 8 C.F.R. § 1240.10(a).

**III. Suggested Advisal** - The judicial inquiry should begin by explaining to the respondent the purpose and process for conducting the judicial inquiry. A sample advisal follows:

> *I am an Immigration Judge. My job is to decide whether you will be allowed to stay in the United States. I am going to hold a hearing to gather information from you and the representative of the Government to help me decide whether you will be allowed to stay in the United States.*
>
> *It is important that you understand what is happening in court. It is important that you understand what is being said about you. It is also important that you are able to tell your side of the story.*
>
> *To make sure that you are able to understand and tell your story, I am going to ask some questions about you and your case. I will use this information to decide whether you will need any special help in the hearing.*
>
> *Can you explain to me what I just said in your own words?*
>
> *Do you have any questions before we begin today?*

**IV. Suggested Questions**

    A. **Areas of Inquiry** - When conducting the judicial inquiry, the Immigration Judge must ask questions to assess respondent's:

        1. understanding of the nature and object of the proceeding,
        2. understanding of and ability to exercise core rights and privileges,
        3. ability to respond to the allegations and charges,
        4. ability to present information and respond to questions relevant to eligibility for relief, and
        5. cognitive, emotional, and behavioral functioning.

B. **Suggested Questions** – The following list of questions is designed to shed light on the respondent's: 1) cognitive, emotional, and behavioral functioning; and 2) ability to represent him- or herself.  This list is not exhaustive.  The judge may ask other questions relevant to the respondent's mental health and ability to function as required in the hearing (*e.g.*, ability to communicate, subjective reality, memory, and interest in self).  It is important for a judge to observe respondent's non-verbal as well as verbal responses to questions posed.

1. **Cognitive, Emotional, and Behavioral Functioning**
   a. How are you today?
   b. What is your name?
   c. What is today's date (including year)?
   d. What state and country are we in today?
   e. How did you get to the United States?
   f. When did you come to the United States?  About how long have you been in the United States?
   g. Do you want to stay in the United States?
   h. Where do you live?
   i. What is the highest level of school that you completed?
   j. Are you seeing a doctor or taking any medications?
      1) If yes, what condition or problems are you being treated for?
      2) If yes, what medications are you taking?
   k. Are you currently being treated for a mental health (psychological/psychiatric) or emotional problem?
      1) If yes, what is the problem for which you are being treated?
      2) If yes, how often do you see the doctor?
      3) If yes, what medications, if any, are you receiving for this problem?
   l. Have you been treated for a mental health (psychological/psychiatric) or emotional problem in the past?
      1) If yes, when and for what problem?

2. **Ability to Respond to the Allegations and Charges**
   a. Why were you arrested?  (Why did the immigration officers pick you up?)
   b. Where were you arrested?
   c. When were you arrested?  (What was the date and time of your arrest?)
   d. Can you explain to me the immigration charges against you? (Can you explain to me what the government says you did wrong?)
   e. Is there anything important that you think I should know about what they say you did wrong? (Do you agree with what the government is saying about you?)

    f.   What does _____ (*e.g.*, alien smuggling, controlled substance, conviction, firearm) mean?

    g.   How do you plan to proceed in court? (What do you plan to do next?)

    h.   What do you want me to know about you and/or why you are here?

    i.   What do you hope happens in court?

**3.  Understanding and Ability to Exercise Rights and Privileges**

    a.   What are your rights in immigration proceedings?

    b.   What is a legal representative?  What does a legal representative do in court?

    c.   How do you find an attorney or legal representative?

    d.   Is there anyone who can help you with your case?

    e.   What is "evidence"?

    f.   Can you give me an example of "evidence" that may be offered in your proceeding?

    g.   What is an "appeal"?

    h.   Why and how would you file an appeal?

**4.  Ability to Present Information and Respond to Questions Relevant to Relief**

    a.   What does "relief from removal" mean?

    b.   What forms of relief from removal may be available in these proceedings?

    c.   How long have you been in the United States?

    d.   Do you have any family in the United States?

    e.   Have you or your family ever had papers or permission to be in the United States?

    f.   Has someone hurt you or tried to hurt you in your country?

    g.   Are you afraid to go back to your country?  Why?

    h.   What does _____ (*e.g.*, asylum, cancellation of removal, withholding of removal) mean?

    i.   I am going to show you a relief application.  Please take a moment to review the application.  Can you explain to me how you would fill the application out or bring it back to me completed?

    j.   Who do you know who might be able to help you with your case?

**5.  Other appropriate questions**

    a.   Is there anything else you would like to tell me?

    b.   Are there any other questions you would like to ask?

**U.S. Department of Justice**
Executive Office for Immigration Review

# Mental Health Examination Referral

Respondent: _____    Date: _____

Case No.: _____    Best Language: _____

Apparent Country of Origin: _____    Ethnicity (if known): _____

Judge: _____    Hearing Location: _____

Place of Detention: _____

Next Scheduled Hearing Date or Requested Due Date: _____

Type of Proceeding: _____    Estimated Length of Hearing: _____

Likely Forms of Relief:

□ Asylum                          □ Adjustment of status              □ Temporary Protected Status
□ Withholding of removal          □ Cancellation of removal (LPR)     □ Waiver(s)
□ Convention Against Torture      □ Cancellation of removal (non-LPR) □ Voluntary Departure
□ Other: _____

Estimated Complexity of Issues (Circle one: 1 is least and 10 is most complex):    1   2   3   4   5   6   7   8   9   10

Indicia of a mental disorder:

□ History of outpatient mental     □ Poor memory                      □ Severe depression or anxiety
  health treatment
□ History of psychiatric           □ Poor attention/concentration     □ Poor intellectual functioning
  hospitalization
□ History of self-injurious        □ Confused or disorganized thinking □ Irrational behavior or speech in
  behavior                                                              court
□ History of suicide attempts      □ Paranoid thinking                □ Lack of responsiveness in court
□ History of limited academic      □ Grandiose thinking               □ Other: _____
  achievement
□ Currently receiving mental       □ Seeing or hearing things not
  health treatment                   present

Other Relevant Documents or Health Information: _____

_____

Other Relevant Information: _____

_____

Contact with Information about Respondent's Health: _____

Attachments:

□ Notice to Appear (Form I-862) or other charging     □ Record of Deportable/Inadmissible Alien (Form I-213)
  document
□ Additional Charges of Deportability/Inadmissibility □ Other: _____
  (Form I-261)

# EXHIBIT 7



VIA: Electronic Mail     **NOTICE OF TERMINATION FOR CONVENIENCE**

<u>Date:</u> April 3, 2025
<u>Vendor Name:</u> Acacia Center for Justice
<u>Subject:</u> Termination for Convenience

Dear Acacia Center for Justice,

This email's purpose is to notify your firm the contracts tied to the procurement instrument identifications (PIID) listed below and all subsequent call orders is hereby terminated for convenience effective April 3, 2025, per clause FAR 52.212-4(l) (Termination for the Government's Convenience).

PIIDs:
  15JPSS22F00000699
  15JPSS22F00000701
  15JPSS22F00000700
  15JPSS22F00000702
  15JPSS22F00000703
  15JPSS22F00000704
  15JPSS24F00000418
  15JPSS23F00000154

The Agency has determined that the services are no longer needed.  Effective April 3, 2025, please discontinue providing the services to the United States Department of Justice and its entities.

Please submit your final invoice with any reasonable charges that result from this termination.

If you have any questions, please feel free to contact me.

Sincerely,

Contracting Officer
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Please acknowledge receipt of this Notice of Termination for Convenience

(End of Notice)

EXHIBIT 8

| AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT | | 1. CONTRACT ID CODE 15JPSS22D00000013 | PAGE 1 | OF | PAGES 1 |
|---|---|---|---|---|---|

| 2. AMENDMENT/MODIFICATION NUMBER P00007 | 3. EFFECTIVE DATE 04/25/2025 | 4. REQUISITION/PURCHASE REQUISITION NUMBER | 5. PROJECT NUMBER *(If applicable)* |
|---|---|---|---|

| 6. ISSUED BY    CODE    15JPSS | 7. ADMINISTERED BY *(If other than Item 6)*    CODE |
|---|---|
| U.S. Department of Justice<br>Procurement Services Staff, OBD<br>145 N St., NE, 8E.300<br>Washington, DC 20530 | |

| 8. NAME AND ADDRESS OF CONTRACTOR *(Number, street, country, state and ZIP Code)* | | (X) | 9A. AMENDMENT OF SOLICITATION NUMBER |
|---|---|---|---|
| ACACIA CENTER FOR JUSTICE<br>1025 CONNECTICUT AVE NW STE 1000A # 1008<br>WASHINGTON, DC 20036-5417<br><br>UEI: CAJ4W5QGNKK9<br>DUNS: 118493024 | | | 9B. DATED *(SEE ITEM 11)* |
| | | | 10A. MODIFICATION OF CONTRACT/ORDER NUMBER<br>15JPSS22F00000704 |
| | | X | 10B. DATED *(SEE ITEM 13)*<br>09/01/2022 |
| CODE | FACILITY CODE | | |

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

☐ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers ☐ is extended, ☐ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing items 8 and 15, and returning _____ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or electronic communication which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by letter or electronic communication, provided each letter or electronic communication makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA *(If required)*

OBD-2024-0339ADIR-JEOIROLAP-JEOIROLAP-JEOIR-JEOIR217-25105-2024

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS.
## IT MODIFIES THE CONTRACT/ORDER NUMBER AS DESCRIBED IN ITEM 14.

| CHECK ONE | | |
|---|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: *(Specify authority)* THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT ORDER NUMBER IN ITEM 10A. | |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES *(such as changes in paying office, appropriation date, etc.)* SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). | |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: | |
| X | D. OTHER *(Specify type of modification and authority)*<br>Unilateral pursuant to FAR 52.249-2 | |

E. IMPORTANT: Contractor ☒ is not, ☐ is required to sign this document and return copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION *(Organized by UCF section headings, including solicitation/contract subject matter where feasible.)*

The purpose of this modification is to partially terminate this order for the convenience of the Government in accordance with FAR 52.249-2. Attached is the Statement of Work that removes the terminated portion of the work.

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| 15A. NAME AND TITLE OF SIGNER *(Type or print)* | | 16A. NAME AND TITLE OF CONTRACTING OFFICER *(Type or print)*<br>Christina Y. Murray<br>Contracting Officer | |
|---|---|---|---|
| 15B. CONTRACTOR/OFFEROR<br><br>_____<br>*(Signature of person authorized to sign)* | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA<br><br>By ███████████ | 16C. DATE SIGNED<br>Digitally signed by ██████<br>████████████<br>██ of Co████████ g Officer ]<br>8.04.25 15:59:40 -04'00'  04/25/2025 |

*Previous edition unusable*

STANDARD FORM 30 (REV. 11/2016)
Prescribed by GSA FAR (48 CFR) 53.243

# EXHIBIT 9

**EOIR Office of Legal Access Programs**
**National Qualified Representative Program**
**(NQRP)**
**FY24/FY25 Statement of Work**
**Option Year 2**
**(Updated 04/25/20~~2~~54)**

**I.** **Introduction and Requirements** ~~to Provide Enhanced Procedural Protections in Immigration Proceedings to Unrepresented Detained Noncitizens with Serious Mental Disorders or Conditions as Required~~ **Under** *Franco-Gonzalez v. Holder* ~~and EOIR's Nationwide Policy~~**.**

**A. Introduction**

The Contractor~~,~~ will provide legal representation and other related services ("program services") via provision of Qualified Representatives to the following unrepresented individuals ("NQRP Respondents"):

NQRP Respondents are: 1) in the custody of the Department of Homeland Security ("DHS"); 2) in covered immigration proceedings, as defined below, before the Executive Office for Immigration Review ("EOIR"); and 3) determined by an immigration judge or the Board of Immigration Appeals ("BIA") to be incompetent to represent themselves in their immigration proceedings consistent with the definition below. Covered immigration proceedings include: removal, deportation, exclusion, asylum-only, withholding-only, and custody redetermination and post-order bond.

**B. Requirements of** *Franco-Gonzalez v. Holder*

1) Apart from the program services required by this Statement of Work, the Contractor is required to provide certain additional and/or distinct program services to NQRP Respondents who are subject to the orders of the District Court in *Franco-Gonzalez v. Holder*[1] ("*Franco* NQRP Respondents"). The program services required by the orders of the District Court in *Franco* are set forth in the attached Appendix A.

2) Nothing in this Statement of Work or the attached Appendix A negates or alters the Government's obligations under the orders of the District Court in *Franco*.

---

[1] *Franco-Gonzalez v. Holder*, CV-02211, Partial Judgment and Permanent Injunction (C.D. Cal. R. Apr. 23, 2013); *Franco-Gonzalez v. Holder*, CV 10-02211, Order Further Implementing This Court's Permanent Injunction (C.D. Cal. R. Oct. 29, 2014).

C.  EOIR's Nationwide Policy

1)  NQRP Respondents also include individuals who have been found incompetent by an immigration judge or the BIA pursuant to EOIR's Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Noncitizens with Serious Mental Disorders or Conditions.

## II.  Objective, Program Name, Program Scope, and Period and Place of Performance

### A.  Objective

The objective of this Statement of Work is for the Contractor to provide program services via the provision of Qualified Representatives to NQRP Respondents.

### B.  Program Name and Terminology

1)  The program through which the Contractor shall provide program services shall be known as the "National Qualified Representative Program," or "NQRP."

2)  Program services described in section III, below, and provided to *Franco* NQRP Respondents are described as "*Franco* NQRP Cases."

3)  Program services described in section III, below, and provided to Nationwide Policy NQRP Respondents are described as "Nationwide Policy NQRP Cases."

### C.  Program Scope

The NQRP is a nationwide program limited to class members covered by *Franco.* and the scope of NQRP services extends to all NQRP Respondents nationwide as implemented under section II.E., below.

### D.  Period of Performance

The period of performance for this task order is A~~pril 25~~,~~ugust 1~~, ~~2024~~2025, to July 31, 2025. Two (2) additional 12-month option periods may be exercised at the discretion of the Government to extend performance through August 31, 2027.

### E.  Place of Performance

The Contractor is required to provide the program services described by this Statement of Work to all NQRP Respondents in covered immigration proceedings at any immigration court location nationwide as required per the *Franco* court orders or the Nationwide Policy.

