**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| AMERICAN GATEWAYS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:25-cv-01370 |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD .......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.     Plaintiffs Are Not Likely To Succeed On The Merits And The Case Should Be
       Dismissed ............................................................................................................... 5

       A.     The Court Lacks Jurisdiction Under The APA To Compel the Government
              To Pay Money Under A Contract ................................................................. 5

       B.     Plaintiffs' APA Claims Fail For Independent Threshold Reasons ........................ 15

              1.     Plaintiffs Have Other Adequate Remedies Available To Them ................ 15

              2.     Program Funding Decisions Are Committed to Agency Discretion
                     By Law ............................................................................................. 17

       C.     Plaintiffs' *Accardi* Theory Independently Fails On Its Merits .......................... 19

       D.     Plaintiffs' Rehabilitation Act Arguments Fail For Additional Reasons ............... 21

II.    Plaintiffs Fail To Show Irreparable Harm Absent An Injunction ...................................... 26

III.   The Remaining Injunction Factors Favor the Government, And Any Relief Should
       Be Limited in Scope ................................................................................................ 30

CONCLUSION .................................................................................................................. 33

# TABLE OF AUTHORITIES

## CASES

*AIDS Vaccine Coal. v. U.S. Dep't of State,*
    __ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025),
    *appeal filed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025) ........................................................... 29, 31

*Albrecht v. Comm. on Emp. Benefits,*
    357 F.3d 62 (D.C. Cir. 2004) ................................................................. 6, 9, 13, 15

*\*Alexander v. Choate,*
    469 U.S. 287 (1985) .................................................................. 22, 25, 26

*Alphapointe v. Dep't of Veterans Affairs,*
    745 F. Supp. 3d 1 (D.D.C. 2020) ........................................................... 7

*Am. Ass'n of Colls. For Teacher Educ. v. McMahon,*
    No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025) ................................ 12, 13

*Am. Council of the Blind v. Mnuchin,*
    977 F.3d 1 (D.C. Cir. 2020) .................................................................... 24

*Am. Council of the Blind v. Paulson,*
    525 F.3d 1256 (D.C. Cir. 2008) ........................................................... 23, 24, 25

*Am. Oversight v. U.S. Dep't of Veterans Affs.,*
    498 F. Supp. 3d 145 (D.D.C. 2020) ........................................................... 4

*Anderson v. United States,*
    344 F.3d 1343 (Fed. Cir. 2003) ............................................................... 17

*Aracely, R. v. Nielsen,*
    319 F. Supp. 3d 110 (D.D.C. 2018) ........................................................... 19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................................. 4, 5

*Barth v. Gelb,*
    2 F.3d 1180 (D.C. Cir. 1993) .................................................................. 24

*Bennett v. Hurley Med. Ctr.,*
    86 F.4th 314 (6th Cir. 2023) ................................................................... 24

*Boarhog LLC v. United States,*
    129 Fed. Cl. 130 (2016) ......................................................................... 16

*\*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .......................................................................... 10, 11, 15

*California v. U.S. Dep't of Educ.,*
    -- F. Supp. 3d --, 2025 WL 760825 (D. Mass. Mar. 10, 2025), *stay granted*,
    145 S. Ct. 966 (2025) ........................................................................................ 11

*Cath. Legal Immigr. Network Inc. v. Exec. Off. for Immigr. Rev.,*
    513 F. Supp. 3d 154 (D.D.C. 2021) ..................................................................... 29

*Chaplaincy of Full Gospel Churches v. England,*
    454 F.3d 290 (D.C. Cir. 2006) ............................................................................. 26

*Chiron Corp. & PerSeptive Biosystems, Inc. v. Nat'l Transp. Safety Bd.,*
    198 F.3d 935 (D.C. Cir. 1999) ............................................................................. 21

*City of New Haven v. United States,*
    634 F. Supp. 1449 (D.D.C. 1986) ........................................................................ 31

*Clark v. La. Dep't of Pub. Safety,*
    63 F.4th 466 (5th Cir. 2023) ................................................................................. 24

*Clevinger v. Advoc. Holdings Inc.,*
    Civ. A. Nos. 23-1159, 23-1176, 2023 WL 4560839 (D.D.C. July 15, 2023), *aff'd*,
    134 F.4th 1230 (D.C. Cir. 2025) ...................................................................... 26, 28

*\*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
    38 F.4th 1099 (D.C. Cir. 2022) .................................................................... *passim*

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ............................................................................................... 5

*Damus v. Nielsen,*
    313 F. Supp. 3d 317 (D.D.C. 2018) ................................................................. 19, 20

*\*Dep't of Educ. v. California,*
    145 S. Ct. 966 (2025) ................................................................................... *passim*

*Diaz v. Neighbors Consejo,*
    77 F. Supp. 3d 227 (D.D.C 2015) ........................................................................... 4

*District of Columbia v. U.S. Dep't of Agric.,*
    444 F. Supp. 3d 1 (D.D.C. 2020), *appeal dismissed*,
    2020 WL 9596420 (D.C. Cir. Nov. 9, 2020) ........................................................ 29

*Doe v. Hampton,*
    566 F.2d 265 (D.C. Cir. 1977) ............................................................................. 21

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999) ............................................................................... 32

*Erickson Air Crane Co. of Wash. v. United States*,
   731 F.2d 810 (Fed. Cir. 1984) ................................................................ 17

*Estate of Martin v. Cal. Dep't of VA*,
   560 F.3d 1042 (9th Cir. 2009), *overruled in part on other grounds*,
   *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019) ........................... 24

*FDA v. All. for Hippocratic Med.*,
   602 U.S. 367 (2024) .............................................................................. 28, 29

*Franco-Gonzalez v. Holder*,
   2013 WL 8115423 (C.D. Cal. Apr. 23, 2013) ............................................ 3

*Franco-Gonzalez v. Holder*,
   No. CV 10-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) ............... 25

*Franklin-Mason v. Mabus*,
   742 F.3d 1051 (D.C. Cir. 2014) ................................................................. 6

*Gill v. Whitford*,
   585 U.S. 48 (2018) ................................................................................... 31

*Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*,
   639 F.3d 1078 (D.C. Cir. 2011) ................................................................. 5

*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002) ......................................................................... 5, 8, 11

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*,
   114 Fed. Cl. 258 (2013) ........................................................................... 16

*Hanson v. District of Columbia*,
   120 F.4th 223 (D.C. Cir. 2024) ............................................................. 5, 24

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................................ 18, 19

*Hein v. Freedom From Religion Found., Inc.*,
   551 U.S. 587 (2007) ................................................................................. 18

*Hettinga v. United States*,
   677 F.3d 471 (D.C. Cir. 2012) ................................................................... 4

*Ingersoll-Rand Co. v. United States*,
   780 F.2d 74 (D.C. Cir. 1985) ........................................................... *passim*

*Int'l Dark-Sky Ass'n v. FCC*,
   106 F.4th 1206 (D.C. Cir. 2024) .............................................................. 22

*Int'l Tech. Corp. v. Winter,*
    523 F.3d 1341 (Fed. Cir. 2008) ................................................................ 17

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan,*
    746 F.2d 855 (D.C. Cir. 1984) ................................................................ 19

*Jenkins v. Howard Univ.,*
    123 F.4th 1343 (D.C. Cir. 2024) .............................................................. 5

*Jones v. City of Monroe,*
    341 F.3d 474 (6th Cir. 2003) ................................................................. 25

*Keepseagle v. Vilsack,*
    815 F.3d 28 (D.C. Cir. 2016) .................................................................. 4

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.,*
    56 F.3d 279 (D.C. Cir. 1995) ......................................................... *passim*

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ..................................................................... 28, 31

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .................................................................. 27

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ............................................................... 17, 18, 19

*Lopez v. FAA,*
    318 F.3d 242 (D.C. Cir. 2003) ............................................................... 20

*Lucas v. VHC Health,*
    128 F.4th 213 (4th Cir. 2025) ............................................................... 23

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .......................................................................... 31

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ........................................................................... 6

*Matter of M-A-M-,*
    25 I&N Dec. 474 (BIA 2011) .......................................................... 22, 23, 24

*McCoy v. Kollar-Kotelly,*
    Civ. A. No. 23-02695, 2025 WL 928611 (D.D.C. Mar. 27, 2025) ............................ 22

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982) ....................................................... *passim*

*Navab-Safavi v. Broad. Bd. of Governors*,
   650 F. Supp. 2d 40 (D.D.C. 2009) .................................................................. 9

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
   435 F.3d 326 (D.C. Cir. 2006) ...................................................................... 30

*Nken v. Holder*,
   556 U.S. 418 (2009).................................................................................... 32

*Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*,
   496 F. Supp. 3d 31 (D.D.C. 2020) ............................................................... 29

**Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ........................................................... *passim*

*Rodriguez v. City of N.Y.*,
   197 F.3d 611 (2d Cir. 1999) ........................................................................ 25

*Seed v. EPA*,
   100 F.4th 257 (D.C. Cir. 2024) .................................................................... 15

*Shaffer v. Veneman*,
   325 F.3d 370 (D.C. Cir. 2003) ...................................................................... 6

*Sharp v. Weinberger*,
   798 F.2d 1521 (D.C. Cir. 1986) .................................................................. 10

*Solutions in Hometown Connections v. Noem*,
   No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ...................... 12