### III.    Specific Program Requirements

#### A. Specific Tasks to Be Performed and Program Services to Be Provided

1) Provide legal representation via provision of a Qualified Representative in the following:

    a. Representation in immigration proceedings prior to entry of a final administrative order or determination, as follows:

        (1) Immigration and Nationality Act Section 240 removal proceedings, deportation proceedings, and exclusion proceedings before the immigration court;

        (2) Custody redetermination (i.e., bond) proceedings before the immigration court;

        (3) Immigration court "asylum only" and "withholding only" proceedings pursuant to 8 C.F.R. § 1208.2; and

        (4) Appellate proceedings before the BIA;

    b. Representation in any custody redetermination or review proceeding before EOIR that occurs after an order of removal has become administratively final (not to include any such proceeding before an Article III court);

    c. Representation in any case-related work before United States Citizenship and Immigration Services ("USCIS") directly relating to representation in section III.A.1.a. or b., above;

    d. Representation in any motions to reopen and/or reconsider directly relating to representation in section III.A.1.a.-c., above;

    e. Representation to obtain post-conviction relief directly relating to representation in section III.A.1.a.-d., above.

2) Provision of other related services reasonably necessary to complete the immigration proceedings listed in III.A.1.a.-d. above and/or a "release plan" for release from DHS custody.

3) Program services (excepting proceedings specified in section III.A.1.e.), shall not include services related to any claims or litigation before federal district courts, circuit courts of appeals, or the Supreme Court of the United States.

4) In the event that there is a final administrative order or determination in a case

where a Qualified Representative has already been appointed, the Qualified Representative is permitted to continue representation in matters before USCIS until those matters are completed.

5) Provide the program services set forth in this Statement of Work for a Baseline Caseload ~~of 1,130 NQRP Respondents~~ as further described by and subject to the provisions of section IX, below.

## B.  Definition and Role of "Qualified Representative"

1) "Qualified Representative" is defined as a licensed attorney, a law student or law graduate directly supervised by a licensed attorney, or a DOJ Accredited Representative with full accreditation, as set forth in 8 C.F.R. § 1292.1.

2) The role of a Qualified Representative in the performance of this Statement of Work and the attached Appendix A is that of an advocate exercising independent professional judgment and providing independent, zealous, and competent representation.

## C.  Requirement of Entry of Appearance by the Qualified Representative

In all cases, the Qualified Representative providing the program services described in this Statement of Work and Appendix A to any NQRP Respondent must enter an appearance before the immigration court and/or the BIA through the completion and filing of Form EOIR-28 or Form EOIR-27, respectively. In completing these forms, the Qualified Representative shall select the option "EOIR has ordered the provision of a Qualified Representative for the party named above and I appear in that capacity."

## D.  Timing of Entry of Appearance by Qualified Representative

1) Within 30 calendar days of the Contractor's notification by the Government of an NQRP Respondent with a matter pending before the immigration court, a Qualified Representative shall meet with the NQRP Respondent and enter an appearance, as described by section III.C., above, in the NQRP Respondent's case before the relevant immigration court.

2) Within 30 calendar days of the Contractor's notification by the Government of an NQRP Respondent with a matter pending before the BIA, a Qualified Representative shall meet with the NQRP Respondent and enter an appearance, as described by section III.C., above, in the NQRP Respondent's case before the BIA.

3) **Accelerated Time Requirement**: Notwithstanding section III.D.1. and section III.D.2., above, in specific circumstances, **within 10 business days of the Contractor's notification by the Government**, the Qualified

Representative shall enter an appearance, as described by section III.C., above, before the immigration court or the BIA. Such circumstances may include cases in which a) an NQRP Respondent has been detained by DHS 180 calendar days or more at the time the NQRP Respondent is found incompetent to represent themself; and b) where the BIA or a Federal Court (excluding the immigration court) has ordered or required an accelerated entry of appearance by a Qualified Representative. The Government and the Contractor will jointly develop guidance on additional situations, if any, where a Qualified Representative is required to comply with this accelerated timeline.

4) **Exception** to section III.D.3.

    a. If, upon notice by the Government of a particular NQRP Respondent(s), the Contractor cannot meet the requirements of section III.D.3., the Contractor shall communicate such to the Government in writing as soon as possible but no later than the next business day after receipt of such notice.

    b. In the event that the Contractor cannot meet the requirements of section III.D.3. for the particular NQRP Respondent(s), the Government may, in its sole discretion, choose to satisfy those requirements using alternative contractors not associated with the Contractor.

    c. Where the Government has chosen to use such alternative contractors to provide program services to certain NQRP Respondents, the Government shall determine, in its sole discretion, the extent to which and the time for which such alternative contractors shall provide program services to those NQRP Respondents.

    d. Where the Government has chosen to use such alternative contractors to provide program services to certain NQRP Respondents, the Government may, in its sole discretion, limit or prohibit the use of contract funds by the Contractor for provision of program services to those NQRP Respondents.

    e. The Contractor's inability to meet the requirements under section III.D.3. above does not constitute a breach under section V below.

    f. This exception does not apply to and does not excuse the Contractor's failure to perform pursuant to, section III.D.1. or section III.D.2. above.

## E.  Lack of Capacity, Consent, or Cooperation by an NQRP Respondent

1) *Franco* ~~and Nationwide Policy~~ NQRP Respondents:

a. Upon a court order that an NQRP Respondent be provided the safeguard of a Qualified Representative, the Qualified Representative shall enter an appearance as required by section III.C. and section III.D., above, and perform the tasks and provide the program services required by this Statement of Work and/or Appendix A on behalf of the NQRP Respondent regardless of that NQRP Respondent's lack of capacity, lack of cooperation, refusal to consent to, and/or objection to representation by the Qualified Representative.

b. Following a court order that an NQRP Respondent be provided the safeguard of a Qualified Representative and the Qualified Representative's compliance with the preceding paragraph, the Qualified Representative shall not seek to withdraw from representation of the NQRP Respondent solely because of that NQRP Respondent's lack of capacity, lack of cooperation, refusal to consent to, and/or objection to representation by the Qualified Representative.

(1) Nothing in this section, however, shall preclude a Qualified Representative from moving to withdraw from representation of an NQRP Respondent where such withdrawal is otherwise required or permitted by law.

(2) Granting of a withdrawal request, however, remains in the sole discretion of the relevant EOIR adjudicator.

(3) The Contractor shall ensure that any withdrawal request filed with the EOIR adjudicator is filed as part of or as the result of substitution of counsel by another Qualified Representative, with the exception of withdrawals pursuant to section ~~IV.B.1. and~~ IV.D., below, so as to ensure that the NQRP Respondent is continuously represented. The Contractor shall notify the Contracting Officer's Representative ("COR") in advance of the filing of a motion to withdraw to ensure that the NQRP Respondent is continuously represented.

**F. Additional Specific Tasks to be Performed by the Contractor and Sub-Contractor Qualified Representative Organizations**

1) **Supplementary Program Operation Plans:** Within 30 calendar days of the start of the Period of Performance, the Contractor shall establish a Supplementary Program Operation Plan ("SPOP"), in consultation with the COR, for the Place of Performance applicable to that organization for each current or prospective Qualified Representative organization intended to provide NQRP services throughout the task order's period of performance. Each SPOP must include, at a minimum, the following:

a. Start date and implementation schedule for all tasks and program services

required by this Statement of Work;

b.  An explanation of the qualifications and capacities of the Qualified Representative organization to efficiently and effectively provide the program services described in this Statement of Work;

c.  Proposed data management (including required data reporting), proposed personnel management and staffing (including staff supervision), and a training plan to equip staff with the capacities to provide the program services required by this Statement of Work;

d.  For *Franco* NQRP ~~and Nationwide Policy NQRP~~ cases, a specific proposed plan to provide or connect (directly or indirectly) NQRP Respondents released from DHS custody to community-based services, including (but not limited to) case management services, mental health services, medical services, substance abuse services, employment services, and housing services;

e.  ~~For Nationwide Policy NQRP cases, a specific proposed plan to utilize *pro bono* resources to facilitate continued legal representation for NQRP Respondents who are released from DHS custody and no longer eligible for program services under this Statement of Work or otherwise to enhance the delivery and / or augment the quality of program services.~~

2)  **Conference Calls:** The Contractor shall conduct monthly conference calls with the COR and Qualified Representatives sub-contracted under this Statement of Work to discuss program performance. The Contractor and the COR may hold fewer conference calls or additional conference calls and/or meetings as they mutually deem necessary. Nothing in this section requires the Contractor or its sub-contractors to breach any ethical obligation the Contractor or its sub-contractors may have to withhold privileged or protected or other confidential information.

3)  **Program Development, Implementation, Monitoring, Evaluation, and Reporting Requirements:** The Contractor shall coordinate with the COR and on-site representatives to develop, implement, monitor, and evaluate the program at the task order's performance sites. On-site representatives may include officials from the Government, from DHS, or other individuals deemed necessary by the Contractor or the COR. The Contractor shall provide information regarding performance of this contract, as requested by the Government and on-site representatives, to permit program development, implementation, monitoring, and evaluation. Nothing in this section requires the Contractor or its Qualified Representative subcontractors to breach any ethical obligation the Contractor or its subcontractors may have to withhold privileged or protected or other confidential information. The Government shall have full access to data collected for the performance of the task order,

not subject to any privilege or otherwise protected from disclosure under the law, and the Contractor shall provide such data to the Government. The Government can request ad hoc reports with 10 business days of notice to the Contractor unless the COR approves an extension. All parties shall work in good faith to determine appropriate deadlines based on the nature and complexity of the reports, and to coordinate the timing of ad hoc reports with quarterly and other required reports.

4) **Stakeholder Relations**

The Contractor will maintain collaborative working relationships with all stakeholders. Any meetings with government stakeholders to discuss matters related to contract services must include the COR or a COR-designee.

5) **Data Collection, Privacy, Records, and Information Security Requirements**

The Contractor shall collect data regarding the NQRP cases for which it is providing representation. The data to be collected must include, at a minimum, the name and alien registration number of each NQRP Respondent being represented, and the information necessary to compile Quarterly Reports, as described below.

G. **Quarterly Reports**. The Contractor shall submit, based on the fiscal year, a quarterly program management progress report to the COR listing the following data fields over the past quarter and cumulatively since the beginning of the task order year, including (i) the number of NQRP cases submitted to the Contractor for fulfillment; (ii) the location and jurisdiction (*Franco* or Nationwide Policy) of each NQRP case submitted to the Contractor for fulfillment; (iii) the number of NQRP cases completed, including the date of completion; (iv) the number of pending NQRP cases; and (v) other data as deemed necessary by the Contractor or the COR. Quarterly reports shall be due 45 calendar days following the end of each quarter.

IV.     **Terms Governing the Availability of Contract Funds for Program Services**

A. **General Rules on Availability of Contract Funds for Program Services**

1) Contract funds are specifically restricted to activities reasonably required to fulfill the contract's requirements and to provide the program services described herein. Contract funds may not be used for any other purpose without the prior written authorization of the Government.

2) As a general matter, and subject to additional provisions below, including section IV.A.2.b., contract funds may be used to provide program services to

NQRP Respondents whose covered immigration proceedings have not reached a final administrative order or determination.

   a. An order or determination becomes administratively final upon:

      (1) The expiration of the period in which DHS and/or the Respondent are permitted to seek BIA review of an immigration judge order (30 calendar days from the date of initial entry of the order); or

      (2) A final BIA determination on an appeal of an order or determination by the immigration judge.

   b. As provided in section III.A.4. above, in the event that there is a final administrative order or determination in a case where a Qualified Representative has already been appointed, the Qualified Representative is permitted to continue representation in matters before USCIS until those matters are completed.

   c. The COR may approve the use of contract funds past the date on which an order or determination becomes administratively final upon a showing by a Qualified Representative of exceptional circumstances warranting the continuation of program funding. Qualified Representatives must receive written approval from the Government before using contract funds in cases that are not subject to the provisions below in which an order or determination has become administratively final.

**B. Availability of Contract Funds Upon an NQRP Respondent's Release from DHS Custody**

1) ~~For Nationwide Policy NQRP cases, upon a Nationwide Policy NQRP Respondent's release from DHS custody, contract funds may be used to provide program services until the issuance of a final administrative order or determination in covered immigration proceedings *or* until 90 calendar days from the NQRP Respondent's release from DHS custody, whichever is earliest.~~

~~2)~~1)    For *Franco* NQRP cases, upon a *Franco* NQRP Respondent's release from DHS custody, contract funds may be used to provide program services until the issuance of a final administrative order or determination in covered immigration proceedings.

**C. Availability of Contract Funds Where NQRP Respondent Remains in DHS Custody Subject to Final Administrative Order**

Where an NQRP Respondent is subject to a final administrative order and remains in DHS custody contract funds are available to provide program services to that

NQRP Respondent for up to 90 calendar days following the initial entry of that final order.

1) This provision, however, shall not limit the availability of contract funds under section III.A.1.b., above (concerning post-order custody redetermination or review proceedings before EOIR).

2) If at any time, however, such an NQRP Respondent is released from DHS custody, the terms of section IV.B., immediately above, govern the availability of contract funds.

**D. Availability of Contract Funds Where Motion to Withdraw Is Denied**

1) Nothing in this Statement of Work or the attached Appendix A requires an NQRP Respondent's Qualified Representative to move to withdraw for any reason.

2) In any case, however, where an NQRP Respondent's Qualified Representative has moved to withdraw from representation before the immigration court or BIA, and that motion is denied on the merits, contract funds will remain available to provide program services to that NQRP Respondent, regardless of that NQRP Respondent's DHS custody status, unless and until:

   a. A motion to withdraw in the same matter is later granted;

   b. A motion for substitution of counsel by another legal representative (not provided through this contract) in the same matter is later granted;

   c. The NQRP Respondent's immigration proceedings reach a final administrative order or determination (except as program services are required under section III.A.1.b., above);

   d. Program services are otherwise completed or terminated.

**E. Availability of Contract Funds Where There is an Entry of Appearance or Substitution of Counsel By Another Legal Representative Not Provided Through This Contract**

Contract funds may not be used to provide program services to an NQRP Respondent in any immigration proceedings in which there is an entry of appearance or substitution of counsel by another legal representative (not provided through this contract) in the same proceeding, and which entry of appearance or substitution of counsel is accepted by the immigration judge or BIA.