**Spectrum Leasing Corp. v. United States*,
   764 F.2d 891 (D.C. Cir. 1985) ........................................................... *passim*

*TigerSwan, Inc. v. United States*,
   110 Fed. Cl. 336 (2013) ........................................................................ 9, 16

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) ...................................................................... 8

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992) ...................................................................... 6

*Twin Metals Minn. LLC v. United States*,
   No. 22-cv-2506, 2023 WL 5748624 (D.D.C. Sept. 6, 2023), *appeal filed*,
   No. 23-5254 (D.C. Cir. Nov. 9, 2023)...................................................... 9, 10

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
   -- F. Supp. 3d --, 2025 WL 763738 (D.D.C. Mar. 11, 2025), *denying mot. for*
   *injunction pending appeal*, No. 25-5066 (D.C. Cir. Mar. 28, 2025) ...................... 12, 15, 17, 31

*United States v. Texas,*
   144 S. Ct. 797 (2024) ................................................................................................. 13

*Vanover v. Hantman,*
   77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002) ................................ 19

*Warth v. Seldin,*
   422 U.S. 490 (1975) .................................................................................................... 31

*Widakuswara v. Lake,*
   No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025),
   *administratively stayed en banc*, No. 25-5150 (D.C. Cir. May 7, 2025) ................................ 13

*Winter v. FloorPro, Inc.,*
   570 F.3d 1367 (Fed. Cir. 2009) ................................................................................. 17

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................. 5, 26, 29

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n,*
   758 F.2d 669 (D.C. Cir. 1985) ................................................................................. 26

*Wright v. Foreign Serv. Grievance Bd.,*
   503 F. Supp. 2d 163 (D.D.C. 2007) ......................................................................... 14

*Yee v. Jewell,*
   228 F. Supp. 3d 48 (D.D.C. 2017) ........................................................................... 11

**STATUTES**

5 U.S.C. § 701 ............................................................................................... 15, 17, 18

5 U.S.C. § 702 ................................................................................................. 6, 11, 14

5 U.S.C. § 704 ..................................................................................................... 15, 17

8 U.S.C. § 1229a ......................................................................................................... 23

28 U.S.C. § 1491 ........................................................................................................... 6

29 U.S.C. § 794 ...................................................................................................... 22, 23

American Relief Act, 2025,
   Pub. L. No. 118-158, 138 Stat. 1722 (2024) ............................................................. 2

Full-Year Continuing Appropriations and Extensions Act, 2025,
  Pub. L. No. 119-4, 139 Stat. 9 ........................................................................ 2

Consolidated Appropriations Act, 2024,
  Pub. L. No. 188-42, 138 Stat. 25 .............................................................. 2, 18

**RULES**

Fed. R. App. P. 8 ............................................................................................ 32

Fed. R. Civ. P. 12 ............................................................................................. 4

Fed. R. Civ. P. 65 .......................................................................................... 32

**REGULATIONS**

8 C.F.R. § 1003.17 ........................................................................................ 29

8 C.F.R. § 1240.4 .......................................................................................... 23

8 C.F.R. § 1240.10 ........................................................................................ 23

48 C.F.R. § 44.203 ........................................................................................ 17

48 C.F.R. § 52.249-2 ....................................................................................... 3

48 C.F.R. § 52.249-6 ....................................................................................... 3

# INTRODUCTION

This case is about a contract. Defendant Executive Office for Immigration Review ("EOIR") previously agreed that a prime contractor would receive court appointments and provide legal services for detained, mentally incompetent aliens in removal proceedings. That arrangement ended on April 25, 2025, however, when EOIR notified the prime contractor that the contract would be descoped to eliminate coverage for these appointments or legal services, for the convenience of the government pursuant to the express terms of the governing contract ("Partial Termination"). The plaintiffs in this case—nine nonprofit organizations that delivered legal services as subcontractors to the prime contractor—sued to challenge the Partial Termination and seek a preliminary injunction.

Plaintiffs' claims are, in essence, contract-based claims for monetary relief against the federal government over which this Court lacks subject-matter jurisdiction. Indeed, a recent Supreme Court order in a near-identical case confirms that federal district courts lack jurisdiction under the Administrative Procedure Act ("APA") "to order" the federal government to "pay[] . . . money" under a contract—the very relief that plaintiffs demand here. *Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). APA review is unavailable in any event because Plaintiffs have other adequate remedies available to them, and Defendants' discretionary decisions regarding the use of appropriated lump-sum funds constitute unreviewable agency action. Accordingly, the Court should deny plaintiffs' motion for a preliminary injunction and dismiss the case.

The other three injunction factors do not favor Plaintiffs, either. Plaintiffs cannot show irreparable harm; instead, they allege financial harms that could be redressed if Plaintiffs succeed in challenging the Partial Termination in the Court of Federal Claims. And the remaining factors tip in the Government's favor, as the Supreme Court's recent grant of a stay in *Department of Education* establishes.

# BACKGROUND

**A. NQRP Funding and Contract.** This case concerns a contract providing government funding for appointment of qualified representatives to certain unrepresented, detained aliens who

have been found mentally incompetent to represent themselves in immigration proceedings by an Immigration Judge or the Board of Immigration Appeals. *See* Declaration of Sirce Owen ¶ 5 (Exhibit 1). Plaintiffs refer to this contract as embodying the "National Qualified Representative Program," or NQRP. *See, e.g.*, Dkt. 8-1 at 10. The scope and format of NQRP is not prescribed in any federal statutes or regulations. Owen Decl. ¶ 6. Rather, for the past several years, NQRP has been funded annually through EOIR's lump sum congressional appropriations, and its implementation and administration has been left to EOIR. *Id.* ¶ 10. Most recently, in March 2024, Congress appropriated $844 million to EOIR for "expenses necessary for the administration of immigration-related activities." Consolidated Appropriations Act, 2024, Pub. L. No. 188-42, 138 Stat. 25, 133. Congress did not earmark specific funds for NQRP or require that EOIR spend a minimum level on NQRP.[1]

In 2022, the Department of Justice ("DOJ") entered into a contract with non-party Acacia Center for Justice, a Washington, DC-based nonprofit organization, to provide legal access, orientation, and representation services for EOIR. *See* Exhibit 2 ("the Acacia Contract" or "the Contract"). Under the Contract, these services are initiated through the issuance of yearly program-specific "task orders" and "statements of work" to Acacia. *See* Exhibit 3 (NQRP Task Order). The task orders and statements of work for NQRP set forth the total amount of funding available for the program for the corresponding fiscal year and describe in detail the services that Acacia is required to deliver. *See* Exhibit 4 (NQRP task order for fiscal year 2024). Acacia in turn subcontracts with various legal services organizations, including Plaintiffs, to fulfill its task order obligations. *See* Compl. ¶ 65.

Relevant here, the Acacia Contract incorporated two provisions from the Federal Acquisition Regulation ("FAR") that permitted DOJ to "terminate the [C]ontract for the

---

[1] Since September 2024, EOIR has been funded through continuing appropriations that maintain funding at fiscal year ("FY") 2024 levels. *See* American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722, 1723 (2024) (extending FY 2024 funding levels to March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9, 12 (extending FY 2024 funding levels to September 30, 2025).

convenience of the Government." *See* Contract at 42-45. More specifically, those provisions provided that "[t]he Government may terminate performance of work under th[e] [C]ontract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest." 48 C.F.R. § 52.249-2(a); *see id.* § 52.249-6(a)(1).

Plaintiffs refer to two other documents and one lawsuit as relevant to this case. First, they refer to an April 22, 2013 memorandum from Chief Immigration Judge O'Leary as "the Nationwide Policy." *See* Dkt. 8-2 at 8-9; Dkt. 8-1 at 5. That memorandum announced that EOIR "will today begin implementation of a system that will accomplish" several objectives in handling removal proceedings involving aliens with "serious mental disorders." Dkt. 8-2 at 8.

Second, Plaintiffs refer to a subsequent document setting out guidance for "Phase I" of EOIR's plan to implement that system. Dkt. 8-2 at 94-115. That document explains that it sets out "final guidance" for an initial period in which EOIR would "test aspects of the plan," that EOIR "may issue revised guidance in conjunction with further roll-out of the plan," and that EOIR "intends to issue a Notice of Proposed Rulemaking on this subject and, upon receipt of public comment, a Final Rule." *Id.* at 94 nn.1-2.

Third, Plaintiffs refer to *Franco-Gonzalez v. Holder*, 2013 WL 8115423 (C.D. Cal. Apr. 23, 2013). In that case, the court issued an injunction requiring the Government to provide qualified representatives for class members—mentally incompetent aliens in removal proceedings—in Washington, California, and Arizona. *Id.*; *see Franco*, No. 10-cv-2211, Dkt. No. 593 (C.D. Cal. Apr. 23, 2013). The injunction did not require "Government-paid counsel for all mentally incompetent class members," instead permitting appointment of "*pro bono* counsel" as well as "non-attorneys" as representatives. *Franco*, 2013 WL 8115423, at *6.