**F. Availability of Contract Funds and Administrative Closure**

Contract funds may be used to continue providing program services to any NQRP Respondent whose immigration proceedings outlined in section III.A.1.a.-d. above are administratively closed, where such services directly relate to those proceedings.

## V.    Termination of the Contract

**Breach by the Contractor**

In the event the Government finds that the Contractor has materially failed to comply with any provision of this Statement of Work (excluding reasonable actions or inactions by a Qualified Representative based on the Qualified Representative's duty to exercise independent professional judgment and to provide independent, zealous and competent representation), the Contractor shall be promptly notified in writing of the identified deficiency along with any remedial suggestions the Government may have. Upon such notice, the Contractor will have 30 calendar days to respond to and/or remedy the deficiency before any further action is taken by the Government. The Government shall notify the Contractor, within seven (7) calendar days of any response or attempt to remedy, as to whether the Contractor's performance remains deficient. If, after the Contractor has had an opportunity to respond and/or remedy the deficiency, the Government finds that the Contractor has materially breached this contract, the Government may, in its discretion, terminate the Contract.

## VI.    Contractor Conflict of Interest

The Contractor shall notify the Government in writing of any conflicts of interest held by the Contractor, its sub-contractors, and/or its agents and representatives within 24 hours of its determination of the existence of the conflict(s) of interest.

## VII.    Contractor Performance Problems

The Contractor shall as soon as possible report to the Government any problems, impediments, or difficulties that arise related to the performance of this task order and will consult with the Government regarding resolution of such problems, impediments, or difficulties. Nothing in this section requires the Contractor or its subcontractors to breach any ethical obligation the Contractor or its subcontractors may have to withhold privileged or protected or other confidential information.

## VIII.    Provisions Governing Contractor Travel

### A.  No Reimbursement for Local Travel; Reimbursement for Long-Distance Travel

Local travel, defined as travel within fifty (50) miles of the applicable primary place of performance (i.e., the immigration court with venue over the NQRP

Respondent's case or the NQRP Respondent's custody location, as specified in each case), will not be reimbursed under this task order. In the event, however, that services are required to be performed more than 50 miles from this location, the Contractor shall be reimbursed for any actual travel costs reasonably necessary to carry out the terms of this contract. The Contractor should make reasonable efforts to assign a Qualified Representative who will not require reimbursement for travel.

**B. Requirements for Reimbursement for Long Distance Travel**

1) All reimbursable long-distance travel related to trainings must be approved in advance, in writing (e-mail is acceptable), by the COR. The COR will approve or deny travel requests and respond within five business days of the request. All travel requirements shall be met using the most economical form of transportation available. If economy class transportation is not available, the Contractor must submit, to the COR, a request for advance approval to utilize higher class travel. All travel should be scheduled sufficiently in advance to permit use of offered discount rates. Individual travel authorization letters may be provided to the Contractor (for all Contractor personnel who are required to travel) which may allow Contractor personnel to receive Government rates when on long-distance travel.

2) The Government encourages advance airfare purchases to take advantage of discounts. If a particular trip is canceled or travel dates are changed due to the Government's actions, the Government will, absent special circumstances, pay airline cancellation charges or airline charges for changes in the travel dates.

**IX. Services and Prices**

**A. Fully-Loaded Fixed Price**

1) The Contractor shall provide the program services in this Statement of Work to the Baseline Caseload for a Fixed Price.

2) The Fixed Price for the Baseline Caseload shall be **fully loaded**; that is, it shall include all costs required to provide program services to the Baseline Caseload (including all subcontracted legal services provider costs, incidental case costs, and all third-party costs (experts, interpreters, etc.), and shall also include the Contractor's costs and Other Direct Costs (ODC)).

**B. Baseline Caseload**

1) The Baseline Caseload for FY24/FY25 (08/01/24 - 07/31/25) is 1,130 total *Franco* and Nationwide Policy NQRP cases:

a. ~~760~~ *Franco* ~~and Nationwide Policy NQRP cases currently open as of 08/01/2024;~~

b. ~~330~~ new *Franco* ~~and Nationwide Policy NQRP cases assigned in FY24/FY25 (08/01/24 - 07/31/25); and~~

c. ~~40~~ *Franco* ~~NQRP cases transferred between Qualified Representatives.~~

d. ~~44~~ ~~Nationwide Policy NQRP cases initiated prior to the present IDIQ and not funded under this Task Order.~~

Baseline caseload numbers are reflected in the pricing proposal ~~effective submitted 07/23/08/01/~~2024 exclu~~ding continuing and new Nationwide Policy NQRP cases.~~

## C. Scaled Fixed Price Model for Variations in Caseload

If there is a case cost variance of greater than 5% between the newly assigned cases and Franco case transfers projected above in sections IX.B.1)b.-c. and the new cases and Franco case transfers actually assigned in FY24/FY25, costs shall scale according to fixed price per case. Prices are pre-determined under the IDIQ.

With the exception of costs incurred under sections IX.B.1)b.-c., the Government will compensate the Contractor, and the Contractor will refund the Government, only for case cost variances more than 5% below, or more than 5% above, as set forth in the preceding paragraph.

**\*\*\*\*\*END OF NQRP STATEMENT OF WORK\*\*\*\*\***
**\*\*\*APPENDIX A FOLLOWS\*\*\***

# EXHIBIT 10

# United States Department of Justice
# Executive Office for Immigration Review



**FY 2023 Performance Budget**

**Congressional Budget Submission**

**March 2022**

# Table of Contents

I.    **Overview** ................................................................................ **2**

II.   **Summary of Program Changes** ................................................. **8**

III.  **Appropriations Language and Analysis of Appropriation Language** .... **9**

IV.  **Program Activity Justification** ................................................ **10**

    A.  Program Description ..................................................... 10
    B.  EOIR Metrics Tables ..................................................... 18
    C.  Performance, Resources, and Strategies ........................... 21

V.   **Program Increases by Item** ................................................... **25**

    A.  Adjudicatory Expansion Initiative ................................... 25
    B.  Protecting the Privacy of EOIR Information ...................... 30
    C.  Legal Access Initiatives ................................................ 35
    D.  Virtual Court Initiative ................................................. 41

VI.  **Program Offsets by Item (N/A)**

VII.  **Exhibits** ........................................................................... **45**

    A.  Organizational Chart
    B.  Summary of Requirements
    B.  Summary of Requirements by Decision Unit
    C.  FY 2023 Program Increases/Offsets by Decision Unit
    D.  Resources by Department of Justice Strategic Goal and Objective
    E.  Justification for Technical and Base Adjustments
    F.  Crosswalk of 2021 Availability
    G.  Crosswalk of 2022 Availability
    H.  Summary of Reimbursable Resources
    I.  Detail of Permanent Positions by Category
    J.  Financial Analysis of Program Changes
    K.  Summary of Requirements by Object Class
    L.  Status of Congressionally Requested Studies, Reports, and Evaluations

## I.    Overview for Executive Office for Immigration Review

### Introduction

To support the mission of the agency, the Department of Justice's (DOJ or "the Department") Executive Office for Immigration Review (EOIR) requests a total of $1,354,889,000; 4,995 permanent positions, and 3,539 full-time equivalents (FTEs). This request includes a $4,000,000 transfer from the Department of Homeland Security's (DHS) Immigration Examination Fee Account. This President's Budget also includes a new mandatory resources request of $4,500,000,000 over a 10-year period to enable EOIR to make grants and enter into contracts or cooperative agreements to increase access to legal representation.

EOIR is responsible for conducting immigration court proceedings, appellate reviews, and administrative hearings to fairly, expeditiously, and uniformly administer and interpret U.S. immigration laws. As the Department's primary office for applying and adjudicating immigration law, EOIR plays an essential role in the Nation's larger immigration system. As a major actor within the immigration space, it is crucial that EOIR be prepared to meet current and future challenges.

Immigration cases typically begin when DHS files a Notice to Appear (NTA), which charges a potential undocumented noncitizen with a violation of federal immigration law and seeks the removal of that individual from the United States. Due to recent changes in immigration enforcement priorities and policies, DHS agencies such as the Immigration and Customs Enforcement (ICE), the Customs and Border Protection (CBP), and the United States Citizenship and Immigration Services (CIS) have significantly increased their enforcement and processing and will likely continue to do so in the coming years. As a result, it remains critically important that EOIR has sufficient resources to keep pace with DHS enforcement efforts.

Electronic copies of the Department of Justice's Congressional Budget Justifications and Capital Asset Plan and Business Case exhibits can be viewed or downloaded from the Internet using the Internet address: https://www.justice.gov/doj/budget-and-performance.

### Budget Summary

EOIR's primary strategic focus is reducing the current 1.5 million pending caseload by increasing adjudicatory and case processing capacity in a fair, expeditious, and uniform manner. Although EOIR is examining all potential avenues to increase efficiency and adjudicative capacity through existing means, additional resources are necessary. EOIR's Fiscal Year (FY) 2023 budget request includes program increases totaling over $377.8 million to provide funding for: additional immigration judges (IJs) and the necessary support staff; increased efforts to promote legal access, including a new $150.0 million grant program to support legal representation; improvements to EOIR privacy protections and programs; and moving the immigration courts into a more technologically savvy virtual capability. Additionally, this legal representation program is complemented by  mandatory resources of $4.5 billion over a 10-year period is requested to provide legal representation.

This request is essential to enable EOIR to advance initiatives that fulfill Presidential and Attorney General strategic and priority goals to advance civil rights, equity, and justice for all

while also fulfilling EOIR's mission and continuing to improve court business processes and record keeping processes and infrastructure.

## Program Overview

### Organization of EOIR

EOIR administers the Nation's immigration court system. EOIR primarily decides whether foreign-born individuals charged by DHS with violating immigration law should be a) ordered removed from the United States or b) granted relief or protection from removal and allowed to remain in the country. To make these critical determinations, EOIR operates approximately 70 immigration courts and adjudication centers throughout the country and has a centralized Board of Immigration Appeals (BIA) located at EOIR Headquarters in Falls Church, Virginia.

EOIR also adjudicates cases involving illegal hiring and employment eligibility verification violations, document fraud, and immigration-related employment discrimination. EOIR Headquarters provides centralized operational, policy, and administrative support to EOIR immigration proceedings and programs conducted throughout the United States.

### EOIR's FY 2023 Budget Strategy

EOIR's program increase of $377.8 million supports EOIR's current strategic initiatives of increasing adjudicatory and case processing capacity, which help advance EOIR's mission[1]. Increasing adjudicatory and case processing capacity is particularly important given the 1.5 million pending caseload and the increase in the rate of new NTAs filed. EOIR also seeks to increase access to EOIR's proceedings for all parties, ensuring that EOIR's proceedings are fundamentally fair and more efficient.

### The Growing Caseload

EOIR continues to face both internal and external challenges to increasing adjudicative and case processing capacity needed to help reduce the pending caseload. Over the years, several factors have contributed to record growth in both the number of pending immigration cases and the time required to adjudicate them. These include substantial changes across the immigration landscape, including but not limited to changes in case law, law enforcement priorities, and trends in migration. These factors are largely outside EOIR's control. While increased staffing of IJs will improve EOIR's ability to adjudicate more cases, staffing alone will not address all the issues contributing to the sustained growth in the immigration pending caseload in the near term.

At the end of FY 2021, there were approximately 1.4 million active cases pending in immigration courts nationwide, by far the largest ever pending caseload before the agency, continuing the fifteenth consecutive year of increased pending caseloads. At the end of the first quarter of FY 2022, the number of pending cases has risen to just over 1.5 million. Additionally, in FY 2021, DHS filed approximately 240,000 NTAs. And through just one quarter of FY 2022 approximately 139,000 have already been filed. While the final number of NTAs filed in FY 2021 was lower than the over 545,000 NTAs filed in FY 2019, this reduction was likely due to

---

[1] EOIR's primary mission is to, "adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws."

issues surrounding the COVID-19 pandemic. Based on the increased number of filings in quarter one, EOIR projects FY 2022 to approach FY 2019 NTA filing heights.

Office of the Chief Immigration Judge
Historic Caseload through FY 2022 Q1



New Cases and Total Completions through FY 2021



Additionally, EOIR remains cognizant that the large and growing pending caseload will also affect the BIA. In FY 2018, nearly 50 percent more appeals were filed than the previous year and in FY 2019, appeals received at the BIA increased by a further 27 percent over FY 2018. Despite issues surrounding the COVID-19 pandemic, approximately 59,000 appeals were filed in FY 2020 and 31,000 in FY 2021. The BIA completed nearly 31,000 appeals in FY 2021 holding the current pending caseload at roughly the same level as the year prior. This work is shared across 23 permanent Board Members, an extremely large volume for any appellate body. As NTAs and the number of immigration judges increase, the BIA will likely continue to face an increase in the number of appeals filed.

Board of Immigration Appeals FY 2021



Internal Challenges

Moving from the authorization of additional IJ positions to having those IJs in courtrooms ready to adjudicate is a lengthy process. The thorough vetting and hiring process for IJs historically took well over a year. However, due to changes implemented at EOIR and the Department, IJ hiring time improved dramatically across FYs 2018, 2019, and 2020, with EOIR hiring 81, 92, and 99 IJs respectively during each fiscal year. Recent hiring time has been reduced to generally six months or less with 65 IJs hired in FY 2021. Additionally, IJ retirements and separations were higher in recent years than in prior years. The average attrition was roughly 12 IJs a year from 2009 to 2016. That average has more than doubled to approximately 25 IJ attrition losses annually since. While, the initial impact of recent adjustments to the hiring process have been positive, EOIR and the Department continue to monitor the time to hire and ensure that each phase of the process moves as expeditiously as practicable.

Further, with having successfully improved the time to hire IJs, EOIR is now focusing on ensuring that courtrooms are available as soon as those adjudicators are trained. EOIR is prioritizing courtroom utilization and scheduling management, which allows EOIR to maximize its hearing blocks. Thus, a critical challenge in increasing adjudicatory capacity is not just time to hire, but also the associated time to obtain or build out space for those IJs and staff. Throughout the initial growth of the Immigration Court program over the last few years, EOIR has successfully partnered with General Services Administration to reduce the traditional time frames to obtain and occupy space and has successfully sped up the space acquisition process.