**B. Partial Termination and Lawsuit.** On April 25, 2025, a contracting officer with the Justice Management Division ("JMD"), the DOJ component that serves as the Department's management and operations arm, partially terminated the Acacia Contract for the convenience of the Government in accordance with FAR § 52.249-2. *See* Exhibit 5. The contracting officer also provided Acacia with an amended statement of work that eliminated the provision of NQRP

services in all but three States. *See id.* The Partial Termination did not affect the portion of the Acacia Contract that provides for appointment of government-funded counsel in the three states covered by the *Franco* injunction. *See* Dkt. 8-1 at 37 (agreeing); Owen Decl. ¶¶ 6, 12. It likewise did not affect funding for appointments made under a previous contract providing for government funded counsel, as Acacia continues to fund Plaintiffs' work on these "legacy" representations. *See, e.g.*, Dkt. 8-4 n.2; Dkt. 8-9 at 2 n.1.

Plaintiffs filed this lawsuit on May 5, 2025, and sought preliminary relief from the Partial Termination on May 7, 2025. *See* Dkt. 1; Dkt. 8; Dkt. 8-1.

## LEGAL STANDARD

Federal courts "are courts of limited jurisdiction," and "[i]t is axiomatic that a court must have jurisdiction before it can hear any argument on the merits." *Keepseagle v. Vilsack*, 815 F.3d 28, 32, 36 (D.C. Cir. 2016) (citation omitted). Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). A "facial" challenge to a court's jurisdiction, like the one Defendants bring here, "contests the legal sufficiency of the jurisdictional allegations contained in the complaint." *Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 152 (D.D.C. 2020). The court accepts such factual allegations as true and "construe[s] 'the complaint in the light most favorable to the non-moving party.'" *Id.* (citation omitted). And if those allegations fail to establish that the court has jurisdiction, "dismissal is required as a matter of law." *Diaz v. Neighbors Consejo*, 77 F. Supp. 3d 227, 229 (D.D.C 2015); *see* Fed. R. Civ. P. 12(h)(3).

To withstand a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[N]or must [a] court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). Rather, a court must disregard

"pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must make a "clear showing" that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of the equities tips in [the party's] favor," and (4) "issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (citation omitted). That Plaintiffs are unlikely to succeed on the merits of their claims is sufficient on its own to deny their request for preliminary relief. *See Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1089 (D.C. Cir. 2011).

## ARGUMENT

### I.    Plaintiffs Are Not Likely To Succeed on the Merits And The Case Should Be Dismissed

#### A.    The Court Lacks Jurisdiction Under the APA To Compel The Government To Pay Money Under A Contract

Plaintiffs' APA claims should be dismissed at the threshold because, as the Supreme Court recently confirmed, district courts lack jurisdiction under the APA "to enforce contractual obligation[s] to pay money" against the federal government. *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). And that jurisdictional principle applies with equal force to any such obligations created by the Acacia Contract in this case.

"[T]he party asserting federal jurisdiction . . . has the burden of establishing it." *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)); *see Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 603 (D.C. Cir. 2017) ("Before delving into the merits, we pause to assure ourselves of our jurisdiction, as is our duty."). For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional

burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014); *see Perry Capital*, 864 F.3d at 619 (noting that sovereign immunity is "jurisdictional in nature"). Plaintiffs here assert claims under the APA, *see* Compl. ¶¶ 105-131, which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702). "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702). This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012). And here, Plaintiffs' attempt to use the APA to compel the federal government to continue to provide funding pursuant to the terms of the Acacia Contract and related subcontracts is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act.

The Tucker Act provides in relevant part that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The D.C. Circuit has accordingly "interpreted the Tucker Act . . . to 'impliedly forbid[]' contract claims against the Government from being brought in district court under . . . the APA." *Perry Capital*, 864 F.3d at 618-19 (citing *Albrecht*, 357 F.3d at 67-68); *see Shaffer v. Veneman*, 325 F.3d 370, 373 (D.C. Cir. 2003) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992)). Thus, regardless of how a claim is styled, a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual." *Perry Capital*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)); *see Albrecht*, 357 F.3d at 67 ("[T]he district court lacks

6

jurisdiction if [the plaintiff's] claim is essentially a contract action."). And that jurisdictional barrier matters. It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law," *Alphapointe v. Dep't of Veterans Affairs*, 745 F. Supp. 3d 1, 11 (D.D.C. 2020), and it respects Congress's deliberate choice to limit the remedies available for such claims, *see Megapulse*, 672 F.2d at 971 (recognizing that a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract"). *See also Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985) ("[W]e must implement the congressional intent to provide a single, uniquely qualified forum for the resolution of contractual disputes.").

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In examining the "source of the rights" prong, the D.C. Circuit has "rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act.'" *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 967-68). But the court has also warned that plaintiffs cannot avoid the Tucker Act and its jurisdictional consequences by artfully crafting a complaint to disguise what is essentially a contract claim as a claim for equitable relief under a separate legal authority. *See id.*; *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Megapulse*, 672 F.2d at 969-70 ("This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."). A court must therefore consider, among other factors, whether "the plaintiff's asserted rights and the government's purported authority arise from statute"; whether "the plaintiff's rights 'exist[] prior to and apart from rights created under the contract'"; and whether "the plaintiff 'seek[s] to enforce any duty imposed upon' the government 'by the . . . relevant contracts to which' the government 'is a party.'" *Crowley*, 38 F.4th at 1107 (citation omitted).

The second prong "considers 'the type of relief sought.'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Money damages and specific performance are "explicitly contractual remed[ies]," for instance. *Perry Capital*, 864 F.3d at 619. The D.C. Circuit has recently explained, moreover, that "the crux of" this relief-focused inquiry "boils down to" whether the plaintiff, "in whole or in part, . . . explicitly or 'in essence' seeks more than $10,000 in monetary relief from the federal government." *Crowley*, 38 F.4th at 1107 (quoting *Kidwell*, 56 F.3d at 284). Although a plaintiff does not necessarily seek monetary relief "merely because . . . success on the merits may obligate the United States to pay the complainant," as with the "source of the rights" prong, a plaintiff cannot avoid the Tucker Act's jurisdictional consequences by "converting" through creative pleading what is essentially a claim for money damages into one "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284; *cf. Great-West*, 534 U.S. at 211 n.1 ("[A]ny claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction."). In assessing the type of relief a plaintiff seeks, a court must accordingly "look to the complaint's substance, not merely its form." *Kidwell*, 56 F.3d at 284. And a plaintiff's request for injunctive or declaratory relief is truly non-monetary only if that requested relief "has 'considerable value' independent of any future potential for monetary relief." *Id. Compare Tootle v. Sec'y of Navy*, 446 F.3d 167, 175-76 (D.C. Cir. 2006) (concluding that a plaintiff's request for injunctive relief was not a disguised claim for monetary relief because the injunctive relief sought had "non-negligible value" compared to any potential monetary recovery the plaintiff might have received), *with Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (concluding that a plaintiff's claim was "one 'founded upon' a contract for purposes of the Tucker Act" in part because the plaintiff's request for an order "compelling the government to pay money owed . . . under an executory contract" was equivalent to the "classic contractual remedy of specific performance").

Applying the two-pronged test described in *Crowley* here confirms that Plaintiffs' APA claims amount to the very sort of contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction. Those claims are premised on a contract with

the government, challenge the government's exercise of an express contractual right, and seek to compel the government to continue paying money pursuant to that contract. They therefore belong, under the Tucker Act, in the Court of Federal Claims.

To start, Plaintiffs' APA claims are effectively based on an alleged right to continued appointments for work under the Acacia Contract and related subcontracts. The theories of standing, relief, and irreparable harm that Plaintiffs assert hinge on funding for their representations and on contractual routing of future appointments to them. *See, e.g.*, Compl. ¶ 89 ("Plaintiffs will have no mechanism for receiving appointments"); *id.* ¶ 90 ("Plaintiffs will not be paid for their work with this population"); *id.* ¶ 113 (complaining of "loss of funding" and "elimination or lapse of the Nationwide NQRP's referral and appointment mechanism"); Dkt. 8-1 at 22 (challenged action "will 'end representation funded by EOIR'"); *id.* at 31-36 (irreparable harm and standing arguments based on lack of funding and future appointments). Yet the only legal "source . . . upon which" Plaintiffs could even plausibly "base[]" their asserted right to ongoing funding and future appointments, *see Crowley*, 38 F.4th at 1108, is the Acacia Contract and their related subcontracts. *See Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 71 (D.D.C. 2009) ("[T]he APA itself does not 'confer a substantive right to be free from arbitrary agency action,' nor does it create any other substantive right that might be violated."). And deciding whether EOIR lawfully terminated NQRP funding pursuant to the termination-for-convenience clauses in the Acacia Contract "turns *entirely* on the terms of" that Contract and principles of federal contracting law. *Albrecht*, 357 F.3d at 69; *see also, e.g.*, *TigerSwan, Inc. v. United States*, 110 Fed. Cl. 336, 344-45 (2013) (describing the legal standard for assessing whether the government's termination of a contract for convenience was improper). Plaintiffs' asserted right to receive NQRP funding thus "in no sense . . . exist[s] independently of" the Acacia Contract and related subcontracts. *Spectrum*, 764 F.2d at 894 (finding a lack of jurisdiction in part because a contract "provide[d] the ultimate source of [the plaintiff's] rights"); *see Ingersoll-Rand Co.*, 780 F.2d at 78 (explaining that "it [was] possible to conceive of" a government contractor's challenge to a termination decision "as entirely contained within the terms of the contract"); *Twin Metals*

*Minn. LLC v. United States*, No. 22-cv-2506, 2023 WL 5748624, at \*7 (D.D.C. Sept. 6, 2023) (finding a lack of jurisdiction because the plaintiff "point[ed] to no other source of its asserted rights" beyond the lease agreements at issue), *appeal filed*, No. 23-5254 (D.C. Cir. Nov. 9, 2023).