Another challenge focuses around EOIR's current case management system (CASE), which is a fragmented, paper-based system. In FY 2017, EOIR began developing an EOIR Court and Appeals Systems (ECAS) to upgrade the current case management system to a single, electronic platform and deployed the ECAS pilot to five courts and the BIA in the late summer/early fall of 2018. EOIR began the nationwide rollout in FY 2020, but was temporarily paused due to travel restrictions associated with COVID-19, which affected training. EOIR is pleased to announce however that upon conclusion of calendar year 2021, ECAS had been rolled across all immigration courts nationwide and the BIA. Although the ECAS system is doing much to enhance EOIR's business process going forward, it does not speak to the existing paper records. Of EOIR's approximately 1.5 million pending cases, at least one million of them exist in a paper format. In order to improve efficiency, increase flexibility to adjudicate across the agency, and prepare for the future closure of the Federal Records Center, EOIR must work towards converting paper files to electronic, and move to a wholly electronic based system rather than a hybrid paper and electronic system.

External Challenges

EOIR faces four prominent external challenges: (1) unpredictable immigration flows; (2) the continuing residual impact of prior policies and recent surges of families and unaccompanied noncitizen children; (3) court rulings on immigration matters which either temporarily or permanently impact government operations; and (4) the exponential increase in the number of Freedom of Information Act (FOIA) requests since FY 2016.

Increased immigration flows, particularly of family units, unaccompanied noncitizen children, and putative asylum seekers from Central America, have led to a substantial increase in new case filings by DHS. Approximately 316,000 new NTAs were filed with EOIR during FY 2018, an

average of about 26,000 cases per month. In FY 2019, over 545,000 new cases were filed, an average of over 44,000 per month and in FY 2020, with numbers reduced from expected levels due to the COVID-19 pandemic, EOIR still received approximately 370,000 new cases. In FY 2021 EOIR received just over 240,000 new cases. The already large pending caseload has increased dramatically in this new enforcement environment, now reaching a peak of over 1.5 million pending cases as of the end of the first quarter of FY 2022.

The residual impact of cases generated by past and current border surges, and of prior EOIR policies, continues to impact EOIR's pending caseload. The surges included an increase in both unaccompanied children and adults with children. Cases involving children tend to take longer to resolve, as their cases often require continuances. Finally, the significant increase in immigration adjudications combined with the FOIA Amendments of 2016, plus increased media and public scrutiny of immigration operations, have resulted in an exponential increase in EOIR FOIA requests. EOIR has had difficulty dealing with this increase due to a paper-based file system, obsolete processing technology, as well as staffing shortages.

## II.    Summary of Program Changes

| Item Name | Description | Pos. | FTE | Dollars ($000) | Page |
|---|---|---|---|---|---|
| **Adjudicatory Expansion Initiative** | • Enables EOIR to add 100 IJs and support staff. <br> • Each IJ and related support staff cost approximately $1.7 million and includes salaries and expenses for a full year. | 600 | 300 | $173,776 | 25 |
| **Protecting the Privacy of EOIR Information** | • Provides for additional staff and resources to manage EOIR privacy needs, provide training for EOIR employees on privacy requirements and protections, and improve EOIR's cybersecurity posture. | 11 | 6 | $5,673 | 30 |
| **Legal Access Initiatives** | • Enables EOIR to provide funding for certain vulnerable populations, including unaccompanied children as well as individuals who are mentally incapacitated. <br> • Provides for additional funding to expand services to a broader pool of custodians for unaccompanied children. <br> • Enables EOIR to provide legal orientation information to individuals in immigration detention in remote or underserved areas. <br> • Provides increased funding for the immigration court helpdesk program to expand into newly and recently constructed court locations. <br> • Provides funding for grants to provide legal representation of certain individuals in immigration court. | 20 | 10 | $188,585 | 35 |
| **Virtual Court Initiative** | • Furthers digitalization efforts to move EOIR closer towards paperless adjudications; provides for a remote or automated option for all processes executed by adjudicatory personnel or support staff; enables transactions external to EOIR to be conducted electronically; and remote participation for stakeholders in EOIR led proceedings. | 3 | 2 | $9,792 | 41 |
| **Total** | | **634** | **318** | **$377,826** | |

III.    Appropriations Language and Analysis of Appropriations Language

**Appropriations Language:**

Executive Office for Immigration Review
(Including Transfer of Funds)

For expenses necessary for the administration of immigration-related activities of the Executive Office for Immigration Review, [$891,190,000] *$1,354,889,000* of which $4,000,000 shall be derived by transfer from the Executive Office for Immigration Review fees deposited in the ''Immigration Examinations Fee'' account: Provided, That, [not to exceed $50,000,000 of the total amount made available under this heading shall remain available until expended] *of the amounts made available under this heading, $125,000,000 shall remain available until expended, of which $75,000,000 shall be available for necessary build-out and modifications of courtroom space*: *Provided further, That, of the amounts made available under this heading, not less than $223,371,000 shall be for Legal Access Programs activities, of which $150,000,000 shall remain available until expended to make grants and enter into contracts or cooperative agreements to provide legal representation: Provided further, That not more than 3 percent of the funds available for legal representation in the previous proviso shall be available for necessary administrative expenses.*

**Analysis of Appropriations Language**

Provides additional language for the authority to create a no-year account for courtroom buildout, separate from the current no-year authority. With this new separate no-year authority, EOIR will be able to obligate funding for new courts, which will expedite court availability for new IJs, thereby addressing a significant bottleneck in the hiring process. Further provides funding to make grants and enter into cooperative agreements to provide legal representation. It also sets a limit on the amount of legal representation funds that can be used for administrative expenses.

## IV.    Program Activity Justification

| *Executive Office for Immigration Review* | Direct Pos. | Estimate FTE | Amount ($000) |
|---|---|---|---|
| 2021 Enacted[1] | 3,761 | 2,277 | $734,000 |
| 2022 Annualized CR | 3,761 | 2,621 | 734,000 |
| Expected Change from FY2022 CR | 600 | 300 | 157,190 |
| Adjustments to Base and Technical Adjustments | 0 | 300 | 85,873 |
| 2023 Current Services | 4,361 | 3,221 | 977,063 |
| 2023 Program Increases | 634 | 318 | 377,826 |
| 2023 Request | 4,995 | 3,539 | 1,354,889 |
| **Total Change 2022-2023** | **634** | **618** | **463,699** |

| *Executive Office for Immigration Review-* **Information Technology Breakout (of Decision Unit Total)** | Direct Pos. | Estimate FTE | Amount ($000) |
|---|---|---|---|
| 2021 Enacted[1] | 39 | 39 | $116,302 |
| 2022 Annualized CR[2] | 39 | 39 | 139,661 |
| Expected Change from FY2022 CR | 0 | 0 | 0 |
| Adjustments to Base and Technical Adjustments | 0 | 0 | 0 |
| 2023 Current Services | 39 | 39 | 139,661 |
| 2023 Program Increases | 7 | 4 | 14,565 |
| 2023 Request | 46 | 43 | 154,226 |
| **Total Change 2022-2023** | **7** | **4** | **14,565** |

[1] FY 2021 FTE is actual.
[2] FY 2022 annualized CR dollar amount includes a higher rate for continued IT service contract.

## 1.  Program Description

Under the direction of the EOIR Director and Deputy Director, the following components conduct adjudicative proceedings:

**Adjudicative Components**

- Office of the Chief Immigration Judge (OCIJ) – The OCIJ oversees the administration of approximately 70 immigration courts and adjudication centers located throughout the United States and exercises administrative supervision over EOIR employees, including immigration judges, assigned to those courts. The OCIJ develops policies and procedures for immigration proceedings throughout the immigration court system. The IJs in OCIJ preside over administrative court proceedings, called removal proceedings, to determine whether foreign-born individuals, who are charged by DHS with violating immigration law, should be ordered removed from the United States or should be granted relief or protection from removal and be permitted to remain in this country. Generally, IJs determine removability and adjudicate applications for relief from removal such as cancellation of removal, adjustment of status, asylum, or waivers of removability. Custody redetermination hearings are held when a noncitizen in DHS custody seeks a reduction in the bond amount set by DHS, or a release on his or her own recognizance.

With respect to criminal noncitizen adjudications, the Institutional Hearing Program (IHP)[2] provides the framework for hearings to determine the immigration status of noncitizens convicted of offenses who are incarcerated in federal, state, and local prisons across the United States. EOIR's IHP is designed to expedite the removal of criminal noncitizens and involves close coordination with DHS, the Bureau of Prisons, and state and local corrections authorities.

The Chief Immigration Judge provides overall program direction, articulates policy, and establishes priorities for the immigration judges located in courts throughout the United States. The Chief Immigration Judge carries out these responsibilities with the assistance of Deputy and Assistant Chief Immigration Judges; offices such as the Chief Clerk's Office and Language Services Unit assist with coordinating management and operation of the immigration courts.

- <u>Board of Immigration Appeals (BIA)</u> – The BIA hears appeals of decisions of immigration judges and certain decisions of DHS officers in a wide variety of proceedings in which the Government of the United States is one party and the other party is a noncitizen, a citizen, permanent resident, or a transportation carrier. The BIA exercises independent judgment in hearing appeals for the Attorney General and provides a nationally uniform application of the immigration laws. The majority of cases before the BIA involve appeals from orders of EOIR's immigration judges entered in immigration proceedings.

  Appeals of decisions of DHS officers, reviewed by the BIA, principally involve appeals from familial visa petition denials and decisions involving administrative fines on transportation carriers. The BIA also issues decisions relating to the EOIR Attorney Discipline Program.

  BIA decisions are binding on immigration judges and all DHS officers unless modified or overruled by the Attorney General or a Federal Court. Certain BIA decisions that the BIA designates as precedent decisions apply to immigration cases nationwide. Through precedent decisions, the BIA provides guidance to immigration judges, DHS, and the general public on the proper interpretation and administration of the immigration laws and regulations. The BIA is the highest administrative tribunal for interpreting and applying U.S. immigration law.

  The BIA plays the major role in interpreting the immigration laws of the country in an area of law the courts have characterized as uniquely complex. A challenge for the BIA is to maintain a high-volume administrative caseload while addressing the differing issues associated with the law of eleven different circuits and the Supreme Court.

- <u>Office of the Chief Administrative Hearing Officer (OCAHO)</u> – The OCAHO adjudicates cases involving illegal hiring and employment eligibility verification violations ("employer sanctions"), document fraud, and employment discrimination under the Immigration and Nationality Act (INA). The OCAHO is headed by a Chief Administrative Hearing Officer (CAHO) who provides overall program direction and

---

[2] Note, DHS refers to this same program as the "Institutional Hearing and Removal Program."

management, articulates and develops policies and procedures, establishes priorities, assigns cases, and administers the hearing process presided over by Administrative Law Judges (ALJs). The CAHO also reviews decisions and orders issued by OCAHO ALJs in employer sanctions and document fraud cases, and may modify, vacate, or remand those decisions and orders.

OCAHO employs ALJs appointed pursuant to 5 U.S.C. § 3105 to adjudicate cases arising under Sections 274A, 274B, and 274C of the INA. Section 274A provides for sanctions (civil penalties and injunctive relief) against employers or entities who: (1) knowingly hire, recruit, or refer for a fee, or continue to employ, unauthorized noncitizens; (2) fail to comply with employment eligibility verification requirements; or (3) require the execution of an indemnity bond by employees to protect the employer or entity from potential liability for unlawful employment practices. Section 274B prohibits employment discrimination based on national origin or citizenship status and provides for civil penalties and various equitable remedies. Section 274C provides civil penalties for immigration-related document fraud. Adjudicative proceedings are initiated by complaints filed with OCAHO by DHS (in Section 274A and Section 274C cases), or the Immigrant and Employee Rights (IER) section in the Civil Rights Division, and/or aggrieved private parties and entities (in section 274B cases).

Parties may seek administrative reviews of ALJ decisions in INA Sections 274A and 274C cases, or the CAHO may review such decisions on their own initiative, and may affirm, modify, vacate, and/or remand such decisions. Unless the case is certified to the Attorney General, the CAHO's decision on review constitutes the final agency action with respect to these cases. Appeals from final OCAHO decisions are brought before the U.S. circuit courts of appeal.

## Non-Adjudicative Components

A number of other Headquarters offices also provide EOIR-wide mission support:

- Office of the Director (OOD) – In addition to the Director, Deputy Director, Chief Management Officer, and senior advisors, the OOD includes the Equal Employment Opportunity Office, the Ombuds, and the Planning, Analysis, and Statistics Division. These offices provide mission support to the OOD by (1) ensuring equality and diversity in the workplace; (2) providing oversight of certain pilot programs and initiatives; (3) overseeing the strategic management process; (4) conducting research, evaluation, and statistical analysis; (5) expanding analytics capacity to meet the demand for advances and predictive analysis; and (6) enhancing data quality and governance to quickly and effectively mitigate any data quality issues in the field. Other mission support housed within OOD includes many of the legal access functions of the Legal Access Programs. Due to the increased need and focus on legal access and representation, many of these programs are now managed out of OOD.

- Office of the General Counsel (OGC) – Provides legal advice on a wide variety of matters involving EOIR employees in the performance of their official duties. OGC staff handle employee labor relations issues, review and prosecute complaints involving attorney misconduct, and coordinate and respond to requests for assistance involving

immigration fraud. OGC also coordinates development of agency regulations and forms; provides litigation support to U.S. Attorneys, the Civil Division's Office of Immigration Litigation, and the Solicitor General's Office; coordinates inter-agency activities; and responds to all EOIR FOIA and Privacy Act requests.

- <u>Office of Policy (OP)</u> – Centralizes coordination between the components on a number of policy projects and issues, including policy development, communications, training, and legal updates. This office (1) identifies, develops, drafts, standardizes, and communicates agency priorities and policies; (2) oversees and standardizes the EOIR regulatory process; (3) coordinates all legal training and related resources; and (4) other related programs.

- <u>Office of Administration (OA)</u> – Provides administrative and managerial support in several areas concerning financial management or special emphasis and compliance programs. Specifically, OA supports the following areas: budget and financial management, contracts and procurement, human resources, space and facilities management, and security.