Plaintiffs argue that "the sources of rights giving rise to this action are the APA, the Constitution, the INA, the Rehabilitation Act, and Defendants' own policies." Dkt. 8-1 at 29. But none of those authorities in any way mandates that any funds be allocated to Plaintiffs specifically. Only the Acacia Contract and related subcontracts could do that. In short, the "ultimate source of [Plaintiffs'] rights" here is the Acacia Contract and related subcontracts, and the Plaintiffs have no colorable claim to funding whatsoever absent those contracts. *Spectrum*, 764 F.2d at 895.

The relief Plaintiffs seek, moreover, only bolsters the conclusion that their APA claims are essentially contractual in nature. *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'"). In their Complaint, Plaintiffs ask the Court to "enjoin[] Defendants from terminating the Nationwide NQRP"—their term for the Acacia Contract's funding for qualified representatives outside the *Franco* states, *see* Compl. ¶¶ 69-78—"and associated funding," *id.* ¶ 12; *see also id.* at 37-38 (Prayer for Relief); Dkt. 8-1 at 10 (arguing that "Defendants terminated the Nationwide NQRP through an 'Amendment of Solicitation/Modification of Contract'"). Plaintiffs seek, in other words, "an order compelling the government to pay [them] money," *Spectrum*, 764 F.2d at 894, pursuant to the only legal instruments that would arguably entitle them to any NQRP funding at all—*i.e.*, the Acacia Contract and related subcontracts. Such relief is indistinguishable from "the classic contractual remedy of specific performance," *id.*, confirming that Plaintiffs' claims "sound in contract," *Perry Capital*, 864 F.3d at 619. *See id.* (observing that "specific performance is an explicitly contractual remedy"); *see also Sharp v. Weinberger*, 798 F.2d 1521, 1523 (D.C. Cir. 1986) (Scalia, J.) ("The waiver of sovereign immunity in the [APA] does not run to actions seeking declaratory relief or *specific performance* in contract cases . . . ." (emphasis added)).

Plaintiffs say they do not seek "money damages," as that term was construed by the Supreme Court in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). *See* Dkt. 8-1 at 29-30. *Bowen*, however, addressed the provision of the APA's sovereign immunity waiver providing that judicial

review is available for "[a]n action . . . seeking relief other than money damages," 5 U.S.C. § 702. *See* 487 U.S. at 891-901. This case, in contrast, concerns whether Plaintiffs' attempt to compel the federal government to continue to provide them NQRP funding pursuant to a contract is "impliedly forbid[den]" by the Tucker Act, 5 U.S.C. § 702, even if that same relief is not necessarily precluded by the APA's "money damages" bar. *See Yee v. Jewell*, 228 F. Supp. 3d 48, 56 (D.D.C. 2017) (recognizing that a demand for "monetary relief" for purposes of Tucker Act jurisdiction is a "concept distinct from 'money damages' in the sense of *Bowen*"). And Plaintiffs cannot escape the Tucker Act's jurisdictional consequences merely by recasting their demand for specific performance of a contract as a request for declaratory and injunctive relief. *See* Compl. at 37-38 (Prayer for Relief); *Kidwell*, 56 F.3d at 284; *see also Ingersoll-Rand Co.*, 780 F.2d at 79-80 (explaining that a plaintiff "may not sidestep" Court of Federal Claims jurisdiction by "avoiding a request for damages" when the relief requested "amounts to a request for specific performance").

Any lingering doubts as to whether this Court has jurisdiction to hear Plaintiffs' contract-based claims are dispelled by the Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). In *Department of Education*, a district court issued a TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at 968, after that court concluded, in relevant part, that the plaintiff grant recipients were likely to succeed on their claim that the government's termination decision was arbitrary and capricious under the APA. *See California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025), *stay granted*, 145 S. Ct. 966 (2025). The Supreme Court stayed the district court's TRO, however, after determining that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 145 S. Ct. at 968. More specifically, the Supreme Court explained that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered." *Id.* (quoting *Great-West*, 534 U.S. at 212). "Instead," according to the Supreme Court,

"the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

   *Department of Education* further underscores that this Court lacks jurisdiction over Plaintiffs' contract-based claims here. Like the *Department of Education* plaintiffs, Plaintiffs seek relief from the termination of a government contract under which they received federal funding. Like the *Department of Education* plaintiffs, Plaintiffs challenge that contract-termination decision under the APA, including on the ground that the termination is arbitrary and capricious. Compl. ¶¶ 105-115. And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" pursuant to a contract, including the Acacia Contract and related subcontracts. 145 S. Ct. at 968.

   This Court should accordingly dismiss Plaintiffs' contract-based APA claims for lack of jurisdiction, which would be consistent with what other courts have done in similar cases involving government grants or contracts, in accordance with the Supreme Court's reasoning in *Department of Education*. *See U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, -- F. Supp. 3d --, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (denying a TRO motion after concluding that the court lacked the authority to "order the Government to pay money due on a contract"); *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 25-5066 (D.C. Cir. Mar. 28, 2025) (per curiam) (denying a motion for injunction pending appeal); *Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885, 2025 WL 1103253, at *8-*10 (D. Md. Apr. 14, 2025) (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants in light of the Supreme Court's *Department of Education* order and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Electronic Order, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041 (D. Mass Apr. 14, 2025), ECF No. 42 (dissolving a TRO after acknowledging that the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also* Order, *Am. Ass'n of Colls. For Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at

*1 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* order).[2]

Importantly, Plaintiffs cannot escape the conclusion that their APA claims are "at [their] essence" contractual, *see Crowley*, 38 F.4th at 1106, by pointing to their status as subcontractors. Although Plaintiffs are not parties to the Contract between the federal government and Acacia, Plaintiffs' asserted right to NQRP funding is undoubtedly grounded in *a contract*—specifically, their respective subcontracts with Acacia, which are derived in turn from the primary Contract. And while Plaintiffs' APA claims here are not strictly based on a contract between Plaintiffs and the federal government, those claims nonetheless "turn[] *entirely* on" contract terms, *Albrecht*, 357 F.3d at 69—namely, the termination-for-convenience clauses found in the Acacia Contract. *See Ingersoll-Rand*, 780 F.2d at 78 (noting that a plaintiff could challenge the Air Force's invocation of a termination-for-convenience clause "based solely on contract principles"). Consequently, Plaintiffs' claims can still be fairly characterized as the sort of claims "sound[ing] in contract" over which the Court lacks jurisdiction under the APA. *Perry Capital*, 864 F.3d at 619.

Additionally, a conclusion that claims sounding in contract would necessarily fall within the APA's waiver of sovereign immunity so long as they are brought by government subcontractors who are not in direct privity with the government would have perverse consequences. The Tucker

---

[2] In *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam), a D.C. Circuit motions panel relied on *Department of Education* to stay a preliminary injunction that required the federal government to restore grants to federally funded broadcast networks that the government had terminated. More specifically, the *Widakuswara* panel explained in its order that the district court's injunction, "[w]hether phrased as a declaration that the agreements remain in force" or "an order to pay the money committed by those agreements," amounted "in substance" to an order for "specific performance of the grant agreements"—a remedy that is "quintessentially contractual." *Id.* at *4. The panel accordingly concluded that because the plaintiffs' "claims of government nonpayment necessarily challenge[d]" the government's "performance under the grants," such claims "are squarely contract claims under the Tucker Act." *Id.* At the time of this filing, that order has been administratively stayed by the en banc D.C. Circuit. *See Widakuswara v. Lake*, No. 25-5150 (D.C. Cir. May 7, 2025). *But see United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay) ("Administrative stays do not typically reflect the court's consideration of the merits of the stay application.").

Act's "primary purpose" is "to ensure that a central judicial body adjudicates most claims against the United States Treasury," *Kidwell*, 56 F.3d at 284, and to that end, the statute "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims," *Crowley*, 38 F.4th at 1106 (citation omitted); *see also Spectrum*, 764 F.2d at 895 (observing that "Congress intended the jurisdiction and remedies of the Tucker Act to be exclusive in cases based on government contracts"). The D.C. Circuit has consistently respected this jurisdictional boundary by reading the Tucker Act to "'impliedly forbid[]' contract claims against the Government from being brought in district court" under the APA's waiver of sovereign immunity. *Perry Capital*, 864 F.3d at 619 (quoting 5 U.S.C. § 702). Yet concluding here that Plaintiffs' APA claims fall within that waiver merely because Plaintiffs are not in direct privity with the government would create an easily exploitable jurisdictional loophole, whereby claims for monetary relief that are grounded in a contract between the government and a prime contractor—claims that ordinarily should be brought in and resolved by the Court of Federal Claims, *see Crowley*, 38 F.4th at 1106; *Spectrum*, 764 F.2d at 895—could instead be reviewed by district courts under the APA so long as a *subcontractor* who benefits indirectly from the prime contract is the one bringing suit.