- <u>Office of Information Technology (OIT)</u> – Responsible for the design, development, operations, and maintenance of the complete range of information technology systems supporting EOIR's day-to-day operations. OIT manages programs such as EOIR's current multi-year effort to modernize the case management and related electronic systems that support EOIR's mission.

## Map of the Immigration Courts and Adjudication Centers



### Adjudication of Immigration Cases

**Immigration Court Proceedings Overview:** DHS initiates all cases before the immigration courts by charging an individual with potential grounds of removability and issuing an NTA in Immigration Court under §240 of the INA (8 U.S.C. 1229a).

IJs are responsible for conducting formal immigration court proceedings. In removal proceedings, IJs determine whether an individual from a foreign country (a noncitizen) should be allowed to enter or remain in the United States or should be removed. IJs also have jurisdiction to consider various forms of relief or protection from removal. If the IJ finds the individual to be removable as charged, the individual can then request several different forms of relief or protection from removal such as asylum and withholding of removal (including protection under the Convention Against Torture), cancellation of removal, voluntary departure, or other forms of relief or protection from removal. IJ decisions are administratively final unless appealed or certified to the BIA.

Some removal proceedings are conducted in prisons and jails as part of the Institutional Hearing Program. In coordination with DHS and correctional authorities across the country, IJs conduct

hearings to adjudicate the immigration status of noncitizen inmates while they are serving sentences for criminal convictions.

***Appellate Review:***  In most appeals to the BIA, the process begins with filing a notice of appeal challenging an IJ decision. The appeal can be filed either by the noncitizen or the Government (represented by DHS's ICE).

When an appeal is filed by either party, the BIA acknowledges receipt of the appeal, transcribes the proceedings (where appropriate), and sets a briefing schedule to allow both parties to present their arguments. Once briefing concludes, the appeal is adjudicated by a panel of one, three, or all Board Members.

If the decision is not published, the decision is binding only on the parties. If the BIA elects to publish the decision, it becomes legal precedent and is binding nationwide. The BIA's decision will stand unless and until modified or overruled by the Attorney General, a Federal Court, or the BIA itself.

The following flow chart details examples of paths to and through removal proceedings.

## EXAMPLE PATHS TO AND THROUGH REMOVAL PROCEEDINGS



***OCAHO Administrative Hearings:*** OCAHO cases begin with the filing of a complaint, either by the DHS/ICE, in employer sanctions and document fraud cases under INA §§ 274A and 274C, respectively, or by private individuals or entities and/or the Civil Rights Division's IER Section in immigration-related employment discrimination cases under INA § 274B. After the complaint is filed, the respondent is given an opportunity to file an answer. Following the answer, the parties typically file prehearing statements, undertake discovery, and participate in one or more telephonic prehearing conferences with the ALJ. Parties may also engage in settlement negotiations and file dispositive motions with the ALJ. Cases that are not resolved or dismissed proceed to a formal evidentiary hearing, typically held near where the parties reside or the alleged violation(s) occurred. Final decisions and orders issued by the ALJ in employer sanctions and document fraud cases are reviewable by the CAHO and/or the Attorney General. Once a final agency decision has been issued, a party may file an appeal with the appropriate federal circuit court of appeals. Final ALJ decisions in immigration-related employment discrimination cases are not reviewable by the CAHO or the Attorney General; rather, these decisions may be appealed directly to the appropriate federal circuit court of appeals.

## 2. Performance and Resource Tables

| PERFORMANCE AND RESOURCES TABLE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Decision Unit: Executive Office for Immigration Review** | | | | | | | | | | |
| **RESOURCES ($ in thousands)** | | | **Target** | | **Actual** | | **Target** | | **Changes** | **Requested (Total)** | |
| | | | **FY 2021** | | **FY 2021** | | **FY 2022** | | **Current Services Adjustments and FY 2023 Program Changes** | **FY 2023 Request** | |
| **Total Costs and FTE** (Reimbursable: FTE are included, but costs are bracketed and not included in totals) | | | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | | 2,621 | 734,000 [546] | 2,277 | 734,000 [4,840] | 2,921 | 891,190 [23,566] | 618 | 463,699 [0] | 3,539 | 1,354,889 [23,566] |
| **TYPE** | **STRATEGIC OBJECTIVE** | **PERFORMANCE** | **FY 2021** | | **FY 2021** | | **FY 2022** | | **Current Services Adjustments and FY 2023 Program Changes** | **FY 2023 Request** | |
| **Program Activity** | 3.4, 5.2 | EOIR | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 | FTE | $000 |
| | | | 2,621 | 734,000 | 2,277 | 734,000 | 2,621 | 891,190 | 618 | 463,699 | 3,539 | 1,354,889 |
| **APG Measure:** | 5.2 | Decrease median case completion time by 25% from a FY 2021 baseline of 947 days | N/A (New Measure) | | N/A (New Measure) | | 853 | | | | 711 | |
| **APG Measure:** | 5.2 | Reduce the vacancy gap for immigration judges to 5% from a FY 2021 baseline of 12% | N/A (New Measure) | | N/A (New Measure) | | 8% | | | | 5% | |
| **KPI:** | 5.2 | Percent of immigration judges who have received all relevant continuing legal education annually | N/A (New Measure) | | N/A (New Measure) | | 90% | | | | 92% | |
| **KPI:** | 5.2 | Median case completion time | N/A (New Measure) | | N/A (New Measure) | | 853 | | | | 711 | |

18

| KPI: | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 5.2 | Average number of vacancy-days for immigration adjudicator positions | N/A (New Measure) | N/A (New Measure) | 403 | | 382 |
| **KPI:** | 5.2 | Visits to the Immigration Court Online Resource (ICOR) | N/A (New Measure) | N/A (New Measure) | 12,000 | | 24,000 |
| **KPI:** | 3.4 | Number and Percent of individuals in Department immigration proceedings with Limited English Proficiency who have access to translation in a language of proficiency | N/A (New Measure) | N/A (New Measure) | 99% | | 99% |

Data Definition, Validation, Verification, and Limitations: OCIJ and BIA data are collected from the Case Access System for EOIR (CASE), a nationwide case tracking system at the trial and appellate levels. Court and appellate staff enters data, which is electronically transmitted and stored at EOIR headquarters, allowing for timely and complete data collection. Data are verified by on-line edits of data fields. Headquarters and field staff use routine daily, weekly, and monthly reports that verify data. Data validation is also performed on a routine basis through data comparisons between EOIR and DHS databases. There are no data limitations known at this time. *A case before the immigration courts is a proceeding that begins when DHS files a charging document. OCIJ case completions do not include administrative closures nor change of venue requests or transfers from one immigration court to another. In addition, initial case completions do not include cases that have been reopened or remanded from the BIA.

| Strategic Objective | PERFORMANCE MEASURE TABLE | | | | |
|---|---|---|---|---|---|
| | Decision Unit: Executive Office for Immigration Review | | | | |
| | Performance Measures | | FY 2021 | FY 2022 | FY 2023 |
| | | | Actual | Target | Target |
| 5.2 | Agency Priority Goals | Decrease median case completion time by 25% from a FY 2021 baseline of 947 days | N/A (New Measure) | 853 | 711 |
| 5.2 | Agency Priority Goals | Reduce the vacancy gap for immigration judges to 5% from a FY 2021 baseline of 12% | N/A (New Measure) | 8% | 5% |
| 5.2 | Key Performance Indicator | Percent of immigration judges who have received all relevant continuing legal education annually | N/A (New Measure) | 90% | 92% |
| 5.2 | Key Performance Indicator | Median case completion time | N/A (New Measure) | 853 | 711 |
| 5.2 | Key Performance Indicator | Average number of vacancy-days for immigration adjudicator positions | N/A (New Measure) | 403 | 382 |
| 5.2 | Key Performance Indicator | Visits to the Immigration Court Online Resource (ICOR) | N/A (New Measure) | 12,000 | 24,000 |
| 3.4 | Key Performance Indicator | Number and Percent of individuals in Department immigration proceedings with Limited English Proficiency who have access to translation in a language of proficiency | N/A (New Measure) | 99% | 99% |

### 3. Performance, Resources, and Strategies

EOIR's adjudication functions are part of the Government's broader immigration and border control programs. As such, EOIR's ability to adjudicate cases involving individuals housed in DHS detention space in a timely fashion allows EOIR to aid in the efficient utilization of DHS detention space. The guarantee of fairness and due process, including for those individuals in detention, remains a cornerstone of our judicial system. EOIR's role in granting relief from removal in meritorious cases, and in the denial of relief from removal in others, helps assure the integrity of the overall process.

### a.        Performance Plan and Report for Outcomes

To align with the DOJ Strategic Plan 2022-2026, EOIR established new metrics which can be found in the Performance and Resources Table and the Metrics Table.

All three of EOIR's adjudicatory components (OCIJ, BIA, and OCAHO) continue their impressive execution of EOIR's mission "to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws."

### b.        Strategies to Accomplish Outcomes

*Filling Existing Vacancies*

EOIR's continued focus on filling existing vacancies has helped increase adjudicative capacity over the last several years. Despite this increase in adjudicative capacity and EOIR's continued efforts to hire new IJs, the pending caseload continues to grow. To successfully decrease the pending caseload to a manageable level, EOIR requires additional authorized IJs and support staff.

*Docket Adjustments*

EOIR continues to make docket adjustments and prioritize certain case types to reflect the shifts in enforcement priorities. EOIR will continue engaging with Federal partners to gauge the impact of enforcement activities, migratory patterns, and other factors that affect the immigration courts and adjust dockets and resource allocations accordingly.

*New and Expanded Court Locations*

Over the last several years EOIR has added space in some existing locations, and expanded its number of locations, going from a total of 337 courtrooms at the close of FY 2016 to 545 at the end of the first quarter of FY 2022. New court locations have opened in each of the last five fiscal years, including most recently courts in Van Nuys, CA, Sacramento, CA, Houston, TX, Richmond, VA and Santa Ana, CA. By adding available court space as the IJ corps expands, EOIR will be able to hear a greater volume of cases, reducing the backlog more quickly.

In addition to expanding the number of courts, to better utilize courtroom space EOIR Policy 19-11 "No Dark Courtrooms" memorialized policies to reduce and minimize the impact of unused courtrooms and docket time. EOIR will continue to implement this policy which assigns cases to dockets and IJs in a manner to maximize courtroom usage.

*Leveraging Existing IT Systems*

To maximize the capacity of immigration courts nationwide, EOIR continues to make efficient use of Video Teleconferencing (VTC) systems, which enable IJs to adjudicate cases in other parts of the country. This has multiple benefits. IJs in locations with a lower caseload can administer cases in higher-volume locations remotely. IJs are able to adjudicate certain detained and Institutional Hearing Program (IHP) cases remotely, diminishing the challenges associated with reaching DHS and Federal facilities that are not co-located with immigration courts. All courtrooms and many conference rooms are now equipped with VTC capability.

Additionally, EOIR has successfully upgraded the Digital Audio Recording systems in all courtrooms. The touch panel and modernized audio-processing components have provided courtroom users with enhanced phone controls, video teleconference capabilities, and simultaneous interpretation controls. Looking forward, EOIR is using analytics to explore how VTC and other video technology use could minimize the number of underutilized courtrooms or expand access beyond a traditional courtroom.

In addition, EOIR continues to strive to modernize and digitize its critical information systems. The benefits of an electronic filing and case management system are undisputed. A fully electronic system will improve case scheduling and adjudication efficiency, reduce time spent on administrative tasks related to paper files, and free space to be used for additional staff or court expansion. In 2018 EOIR piloted its new electronic filing system, ECAS, at five immigration courts and the BIA. It is with great news that at the end of calendar year 2021, ECAS has now been launched nationwide across all immigration court locations and the BIA and as of the end of January 2022, over 20,000 attorneys have registered to use ECAS, over 2,3000,000 documents have been uploaded, over 480,000 electronic records of proceeding (eROP) have been created, and over 2,400 EOIR users have been trained.

*Policy Coordination and Analysis*

In addition to process improvement, technology, and communication strategies, EOIR strategies work to ensure that short- and long-term human capital needs are met, particularly as they relate to the IJ hiring process and immigration court staffing and resourcing requirements. OCIJ, BIA, and agency leadership continually examine activities critical to case completion and the amount of time required for staff to complete these activities thoroughly.

EOIR works with DHS, DOJ Office of Legal Policy and others on immigration related policies and regulations to increase the adjudicatory capacity, as well as implement many new internal policies which serve to enhance EOIR decision making by furthering consistency as well as enhancing fraud prevention and detection activities.

<u>Improving the IJ Hiring Process</u>

EOIR and DOJ continue to take steps to reduce the timeline to hire and on-board new IJs. The Department implemented a streamlined hiring plan in 2017 that EOIR has been using ever since. It retains the same degree of rigorous vetting as before, but aims to reduce the timeline an application is pending before the agency.

The revised process: 1) sets clear deadlines for assessing applicants at each stage of the process and for making decisions to move them to the next stage; 2) eliminates steps that did not aid or advance the selection process; and 3) allows for temporary appointments pending full background investigations,

which can often take several months to a year to complete. The new process aims to reduce the amount of time that it takes to recommend applicants for appointment to six months or less.

Under the current process, hiring times have been reduced by approximately 50 percent with EOIR hiring 99 IJs in FY 2020, nearly double the number hired in FY 2016, the final year of the prior IJ hiring process. EOIR hired an additional 65 IJs in FY 2021 and has been able to clear a new IJ to start in as little as 150 days and to on-board a new IJ in as little as 195 days, which is a 74 percent reduction in hiring time compared to the 742 days cited in a 2017 GAO report on the subject[3]. Moving forward, EOIR will continue to assess the hiring process and identify any areas for improvement.

| Fiscal Year | Total IJs Hired | Total IJs On-Board |
|---|---|---|
| 2011 | 39 | 273 |
| 2012 | 4 | 267 |
| 2013 | 8 | 262 |
| 2014 | 0 | 249 |
| 2015 | 20 | 254 |
| 2016 | 56 | 289 |
| 2017 | 64 | 338 |
| 2018 | 81 | 395 |
| 2019 | 92 | 442 |
| 2020 | 99 | 517 |
| 2021 | 65 | 559 |

**Immigration Judge (IJ) Hiring Through FY 2021**



---

[3] Report GAO-17-438, *Actions Needed to Reduce Case Backlog and Address Long-Standing Management and Operational Challenges*

### c.      Priority Goals

EOIR's mission directly aligns with the Department's priority goal to improve efficiency in immigration adjudication. The efforts made by EOIR adjudicators and staff to address the agency mission to adjudicate immigration cases by fairly, expeditiously, and uniformly interpreting and administering the Nation's immigration laws means that EOIR employees work every day to address this priority goal. The proposals contained in this budget are all designed to further strengthen EOIR's ability to meet its mission and this goal. By increasing adjudicative capacity, strengthening the privacy protections and framework for the sensitive information shared by participants in the immigration process, providing for meaningful assistance with legal access, and ensuring a system wherein all can participate regardless of location, EOIR is working to improve the immigration system on multiple fronts.