The Court's endorsement of such a novel jurisdictional strategy here would threaten to undermine the jurisdictional scheme that Congress devised under the Tucker Act. *Cf. Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 181 (D.D.C. 2007) ("To allow a plaintiff to utilize the [APA's] waiver of sovereign immunity . . . to obtain a district-court judgment that a government contract is void would 'create such inroads into the restrictions of the Tucker Act that it would ultimately result in the demise of the Court of Claims.'" (quoting *Megapulse*, 672 F.2d at 967)). Such an outcome would also upend the settled expectations and agreed-upon obligations reached by the federal government in its contracts by subjecting any consequential exercise of a contractual right to APA lawsuits brought by subcontractors in district court, whereas an identical contract-based claim brought by a prime contractor could only be brought in the Court of Federal Claims. The APA's waiver of sovereign immunity should not be read to permit such an absurd

14

result. *See Seed v. EPA*, 100 F.4th 257, 265 (D.C. Cir. 2024) ("Courts, in turn, must strictly construe a waiver of sovereign immunity in terms of its scope, in favor of the sovereign." (cleaned up)).

At bottom, when Plaintiffs' claims here are "[s]tripped" of their APA embellishments and "equitable flair," their "requested relief seeks one thing": they "want[] the Government to keep paying up" under the Acacia Contract and related subcontracts. *U.S. Conf. of Cath. Bishops*, 2025 WL 763738, at *5. But because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 145 S. Ct. at 968, or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht*, 357 F.3d at 68, Plaintiffs' claims should be dismissed and judgment entered in Defendants' favor.

## B.    Plaintiffs' APA Claims Fail For Independent Threshold Reasons

Even if the Court were to conclude that it has subject-matter jurisdiction over Plaintiffs' APA claims, judicial review of the Partial Termination is nonetheless unavailable under the APA for the separate threshold reasons that (1) Plaintiffs have "other adequate remed[ies]" available to them, 5 U.S.C. § 704, and (2) Defendants' decisions concerning the allotment and expenditure of its lump-sum funding constitute unreviewable agency action "committed to agency discretion by law," *id.* § 701(a)(2).

### 1.    Plaintiffs Have Other Adequate Remedies Available To Them

Notwithstanding the jurisdictional defects with Plaintiffs' contract-based APA claims, those claims fail for the independently sufficient reason that Plaintiffs have "other adequate remed[ies]" available to them to vindicate their asserted right to continued NQRP funding under the Acacia Contract and related subcontracts. *Id.* § 704. APA review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.* The APA's "adequate remedy" bar "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen*, 487 U.S. at 903; *see Perry Capital*, 864 F.3d at 621 (Section 704's "finality requirement and adequate remedy bar . . . determine whether" there is a "cause of action under the APA.").

15

Here, Plaintiffs challenge Defendants' decision to descope the Acacia Contract by exercising the contract's termination-for-convenience clauses. But Plaintiffs fail to clearly show why they lack an adequate remedy for such a contract-based claim in the Court of Federal Claims, which routinely adjudicates similar challenges to the lawfulness of such contract termination decisions. *See TigerSwan, Inc.*, 110 Fed. Cl. at 347 ("[The plaintiff] has alleged sufficient facts to demonstrate a potential breach of contract for improper termination for convenience . . . ."); *Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134-35 (2016) ("[The plaintiff] has not shown or alleged that [the defendant] committed bad faith or abused its discretion in terminating the contract for convenience."); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 370 (2013) ("The termination for convenience . . . was within the contracting officer's discretion and, therefore . . . was not a breach of contract."); *see also Ingersoll-Rand*, 780 F.2d at 78, 80 (D.C. Cir. 1985) (concluding that claims based on the government's termination of a contract for convenience were "based solely on contract principles" and thus "should be resolved in the Claims Court").

Plaintiffs attempt to evade the jurisdictional consequences of their contract-based claims by contending that they are seeking prospective relief that the Court of Federal Claims ordinarily cannot grant. *See* Dkt. 8-1 at 29; *see also* Compl. at 38 (requesting an injunction barring Defendants from "withholding or refusing to expend funds as necessary to continue the Nationwide NQRP"). But Plaintiffs cannot "bypass Tucker Act jurisdiction" simply by "converting" through artful pleading what are essentially claims for monetary relief into ones "requesting injunctive relief or declaratory actions." *Kidwell*, 56 F.3d at 284; *see Crowley*, 38 F.4th at 1107. And in any event, the injunctive relief Plaintiffs demand—which is essentially equivalent to specific performance of the relevant portions of the Acacia Contract—is not available in this Court either, and it thus cannot serve as a basis for avoiding the APA's "adequate remedy" bar. *See Megapulse*, 672 F.2d at 971 (noting the "generally recognized rule that a plaintiff cannot maintain a contract action in either the district court or the Court of [Federal] Claims seeking specific performance of a contract"); *Spectrum*, 764 F.2d at 893 n.2 (citing legislative history indicating that Congress intended for the Tucker Act to "foreclose specific performance of government

16

contracts" (citation omitted)); *see also U.S. Conf. of Cath. Bishops*, 2025 WL 763738, at *6 ("Like [the plaintiffs in *Spectrum Leasing* and *Ingersoll-Rand*], the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do.").

That Plaintiffs are subcontractors rather than prime contractors in direct privity with the federal government does not necessarily mean Plaintiffs are categorically barred from bringing suit in the Court of Federal Claims. While it is generally true that "[t]o have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States," *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003), prime contractors "are permitted to sponsor claims brought by subcontractors against the government . . . through, and with the consent and cooperation of, the prime, and in the prime's name.'" *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 (Fed. Cir. 2009) (quoting *Erickson Air Crane Co. of Wash. v. United States*, 731 F.2d 810, 814 (Fed. Cir. 1984)); *see* 48 C.F.R. § 44.203(c). Alternatively, a "pass-through claim allows a prime contractor to assert against the government a claim for harm caused by the government to a subcontractor where the subcontractor could hold the prime contractor liable for that harm." *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1347 (Fed. Cir. 2008). Plaintiffs do not even attempt to show why these alternative—and potentially "adequate," 5 U.S.C. § 704—procedural mechanisms are wholly unavailable to them, and they cannot simply disregard their contractual rights and obligations *vis a vis* Acacia altogether by trying to seek relief against the federal government under the APA instead.

### 2. Program Funding Decisions Are Committed to Agency Discretion By Law

Plaintiffs' challenge to Defendants' descoping of the Acacia Contract fails for a separate reason: such a decision concerning how to allocate and expend federal funding is "committed to agency discretion by law" and is thus not subject to APA review. 5 U.S.C. § 701(a)(2). In *Lincoln v. Vigil*, the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as

'committed to agency discretion.'" 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). The *Lincoln* Court then held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court accordingly concluded that the Indian Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum appropriations from Congress (2) but not otherwise mandated or prescribed by statute was "committed to the [agency's] discretion" and thus "unreviewable" under the APA. *Id.* at 193-94.

That same principle from *Lincoln* applies squarely to NQRP funding. NQRP is not prescribed by any federal statute or regulation. Nor has EOIR received NQRP funding through targeted appropriations. "[T]he appropriations Acts for the relevant period do not so much as mention the Program." *Id.* at 193-94. Instead, NQRP is paid for from EOIR's general, lump-sum appropriation, which provides funding for "expenses necessary for the administration of immigration-related activities." Consolidated Appropriations Act, 2024, 138 Stat. at 133; *see* Owen Decl. ¶10 (describing non-*Franco* portion of NQRP as "discretionary"). Congress gave EOIR broad discretion to decide when and how to spend funds consistent with that purpose. "These appropriations did not expressly authorize, direct, or even mention the expenditures of which [Plaintiffs] complain." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 605 (2007). "The expenditures resulted from executive discretion, not congressional action." *Id.* Congress's appropriation thus provides no standards "against which to judge the agency's exercise of discretion" in choosing how best spend that money for "immigration-related activities." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). Congress's broad mandate demonstrates that it authorized EOIR to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192 (stating that agencies must have "flexibility" to make "necessary

18

adjustments for 'unforeseen developments' and 'changing requirements'" when deciding how to spend lump sum appropriations).

As *Lincoln* made clear, EOIR's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a particular program 'best fits the agency's overall policies.'" *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831). For programs like NQRP that are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to the program, or whether to fund the program at all, are committed entirely to EOIR's discretion. *See id.* at 193-94; *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."). And that discretion includes the authority to terminate funding for aspects of NQRP as EOIR deems appropriate. *See* Owen Decl. ¶ 10 (noting that "NQRP was funded annually through EOIR's general lump-sum appropriation" and that NQRP funding in non-*Franco* States "was discretionary"). Defendants' "decision to discontinue" funding for NQRP is "accordingly unreviewable under § 701(a)(2)" of the APA. *Lincoln*, 508 U.S. at 193. Plaintiffs' APA claims are therefore unlikely to succeed on the merits and should be dismissed for failure to state a claim.