**V.    Program Increases by Item**

**Item Name:**                          **Adjudicatory Expansion Initiative**

Budget Decision Unit(s):            Executive Office for Immigration Review

Organizational Program:            Immigration Adjudications


Program Increase:  Positions 600  Agt/Atty 250  FTE  300  Dollars  $173.8 million

Description of Item

This request provides $173.8 million, which will enable EOIR to add 100 new immigration judges (IJs), for a total of 834 authorized IJs, and necessary support staff. To provide needed support to the individual IJs in the courts, as well as to manage the workload in other EOIR components associated with increased immigration court adjudications, this model includes the following positions for each IJ: one attorney position in the immigration courts; one half attorney position for the Board of Immigration Appeals, or other headquarters legal component; one lower grade legal clerk or assistant and one half higher grade legal clerk or assistant; and two other positions comprised of a combination of the following positions on an as-needed basis: additional legal support staff, interpreter, and/or other EOIR mission support staff (see table below for visual representation). Some support positions may also go to headquarters to support the growth of immigration courts. The model has been updated from past years to more accurately reflect the costs associated with the new staff, space, equipment and adjudicatory costs.

| IJ Cost Model Positions | | | |
|---|---|---|---|
| Immigration Judge = 1 | | Total IJs: 100 | |
| Attorney = 1 | BIA Attorney = .5 | Total Attorney: 150 | |
| Lower graded legal clerk or assistant = 1 | Higher graded legal clerk or assistant = .5 | Total Legal Assistant: 150 | |
| Additional legal support staff, interpreter, and/or other EOIR mission support staff = 2 | | Total Professional Admin: 200 | |

This program increase also includes funding for the necessary corresponding courtrooms, office space, and associated expenses (e.g. interpreter services, furniture, equipment, and funding for guard services). Finally, this program increase also includes adjudicatory costs to account for IJ increases, as well as the changing immigration climate over recent fiscal years. These adjudicatory costs include processing FOIA requests, BIA transcriptions and certifications, and costs associated with the National Qualified Representative Program.

Justification

EOIR must increase the number of immigration judges as the pending caseload has been steadily increasing since FY 2006, hitting a new high of approximately 1.5 million pending cases at the end of the first quarter FY 2022. As a result of the growth in the backlog, the time it takes to close a case has increased. Recently, this caseload increase has been exacerbated by the closures and reductions in service associated with the COVID-19 pandemic, as well as the consistent rise in the number of new

NTAs that DHS has filed before the immigration court over the last five years, even with the reduction in filings over FY 2020 and FY 2021 (from a high of almost 550,000 in FY 2019). While receipts decreased to 370,000 in FY 2020 and just over 240,000 in FY 2021, these decreases were associated with the issues surrounding the COVID-19 pandemic and already through just one quarter of FY 2022 over 144,000 NTAs have been filed. Further, even though receipts declined during COVID-19, EOIR completions continued to fall below incoming receipt levels due to limited operations in the immigration courts during the pandemic. Without corresponding increases in resources, combined with process improvements, EOIR will not be able to successfully manage the incoming caseload, while also addressing the backlog.

As the caseload has grown, processing time has increased. Certain typically lengthy applications, like asylum, have also increased proportional to the incoming receipts. Conversely, voluntary departure, a relatively speedier process, has decreased. EOIR is working to make internal changes that will address the backlog. Beyond the allocation of additional resources, including the hiring of additional immigration judges, EOIR has undertaken measures to address the pending caseload. Specifically, in early 2021 EOIR implemented a revised case flow process to manage its cases, detailed in EOIR Policy Memorandum 21-18. This process will conserve judicial resources by handling more routine and administrative case matters through paper and electronic filings, thereby preserving limited courtroom time for trials and adjudications on the merits. Additionally, EOIR continues to develop priority dockets for adjudication which allows for efficient adjudication of these priority cases, and helps to address the case backlog in the most effective way. Finally, EOIR continues to leverage technological advances to increase access to the courts and its own efficiency with existing resources. Each of these is a step in the right direction, but with the growth of the caseload, additional adjudicators and support staff are necessary to more robustly address the pending caseload.

<u>Impact on Performance</u>

This program increase directly supports current EOIR strategic initiatives to increase adjudicatory and case processing capacity, and EOIR's overall mission. Through the second quarter of FY 2020, the last quarter with caseloads minimally affected by the COVID-19 pandemic, EOIR had completed approximately 200,000 cases with fewer than 430 IJs hearing full caseloads. The number of cases completed per IJ varies, due to docket size, NTA flow, attrition, and the differences and complexities of each individual case. However, EOIR projects an average of at least 500 cases per IJ, and with additional efficiencies, (as described in EOIR's FY 2022 Presidents Budget Request - Backlog Reduction Efficiencies), EOIR could increase that number substantially, to approximately 600 cases per IJ. EOIR's capability to reduce the pending caseload backlog is still predicated on the receipt of NTAs in a given year being less than EOIR's completion capacity. Even with a robust IJ hiring and on-boarding process, there is a six to twelve month learning curve timeline for new IJs to begin hearing cases at a rate as efficiently as experienced IJs. This program increase will not affect performance immediately but rather over the course of the next several years upon IJ tenure. However, with a sustained commitment to increasing the number of IJs and the number of IJ support staff including attorneys, EOIR will be able to decrease the pending caseload and reduce the amount of time respondents must wait until their case is heard.

# Funding

## 1. Base Funding

| FY 2021 Enacted | | | | FY 2022 President's Budget | | | | FY 2023 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) |
| 3,761 | 1,611 | 2,277 | 734,000 | 4,361 | 1,911 | 2,921 | 891,190 | 4,361 | 1,911 | 3,221 | 977,063 |

## 2. Personnel Increase Cost Summary

| Type of Position/Series | Positions Requested | Annual Costs per Position* ($000) | | | FY 2023 Request ($000) | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|
| | | 1st Year Adjusted Cost | 2nd Year Adjusted Cost | 3rd Year Full Cost (Modular) | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Immigration Judges (0905) | 100 | 161 | 129 | 299 | 16,131 | 12,943 | 858 |
| Attorneys (0905) | 150 | 114 | 92 | 240 | 17,173 | 13,843 | 4,968 |
| Legal Assistant (0986) | 150 | 85 | 43 | 128 | 12,693 | 6,426 | 150 |
| Professional Admin and Other Law (001-0599; 950; 1000-2299) | 200 | 118 | 88 | 239 | 23,581 | 17,628 | 6,620 |
| **Total Personnel** | **600** | | | | **69,578** | **50,840** | **12,596** |

*Annual Costs per Position:

1st Year Adjusted Cost assumes hiring at the minimum grade level and applies a 50% lapse to pay and benefits, reflecting the distribution of hiring new personnel throughout an entire year.

2nd Year Adjusted Cost restores the pay and benefits lapse, removes one-time only costs that are applicable only to the first year, and assumes an increase in pay grade where applicable.

3rd Year Full Cost (Modular) is the standardized full-year cost for each position which includes pay and benefits at the full performance or journeyman level, equipment, training, and miscellaneous expenses.

### 3. Non-Personnel Increase/Reduction Cost Summary

| Non-Personnel Item – Court Costs | FY 2023 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Operational Travel | 331 | 3 | 100 | -260 | 1 |
| Communications, Utilities, and Miscellaneous Charges | 1,758 | 18 | 100 | -1,310 | 7 |
| Guard Services – Security Work Authorizations | 3,168 | 32 | 100 | 1,119 | 64 |
| Furniture | 2,652 | 27 | 100 | -2,387 | 27 |
| Network Costs | 2,858 | 29 | 100 | -1,958 | 14 |
| Video Teleconferencing (VTC) Equipment | 2,217 | 22 | 100 | -1,668 | 8 |
| Digital Audio Recording (DAR) System | 3,174 | 32 | 100 | -2,218 | 14 |
| Printing Equipment | 1,177 | 12 | 100 | -715 | 7 |
| Document Reader | 204 | 2 | 100 | -142 | 1 |
| ECAS Scanner | 335 | 3 | 100 | -229 | 2 |
| Guard Services Equipment (X-ray, magnetometers, etc.) | 1,056 | 11 | 100 | -829 | 3 |
| Space Buildout Associated with IJ Teams | 75,000 | 750 | 100 | -75,000 | 0 |
| **Total Non-Personnel** | **93,930** | **939** | | **-85,596** | **148** |

| Non-Personnel Item – Adjudicatory Costs | Quantity | Annual Unit Cost ($000) | | | FY 2023 Request ($000) | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|
| | | 1st Year Adjusted Cost | 2nd Year Adjusted Cost | 3rd Year Full Cost (Modular) | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| National Qualified Representation Program (NQRP) | 100 | 10 | 10 | 21 | 1,000 | 1,030 | 30 |
| Interpretation | 100 | 80 | 82 | 164 | 7,950 | 8,189 | 242 |
| Transcription | 100 | 11 | 11 | 22 | 1,075 | 1,107 | 33 |
| Litigation Support | 100 | .17 | .17 | .3 | 17 | 17 | 1 |
| Freedom of Information Act (FOIA) | 100 | 2 | 2 | 5 | 226 | 233 | 7 |
| **Total** | | **103** | **105** | **212** | **10,268** | **10,576** | **313** |

### 4. Justification for Non-Personnel Annualizations

The future annualizations contained in the above charts reflect resources needed to fully fund the associated costs with the hiring of 100 IJs.

### 5. Total Request for this Item

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Current Services | 4,361 | 1,911 | 3,221 | 490,887 | 486,176 | 977,063 | | |
| Increases | 600 | 250 | 300 | 69,578 | 104,198 | 173,776 | -24,180 | 13,057 |
| **Grand Total** | **4,961** | **2,161** | **3,521** | **560,465** | **590,374** | **1,150,839** | **-24,180** | **13,057** |

### 6. Affected Crosscuts

Immigration

| Item Name: | **Protecting the Privacy of EOIR Information** |
|---|---|
| Budget Decision Unit(s): | Executive Office for Immigration Review |
| Organizational Program: | Immigration Adjudications |

Program Increase:  Positions  11   Agt/Atty  4   FTE   6   Dollars  $5.7 million

Description of Item

This budget request will protect the privacy of EOIR information by strengthening the existing privacy program, Freedom of Information Act (FOIA) program, as well as to protect the security of EOIR information and data.

To ensure compliance with privacy and civil liberties-related law, EOIR requests funding for three attorneys and one half analyst to focus on privacy. This will provide the necessary staff to manage EOIR privacy needs, update and complete training for EOIR staff, and remain in compliance with federal statutes and regulations. The additional positions will serve as trainers for the EOIR workforce regarding privacy and cybersecurity issues. By maintaining a properly trained workforce who is diligent of privacy and cybersecurity issues, EOIR information and systems are better equipped to identify and manage accidental and malicious informational breaches. EOIR has consulted with the Office of Privacy and Civil Liberties (OPCL), which is responsible for ensuring the Department's compliance with privacy and civil liberties-related laws and policies on this request. OPCL agrees these positions are necessary for EOIR to continue to comply with its privacy and security obligations.

Additionally, due to ongoing litigation, EOIR expects to be required to make available to the public some portion, if not all decisions released by the BIA. To ensure the protection of personal identifying information (PII) and other critical personal information of citizens, lawful permanent residents, and noncitizens, EOIR requests funding for one attorney and two analysts to build a new team within the FOIA Unit to ensure the removal of all PII from decisions issued by the BIA. To assist in keeping staffing costs low, EOIR also requests funding to obtain artificial intelligence software to effectively redact a majority of information enabling a quicker and more thorough review.

Further, in keeping with Executive Order (EO) 14028, regarding improving the Nation's Cybersecurity, EOIR requests funding to improve EOIR's cybersecurity posture. As noted in the EO, the United States faces persistent and increasingly sophisticated malicious cyber campaigns that threaten the public sector, the private sector, and ultimately the American people's security and privacy. The Federal Government must improve its efforts to identify, deter, protect against, detect, and respond to these actions and actors. Given the sensitive nature of the information EOIR stores and manages related to immigration cases, it is imperative that EOIR ensure the data is protected. This request would provide funding to address the issues and concerns identified as a result of the Deputy Attorney General's comprehensive cyber review in May 2021.

Justification

With the significant increase in privacy-related work, and the rapidly evolving cybersecurity threat landscape, EOIR's current privacy-focused workforce and perimeter focused IT security architecture is

becoming obsolete, leading to an eventual future degradation of EOIR's risk posture. In order to prevent this, EOIR will need to invest in people, processes, and technologies in multiple areas.

EOIR requires additional staff to support the privacy efforts at the agency. EOIR's privacy team is small, consisting of one attorney who works on the portfolio on a part-time basis, and a judicial law clerk. The addition of a supervisory attorney, two full-time attorney advisors and one analyst would more appropriately match the level of need for EOIR's growing workforce, which has increased in size from 1,393 personnel on-board at the end of FY 2015 to 2,300 personnel on-board at the end of FY 2021 and will continue to grow as more IJs and support staff are added. To keep pace with these on-board levels and an increased need to manage the privacy of records, as well as to train the personnel, the privacy team needs to be expanded to accommodate it. The additional personnel requested would improve EOIR's efforts to address privacy compliance and cybersecurity needs in a timely manner. Further, the additional staff would ensure all planned and active systems and applications are in compliance with the Privacy Act of 1974 and E-Government Act of 2002, especially in EOIR's rapidly growing electronic records keeping and data sharing capabilities. The additional staff would be able to review compliance documents, address informational breaches, and provide training modules for new and existing employees. EOIR's training needs are unique, in that EOIR collects information from noncitizens and legal permanent residents in addition to U.S. citizens, which provides EOIR with unique privacy questions and issues. To address those issues, the additional staff will work to develop EOIR-specific privacy training.