###    C.    Plaintiffs' *Accardi* Theory Independently Fails On Its Merits

An argument based on *Accardi* must generally be brought in the context of an APA claim. *See Damus v. Nielsen*, 313 F. Supp. 3d 317, 335 (D.D.C. 2018) (applying the *Accardi* doctrine to APA claims); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 151 (D.D.C. 2018) (APA claims based on *Accardi* can involve "procedural rights for asylum seekers in connection with the parole process," or similar procedural rights); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 107 (D.D.C. 1999) ("Courts have often relied upon the APA as the source of the *Accardi* doctrine"), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2002). Plaintiffs do not dispute this, pleading their *Accardi* theory as an APA claim. Compl. ¶¶ 124-131. Because Plaintiffs' *Accardi* theory arises under the APA, it fails for the same

threshold reasons as Plaintiffs' other APA claims. *See supra* pp. 5-19. Plaintiffs' *Accardi* theory also fails on its own terms, for at least three reasons.

*First*, *Accardi* requires agencies to follow their own "internal, procedural regulations" in making decisions. *Lopez v. FAA*, 318 F.3d 242, 246 (D.C. Cir. 2003). Plaintiffs seek to challenge the Partial Termination that descoped the Acacia Contract. But Plaintiffs point to no regulations governing EOIR's procedures for making the decision that they challenge. Instead, their argument is that the Partial Termination will lead EOIR to violate its policies in *future* removal proceedings by failing to provide qualified representatives. That is not an *Accardi* claim. *See id.* at 246-47 (collecting examples of *Accardi* claims, each of which argued that the agency made a decision without following the procedures applicable to making that decision).

Plaintiffs tellingly identify no similar invocations of *Accardi*. Instead, Plaintiffs' leading case, *Damus v. Nielsen*, involved a far different paradigm—as do the other *Accardi* cases on which they rely. 313 F. Supp. 3d 317 (D.D.C. 2018). There, "noncitizens being held at five ICE Field Offices" had "received a credible-fear determination but [were] denied parole." *Id.* at 323. They argued under *Accardi* that the government had failed, in their cases, to follow a directive establishing procedures for aliens seeking asylum and directing parole for aliens like them. *Id.* at 324. Plaintiffs, unlike the *Damus* plaintiffs, do not challenge the procedures by which EOIR made the Partial Termination decision they challenge, and *Damus* does not support their ersatz *Accardi* theory.

*Second*, Plaintiffs do not cite a rule or regulation that could give rise to an *Accardi* claim. Their claim appears to spring from a two-page 2013 memorandum from Chief Immigration Judge Brian O'Leary addressed to other immigration judges. *See* Dkt. 8-1 at 27-28 (citing this memorandum). That memorandum, however, did not itself purport to dictate procedures or create rights. Instead, it was an "announc[ment]" of procedural enhancements that EOIR planned to roll out through subsequent "implementation of a system" that would accomplish the objectives set out in the memorandum. Dkt. 8-2 at 8. In a single bullet point, the memorandum previewed that in the coming "system," EOIR planned to "make available a qualified legal representative to represent

the alien in all future detained removal and/or bond proceedings." *Id.* at 9. Nor, to the extent Plaintiffs rely on the subsequent "Phase I" preliminary implementation of the O'Leary memorandum, did that document do anything more to create an enforceable procedural rule or regulation. *See id.* at 95-115. It expressly did not represent a lasting decision on procedures or policies to which EOIR sought to bind itself. *Id.* at 95 n.2. Instead, it was issued "to test out" new procedures, and EOIR announced in the document that it planned to conduct a rulemaking in the future based on the results of the "test." *Id.* at 95 n.1. In determining whether the agency bound itself, Courts look to the agency's intent, which is best "ascertained by an examination of the provision's language, its context, and any available extrinsic evidence." *Chiron Corp. & PerSeptive Biosystems, Inc. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 944 (D.C. Cir. 1999) (quoting *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977)). Here, all the evidence for both documents indicates that EOIR did not intend to bind itself to appoint government-funded counsel in all relevant cases going forward—and Plaintiffs identify no remotely similar documents that have formed the basis of an *Accardi* claim.

*Third*, descoping the Contract's provision for public funding of qualified representatives would not violate the 2013 O'Leary memorandum or the "Phase I" preliminary implementation in any event. Those documents provided only that EOIR planned to "make available a qualified legal representative." Dkt. 8-2 at 9 (memorandum); *id.* at 109 ("Phase I"). Neither document specified that EOIR would *publicly fund* a qualified legal representative, let alone that it would do so through the Acacia Contract or that EOIR would additionally publicly fund expert witnesses and other litigation costs. To the extent those documents could give rise to an *Accardi* challenge if EOIR failed to comply with them, it has not failed to comply with them here.

### D. Plaintiffs' Rehabilitation Act Arguments Fail For Additional Reasons

Last, Plaintiffs argue that descoping the Acacia Contract is contrary to law because it violates section 504 of the Rehabilitation Act. Dkt. 8-1 at 22-25. Section 504 provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected

to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). Plaintiffs argue that the Partial Termination violates section 504 because mentally incompetent aliens lack meaningful access to their removal proceedings without the accommodation of court-appointed, government-funded counsel. *See* Compl. ¶¶ 116-23; Dkt. 8-1 at 22-25.

Plaintiffs couch their Rehabilitation Act arguments as an APA claim, which fails for the threshold reasons explained already. Compl. ¶¶ 116-23; *see supra* pp. 5-19.[3] The claim fails for at least three additional reasons, too.

*First*, Plaintiffs fail to establish that mentally incompetent individuals will be "excluded from the participation in, be denied the benefit of, or be subjected to discrimination," 29 U.S.C. § 794(a), in removal proceedings absent court-appointed, government-funded counsel—in other words, that they will lack "meaningful access" to removal proceedings without that specific accommodation, *Alexander v. Choate*, 469 U.S. 287, 304 (1985).

Plaintiffs have failed to support this theory. Immigration judges conducting removal proceedings are required to conduct individualized assessments of a mentally incompetent alien's need for procedural safeguards and to ensure that the alien's needs are accommodated in each proceeding. Entirely independent of government-funded, court-appointed counsel, "Immigration Judges have discretion to determine which safeguards are appropriate, given the particular circumstances in a case before them." *Matter of M-A-M-*, 25 I&N Dec. 474, 481-82 (BIA 2011).

---

[3] Plaintiffs cannot press a freestanding Rehabilitation Act claim because they are suing on their own behalf as nonprofit organizations, and they are not individuals with disabilities. Plaintiffs do not press an associational standing theory under which they could assert members' injuries or claims. *See, e.g.*, *Int'l Dark-Sky Ass'n v. FCC*, 106 F.4th 1206, 1217 (D.C. Cir. 2024) (finding associational standing for a "genuine membership organization" whose "members would have standing to sue in their own right"). Indeed, they do not allege or argue that they are membership organizations or that they have any members, let alone affected members. *See* Compl. ¶¶ 18-28. Plaintiffs thus could not and do not attempt to press a Rehabilitation Act claim independent of the APA. *See* 29 U.S.C. § 794(a) (barring exclusion of any individual "solely by reason of *her or his* disability" (emphasis added)); *see, e.g.*, *McCoy v. Kollar-Kotelly*, Civ. A. No. 23-02695, 2025 WL 928611, at *3 (D.D.C. Mar. 27, 2025) (dismissing Rehabilitation Act claim when plaintiff failed to allege that she had a disability).

For example, immigration judges may directly question witnesses themselves. *Id.* at 482; *see* 8 U.S.C. § 1229a(b). They may "manag[e] the case to facilitate the respondent's ability to obtain legal representation and/or medical treatment" that could restore competency. *Matter of M-A-M-*, 25 I&N Dec. at 483. They can permit a guardian, family member, or close friend to participate in the proceedings; waive the alien's appearance in court; reserve appeal rights for the alien; and craft "other relevant safeguards." *Id.*; *see* 8 C.F.R. § 1240.4. But the immigration judge cannot "accept[] an admission of removability from an unrepresented alien who is incompetent." *Matter of M-A-M-*, 25 I&N Dec. at 482 (citing 8 C.F.R. § 1240.10(c)). And the immigration judge must "consider the facts and circumstances of an alien's case to decide" which safeguards will protect the alien's rights and privileges, and "must articulate his or her reasoning" on the adequacy of the chosen safeguards. *Id.* at 483; *see* Owen Decl. ¶¶ 18-19 (summarizing available safeguards and training Immigration Judges receive to handle hearings with mentally incompetent individuals).

Plaintiffs offer no basis to conclude that immigration judges will fail to discharge their duties and appropriately exercise their discretion to ensure adequate safeguards based on individualized findings. Nor do they show that the Board of Immigration Appeals will not correct a failure to provide adequate safeguards if an immigration judge errs. And they do not and cannot argue that use of these alternatives, tailored to the needs to each individual case and determined by a judicial officer to be sufficient, would be "anathema" to the Rehabilitation Act, akin to requiring "the mobility impaired" to "crawl on all fours in navigating architectural obstacles." *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008). In sum, Plaintiffs' Rehabilitation Act argument depends on concluding that immigration judges and the Board of Immigration Appeals will fail to appropriately exercise their discretion to tailor individualized procedural safeguards to the needs of each case, across the board. That unsupported argument fails.