Additionally, EOIR requires additional support for the FOIA program. FOIA receipts have increased by nearly 72 percent from FY 2016 to FY 2021 (from approximately 35,500 to approximately 61,000). EOIR has been in ongoing litigation concerning the potential required release of all BIA decisions. The BIA currently releases approximately 30,000 decisions per year and has decisions dating back to the 1940s. Given the current posture of the litigation, EOIR is concerned it may not prevail and will be responsible for providing some portion if not all of the BIA's decisions to the public. EOIR is not only required by the Privacy Act to redact all PII, EOIR is also responsible under the Immigration and Nationality Act to protect the asylum information of certain vulnerable groups of noncitizens as well as comply with regulations restricting the release of information in all asylum cases. EOIR does not have sufficient staff within the FOIA program to produce these cases for public review while providing the level of privacy protection demanded by the law. Along with the acquisition of Artificial Intelligence software, EOIR requests one attorney and two analysts to effectively meet the FOIA and PII need.

Improving EOIR's cybersecurity posture for the future will require investment in hardware, software, cloud based services and the people to design, install and operate this new environment. With the increase in personnel, the number of devices on EOIR's network that must be managed is now over 10,000 and expanding. The digitization of EOIR's adjudicatory proceedings and other functionality also means more applications and services to be monitored, analyzed, and managed. This, combined with the increased threat landscape as identified by E.O. 14028 and the growing amount of EOIR information present in a cloud based system, requires EOIR to improve its security and resilience. This starts with the appointment of a full-time Chief Information Security Office (CISO). The CISO will formalize and lead a two-pronged strategy to ensure EOIR's security posture rises to today's ever evolving challenges. First, EOIR will adopt DOJ's Zero Trust capability. The journey to zero trust includes:

- <u>Defining the Protect Surface:</u> EOIR's Courts and Appeal System (ECAS) was fully deployed at the end of calendar year 2021 placing EOIR's immigration data completely in the cloud. As EOIR digitizes more of its processes, the environment will get increasingly complex.

Understanding the entire environment and not just its perimeter, is vital to implementing zero trust.

- <u>Map Data Flows:</u> Not only are EOIR's systems becoming more complex, more and more data is flowing in and out of the systems to meet mission needs. Increasingly, DHS components (ICE, USCIS, CBP) are interested in the electronic exchange of information. This effort will address understanding where EOIR data is at rest and where it is moving. The intent is to encrypt data in all its states and to only allow access to appropriate entities.

- <u>Policy Creation:</u> This effort will define role based access and control of EOIR's data and services.

- <u>Service Segmentation:</u> From a cybersecurity perspective, IT services are currently viewed at the macro level. This leads to securing of the network and the ingress and egress to the network. The implementation of a zero trust architecture involves securing at the micro segmentation level – authentication and authorization capabilities will be placed in front of these micro services (e.g. ECAS) to enforce role-based access to the service. These changes must be implemented so that trusted users are recognized and allowed access based on the electronic credentials facilitating single sign on.

- <u>Operate, Monitor, and Maintain:</u> Ensure policies are being applied as planned, make adjustments as needed and as policy changes dictate.

In addition to implementing Zero Trust, EOIR must overhaul its cybersecurity policy and oversight capabilities. As EOIR's IT presence increases and grows more complex, the ability to monitor and review the required security controls requires a significant amount of oversight.  EOIR must move from its current three year Accreditation and Authorization process to an ongoing authorization model. EOIR can efficiently and effectively improve the necessary oversight via automation. Specifically, two ways that EOIR will implement automation are: to monitor developers to ensure they are following appropriate security policies and all applications are reviewed before operational release; and to continuously monitor and analyze the security posture of the infrastructure, i.e. reviewing logs for threats and exploited vulnerabilities as well as reporting unauthorized changes to configurations. Successful implementation of this strategy requires skill sets not currently present within the Office of Information Technology (OIT). In addition to contract labor to accomplish this, OIT will require certain skills to be performed by federal employees.

- One Systems Engineer to address identity management, zero trust policy decision and enforcement points, and end point detection and response technologies.

- Two cybersecurity analysts to conduct more detailed risk assessment, supply chain risk assessments, etc.

- One data analyst to define, analyze, and optimize data flows ensuring all EOIR data is accounted for and secured.

<u>Impact on Performance</u>

Without the requested increase in funding for the proposed privacy and cybersecurity efforts, EOIR will not be able to efficiently address privacy needs, will not be able to respond to results from existing litigation, and will not be best prepared to protect the cybersecurity of the agency's operations.

## Funding

### 1. **Base Funding**

| FY 2021 Enacted | | | | FY 2022 President's Budget | | | | FY 2023 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) |
| 3,761 | 1,611 | 2,277 | 734,000 | 4,361 | 1,911 | 2,921 | 891,190 | 4,361 | 1,911 | 3,221 | 977,063 |

### 2. **Personnel Increase Cost Summary**

| Type of Position/Series | Positions Requested | Annual Costs per Position* ($000) | | | FY 2023 Request ($000) | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|
| | | 1st Year Adjusted Cost | 2nd Year Adjusted Cost | 3rd Year Full Cost (Modular) | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Attorneys (0905) | 4 | 127 | 109 | 274 | 509 | 436 | 149 |
| Professional Admin and Other Law (001-0599; 950; 1000-2299) | 7 | 131 | 105 | 273 | 914 | 735 | 260 |
| **Total Personnel** | **11** | | | | **1,423** | **1,171** | **409** |

*Annual Costs per Position:

1st Year Adjusted Cost assumes hiring at the minimum grade level and applies a 50% lapse to pay and benefits, reflecting the distribution of hiring new personnel throughout an entire year.

2nd Year Adjusted Cost restores the pay and benefits lapse, removes one-time only costs that are applicable only to the first year, and assumes an increase in pay grade where applicable.

3rd Year Full Cost (Modular) is the standardized full-year cost for each position which includes pay and benefits at the full performance or journeyman level, equipment, training, and miscellaneous expenses.

### 3. Non-Personnel Increase/Reduction Cost Summary

| Non-Personnel Item | FY 2023 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Contract Labor | 2,000 | 2,000 | 1 | 0 | 0 |
| Equipment/Hardware | 1,000 | 1,000 | 1 | 0 | -700 |
| Software Costs | 1,150 | 1,150 | 1 | 0 | -500 |
| Other Services | 100 | 100 | 1 | 0 | -100 |
| **Total Non-Personnel** | **4,250** | **4,250** | | **0** | **-1,300** |

### 4. Total Request for this Item

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Current Services | 4,361 | 1,911 | 3,221 | 490,887 | 486,176 | 977,063 | | |
| Increases | 11 | 4 | 6 | 1,423 | 4,250 | 5,673 | 1,171 | -891 |
| **Grand Total** | **4,372** | **1,915** | **3,227** | **492,310** | **490,426** | **982,736** | **1,171** | **-891** |

### 5. Affected Crosscuts

Immigration
Cybersecurity

**Item Name:**                          __**Legal Access Initiatives**_____

Budget Decision Unit(s):          __Executive Office for Immigration Review_____

Organizational Program:          __Immigration Adjudications_____


Program Increase: Positions __20__ Agt/Atty _8_ FTE __10__ Dollars $188.6 million

<u>Description of Item</u>

This request provides $188.6 million to EOIR through the Office of Legal Access Programs (OLAP). The funding will enable EOIR to increase and improve access to adjudications for certain individuals without representation, specifically:

- $4.7 million for Programs Associated with Unaccompanied Children
    - $3.0 million for the continuation of a pilot program to provide representation for unaccompanied immigrant children
    - $1.5 million for Legal Orientation Program for the Custodians of Unaccompanied Alien Children (LOPC) National Call Center
    - $192,500 for one and a half positions, (one attorney and half a paralegal)
- $14.4 million for the Nationwide Policy, which includes the National Qualified Representatives Program (NQRP)
    - $14.2 million for forensic competency evaluations, qualified representation and contract escalations
    - $192,500 for one and a half positions, (one attorney and half a paralegal)
- $19.5 million for Current Legal Access Programs
    - $15.0 million for the expansion of the Immigration Court Helpdesk
    - $2.5 million increase for pro bono representation
    - $2.0 million for the creation of a remote virtual or telephonic legal orientation program
- $150.0 million for Legal Representation
    - $147.8 million for grant resources supporting representation for specific categories of individuals and families in immigration proceedings before the agency
    - $2.2 million for 17 positions (six attorneys and 11 professional administration)


<u>Justification</u>

*Programs Associated with Unaccompanied Children*

EOIR launched the LOPC in the fall of 2010, to provide legal orientation presentations to the adult caregivers (custodians) of unaccompanied children in EOIR removal proceedings. The purpose of this program is to inform the children's custodians of their responsibilities in ensuring the child's

appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. EOIR works with the Department of Health and Human Services, Office of Refugee Resettlement, and non-government partners to carry out this program nationally. Specifically, the LOPC educates custodians on:

- The immigration court process and how it works;

- The importance of the children's attendance at removal hearings and consequences of failure to appear;

- The forms of immigration relief available to children in removal proceedings; and

- The custodians' responsibility to protect the children from mistreatment, exploitation, and human trafficking.

This request includes additional resources for the LOPC and LOPC national call center to enable those programs to continue and expand their valuable work providing legal orientation information to custodians of as many unaccompanied children as possible.

Additionally, the program increase requests funds to continue and expand a pilot program, separate from LOPC, which provides for the representation of unaccompanied immigrant children. Legal representation in immigration court contributes to the effectiveness of proceedings. When unaccompanied children are capably represented, Immigration Courts are able to adjudicate those cases more efficiently. Legal representation also allows for identification of children who have been subjected to mistreatment, exploitation, and trafficking to ensure protection for this vulnerable population.

The pilot was started in FY 2021 with temporary cost-savings associated with reduced services due to COVID-19 and is located in seven immigration courts. This increase would allow the program to remain in those locations and expand to additional locations. In addition, EOIR requests an increase in staffing of one and a half positions to manage this program, which includes one attorney advisor position, and half of a paralegal position.

*Nationwide Policy*

In April 2013, EOIR, in collaboration with the Department of Homeland Security, initiated a new Nationwide Policy to provide enhanced procedural protections, including competency inquiries, mental health examinations, and bond hearings to certain unrepresented and detained respondents with serious mental disorders or conditions that may render them incompetent to represent themselves in immigration proceedings. At the same time, and as part of the Nationwide Policy's enhanced procedural protections, EOIR also launched the NQRP, a nationwide program to provide qualified representatives to certain unrepresented and detained respondents who are found by an Immigration Judge or the Board of Immigration Appeals to be mentally incompetent to represent themselves in immigration proceedings. At this time, due to the results of the *Franco*[4] litigation and the costs associated with rolling out the Policy nationwide, EOIR is no longer able to absorb the costs without this requested program increase.

---

[4] *Franco-Gonzalez, et al. v. Holder et al.*, 10-cv-2211, (C.D. Cal. 2010)

EOIR expects that there will be an increase in the projected number of cases involving detained respondents who are determined to be mentally-incompetent to represent themselves in immigration proceedings. These cases include those identified in the three states covered by the *Franco* class action settlement (CA, WA, and AZ), as well as those identified under the DOJ and DHS' National Policy for Enhanced Procedural Protections for Aliens with Diminished Mental Capacity ("Nationwide Policy"). Cases covered under the *Franco* litigation have different costs than those covered under the Nationwide Policy, and all *Franco* sites are currently active. In January 2022, EOIR completed the roll out of the Nationwide Policy to all remaining locations at which it was not already in place.

In FY 2021, EOIR spent approximately $12.3 million to provide for forensic competency evaluations and qualified representatives at approximately 75 locations, in an estimated 1,383 cases. This enhancement request would enable the implementation of the nationwide rollout of the Nationwide Policy an approximately 66 percent increase in non-*Franco* (less costly) cases, costing an additional $14.2 million for the associated forensic competency evaluations and qualified representatives. In addition, this request includes funding for additional staff for OLAP to manage the workload associated with an increase in Nationwide Policy related cases (one attorney advisor position, and one half-time paralegal specialist). This program increase will provide OLAP with adequate staffing resources for its administration of the Nationwide Policy.

*Other Legal Access Programs*

At this time, EOIR is asking for additional support for the programs within OLAP. Specifically, EOIR requests funding to support the expansion of the Immigration Court Helpdesk (ICH) program. The ICH is a program currently available to non-detained respondents in 13 immigration courts. It is intended to be a live resource for noncitizens seeking general information. The services rendered at the ICH are not a substitute for legal representation, although they do provide valuable information and resources. In an effort to increase and improve the due process and fairness of immigration proceedings, EOIR is requesting funding sufficient to begin bringing an in-person ICH to every non-detained immigration court location nationwide. This request will provide for ICH presence at the most recently authorized and constructed immigration courts, and any additional funding will be spent bringing the ICH to those locations where there is both a significant demonstrated need for services as well as the physical space in which to house the provider and participant.

Additionally, part of this request would go towards increasing pro bono representation - this funding would be utilized to do research, develop materials, and perform outreach to identify and enlist pro bono providers. Some portion of this funding would also go towards providing contract interpretation assistance for pro bono attorneys that do not have access to interpretation and who agree to represent particularly vulnerable individuals, remotely located individuals, or otherwise challenging to serve clients. As noted in the statement accompanying the President's memorandum to expand access to legal representation and the courts, timely and affordable access to the legal system can make all the difference in a person's life. The statement further noted that the federal government has a critical role to play in expanding access to the nation's legal system and supporting the work of civil legal aid providers and public defenders. EOIR can assist with the identification of, and provision of information regarding pro bono representation. EOIR has previously conducted these efforts through the existing LOP programs as well as through a number of other efforts, such as the Model Hearing Program and the BIA Pro Bono Project.