*Second*, Plaintiffs likewise fail to establish that the Government took the challenged action "solely because of" anyone's disability, as the Rehabilitation Act requires for a section 504 claim. 29 U.S.C. § 794(a); *see, e.g.*, *Lucas v. VHC Health*, 128 F.4th 213, 220-21 (4th Cir. 2025) (plaintiff failed to allege that failure to treat her "had anything to do with her disabilities"); *Bennett v. Hurley*

*Med. Ctr.*, 86 F.4th 314, 325-26 (6th Cir. 2023) (Rehabilitation Act claim failed because of nondiscriminatory reasons for denial of service-dog accommodation); *Clark v. La. Dep't of Pub. Safety*, 63 F.4th 466, 470-71 (5th Cir. 2023) (same, for requiring plaintiff to fill out a form); *Estate of Martin v. Cal. Dep't of VA*, 560 F.3d 1042, 1048 (9th Cir. 2009) (same, for denying plaintiff admission to facilities), *overruled in part on other grounds*, *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) (addressing causation requirements for ADA claims). Plaintiffs make no allegations, supply no evidence, and present no argument that the decision to partially descope NQRP in certain States was because of anyone's disability. *See Hanson,* 120 F.4th at 231 (emphasizing that plaintiffs must make a "clear showing" to obtain a preliminary injunction).

*Third*, ordering EOIR to provide the specific accommodation of court-appointed, government-funded counsel for each detained alien in removal proceedings would not be a permissible accommodation under the Rehabilitation Act. An agency typically has "broad discretion to determine how to come into compliance with section 504." *Am. Council*, 525 F.3d at 1273; *see Am. Council of the Blind v. Mnuchin*, 977 F.3d 1, 9 (D.C. Cir. 2020) (reiterating that court could not require specific features as an accommodation or even set a timeline for rollout of accommodation); *Barth v. Gelb*, 2 F.3d 1180, 1189 (D.C. Cir. 1993) (requested accommodation would be undue burden when it would have caused "the loss of essential operational flexibility"). Here, as explained, immigration judges have a duty to "evaluate which available measures would result in a fair hearing" and discretion to "prescribe safeguards to protect the rights and privileges of" each individual alien. *Matter of M-A-M-*, 25 I. & N. Dec. at 477-78. Requiring an immigration judge, under the Rehabilitation Act, to appoint a government-funded attorney any time it determines that an alien is mentally incompetent would foreclose that discretionary, case-specific evaluation of what accommodations are appropriate and adequate. *See id.* at 483 (identifying numerous safeguards that may be warranted depending on "the facts and circumstances of an alien's case"). And providing court-appointed, government-funded counsel for each case would require substantial expenditures by the Government, an undue financial burden. *See, e.g.*, Dkt. 8-8 ¶¶ 14, 32 (RMIAN, which represents 22 individuals under NQRP, anticipated receiving $312,000

in NQRP funding in 2025); Dkt. 8-11 ¶¶ 11, 22 (PIRC, which represents 8 individuals under NQRP, anticipated receiving $100,000 in NQRP funding annually).

Indeed, tellingly, Plaintiffs' requested accommodation would go far beyond what even the *Franco* court ordered. *Franco* found that a reasonable accommodation would be a qualified representative, who could be an attorney, a law student under supervision, or a non-attorney "accredited representative," and it made crystal clear that nothing it said required the government to provide mentally incompetent aliens "with *paid* legal counsel." *Franco-Gonzalez v. Holder*, No. CV 10-02211, 2013 WL 3674492, at *6 (C.D. Cal. Apr. 23, 2013) (emphasis in original). That was key to the *Franco* court's analysis of whether the accommodation would impose an undue financial burden—indeed, the court was "wary of issuing an unfunded mandate requiring Government-paid counsel for all mentally incompetent class members." *Id.* But that is the mandate plaintiffs now demand from this Court.

Plaintiffs' requested remedy is likewise unwarranted because the Rehabilitation Act "does not mandate the provision of new benefits." *Am. Council*, 525 F.3d at 1268 (quoting *Rodriguez v. City of N.Y.*, 197 F.3d 611, 619 (2d Cir. 1999)). That is why, for example, it does not require enhanced Medicaid benefits "simply to meet the reality that [individuals with disabilities] have greater medical needs." *Alexander*, 469 U.S. at 303. Instead, it accords with the "substantial discretion" that agencies have to "choose the proper mix" of publicly funded benefits to provide from their general appropriations. *Id.* Here, though, Plaintiffs ask the Court to require EOIR to extend "a substantively different benefit" than it has chosen to provide. *Am. Council*, 525 F.3d at 1268. Plaintiffs seek, for mentally incompetent aliens in detained removal proceedings, the benefit of government-funded, court-appointed counsel—akin to other government benefits, like additional Medicaid coverage, *Alexander*, 469 U.S. at 290, or free street parking near an individual's place of employment, *Jones v. City of Monroe*, 341 F.3d 474, 475 (6th Cir. 2003).

It makes no difference that EOIR previously provided the benefit Plaintiffs desire while it funded the Acacia Contract. In *Alexander*, for example, Tennessee previously provided an expanded benefit for individuals with disabilities, but the Supreme Court held that the

Rehabilitation Act did not require Tennessee to "reinstate" that previous benefit. 469 U.S. at 306; *see id.* at 290 (plaintiffs challenged "the change from 20 to 14 days of coverage" for in-patient hospital stays).

## II.    Plaintiffs Fail To Show Irreparable Harm Absent An Injunction

In addition to a lack of success on the merits, Plaintiffs also are not entitled to a preliminary injunction because they cannot establish that they will be irreparably harmed before final judgment absent a preliminary injunction. "The cornerstone of preliminary injunctive relief is irreparable harm that injures the moving party in a manner that cannot be remedied through other types of relief." *Clevinger v. Advoc. Holdings Inc.*, Civ. A. Nos. 23-1159, 23-1176, 2023 WL 4560839, at *4 (D.D.C. July 15, 2023), *aff'd*, 134 F.4th 1230 (D.C. Cir. 2025); *Winter*, 555 U.S. at 20 (A movant "must establish … that he is likely to suffer irreparable harm in the absence of preliminary relief."). The D.C. Circuit has established "a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To satisfy this standard, "the injury must be beyond remediation." *Id.* "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98.

As the Government has explained, this case is about funding. Plaintiffs' irreparable harm arguments largely focus on interim harms they will experience based on lack of funding—exploring and drawing on other funding sources, considering staff layoffs, and bearing costs associated with representations. The law is clear that recoverable financial losses that do not "threaten[] the very existence of the movant's business" are not irreparable harm. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, Case No. 25-cv-0740-TJK (D.D.C.), ECF No. 17, at 12-13 (Mar. 18, 2025) (transcript of oral ruling) (denying temporary restraining order, finding plaintiff grant recipient whose grant funds were frozen did not establish irreparable harm, because plaintiff did

not show that it "faces an imminent risk of shutdown absent reimbursement" and having to lay off employees "is the type of 'economic loss' that typically 'does not, in and of itself, constitute irreparable harm'"). Recovery against the government on improperly terminated contracts is available in appropriate actions in the Court of Federal Claims, so this is not an instance in which sovereign immunity leaves government funds unrecoverable. *See Dep't of Educ.*, 145 S. Ct. at 969 (concluding that stay of injunction was warranted because grant recipients "can recover any wrongfully withheld funds through suit in an appropriate forum").

Nor does any plaintiff identify a "certain" or "clear and present need" for an injunction to prevent it from closing its doors before a final judgment. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation omitted). Just the opposite—to the extent Plaintiffs discuss the issue, they affirmatively disclaim a view about when any follow-on effects of loss of funding will manifest. *See* Dkt. 8-6, ¶ 29 (GHIRP's "management team is determining how long we can continue representing our clients without funding"); Dkt. 8-8 ¶ 32 ("RMIAN is still assessing the impact of the halt in NQRP funding."); *see also* Dkt. 8-3 ¶ 19 (predicting effects "[o]ver time" for NIJC, without more); Dkt. 8-4 ¶ 25 (Amica may "look at plans to potentially lay off staff" at an unspecified point in the future). No Plaintiff identifies imminent, irreversible financial harm.

By contrast, every Plaintiff plans to continue representing existing clients in the interim. Dkt. 8-3 ¶¶ 16, 18 ("NIJC is likely to seek to continue representing this population," and has access to separate funding for Illinois residents it represents or seeks to represent); Dkt. 8-4 ¶¶ 30, 34 (Amica "do[es] not plan to file Motions to Withdraw" in cases with imminent hearings, and will make "case-by-case decisions regarding withdrawal" in cases that do not have imminent hearings); Dkt. 8-5 ¶ 15 (American Gateways "will continue to represent these individuals"); Dkt. 8-6 ¶ 29 ("GHIRP's legal team will not withdraw from client cases immediately"); Dkt. 8-7 ¶ 14 ("ISLA is committed to providing qualified representation whenever there is a need, regardless of location or funding source"); Dkt. 8-8 ¶ 32 (RMIAN "will remain on cases during an interim period as it assesses how best to proceed"); Dkt. 8-9 ¶ 15 ("It is Estrella del Paso's ethical duty to continue

representation for current clients"); Dkt. 8-10 ¶ 16 (describing ILCM's plans to continue representing its three current clients); Dkt. 8-11 ¶ 15 (PIRC "anticipate[s] continuing to represent these clients under separate funding").