Finally, EOIR requests resources to focus on increasing access to LOP presentations in remote, underserved, or sparsely populated areas with the creation of a remote virtual or telephonic legal orientation program. Due to the nature of these programs, these LOP presentations would be conducted remotely, over video or telephonically, so as to ensure these hard-to-serve LOP populations receive services similar to those provided at other detention facilities where the broader number of providers or larger demonstrated need has led to greater in person LOP availability.

*Legal Representation*

Although noncitizens have the right to legal counsel in removal proceedings, there is no right to government-paid counsel, and a significant number therefore do not have counsel when appearing in immigration court. EOIR has historically only provided contract representation services to very small populations, limiting that work to programs for individuals with mental capacity issues or pilot programs for children. This request will provide for grant funding that will allow for increased representation for these and comparable populations appearing in immigration court.

Studies have shown that legal representation can increase efficiency in immigration proceedings and reduce costs associated with immigration enforcement and detention. Those studies observe that represented individuals are more likely to appear for their hearings and less likely to need a continuance to another hearing date. Thus, expanded representation leads to a reduction in time spent by immigration judges on each case, and better use of time leads to greater efficiencies in court proceedings.

This new initiative will include public engagement to identify key partners, need, and best practices; the development of a competitive grant program to support expanded legal representation, focusing first on areas of greatest need; and national training and technical assistance for the grantees and those providing noncitizens with legal services. In addition, grantees will be encouraged to coordinate with organizations offering other types of legal assistance or services to noncitizens seeking relief or protection, and organizations providing other legal assistance related to housing, social services, crime victim service, or transition and support services for noncitizens.

In conjunction with other, ongoing efforts to make EOIR adjudications more fair, and more efficient, this legal representation initiative will help to create a more level playing field, so that observers and participants in the immigration adjudication center can feel confident that their case was decided based on the fullness of the merits and the law, and not on whether the noncitizen had access to an attorney to advocate on their behalf. A portion of the provided funding will be used to administer the program.

This program is complemented by a proposed $4.5 billion in mandatory resources to expand these efforts over a 10-year period.

<u>Impact on Performance</u>

Without the requested increase in funding for these proposed legal access initiatives, EOIR will not be able to respond as robustly to the legal access needs of the noncitizens with cases before the immigration court. Improved legal access improves efficiencies in court, which could help address the immigration caseload, working to mitigate the current backlog while also improving and increasing fairness in the process.

# Funding

## 1. Base Funding

| FY 2021 Enacted | | | | FY 2022 President's Budget | | | | FY 2023 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) |
| 3,761 | 1,611 | 2,277 | 34,786 | 4,361 | 1,911 | 2,921 | 34,786 | 4,361 | 1,911 | 3,221 | 34,786 |

## 2. Personnel Increase Cost Summary

| Type of Position/Series | Positions Requested | Annual Costs per Position* ($000) | | | FY 2023 Request ($000) | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|
| | | 1st Year Adjusted Cost | 2nd Year Adjusted Cost | 3rd Year Full Cost (Modular) | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Attorneys (0905) | 8 | 127 | 109 | 274 | 1,017 | 873 | 297 |
| Professional Admin and Other Law (001-0599; 950; 1000-2299) | 12 | 131 | 105 | 273 | 1,568 | 1,259 | 446 |
| Total Personnel | 20 | | | | 2,585 | 2,132 | 743 |

*Annual Costs per Position:

1st Year Adjusted Cost assumes hiring at the minimum grade level and applies a 50% lapse to pay and benefits, reflecting the distribution of hiring new personnel throughout an entire year.

2nd Year Adjusted Cost restores the pay and benefits lapse, removes one-time only costs that are applicable only to the first year, and assumes an increase in pay grade where applicable.

3rd Year Full Cost (Modular) is the standardized full-year cost for each position which includes pay and benefits at the full performance or journeyman level, equipment, training, and miscellaneous expenses.

## 3. Non-Personnel Increase/Reduction Cost Summary

| Non-Personnel Item | FY 2023 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Representation of Unaccompanied Minors | 3,000 | 3,000 | 1 | 0 | 0 |
| LOPC Call Centers | 1,500 | 1,500 | 1 | 0 | 0 |
| Nationwide Policy | 14,200 | 14,200 | 1 | 0 | 0 |
| Office of Legal Access Programs | 19,500 | 19,500 | 1 | 0 | 0 |
| Legal Representation | 147,800 | 147,800 | 1 | 0 | 0 |
| Total Non-Personnel | 186,000 | 186,000 | | 0 | 0 |

**4.  <u>Total Request for this Item</u>**

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | **Count** | **Agt/ Atty** | **FTE** | **Personnel** | **Non-Personnel** | **Total** | **FY 2024 (net change from 2023)** | **FY 2025 (net change from 2024)** |
| Current Services | 4,361 | 1,911 | 3,221 | | 34,786 | 34,786 | | |
| Increases | 20 | 8 | 10 | 2,585 | 186,000 | 188,585 | 323 | 111 |
| **Grand Total** | **4,381** | **1,919** | **3,231** | **2,585** | **220,786** | **223,371** | **2,132** | **743** |

**5.  <u>Affected Crosscuts</u>**

Access to Justice
Immigration

| Item Name: | <u>**Virtual Court Initiative**</u> |
|---|---|
| Budget Decision Unit(s): | <u>Executive Office for Immigration Review</u> |
| Organizational Program: | <u>Immigration Adjudications</u> |

Program Increase:  Positions <u> 3 </u>  Agt/Atty <u> 0 </u>  FTE <u> 2 </u>  Dollars <u>$9.8 million</u>

<u>Description of Item</u>

The Virtual Court Initiative will further the digitization efforts currently being undertaken at EOIR such that: (1) EOIR adjudications will become paperless or near paperless; (2) all process executed by adjudicatory personnel and support staff can be executed remotely and/or with automation; (3) all transactions external to EOIR will be capable of being conducted electronically; and (4) all stakeholders participating in EOIR led proceedings will be able to participate remotely. EOIR requests $9.8 million to complete this initiative.

Achieving a "virtual court" begins with ensuring court operations occur consistently whether stakeholders are physically present in court or appearing remotely. At its core, such a development requires establishment of a "cloud-based" court. In effect, such a program would, once complete, allow stakeholders appearing remotely to authenticate themselves, or "check-in," in order to receive proper permissions for their appropriate role in a proceeding. The remote stakeholders would then have the necessary visual and audio access to effectively participate in the hearing. During and after the hearing, processes would be improved to allow for fully electronic management of the paperwork and data associated with the case.

The Electronic Courts and Appeals System (ECAS) was EOIR's first step to migrate away from paper processes. ECAS includes a portal that allows DHS components to electronically file and view some documents, and it also includes identity federation with DHS to facilitate single sign on and improved direct system to system data exchange. To complement and build on the ECAS program, the following, as part of a virtual court program, will minimize paper, improve court efficiency, and increase the agency's ability to respond to weather-related or other court closure.

*Check In* – Currently, EOIR is rolling out a system of electronic docket displays that will replace paper dockets posted in lobby areas with an electronic display of the daily docket with courtroom information for respondents and their attorneys. In the virtual court model, this information will also be accessible remotely to parties to the proceedings once they authenticate into the system. Check in will be available via smartphone in addition to at the registration desk. Electronic check in will increase capacity at the registration desk for the staff to answer more complicated questions as well as send the relevant information directly to the assigned courtroom so as to assist with the daily management of dockets.

*Virtual Court Proceedings* – Requested funds will allow EOIR to continue to provide for appropriate remote work kits and other technology for adjudicators and staff so that they can work from any appropriate location. It will improve virtual meeting technologies for not only EOIR employees but all parties to create better configurations and "meeting rooms." Further, it will enable electronic display and submission during proceedings of court documents for all parties and provide for appropriate

cameras so that individuals who appear remotely and need sign language interpretation will be able to receive those services.

*Automation* – Funding will increase the use of electronic transcription, which will reduce the time required to convert the digital audio recording of proceedings to text. This will also not only enable indexing and searching capabilities for proceedings, but will also decrease transcription contract costs in the out-years. Remote participants will be able to sign documents in real time as if they were approaching the clerk's station during a hearing. No one would have to leave their station, all document sharing, signatures, etc. would be electronic. Additionally, EOIR will work to improve automation of other manual processes, such as certain monthly reports and data downloads.

*Virtual Presence* – Each EOIR physical courtroom will have a virtual presence. Utilizing the capabilities of such products as WebEx and Teams, where stakeholders whether remote or in person, will be able to be present in a virtual space. Each courtroom will have the capability to have virtual rooms for the judge to conduct a sidebar, attorneys to consult with their clients, etc. Each courtroom will also be able to be broadcast to a gallery of authenticated interested parties.

*Infrastructure* – Additional network infrastructure will be required to support agency operations with the increasing amount of electronic documents. The request will include funding for electronic file storage and cloud computer processing capacity. The focus will be on providing a resiliency tool that will both improve performance and maintain operations during times of internet connectivity issues. It will also provide for improved wireless communications, with greater levels of routers or internet bandwidth for adjudicators to improve virtual performance. As the opportunity exists for a hearing to be a hybrid of both in person and remote, each station in the courtroom should be configured with a tablet device with camera capability so that a remote participant will be able to be fully present.

*Security and Resilience* – Participants must authenticate to be allowed access into the virtual courtroom. Adaptation of a zero trust architecture will be utilized to implement security controls. Proceedings must be able to move from virtual to physical and in the reverse in response to incidents such as inclement weather, power outages, building closure, etc.

<u>Justification</u>

The Virtual Court Initiative is a modernization effort designed to address outdated and inefficient routines and processes. It represents an integrated approach to introduce business process reengineering of existing procedures as well as the intelligent application of technology. Taking a holistic view of the court, the procedures for adjudicators, staff, government attorneys, respondents and their attorneys will be included in the design process. In addition to providing stakeholders with a consistent experience, whether remote or in person, this process change will also include infrastructure upgrades to increase flexibility for EOIR adjudicators. In addition to enabling all courts to operate their processes autonomously for multiple days in the event of a communications outage, conversion to a more virtual platform will enable the Immigration Adjudication Centers to make full use of this model, increasing their agility and ability to pivot to new and developing needs or challenges.

<u>Impact on Performance</u>

Without the requested increase in funding for the proposed virtual courtroom, EOIR will not be best able to make use of efficiencies to address workload and the pending caseload. Therefore, EOIR will not be able to respond as robustly to the increasing immigration caseload, and it will continue to grow.

## Funding

### 1. Base Funding

| FY 2021 Enacted | | | | FY 2022 President's Budget | | | | FY 2023 Current Services | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) | Pos | Agt/ Atty | FTE | Amount ($000) |
| 0 | 0 | 0 | $1,640 | 0 | 0 | 0 | $650 | 0 | 0 | 0 | $650 |

### 2. Personnel Increase Cost Summary

| Type of Position/Series | Positions Requested | Annual Costs per Position* ($000) | | | FY 2023 Request ($000) | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|
| | | 1st Year Adjusted Cost | 2nd Year Adjusted Cost | 3rd Year Full Cost (Modular) | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Professional Admin and Other Law (001-0599; 950; 1000-2299) | 3 | 131 | 105 | 273 | 392 | 315 | 112 |
| **Total Personnel** | **3** | | | | **392** | **315** | **112** |

*Annual Costs per Position:

1st Year Adjusted Cost assumes hiring at the minimum grade level and applies a 50% lapse to pay and benefits, reflecting the distribution of hiring new personnel throughout an entire year.

2nd Year Adjusted Cost restores the pay and benefits lapse, removes one-time only costs that are applicable only to the first year, and assumes an increase in pay grade where applicable.

3rd Year Full Cost (Modular) is the standardized full-year cost for each position which includes pay and benefits at the full performance or journeyman level, equipment, training, and miscellaneous expenses.

### 3.   Non-Personnel Increase/Reduction Cost Summary

| Non-Personnel Item | FY 2023 Request ($000) | Unit Cost ($000) | Quantity | Annualizations ($000) | |
|---|---|---|---|---|---|
| | | | | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Contract support for studies, analysis, and implementation services | 2,000 | 2,000 | 1 | 500 | -500 |
| Infrastructure Equipment | 3,000 | 3,000 | 1 | -1,500 | -750 |
| End User Equipment | 1,600 | 1,600 | 1 | -250 | -750 |
| Artificial Intelligence/Robotic Process Automation Initiatives | 1,900 | 1,900 | 1 | -650 | -500 |
| Software | 750 | 750 | 1 | 0 | 0 |
| Other Services/ODC/Implementation Supplies | 150 | 150 | 1 | 0 | 0 |
| **Total Non-Personnel** | **9,400** | **9,400** | | **-1,900** | **-2,500** |

### 4.   Total Request for this Item

| Category | Positions | | | Amount Requested ($000) | | | Annualizations ($000) | |
|---|---|---|---|---|---|---|---|---|
| | Count | Agt/ Atty | FTE | Personnel | Non-Personnel | Total | FY 2024 (net change from 2023) | FY 2025 (net change from 2024) |
| Current Services | | | | | $650 | $650 | 0 | 0 |
| Increases | 3 | | 2 | $392 | $9,400 | $9,792 | -1,585 | -2,388 |
| **Grand Total** | **3** | | **2** | **$392** | **$10,050** | **$10,442** | **-1,585** | **-2,388** |

### 5.   Affected Crosscuts

Immigration

**VI. Program Offsets by Item**

Not applicable.

**VI.    Exhibits**

(Exhibits begin on the following page)

EXHIBIT 11



**U.S. Department of Justice**
Justice Management Division
*Procurement Services Staff*
*Washington, D.C. 20530*

April 4, 2025

Acacia Center for Justice
ATTN: Leah Prestamo
1025 Connecticut Ave, Suite 701
Washington, DC 20036-5417

Subject: Rescission of April 3, 2025 Notice

Dear Ms. Prestamo,

On April 3, 2025, you received an email and letter titled "Notice of Termination for Convenience" from Ms. Allison Polizzi. The purpose of this letter is to rescind that April 3, 2025 communication. Please disregard that communication in its entirety, which has no legal effect.

The contracts and task orders referenced in the April 3, 2025 communication remain in place, and will remain in place, until further notice.

If you have any questions, please feel free to contact me.

Sincerely,

Digitally signed by
Date: 2025.04.04
15:44:39 -04'00'

Contracting Officer
U. S. Department of Justice
145 N Street NE
Washington, DC 20530