Plaintiffs point to non-financial harms, too, but none suffices. First, Plaintiffs say they will be less able to take on new representations because they cannot receive new appointments through the Acacia Contract, and that this will interfere with their mission. Dkt. 8-1 at 31-32. The Supreme Court has held attorneys lack standing to bring an action on behalf of hypothetical future clients. *See Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004). Further, in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024), the Supreme Court made clear that organizations do not establish standing to sue simply by asserting that an agency action "impaired their ability to provide services and achieve their organizational missions." *Id.* at 394 (quotation omitted). In any event, Plaintiffs repeatedly show that they are able to identify potential new clients without formal referrals through the Acacia Contract. *See* Dkt. 8-3 ¶ 15 (NIJC); Dkt. 8-4 ¶ 27 (Amica); Dkt. 8-8 ¶ 15 (RMIAN). And they do not argue that they will be unable to establish attorney-client relationships with potential new clients absent a formal appointment.

Second, Plaintiffs point to potential harms to their current and potential new clients and to the immigration courts. Dkt. 8-1 at 32-33, 35-36. The irreparable harm inquiry, though, is limited to harm to "the moving party," *Clevinger*, 2023 WL 4560839, at *4, and harms to third parties are instead assessed in the third and fourth injunction factors.

Third, Plaintiffs say they will experience harm from being forced into an ethical bind with respect to existing cases by having to consider withdrawing. Dkt. 8-1 at 34. But no Plaintiff presently plans to withdraw from existing cases. *See supra* pp. 27-28. In any event, the partial descoping of the contract does not prevent Plaintiffs from continuing with their existing attorney-client relationships. Owen Decl. ¶ 15. Qualified representatives have the choice to continue in their representation of their previously assigned cases without EOIR funding, or they may request to withdraw from that representation, if they choose. *Id.* There is no EOIR requirement that attorneys withdraw from any of their cases. *Id.* Should any current attorney choose to withdraw, however,

28

governing regulations for immigration court proceedings provide an orderly process for doing so. *See* 8 C.F.R. § 1003.17(a)(3).

Plaintiffs focus on two cases that found irreparable harm on facts they argue are similar to this case. *See Cath. Legal Immigr. Network Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154, 175-76 (D.D.C. 2021) ("*CLINIC*"); *Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 79-80 (D.D.C. 2020) ("*NWIRP*"). Both cases were litigated by organizations that provide legal assistance for aliens. *See CLINIC*, 513 F. Supp. 3d at 159; *NWIRP*, 496 F. Supp. 3d at 46-47. Both cases challenged significantly increased fees charged to aliens. *See CLINIC*, 513 F. Supp. 3d at 159 (filing fees charged by EOIR "for various types of motions, applications, and appeals" in immigration adjudications); *NWIRP*, 496 F. Supp. 3d at 43 (application fees charged by DHS for various services). In neither case was there an identified mechanism for recovery of the challenged fees once paid, as there is here via a contract suit in the Court of Federal Claims. Substantial, *unrecoverable* financial losses are an established form of irreparable harm. *See, e.g.*, *District of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 37 n.25 (D.D.C. 2020), *appeal dismissed*, 2020 WL 9596420 (D.C. Cir. Nov. 9, 2020). Reading the decisions more broadly, to recognize irreparable harm anytime an action causes an organization to divert resources from its other activities while litigation is pending, would run afoul of the principle that a preliminary injunction is an "extraordinary remedy" suitable only in exceptional cases. *Winter*, 555 U.S. at 22. Indeed, it would set the bar for *irreparable harm* at or even below the bar for *standing* for organizations. *See All. for Hippocratic Med.*, 602 U.S. at 394 (rejecting argument that organizational "standing exists when an organization diverts its resources in response to a defendant's actions"). That cannot be right.

Nor is this case remotely like *AIDS Vaccine Advocacy Coalition*, where the Court found far more substantial immediate effects. *See AIDS Vaccine Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, 2025 WL 752378, at *18-19 (D.D.C. Mar. 10, 2025), *appeal filed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025). The only remotely similar submission here is that one plaintiff furloughed two employees "in part" because of the descoping of the Acacia Contract. *See* Dkt. 8-11 ¶ 13. Even

that plaintiff does not claim that it would have furloughed the employees based only on the Partial Termination it challenges here, or that it would have been able to avoid furloughing those employees if not for the Partial Termination. *See id.*

## III.    The Remaining Injunction Factors Favor the Government, And Any Relief Should Be Limited in Scope

The Supreme Court's order in *Department of Education* underscores why the remaining injunction factors tip in Defendants' favor. As that order noted, the harm Defendants would face if the Court were to reinstate the contract pending final resolution of this case—which is what Plaintiffs' effectively demand—would be irreparable given that Defendants would be "unlikely to recover . . . [NQRP] funds once they are disbursed." *Dep't of Educ.*, 145 S. Ct. at 969. The public also has an interest in the judiciary respecting the jurisdictional limits set by Congress, and the preliminary relief Plaintiffs seek would likewise interfere with the Executive Branch's ability to lawfully direct and guide agencies' spending decisions. In sum, the likelihood-of-success, irreparable-harm, balance-of-the-equities, and public-interest factors all decidedly weigh against any grant of injunctive relief here.

Other considerations do not cut against that conclusion. If attorneys employed by Plaintiffs withdraw from their representations, their former clients can seek representation at no expense to the government. Owen Decl. ¶ 17 (citing INA § 240(b)(4)). EOIR also provides unrepresented respondents with a list of pro bono legal service providers. *Id.* Further, as discussed already, immigration courts have an established framework to provide individualized safeguards to protect aliens who lack sufficient competency to meaningfully participate in proceedings. *See supra* pp. 22-23; Owen Decl. ¶ 18. EOIR trains immigration judges on these safeguards to ensure that they are implemented effectively. Owen Decl. ¶ 18.

In the event the Court concludes otherwise and decides to grant injunctive relief, it is well settled that such relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide

complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In light of these principles, any injunctive relief the Court grants should be limited in at least five respects.

First, any relief should be limited to Plaintiffs alone, and, even then, only to those Plaintiffs that have clearly shown that they face imminent irreparable harm in the absence of such relief. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72 (2018). Plaintiffs therefore cannot seek relief on behalf of legal aid organizations who are not parties to this suit. *See Kowalski*, 543 U.S. at 129 (explaining that a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties" (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975))).

Second, the scope of injunctive relief that the Court can grant here is limited by separation of powers principles. As this Court recognized recently, the Court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress." *AIDS Vaccine Coal.*, 2025 WL 752378, at *23. "The relief" that that Plaintiffs seek here—namely, "reinstatement of contracts terminated by the Government"—is "beyond the power of this Court." *U.S. Conf. of Cath. Bishops*, 2025 WL 763738, at *7. Accordingly, the Court should, at most, order Defendants to "make available for obligation the full amount of funds" EOIR would otherwise have spent on the terminated portion of the Acacia Contract, *AIDS Vaccine Coal.*, 2025 WL 752378, at *23 (quoting *City of New Haven v. United States*, 634 F. Supp. 1449, 1460 (D.D.C. 1986)), and leave decisions as to how, when, and to whom to disburse those funds to Defendants' discretion.

Third, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been

wrongfully enjoined." Fed. R. Civ. P. 65(c). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, at 5 n.4 (D.C. Cir. May 16, 2025). This Rule provides "broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). Should the Court issue an injunction at this preliminary stage requiring Defendants to continue to pay Acacia and its subcontractors millions of dollars under the Contract, Defendants request that Plaintiffs post a bond in the amount of fees and costs they expect to obtain under the contract prior to final judgment in this case. *See Dep't of Educ.*, 145 S. Ct. at 969 (discussing the harm the government would face from the continued disbursement of terminated grant funds and noting that that "the District Court declined to impose bond").

Fourth, the Court should reject Plaintiffs' request for a stay pursuant to Section 705 of the APA. *See* 5 U.S.C. § 705. As Plaintiffs' acknowledge, the standard for a stay of agency action under § 705 is governed by the same four-factor test as a preliminary injunction. *See* Pls.' Mot. at 12. For the reasons explained above, neither a stay under § 705 nor a preliminary injunction should issue in this case.

Fifth, if the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General. *See* Fed. R. App. P. 8(a). For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions"); *Dep't of Educ.*, 145 S. Ct. at 969 (staying a preliminary injunction that required the Government to pay funds that it would be "unlikely to recover" once disbursed).

**CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiff's motion for a preliminary injunction, dismiss Plaintiffs' complaint, and enter judgment in Defendants' favor. A proposed order is attached.


DATED: May 16, 2025                    Respectfully submitted,


                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General


                                       */s/ Andrew I. Warden*
                                       ANDREW I. WARDEN (IN Bar #23840-49)
                                       Assistant Director
                                       Federal Programs Branch
                                       United States Department of Justice
                                       Civil Division
                                       1100 L. Street, NW
                                       Washington, DC 2005
                                       Tel: 202-616-5084
                                       E-mail:  andrew.warden@usdoj.gov

                                       SARAH WELCH
                                       Ohio Bar No. 99171
                                       Counsel
                                       United States Department of Justice
                                       Civil Division
                                       950 Constitution Ave. NW
                                       Washington, DC 20005
                                       Phone: (202) 514-3180
                                       Email: sarah.e.welch@usdoj.gov

                                       *Counsel for Defendants*