**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN GATEWAYS, *et al.*,<br><br>*Plaintiffs,*<br><br>–v.–<br><br>DEPARTMENT OF JUSTICE, *et al.*,<br><br>*Defendants.* | **Case No. 1:25-cv-01370-AHA** |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**AND REPLY IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR PRELIMINARY INJUNCTION**
**OR STAY PURSUANT TO 5 U.S.C. § 705**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ON MOTION TO DISMISS .................................................................. 3

LEGAL STANDARD ......................................................................................................... 7

ARGUMENT ...................................................................................................................... 8

I.    Plaintiffs' Challenge Belongs in This Court, Not the Court of Federal Claims. .................... 8

    A.   The Tucker Act does not apply ............................................................................. 8

    B.   Department of Education v. California did not change the law. ....................................... 13

II.   Plaintiffs Have Plausibly Alleged Claims Under the APA and Are Likely to Succeed on the
      Merits ........................................................................................................................ 14

    A.   Defendants' decision to terminate the Nationwide NQRP is not committed to agency
         discretion by law. ............................................................................................... 14

    B.   There is no other adequate remedy for Plaintiffs' claims. ..................................... 18

    C.   Defendants do not dispute that the termination was arbitrary and capricious. ................ 20

    D.   Defendants' Rehabilitation Act arguments are incorrect. .................................... 21

    E.   Defendants' Accardi argument misrepresents Defendants' policies and the case law. ...... 27

III.  Plaintiffs Have Shown a Likelihood of Irreparable Harm ......................................... 30

IV.   The Remaining Injunction Factors Favor Plaintiffs and Nationwide Relief ......................... 38

V.    The Court Can Enter a Permanent Injunction on Count 1. .................................... 41

CONCLUSION ................................................................................................................. 42

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Aamer v. Obama*,
  742 F.3d 1023 (D.C. Cir. 2014) ............................................................................................. 7

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ............................................................................................................ 18

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  CV No. 25-00400 (AHA), CV No. 25-00402 (AHA),
  2025 WL 1380421 (D.D.C. May 13, 2025) ......................................................... 8, 9, 12, 13, 14

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  No. 25-00400 (AHA), No. 25-00402 (AHA),
  2025 WL 752378 (D.D.C. Mar. 10, 2025) ...................................................................... 30, 34

*Alexander v. Choate*,
  469 U.S. 287 (1985) ...................................................................................................... 25, 27

*Alexian Bros. Med. Ctr. v. Sebelius*,
  63 F. Supp. 3d 105 (D.D.C. 2014) ....................................................................................... 34

*Am. Council of the Blind v. Mnuchin*,
  878 F.3d 360 (D.C. Cir. 2017) ............................................................................................. 24

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir. 2008) ................................................................... 23, 24, 25, 26

*Battle v. FAA*,
  393 F.3d 1330 (D.C. Cir. 2005) ........................................................................................... 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................. 8

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) .................................................................................................. 12, 13, 19

*Bowen v. Michigan Acad. of Fam. Physicians*,
  476 U.S. 667 (1986) ............................................................................................................ 18

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ............................................................................................................ 39

*Catholic Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
  513 F. Supp. 3d 154 (D.D.C. 2021) ............................................................................ 33, 34, 36

*Chow v. Washington Metro. Area Transit Auth.*,
  391 F. Supp. 3d 37 (D.D.C. 2019) ............................................................. 7

*\*Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*,
  No. 25-2808, --- F.4th ----, 2025 WL 1393876 (9th Cir. May 14, 2025) .............. 11, 13, 17, 18

*Cmty. Legal Servs. v. U.S. Dep't of Health & Human Servs.*,
  No. 25-cv-02847-AMO, --- F. Supp. 3d. ----,
  2025 WL 1233674 (N.D. Cal. Apr. 29, 2025) ........................................ 28

*Cmty. Nutrition Inst. v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) ............................................................. 29

*Council of the Blind v. Snow*,
  311 F. Supp. 2d 86 (D.D.C. 2004) ........................................................ 25

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022) ........................................................... 9

*D.C. v. U.S. Dep't of Agric.*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ......................................................... 40

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) .......................................................................... 17

*Department of Education v. California*,
  145 S. Ct. 966 (2025) ................................................................ 12, 13

*Doe 2 v. Mattis*,
  344 F. Supp. 3d 16 (D.D.C. 2018) ....................................................... 40

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*,
  396 F.3d 1265 (D.C. Cir. 2005) .......................................................... 18

*Esch v. Yeutter*,
  876 F.2d 976 (D.C. Cir. 1989) ........................................................... 12

*Food & Drug Administration v. Alliance for Hippocratic Medicine*,
  602 U.S. 367 (2024) ...................................................................... 33

*Franco-Gonzalez v. Holder*,
  767 F. Supp. 2d 1034 (C.D. Cal. 2010) ................................................... 4

*\*Franco-Gonzalez v. Holder*,
  No. CV 10-02211 DMG,
  2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) ........................ 4, 9, 10, 12, 15, 21, 23, 25, 26, 39

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................................................ 33

*Irwin County v. United States*,
   170 Fed. Cl. 355 (2024) .......................................................................................... 20

*Kowalski v. Temer*,
   543 U.S. 125 (2004) ................................................................................................ 37

\*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................ 30, 32, 37, 38

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ..................................................................................... 2, 15, 17

*Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*,
   763 F.2d 1441 (D.C. Cir. 1985) ............................................................................ 11

\*Mathis v. United States Parole Comm'n*,
   749 F. Supp. 3d 8 (D.D.C. 2024) ............................................................ 24, 25, 38

*McLouth Steel Prod. Corp. v. Thomas*,
   838 F.2d 1317 (D.C. Cir. 1988) ............................................................................ 29

*Nat'l Ass'n of the Deaf v. Trump*,
   486 F. Supp. 3d 45 (D.D.C. 2020) ........................................................................ 25

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ..................................................................... 39, 40

\*Northwest Immigrant Rights Project v. U.S. Citizenship & Immigration Services*,
   496 F. Supp. 3d 31 (D.D.C. 2020) ........................................................................ 33

*Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*,
   878 F. Supp. 2d 241 (D.D.C. 2012) ........................................................................ 8

*Physicians for Soc. Resp. v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020) .............................................................................. 15

*Protect Democracy Project, Inc. v. U.S. Dep't of Just.*,
   498 F. Supp. 3d 132 (D.D.C. 2020) ........................................................................ 7

*S. Educ. Found. v. United States Dep't of Educ.*,
   No. CV 25-1079 (PLF), 2025 WL 1453047 (D.D.C. May 21, 2025) ................... 14

*Tootle v. Sec'y of Navy*,
   446 F.3d 167 (D.C. Cir. 2006) .............................................................................. 12

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*,
　No. 25-cv-00465 (TNM), --- F. Supp. 3d ----, 2025 WL 763738 (D.D.C. Mar. 11, 2025)...... 13

*Vox Media, Inc. v. Mansfield*,
　322 F. Supp. 3d 19 (D.D.C. 2018) .............................................................................. 7

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
　485 F. Supp. 3d 1 (D.D.C. 2020) ......................................................................... 36, 37

*Widakuswara v. Lake*,
　No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) .................................... 14

*Winter v. FloorPro, Inc.*,
　570 F.3d 1367 (Fed. Cir. 2009) ............................................................................... 20

## STATUTES

5 U.S.C. § 702 ............................................................................................................ 36

8 U.S.C § 1229a(b)(4) ................................................................................................... 3

8 U.S.C. § 1229a(b)(3) .................................................................................................. 3

Immigration and Nationality Act, Pub. L. No. 82-414, § 242(b), 66 Stat. 163, 208 (1952).......... 3

## OTHER AUTHORITIES

Brief for the United States as Amicus Curiae Supporting Petitioner at 13–16, *A.J.T. v. Osseo
　Area Schools*, No. 24-249, 2025 WL 755897 ....................................................... 24

Notice of Defendants' New Nationwide Policy for Unrepresented Immigration Detainees with
　Serious Mental Disorders or Conditions, *Franco-Gonzalez v. Holder*, No. 2:10-cv-02211-
　DMG (C.D. Cal. Apr. 22, 2013), ECF No. 583 ..................................................... 28

Organization of the Executive Office for Immigration Review,
　84 Fed. Reg. 44537 (interim Aug. 26, 2019) ......................................................... 17

Procedures for Asylum and Withholding of Removal,
　85 Fed. Reg. 81698 (Dec. 16, 2020) ...................................................................... 16

Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal,
　and CAT Protection Claims by Asylum Officers*,
　87 Fed. Reg. 18078 (interim Mar. 29, 2022) ......................................................... 16

U.S. Dep't of Justice, *National Qualified Representative Program (NQRP)*,
　https://perma.cc/AL7X-6HJS) ............................................................................. 5, 6

U.S. Immigration and Customs Enforcement, *Civil Immigration Detention: Guidance for New
　Identification and Information-Sharing Procedures Related to Unrepresented Detainees With
　Serious Mental Disorders or Conditions,* (Apr. 22, 2013), https://perma.cc/T7FX-3QNY) ..... 6

**REGULATIONS**

6 C.F.R. § 15.30(a)................................................................................................................. 15

28 C.F.R. § 39.130(a)............................................................................................................ 15

## <u>INTRODUCTION</u>

Plaintiffs' Complaint and Motion for Preliminary Injunction or Stay detail why the termination of the National Qualified Representative Program (NQRP) outside of the *Franco* states[1] is unlawful and must be enjoined or stayed. In response, Defendants do not dispute numerous core premises of Plaintiffs' allegations and arguments. For example, Defendants do not contest that they terminated the NQRP outside of the three *Franco* states and that the now-terminated program provided the only way for immigration judges to appoint counsel for individuals whom the judges determined could not represent themselves because of their mental disabilities. The harm that results from the termination of this core aspect of the Nationwide NQRP has nothing to do with any contract, and it cannot be redressed by the payment of money or the restoration of a contract. And despite their unsupported suggestions that there are other qualified representatives available and willing to serve this population, Opp'n 30;[2] Declaration of Sirce Owen ¶ 17, ECF No. 13-1, Defendants do not dispute that, because of the termination, immigration judges cannot appoint counsel, paid or otherwise.

Because Defendants insist that this case is about a contract and not subject to the Administrative Procedure Act (APA), Opp'n 5–15, they do not respond to Plaintiffs' arguments that the termination of the Nationwide NQRP was arbitrary and capricious. They do not dispute that Defendants have provided no reasoning for their termination of the program and have not considered various important aspects of the problem. Defendants have not grappled with Plaintiffs' reliance interests or the ethical dilemma that Plaintiffs now face as they decide whether to continue

---

[1] As in the Motion for Preliminary Injunction or Stay, we refer to the operation of the NQRP outside of the *Franco* states as the "Nationwide NQRP."

[2] Because Defendants' Motion to Dismiss, ECF No. 14, and Memorandum in Opposition to Plaintiffs' Motion for Preliminary Injunction, ECF No. 13, are identical, Plaintiffs cite to Defendants' briefs as "Opp'n" throughout.

representation without payment or to move to withdraw, which may leave their clients unrepresented. These concessions show that the Court can grant Plaintiffs' Motion and deny Defendants' Motion to Dismiss.

Defendants' threshold arguments under the Tucker Act and *Lincoln v. Vigil*, 508 U.S. 182 (1993), fail because both ignore that this challenge is to the termination of a program, not a contract. As to the former, while Defendants repeatedly refer to this as a "contract case," the Acting Director of EOIR has declared that she "terminated program services," not just the contract, and that "the NQRP is no longer in effect outside of *Franco* states." Owen Decl. ¶¶ 6, 13. As to the latter, Plaintiffs contend that EOIR's termination decision fails under multiple sources of law—the Rehabilitation Act, the Immigration and Nationality Act, and Defendants' own policies requiring the appointment of counsel. These sources provide law to apply under the APA and take this case well out of the Tucker Act and *Lincoln* arena.

In the four weeks since the termination, the irreparable harms have been irrefutable. Defendants have no answer to the ethical bind that Plaintiffs face. Plaintiff PIRC has furloughed staff members due in part to the termination. And since the filing of Plaintiffs' Motion, additional harms have accrued. Plaintiff American Gateways has been forced to stop representing two NQRP clients on appeal because of the termination. Now those individuals—whom judges have found cannot represent themselves because of their disabilities—are left without counsel. Plaintiff NIJC is unable to accept a referral from a qualified representative at another organization, who has secured a grant of protection from deportation for an NQRP client but now cannot represent that client in defending against DHS's appeal. Without the Nationwide NQRP, that client is not guaranteed replacement counsel and instead, must hope that another organization will have the capacity to take on his case. Worse still, Plaintiffs are aware of at least one individual for whom a

judge has ordered the appointment of a qualified representative, but who is not receiving counsel and whom Plaintiffs would have otherwise been appointed to represent.

For those reasons and as described below, the Court should grant the Motion for Preliminary Injunction or Stay and deny Defendants' Motion to Dismiss.

## BACKGROUND ON MOTION TO DISMISS

Plaintiffs' memorandum in support of their Motion for Preliminary Injunction or Stay provided the relevant background in this matter, ECF No. 8-1, which is also alleged in the Complaint. In light of Defendants' concurrent Motion to Dismiss, however, Plaintiffs briefly summarize some of the relevant allegations.

Under the INA, individuals have both a constitutional and statutory right to a full and fair hearing, which includes a "reasonable opportunity . . . to present evidence," examine evidence, and cross-examine witnesses. 8 U.S.C § 1229a(b)(4); Compl. ¶ 35. For individuals with mental or cognitive disabilities who are not competent to represent themselves in immigration proceedings, safeguards, including qualified counsel, are required to ensure a fair hearing. Compl. ¶ 36. For example, the INA recognizes that "[i]f it is impracticable by reason of [a noncitizen's] mental incompetency for the [noncitizen] to be present at the proceeding, the Attorney General shall prescribe safeguards to protect the rights and privileges of the [noncitizen]." 8 U.S.C. § 1229a(b)(3); Compl. ¶ 36. The INA has provided for these safeguards since 1952. *See* Immigration and Nationality Act, Pub. L. No. 82-414, § 242(b), 66 Stat. 163, 208 (1952).

Yet, despite the mandate to prescribe safeguards, there was no process by which an immigration judge could appoint counsel because of a competency concern until the creation of the NQRP in 2013. Compl. ¶ 41. As a result, individuals with mental disabilities who were U.S. citizens were wrongly deported, effectively unable to prove their citizenship. Compl. ¶ 102. Others

3

languished in immigration detention for months or years because there was no mechanism to provide them with a meaningful hearing process. *Id.* Attorneys had difficulty representing individuals who were mentally incompetent because, due to those individuals' impairments, it was often practically impossible for the attorneys to establish an attorney-client relationship with them. Compl. ¶ 62.

The legal obligation under section 504 of the Rehabilitation Act for the government to provide qualified representation to individuals who cannot represent themselves in immigration proceedings due to their mental disabilities was formally recognized in *Franco*. *See Franco-Gonzalez v. Holder*, 767 F. Supp. 2d 1034, 1058 (C.D. Cal. 2010) (finding that "a Qualified Representative would be a reasonable accommodation" for the plaintiffs); *see* Compl. ¶¶ 44–46. The *Franco* court held that "the provision of competent representation able to navigate the proceedings is the only means by which [incompetent detainees] may invoke" their rights under the INA to present evidence and challenge the government's case. *Franco-Gonzalez v. Holder,* No. CV 10-02211 DMG, 2013 WL 3674492, at *5 (C.D. Cal. Apr. 23, 2013); Compl. ¶ 45. The *Franco* decision and subsequent settlement applied to individuals held in immigration custody in Arizona, California, and Washington. Compl. ¶ 46.

Consistent with their obligations under *Franco*, Defendants launched the NQRP, which applied nationwide. Compl. ¶¶ 47–59; Pls.' Mem. Exs. 2, 6. On April 22, 2013, EOIR's Chief Immigration Judge Brian O'Leary issued a policy to all immigration judges entitled "Nationwide Policy to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders or Conditions" (the Nationwide Policy). Compl. ¶ 48; *see also* Pls.' Mem. Ex. 2, at 1. This policy acknowledged that immigration judges "who have had unrepresented detained [noncitizens] with serious mental disorders or conditions appear in [their] courtrooms . . . are more

than aware of the many unique challenges encountered in conducting removal proceedings involving such individuals." Compl. ¶ 48 (quoting the Nationwide Policy); *see also* Pls.' Mem. Ex. 2, at 1. The policy announced "a number of enhancements" designed "to enable Immigration Judges to more efficiently and effectively carry out their adjudicatory duties" in cases involving detained individuals "with serious mental disorders or condition[s]." Compl. ¶ 48 (quoting the Nationwide Policy); *see also* Pls.' Mem. Ex. 2, at 1. The enhancements included instructions for competency hearings and provided that, where an unrepresented detained noncitizen was "not mentally competent" to represent themselves, EOIR would appoint "a qualified legal representative to represent the [noncitizen] in all future detained removal and/or bond proceedings." Compl. ¶ 50 (quoting the Nationwide Policy); *see also* Pls.' Mem. Ex. 2, at 2. "[A]s part of the Nationwide Policy's enhanced procedural protections," the government explained, "EOIR also launched the National Qualified Representative Program (NQRP), a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in immigration proceedings." U.S. Dep't of Justice, *National Qualified Representative Program (NQRP)*, https://perma.cc/AL7X-6HJS; Compl. ¶ 3; Pls.' Mem. Ex. 3.

Likewise, on April 22, 2013, the Director of ICE issued a memorandum that "direct[ed] that procedures be in place to ensure that . . . detainees who may be mentally incompetent to represent themselves in removal proceedings . . . are identified, that relevant information about them is provided to the immigration court so that an immigration judge (IJ) can rule on their competency and, where appropriate, that such [noncitizens] are provided with access to new procedures." Compl. ¶ 56 (quoting U.S. Immigration and Customs Enforcement, *Civil Immigration Detention: Guidance for New Identification and Information-Sharing Procedures*

*Related to Unrepresented Detainees With Serious Mental Disorders or Conditions*, (Apr. 22, 2013), https://perma.cc/T7FX-3QNY.

In December 2013, EOIR issued the 2013 Directive implementing its Nationwide Policy. Compl. ¶ 51; Pls.' Mem. Ex. 6. The Directive reiterated that EOIR "is committed to identifying detained unrepresented respondents in immigration custody who are not competent to represent themselves in removal and custody redetermination proceedings." Compl. ¶ 52 (quoting the 2013 Directive); Pls.' Mem. Ex. 6, at 1. It added that "EOIR will not proceed in the case of any detained unrepresented respondent determined to be incompetent to represent him- or herself in a removal or custody redetermination proceeding until appropriate procedural protections and safeguards are in place." Compl. ¶ 52 (quoting the 2013 Directive); Pls.' Mem. Ex. 6, at 1. Finally, the Directive instructed that, pursuant to the Nationwide Policy, EOIR would "make[] a qualified legal representative available in removal and custody redetermination proceedings if it is determined that a respondent with a serious mental disorder or condition is detained, unrepresented, and incompetent to represent him- or herself." Compl. ¶ 51 (quoting the 2013 Directive); Pls.' Mem. Ex. 6, at 1, 15.

From April 2013 through January 2020, over 2,000 detained noncitizens with "serious mental illness" were provided representation through the NQRP. Compl. ¶ 84. Though Defendant EOIR "carrie[d] out" the NQRP through a federal contract, U.S. Dep't of Justice, *National Qualified Representative Program (NQRP)*, https://perma.cc/AL7X-6HJS; *see also* Compl. ¶ 64, the program involves much more than funding. It provided the only process by which immigration judges could appoint counsel for individuals who are unable to represent themselves due to their mental or cognitive disabilities. Compl. ¶¶ 62, 89.

On April 25, 2025, Defendants terminated the NQRP outside of the three *Franco* states. Compl. ¶¶ 74–79. Court filings show that Defendant EOIR knew that the decision would "end representation funded by EOIR," and intended to "allow" Plaintiffs and other Qualified Representatives "to withdraw and facilitate finding other representation (not funded by the Government) for these individuals." Admin. Rec., *Amica Center for Immigrant Rights v. U.S. Dep't of Justice*, No. 1:25-cv-00298-RDM (D.D.C Apr. 24, 2025), ECF No. 65-2; Pls.' Mem. Ex. 1. Defendants do not offer any justification for the termination in their Motion. They also do not dispute that without the Nationwide NQRP, Plaintiffs will have no mechanism for receiving appointments for individuals deemed mentally incompetent outside of the *Franco* states.

## LEGAL STANDARD

Defendants have combined their opposition to Plaintiffs' Motion for a Preliminary Injunction or Stay under 5 U.S.C. § 705 with a motion to dismiss under Rules 12(b)(1) and (6). Plaintiffs have met the legal standard for a preliminary injunction or a stay because they have demonstrated that they are likely to succeed on the merits of their claims, will likely suffer irreparable harm in the absence of such relief, and that the balance of equities and public interest tip in their favor. *See Protect Democracy Project, Inc. v. U.S. Dep't of Just.*, 498 F. Supp. 3d 132, 137 (D.D.C. 2020) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).

As to dismissal, under both standards courts "must accept as true all of the factual allegations contained in the complaint" and "give the plaintiff the 'benefit of all inferences that can be derived from the facts alleged.'" *Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 23 (D.D.C. 2018) (citations omitted); *Chow v. Washington Metro. Area Transit Auth.*, 391 F. Supp. 3d 37, 40 (D.D.C. 2019). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face and to 'nudge his or

her claims across the line from conceivable to plausible.'" *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 245 (D.D.C. 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)) (cleaned up).

## ARGUMENT

## I.    Plaintiffs' Challenge Belongs in This Court, Not the Court of Federal Claims.

Defendants' Tucker Act argument is written for a different case. Plaintiffs' challenge is not to a mere funding decision, but to the "termination of program services" such that "the NQRP is no longer in effect outside of *Franco* states." Owen Decl. ¶¶ 9, 13. This case is a classic APA dispute concerning Defendants' termination of an established program. Because this Court has subject-matter jurisdiction over Plaintiffs' claims, dismissal would be improper.

### A.    The Tucker Act does not apply.

As this Court has recognized, "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach." *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, CV No. 25-00400 (AHA), CV No. 25-00402 (AHA), 2025 WL 1380421, at *2 (D.D.C. May 13, 2025).

The same reasoning applies here. Plaintiffs' claims "do not at all depend on whether the terms of particular [contracts] were breached." *Id.* Plaintiffs are not parties to any NQRP contract with the government, do not argue that any contract has been breached, do not seek specific performance of a contract, and do not ask the Court to provide money damages to compensate for a prior contractual injury. Indeed, eliminating the only mechanism for immigration judges to appoint counsel—and, as a result, for Plaintiffs to receive appointments—has nothing to do with any contract.

8

Instead, this challenge is within the heartland of APA actions reviewable by this Court. The question is whether the termination of the NQRP outside of the three *Franco* states is unlawful, "irrespective of any breach" of a contract. *Id.* As in *AIDS Vaccine*, "Plaintiffs seek only invalidation of the policy" terminating a program, which includes, but is not premised on, "the withholding of payment that flowed from it." *Id.*[3]

This case is even further removed from the Tucker Act than *AIDS Vaccine* because Plaintiffs here seek significant non-monetary relief that has "'considerable value' independent of any future potential for monetary relief." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107–08 (D.C. Cir. 2022); *see* Compl. 37–38. Defendants have eliminated the procedural process by which immigration judges appoint counsel in immigration proceedings for individuals who cannot represent themselves due to mental disabilities. That procedure exists *only* because of the NQRP. Compl. ¶¶ 6, 41. Without the NQRP, no mechanism exists for immigration judges to appoint counsel for individuals deemed mentally incompetent, whether that counsel is employed by Plaintiffs or not. *Franco*, 2013 WL 3674492, at *6 ("[T]here is no statute or regulation that specifically confers Immigration Judges with the power to appoint counsel for any unrepresented alien." (quoting EOIR declaration)). Defendants do not dispute this point, nor could they. Incompetent immigrants outside of the *Franco* states will now be forced to proceed without counsel because of the lack of appointment mechanism provided by the NQRP. *See, e.g.*, Compl. ¶¶ 79–81; GHIRP Decl. ¶ 19, ECF No. 8-6 (explaining that without the NQRP "[d]etained

---

[3] Defendants argue that "the Nationwide NQRP" is Plaintiffs' "term for the Acacia Contract's funding for qualified representatives outside the *Franco* states." Opp'n 10. That argument misreads Plaintiffs' Complaint and Motion for Preliminary Injunction or Stay, which explain that Plaintiffs use "the Nationwide NQRP" to describe the portion of the NQRP that operated outside of the *Franco* states, which includes judicial competency inquiries and the resulting appointment mechanism, not just funding.

individuals who are mentally incompetent will remain in the shadows undetected and unrepresented"); Amica Center Decl. ¶ 26, ECF No. 8-4; RMIAN Suppl. Decl. ¶ 10; American Gateways Suppl. Decl. ¶ 7. Prior to April 25, 2025, immigration judges would have appointed counsel to those individuals.

The reinstatement of the appointment process thus has a significant independent value. Indeed, even if the NQRP were purely *pro bono*, Defendants' termination would still be reviewable and unlawful. In that situation, the elimination of a *pro bono* program that provided immigration judges with the sole mechanism to appoint counsel would violate the Rehabilitation Act and Defendants' own policies for the same reasons as the termination of the funded program.

Moreover, Plaintiffs would obtain some relief from the reinstatement of the Nationwide NQRP even if Plaintiffs themselves did not receive any funding. In the hypothetical situation where Defendants found qualified replacement counsel for Plaintiffs' clients from another source, many of Plaintiffs' injuries would be redressed. Plaintiffs would no longer be subject to the ethical dilemma of whether to continue existing representations without payment or seek to withdraw and leave clients unrepresented. And, as to other individuals exhibiting indicia of incompetency, Plaintiffs would be able to make referrals to immigration judges so that other qualified representatives could be appointed. Defendants offer no response to this. Nor do they acknowledge the practical reality that this hypothetical corps of qualified replacement counsel does not exist— a fact the government did acknowledge in the *Franco* context. *Franco*, 2013 WL 3674492, at *6 ("EOIR claims that it has found 'relatively scarce capacity among pro bono providers to fill very limited roles.'" (quoting EOIR declaration)).[4]

---

[4] The Court should reject out of hand Defendants' suggestion that Plaintiffs and other non-profits are free to solve this problem for the government by increasing their fundraising. Owen Decl. ¶ 21

Defendants misunderstand Plaintiffs' challenge when they argue that "the only legal 'source . . . upon which' Plaintiffs could even plausibly 'base[]' their asserted right to ongoing funding and future appointments . . . is the Acacia Contract and their related subcontracts." Opp'n 9. Whether the government properly terminated the Nationwide NQRP has nothing to do with the terms of the Acacia contract or related subcontracts. *See Cmty. Legal Servs. in E. Palo Alto v. United States Dep't of Health & Hum. Servs.*, No. 25-2808, --- F.4th ----, 2025 WL 1393876, at *2 (9th Cir. May 14, 2025) (holding the Tucker Act did not apply to challenge to termination of a program providing counsel to unrepresented minors where "plaintiffs seek to enforce compliance with statutes and regulations, not any government contract"); *see also* Compl. ¶¶ 106–15.

Plaintiffs' claims instead "turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985). Specifically, Plaintiffs' challenge relies on the INA, the Rehabilitation Act, the Due Process Clause of the Fifth Amendment, and Defendants' own policies requiring the appointment of counsel to individuals who cannot represent themselves. *See* Compl. ¶¶ 35–37, 42–43, 48–56, 106–115. Defendants' only response is that those laws and policies do not mandate funding. Opp'n 10. But that again misconstrues Plaintiffs' challenge, which is about the termination of a program and not a funding decision. Importantly, the Acacia contract and subcontracts do not provide immigration judges (who are not parties to those contracts) with the ability to appoint counsel—the NQRP does that.

That the government has operated the Nationwide NQRP by funding organizations like Plaintiffs does not make this a Tucker Act case. As Defendants explained in their now-deleted

_____

(noting that "[t]he contract de-scoping does not prevent Plaintiffs or other legal aid organizations from raising funds to support their activities, including representation of mentally incapacitated individuals").

NQRP website and Policy Manual, EOIR "carries out" the NQRP through a contract. *See* Pls.' Mem. at 6 n.2. The contract, however, is not the NQRP. EOIR effectuates the NQRP through a contract simply because there is insufficient *pro bono* capacity to allow it to comply with its obligations any other way. *Franco*, 2013 WL 3674492 at *6. Because the challenge here is to the termination of the Nationwide NQRP, the Tucker Act does not apply.

This Court's jurisdiction is not barred even if the reinstatement of the Nationwide NQRP— the relief sought here—leads to the government continuing to pay for counsel. *See Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages."). Defendants' position would require funneling to the Court of Federal Claims any challenge to agency action with a monetary component. But that argument runs squarely into *Bowen* and its progeny. "[T]he Supreme Court expressly repudiated the notion that suits seeking monetary relief from the Federal Government are necessarily suits seeking 'money damages' cognizable exclusively in the Claims Court." *Esch v. Yeutter*, 876 F.2d 976, 978 (D.C. Cir. 1989) (citing *Bowen*, 484 U.S. 879). As this Court explained, even the Supreme Court's decision in *California* recognizes that a district court retains jurisdiction where "an order setting aside an agency's action may result in the disbursement of funds." *AIDS Vaccine*, 2025 WL 1380421, at *3 (citing *Department of Education v. California,* 145 S. Ct. 966 (2025)).

Finally, Defendants do not dispute that Plaintiffs, as subcontractors, do not have standing to bring their APA claims regarding a program termination in the Court of Federal Claims. *See infra* Section II(B). Under D.C. Circuit precedent, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006). That binding case law "categorically reject[ed] the suggestion that a

federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Id.* at 176. In a similar case involving the appointment and funding of counsel for unaccompanied immigrant children, the Ninth Circuit rejected the government's identical Tucker Act arguments because "[t]he result requested by the Government would mean that no court has jurisdiction to hear plaintiffs' claims," which is "contrary to common sense" and "also conflicts with the 'strong presumption favoring judicial review of administrative action.'" *Cmty. Legal Servs.*, 2025 WL 1393876, at *3 (denying motion for stay of preliminary injunction pending appeal) (citation omitted).

### B.    *Department of Education v. California* did not change the law.

*Department of Education v. California* does not call for a different result. 145 S. Ct. 966 (2025). First, *California* did not overturn existing Tucker Act jurisprudence, including *Bowen*. *See AIDS Vaccine*, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025) ("[T]he Court [in *California*] accordingly reaffirmed the precedents that this Court relied upon in its preliminary injunction ruling." (citing *Bowen*, 487 U.S. at 910)).

Second, Plaintiffs' challenge is not "premised on the terms of individual grants." *AIDS Vaccine*, 2025 WL 1380421, at *3. For that reason, the cases cited by Defendants applying *California* to dismiss claims based on the Tucker Act are inapposite. *See, e.g.*, *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,* No. 25-cv-00465 (TNM), --- F. Supp. 3d ----, 2025 WL 763738, at *6 (D.D.C. Mar. 11, 2025) (recognizing a distinction between a plaintiff that "had no contractual relationship with [the government] itself, so any remedy afforded against [the government] could neither be construed as damages nor specific performance"—and would thus be outside the Tucker Act—and a plaintiff that did have a contractual relationship with the government).

13

In a footnote, Defendants suggest that the D.C. Circuit's unpublished order in *Widakuswara v. Lake* is also on point. Opp'n 25 n.2 (citing *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)). But the *Widakuswara* motions panel viewed the issue as involving only funding as the relevant statute "created a contractual scheme for allocating funds to the grantees." 2025 WL 1288817, at *3. Here, however, the case concerns a program that created benefits, like the appointment mechanism, separate and apart from the funding.

In addition, "a key inquiry in that case was whether it was 'more like [*AIDS Vaccine*], in which the Supreme Court declined to stay interim injunctive relief despite assertions that the plaintiffs' statutory claims were really claims for monetary relief that belonged in the Court of Claims,' or more like *Department of Education*." *AIDS Vaccine*, 2025 WL 1380421, at *3 (quoting *Widakuswara*, 2025 WL 1288817, at *14 (Pillard, J., dissenting)). Because this case is more like *AIDS Vaccine* than *California*, *Widakuswara* is inapposite. *See also S. Educ. Found. v. United States Dep't of Educ.*, No. CV 25-1079 (PLF), 2025 WL 1453047, at *10 (D.D.C. May 21, 2025) ("*Widakuswara II* is an unpublished opinion that may not be binding on this Court. And respectfully, the Court does not find the panel majority's reasoning persuasive.").

## II.    Plaintiffs Have Plausibly Alleged Claims Under the APA and Are Likely to Succeed on the Merits.

### A.    Defendants' decision to terminate the Nationwide NQRP is not committed to agency discretion by law.

Like their Tucker Act argument, Defendants' agency discretion argument is incorrect because it narrowly views this case through a funding lens. Defendants argue that their "decision to discontinue funding for NQRP" is committed to agency discretion by law. Opp'n 19. But the Defendants have not just discontinued funding, they have, in their own words, "terminated program services" such that "the NQRP is no longer in effect outside of *Franco* states." Owen Decl. ¶¶ 6, 13; *see also* Compl. ¶¶ 74–76, 79. Defendants never argue that judicial review of the

14

termination of the program is barred as an act of agency discretion, and so Defendants' agency discretion argument fails on that basis alone.

Because this is a challenge to a program required by law and Defendants' own policies, the circumscribed exception articulated in *Lincoln v. Vigil* is inapplicable. 508 U.S. 182 (1993). In that case, the Court recognized the longstanding principle that there is a presumption of judicial review under the APA, and that one of the few circumstances in which review is unavailable is when agency actions are committed to agency discretion, which includes decisions about the allocation of lump-sum appropriations. *Id.* at 192. Yet "regardless of whether a case is governed by *Overton Park* (no law to apply so the presumption of reviewability is lost) or *Chaney* (agency action where a presumption of non-reviewability has not been overcome), judicial review is available where there are meaningful standards to cabin the agency's otherwise plenary discretion." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (cleaned up). Such standards "may be found in formal and informal policy statements and regulations as well as in statutes." *Id.*

Multiple "meaningful standards" cabin Defendants' discretion here. The Rehabilitation Act, the INA, Defendants' own regulations, and "formal and informal policy statements" all provide meaningful standards by which this court can assess Defendants' decision to terminate the Nationwide NQRP. *Id.*

To start, *Franco* held that the Rehabilitation Act required the government to provide qualified representation to effectuate individuals' rights under the INA. *See Franco*, 2013 WL 3674492, at *5. Defendants' decision to terminate the Nationwide NQRP is conscribed by the Rehabilitation Act's and the INA's statutory requirements; Defendants' continued operation of the NQRP in *Franco* states is proof positive of this. *See also* 6 C.F.R. § 15.30(a); 28 C.F.R. § 39.130(a) (regulations implementing Rehabilitation Act).

Defendants' own policies—the Nationwide Policy and 2013 Directive—provide additional law to apply. The Nationwide Policy states that EOIR "will make available" a qualified representative to an unrepresented, detained noncitizen upon a finding that that individual is not mentally competent to represent him or herself. Pls.' Mem. Ex. 2, at 1; *see also* Compl. ¶ 50. The 2013 Directive also requires EOIR to "make[] a qualified legal representative available in removal and custody redetermination proceedings if it is determined that a respondent with a serious mental disorder or condition is detained, unrepresented, and incompetent to represent him- or herself." Pls.' Mem. Ex. 6, at 1; Compl. ¶ 51. Defendants do not dispute that they no longer "will make available" legal representatives in such cases. Because termination of the Nationwide NQRP is contrary to those policies, the policies provide a standard for review.

There is nothing tentative about either policy, which have both been in place for over a decade. *See also infra* Section II(E). According to the government, "[t]he purpose of the NQRP is to ensure EOIR's compliance with the . . . *Franco* Orders and to carry out EOIR's commitment under the Nationwide Policy." ECF No. 13-2 at 63; Compl. ¶ 61. In rulemakings, EOIR has stated that it "will provide a qualified representative through the EOIR National Qualified Representative Program ('NQRP') to a respondent who is found to be incompetent to represent themselves in immigration proceedings and who is both unrepresented and detained." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18173 n.88 (interim Mar. 29, 2022). In the government's own words, the NQRP is part of an "existing agency protocol for ensuring that proceedings involving such individuals [with competency issues] are fair." Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81698, 81735 (Dec. 16, 2020). And the program is "part of EOIR's Nationwide Policy regarding procedural protections for detained [noncitizens]

who may have competency issues in immigration proceedings." Organization of the Executive Office for Immigration Review, 84 Fed. Reg. 44537, 45537 (interim Aug. 26, 2019).

*Lincoln v. Vigil* is thus far afield from this case. Though the NQRP is funded via a lump-sum appropriation, Plaintiffs here are not challenging the allocation of that appropriation, but rather the termination of a program required by law and Defendants' own policies. *See also Cmty. Legal Servs.*, 2025 WL 1393876, at *4 ("The rule announced in *Lincoln* has no application where, as here, the agency fails to carry out a program that is required by statute."). *Lincoln* itself underscored that "an agency is not free simply to disregard statutory responsibilities." 508 U.S. at 193. And *Lincoln* did not involve any statutory, regulatory, or policy standards governing the shifting of resources from one healthcare program to another. Instead, the plaintiffs in *Lincoln* relied primarily on legislative history. That is not this case.

The analogous Supreme Court precedent here is not *Lincoln*, but *Regents*. In *Regents*, the government argued that the immigration program at issue, Deferred Action for Childhood Arrivals (DACA), was a non-enforcement policy and the government's recission of the program was thus presumptively committed to agency discretion. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 18 (2020). But the Supreme Court disagreed, finding that "the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an action [that] provides a focus for judicial review." *Id.* (alteration in original). Just like in *Regents*, this case is about the "access to . . . benefits" and rights of the type that "courts are often called upon to protect." *Id.* at 19 (citation omitted). "Because the [Nationwide NQRP] is more than" the allocation of funds from a lump-sum appropriation and concerns access to critical rights in immigration proceedings, "its rescission is subject to review under the APA." *Id.*

17

Indeed, Defendants may choose how to fund the Nationwide NQRP *so long as* their operation of the program satisfies their legal obligations under the INA, Rehabilitation Act, and any internal policies or regulations. Plaintiffs do not contend that their specific organizations must be funded or that Defendants are barred from exploring other options to ensure access to counsel for this population—something they have not done likely because they know that there is no other cadre of attorneys ready to take on this work, whether *pro bono* or not. In other words, Defendants continue to have ample discretion to negotiate for the provision of these services. But their funding discretion does not "defeat[] judicial review." *Cmty. Legal Servs.*, 2025 WL 1393876, at *5 ("APA Section 701(a)(2) has 'never been thought to put all exercises of discretion beyond judicial review.'") (citation omitted).

### B.    There is no other adequate remedy for Plaintiffs' claims.

Defendants' assertion that Plaintiffs have adequate alternative remedies in the Court of Federal Claims, Opp'n 15–17, suffers from the same flaws as their Tucker Act argument. There is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 670 (1986). Indeed, "[t]he Supreme Court has long instructed that the 'generous review provisions' of the APA must be given 'a hospitable interpretation.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)). Defendants fail to establish by "clear and convincing evidence" that there is an adequate alternative remedy in the Court of Federal Claims for several reasons. *Id*.

*First*, Plaintiffs' claims do not sound in contract. *See supra* Section I; Compl. 37–38. Plaintiffs' claims in this case arise from the Rehabilitation Act, the INA, and Defendants' own policies, and the rights under these sources of law exist separate and apart from the Acacia contract.

18

*Supra* Section I; Compl. ¶¶ 35–37, 42, 44–45, 117–24. It "would be nothing less than remarkable to conclude that Congress intended judicial review of these complex questions of" administrative law and policy "to be reviewed in a specialized forum such as the Court of Claims." *Bowen*, 487 U.S. at 908.

*Second*, it is undisputed that the Court of Federal Claims cannot order the prospective relief requested. *Bowen*, 487 U.S. at 904–05 ("The Claims Court does not have the general equitable powers of a district court to grant prospective relief."). Plaintiffs seek to enjoin or set aside Defendants' unlawful termination of the Nationwide NQRP—equitable relief the Court of Federal Claims cannot grant. Compl. 37–38. This relief is not, as Defendants suggest, "essentially equivalent" to specific performance of the Acacia contract, to which Plaintiffs are not parties. *See* Opp'n 16. The Acacia contract does not provide the process by which immigration judges appoint counsel—the NQRP does that.

Nor do Plaintiffs seek money damages to compensate for past harm, which is the principal form of relief available in the Court of Federal Claims. Such relief would be inadequate to remedy the harm Defendants' action has caused, including because Plaintiffs would still be unable to be appointed to represent noncitizens deemed mentally incompetent and face an ethical dilemma with respect to existing clients. Compl. ¶¶ 6, 89, 100, 113. Here, as in *Bowen*, "the doubtful and limited relief available in the Claims Court is not an adequate substitute for review in the District Court." *Bowen*, 487 U.S. at 901.

*Third*, Plaintiffs, as subcontractors, cannot bring these claims on their own—a fact Defendants do not contest. *See supra* Section I(A). Defendants instead contend that Plaintiffs can use sponsored or pass-through claims as a vehicle for suit in the Claims Court, halfheartedly asserting those procedural mechanisms are "*potentially* 'adequate.'" Opp'n 17 (emphasis added).

But sponsored and pass-through claims would require Acacia to (1) sponsor Plaintiffs to bring claims against the government based on its NQRP contract or (2) assert claims against the government itself, respectively. *See Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1369 n.1 (Fed. Cir. 2009) (sponsored claims "proceed against the government 'through, and with the consent and cooperation of, the prime, and in the prime's name'") (citation omitted); *Irwin County v. United States*, 170 Fed. Cl. 355, 365 (2024) ("[Pass-through] claims are brought by the prime contractor in the prime contractor's name and may only be brought if the prime contractor is liable to the subcontractor for the damages that result from the government's breach."). Defendants offer no support that an alternative remedy is adequate when it depends on the voluntary action of a third party like Acacia. Because Plaintiffs could not bring claims to vindicate these statutory rights in the Court of Federal Claims, they have no adequate alternative remedy in that court.

### C.    Defendants do not dispute that the termination was arbitrary and capricious.

Plaintiffs have plausibly alleged violations of the APA and have indisputably shown a likelihood of success on the merits. Plaintiffs' Motion and Complaint illustrate why Defendants' termination of the Nationwide NQRP was arbitrary and capricious. Pls.' Mem. 12–20; Compl. ¶¶ 7, 10, 69, 72, 74–76, 78, 107–115. Among other issues, Defendants failed to provide a reasoned explanation for the termination, failed to consider important aspects of the problem, and failed to consider reliance interests. On the merits, Defendants respond to none of those arguments and thus concede them. And, despite filing a dispositive motion, Defendants have not produced an administrative record as required by Local Rule 7(n), further underscoring the absence of any reasoned basis for Defendants' termination decision. The Court should deny Defendants' Motion to Dismiss as to Count 1 and find that Plaintiffs have shown a likelihood of success on the merits.

### D.    Defendants' Rehabilitation Act arguments are incorrect.

Plaintiffs have plausibly alleged that Defendants' termination decision is contrary to the Rehabilitation Act and are likely to succeed on the merits of that claim. Compl. ¶¶ 85, 86, 100–02, 117–23. Many of Defendants' arguments regarding this claim were rejected in *Franco*, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), which Defendants do not claim was wrongly decided.

*First*, Defendants contend that appointed counsel is not necessary because immigration judges can impose other safeguards in individual cases pursuant to *Matter of M-A-M-*, 25 I. & N. Dec. 474, 481–82 (BIA 2011). Opp'n 22. This argument misses the mark. "*M–A–M–* does not suggest any authority to appoint counsel for individuals not competent to represent themselves"— a fact that the government acknowledged in *Franco*. 2013 WL 3674492, at *8 (internal quotation marks omitted). As the *Franco* court found, the *M-A-M-* safeguards alone "are left to the Immigration Judge's discretion, and none guarantee that the [individual deemed mentally incompetent] may participate in his proceedings as fully as an individual who is not disabled." *Id.*

Further, Defendants' argument that immigration judges have additional safeguards at their disposal under *M-A-M-*, such as permitting a friend or family member to participate in the proceedings, Opp'n 23, ignores that these lesser safeguards are inadequate in cases involving individuals suffering from severe mental health conditions. *See Franco*, 2013 WL 3674492, at *8– 9. And, without the Nationwide NQRP, Defendants have eliminated the mechanism for immigration judges to apply the safeguard of appointing counsel when necessary. EOIR itself agreed in the 2013 Directive that "the provision of a qualified representative is a safeguard or protection deemed necessary by the court to guarantee the fairness of the proceeding." Pls.' Mem. Ex. 6, at 15. If proceedings were fair without appointed counsel, then immigration judges would

not have ordered that counsel be appointed. But they have done so in thousands of cases since the NQRP's inception. *See* Compl. ¶ 84.

Defendants' baseless suggestion that other safeguards are sufficient is also refuted by Plaintiffs' declarations and other evidence provided in support of their Motion for Preliminary Injunction or Stay, which are replete with examples demonstrating the need for counsel. *See also* Compl. ¶¶ 38–42, 45, 57–60, 84–86, 100–02. For example, Plaintiffs have provided an expert declaration from Professor Robert Dinerstein, explaining that "it would be extremely difficult, if not impossible, for a person with mental disabilities to navigate and engage meaningfully in any legal proceeding—especially including immigration proceedings—without the assistance of counsel." Dinerstein Decl. ¶ 13, ECF No. 8-12. Plaintiffs have also explained how their NQRP clients are often severely cognitively disabled or mentally ill; no other "safeguard" besides appointed counsel could ensure that these individuals receive the fair hearing to which they are entitled. *See, e.g.*, Amica Center Decl. ¶ 19 (one NQRP client experienced a manic episode at his Individual Hearing, during which he "secluded himself in a corner, attempted to remove some of his clothes and urinated on himself" and ultimately had to be removed from the hearing); RMIAN Decl. ¶ 27, ECF No. 8-8 (describing an NQRP client with a moderate cognitive impairment and severe PTSD who attempted suicide three times and was hospitalized while detained in ICE custody); GHIRP Decl. ¶¶ 15, 21–25; ILCM Decl. ¶¶ 20–22, ECF No. 8-10; PIRC Decl. ¶¶ 16, 18–19, ECF No. 8-11; ISLA Decl. ¶ 20, ECF No. 8-7; Amica Suppl. Decl. ¶¶ 8–12; American Gateways Decl. ¶¶ 16, 19–21, ECF No. 8-5; Estrella del Paso Decl. ¶ 19, ECF No. 8-9. *Amici* former immigration judges confirm that, prior to the NQRP, they "were often left without any meaningful way to proceed in cases involving incompetent respondents" and were consequently

"forced to delay, administratively close, or even terminate proceedings in the absence of safeguards." Amicus Brief of Former Immigration Judges at 2, ECF No. 19-1.

The D.C. Circuit decision in *Paulson* is instructive. *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1269 (D.C. Cir. 2008). There, visually impaired plaintiffs alleged that the physical design of U.S. paper currency violated section 504 of the Rehabilitation Act because they could not recognize the denominations on the currency due to their disabilities. *Id.* The government argued that the visually impaired "are not denied meaningful access under section 504" because they "have developed coping mechanisms for using paper currency, whether by relying on third parties, purchasing expensive computer equipment, or folding corners of paper currency in a particular manner to distinguish denominations." *Id.* The D.C. Circuit disagreed, explaining that the government's "argument is analogous to contending that merely because the mobility impaired may be able . . . to rely on the assistance of strangers . . . they are not denied meaningful access to public buildings." *Id.*

Here, the government asks individuals with mental disabilities who cannot represent themselves to rely on either the discretion of immigration judges—who are not their advocates— or "a guardian, family member, or close friend"—who are not lawyers, and to whom noncitizens often lack access to while detained—to help them navigate the highly complex legal framework of immigration proceedings. That "dependence is anathema to the stated purpose of the Rehabilitation Act." *Id.*; *see also Franco*, 2013 WL 3674492, at *9 (noting that the government offered "no safeguard that [a family member or close friend would be] qualified to provide this type of assistance for a mentally incompetent person").

*Second*, Defendants invoke the wrong legal standard in insisting that Plaintiffs must show that the government took action "'because of' anyone's disability." Opp'n 23–24. "Intent" is not

what the Rehabilitation Act requires here. Plaintiffs seek only prospective relief, Compl. 37–38, which requires a showing that disabled individuals cannot meaningfully access a benefit or program "solely because of" their disabilities. It does "not require proof of discriminatory intent." *Paulson*, 525 F.3d at 1260; *see also* Brief for the United States as Amicus Curiae Supporting Petitioner at 13–16, *A.J.T. v. Osseo Area Schools*, No. 24-249, 2025 WL 755897 (acknowledging distinction between prospective relief and damages). Defendants' intent is thus not relevant here; by terminating the Nationwide NQRP, Defendants are denying certain individuals with mental or cognitive disabilities the only reasonable accommodation (appointed counsel) that would allow them to meaningfully access to immigration proceedings. *See Am. Council of the Blind v. Mnuchin*, 878 F.3d 360, 363 (D.C. Cir. 2017) (noting that "[u]nder section 504, disabled individuals must have 'meaningful access' to" the benefits of federal programs).

Judge McFadden's decision in *Mathis* illustrates the proper inquiry. *See Mathis v. United States Parole Comm'n*, 749 F. Supp. 3d 8, 16 (D.D.C. 2024). In *Mathis*, plaintiffs were parolees who alleged that the government failed to accommodate their disabilities while on parole, making it more likely they would violate the terms of supervision. *Id.* The plaintiffs satisfied both their pleading and preliminary injunction burdens because they had "shown that they face 'obstacle[s],' solely because of their disabilities, 'that impede[ ] their access to a government benefit or program.'" *Id.* The plaintiffs' "claim under the Act ripened the moment their disabilities made it harder for them—compared to their non-disabled counterparts—to participate in the Government's supervision programs without reasonable accommodations." *Id.* at 17. There was no need to show the government's intent; "the Government injured [the plaintiffs] by requiring them to navigate supervision without offering reasonable accommodations. *That* injury—obstacles to equal access—exists 'solely by reason' of their disabilities." *Id.* at 16; *Nat'l Ass'n of the Deaf v. Trump*,

486 F. Supp. 3d 45, 57 (D.D.C. 2020) (noting that for a Rehabilitation Act claim, "the relevant inquiry is 'whether those with disabilities are as a practical matter able to access benefits to which they are legally entitled'").

The same reasoning applies here. Plaintiffs' current and future clients face "obstacles to equal access" to a fair hearing "'solely by reason' of their disabilities." *Mathis*, 749 F. Supp. 3d at 16; *see* Compl. ¶¶ 35, 38–42, 45, 85–86, 100–102. *Franco* made this same finding. *Franco*, 2013 WL 3674492, at *4 ("In an action solely for injunctive relief, however, it is sufficient that Plaintiffs are unable to meaningfully access the benefit offered—in this case, full participation in their removal and detention proceedings—because of their disability." (citing *Alexander v. Choate*, 469 U.S. 287, 299 (1985)).

*Third*, though Defendants argue that continuing the Nationwide NQRP is an undue burden, they do not satisfy their burden of proof. Opp'n 24–25; *see Paulson,* 525 F.3d at 1269, 1271 (defendants bear burden to show "affirmative defense" that accommodation is unduly burdensome).[5] Defendants have made qualified legal representation available for over a decade, through presidential administrations of both parties, without any claim of undue burden. While the *Franco* court did not mandate that the government provide paid counsel, 2013 WL 3674492, at *6, Defendants have done so for over a decade precisely because they realize that there is no other practical way to meet their legal obligations under the INA and the Rehabilitation Act. Defendants do not argue that they could fulfill their duty to provide counsel without funding. Indeed, the government in *Franco* admitted that it had found "relatively scarce capacity among pro bono

---

[5] The undue burden argument is an affirmative defense that is not an appropriate basis to dismiss a claim. *Council of the Blind v. Snow*, 311 F. Supp. 2d 86, 89 (D.D.C. 2004) ("Defendants do not assert, nor could they appropriately assert on a motion to dismiss, that redesign of the currency would impose undue financial or administrative burdens. The place for that argument would be a motion for summary judgment.").

providers to fill very limited roles." 2013 WL 3674492, at *6 (quoting EOIR declaration). That is especially true for representations involving clients with mental or cognitive disabilities, which present unique practical and ethical challenges. *See* Dinerstein Decl. ¶ 26; Amica Center Decl. ¶ 12; GHIRP Decl. ¶ 17. Plaintiffs' experiences trying (and mostly failing) to recruit *pro bono* representation for NQRP cases confirms as much. *See, e.g.*, Amica Center Decl. ¶ 32; NIJC Decl. ¶ 17, ECF No. 8-3; *see also* RMIAN Suppl. Decl. ¶¶ 6–9.

Further, as *Franco* recognized, "the accommodation is just as reasonable as and no more burdensome than EOIR's requirement that interpreters be provided to those who cannot understand English" at government expense. *Franco*, 2013 WL 3674492, at *8 & n.10. The Nationwide NQRP is but a "small fraction" of Defendants' "annual expenditures" of more than $800 million. *Paulson*, 525 F.3d at 1272. And, if anything, the provision of counsel through the NQRP increases efficiency and facilitates the resolution of difficult cases. *See* Pls.' Mem. 14; Amica Center Decl. ¶ 6; Estrella del Paso Decl. ¶ 23; PIRC Decl. ¶ 21; RMIAN Decl. ¶ 31; Amicus of Former Immigration Judges at 13 ("Terminating NQRP does not make mentally incompetent respondents disappear from the immigration courts, nor does it make these individuals easier to remove from the United States. The result, instead, is chaos and delay as immigration judges struggle to provide the fair hearing that is required by law."). But, regardless, Plaintiffs do not contend that Defendants must continue to operate the Nationwide NQRP in the same manner using the same contractors or funding arrangements, just that Defendants must continue to operate the NQRP (or some program that provides counsel to individuals who cannot represent themselves due to competency concerns) nationally in compliance with their statutory and policy obligations. That is the only "mandate" that Plaintiffs request. *See* Compl. 37–38.

Defendants also mischaracterize the provision of appointed counsel as a "new benefit," even though the NQRP has provided appointed counsel for over a decade. In so arguing, Defendants attempt to recast the issue as Plaintiffs' dissatisfaction with a reasonable accommodation that Defendants are offering them. *See* Opp'n 25. That is not so. Defendants are, without explanation, taking away a previously provided, essential accommodation, offering no alternative whatsoever, and leaving those affected noncitizens to fend for themselves. *Alexander* is easily distinguishable. The Court in that case found that the affected disabled individuals still "ha[d] meaningful and equal access to" the government benefit at issue, 469 U.S. at 302, 306, whereas Plaintiffs' clients and other noncitizens deemed mentally incompetent cannot meaningfully access their immigration proceedings without counsel.[6]

Accordingly, Plaintiffs have shown a substantial likelihood of success on their Rehabilitation Act claim, and the Court should deny the Motion to Dismiss on Count 2.

### E. Defendants' *Accardi* argument misrepresents Defendants' policies and the case law.

Defendants' *Accardi* arguments are equally unpersuasive.[7] Their contention that they are not violating the Nationwide Policy or 2013 Directive strains credulity. Opp'n 21. Defendants do not dispute that the Nationwide Policy and 2013 Directive—which are still in effect—provide that EOIR will "make available a qualified legal representative" to detained noncitizens who are found to be mentally incompetent. Pls.' Mem. Ex. 2, at 2; Pls.' Mem. Ex. 6, at 1. Defendants also do not dispute that they are no longer "mak[ing] available" *any* qualified representatives, funded or

---

[6] Defendants' argument that appointed counsel for individuals who cannot represent themselves by virtue of mental disabilities is like "free street parking" highlights how divorced their arguments are from the reality of their termination decision. Opp'n 25.

[7] Defendants do not appear to move to dismiss the portion of Plaintiffs' *Accardi* claim that Defendants violated their respective regulations implementing the Rehabilitation Act, 6 C.F.R. § 15.30(a) and 28 C.F.R. § 39.130(a). *See* Compl. ¶¶ 11, 129–131.

unfunded, to individuals deemed mentally incompetent. *See* Owen Decl. ¶ 13 ("[A]s of April 25, 2025, the NQRP is no longer in effect outside of *Franco* states."). In refusing to provide representation, Defendants are failing to comply with the plain language of the Nationwide Policy and 2013 Directive.

Defendants suggest that *Accardi* applies only in narrow circumstances concerning an individual adjudication. But "*Accardi* has come to stand for the proposition that agencies may not violate their own rules and regulations to the prejudice of others." *Battle v. FAA*, 393 F.3d 1330, 1336 (D.C. Cir. 2005). While unusual for an agency to terminate a program without rescinding the policy underlying that program, that situation still violates the APA under *Accardi*. *See Cmty. Legal Servs. v. U.S. Dep't of Health & Human Servs.,* No. 25-cv-02847-AMO, --- F. Supp. 3d. ----, 2025 WL 1233674, at *11 (N.D. Cal. Apr. 29, 2025), *appeal filed* No. 25-2808 (9th Cir. May 1, 2025) ("The Government's Cancellation Order thus violates the Foundational Rule, and Plaintiffs have shown a likelihood of success on their APA claim under the *Accardi* doctrine.").

Defendants then try to argue that their prior policies are not in fact binding, Opp'n 20–21, but there is no support for that position. The Nationwide Policy and 2013 Directive set out procedures to identify, assess, and address issues of incompetency in immigration proceedings. *See* Pls.' Mem. Exs. 2, 4, 6. The Nationwide Policy, by its text, articulates a new policy instructing immigration judges "to provide enhanced procedural protections to unrepresented detained [noncitizens] with serious mental disorders or conditions" that requires, among other things, EOIR to provide counsel to eligible noncitizens. Pls.' Mem. Ex. 2; *see also* Notice of Defendants' New Nationwide Policy for Unrepresented Immigration Detainees with Serious Mental Disorders or Conditions, *Franco-Gonzalez v. Holder*, No. 2:10-cv-02211-DMG (C.D. Cal. Apr. 22, 2013), ECF No. 583 (government representing to the *Franco* court that it had created new procedural

protections "applicable to unrepresented immigration detainees with serious mental disorders or conditions in immigration protections," including "[p]rocedures that will make available qualified representatives to" those "deemed mentally incompetent"). Similarly, the 2013 Directive is over 20 pages and details specific procedures and safeguards, including how immigration judges should conduct competency hearings and that "the provision of a qualified representative is a safeguard or protection deemed necessary by the court to guarantee the fairness of the proceedings." Pls.' Mem. Ex. 6, at 15. As the 2013 Directive states, "EOIR *will* provide a qualified legal representative to any detained, unrepresented alien in a removal or custody redetermination proceeding found to be incompetent to represent him- or herself." *Id.* at 3 (emphasis added); *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) (noting the "use of 'will' indicates statement is in fact a binding norm").

Any argument that these policies do not dictate binding procedures is further belied by the fact that they have governed immigration proceedings for over a decade and have resulted in the appointment of qualified representatives to over 2,000 detained noncitizens who were deemed mentally incompetent to represent themselves. Compl. ¶ 84; *McLouth Steel Prod. Corp. v. Thomas*, 838 F.2d 1317, 1321 (D.C. Cir. 1988) ("More critically than [the agency's] language adopting the model, its later conduct applying it confirms its binding character."). During that time, Defendants have cited these policies in their regulations. *See supra* Section II(A); Compl. ¶¶ 58–59.

Defendants' description of the 2013 Directive as merely a "test" of new procedures is inaccurate. Opp'n 20–21. The 2013 Directive explains that "[t]his document constitutes EOIR's *final guidance* for Phase I of its nationwide plan" that "set forth principles by which Immigration Judges should assess competency," the "test[ing]" having occurred *prior to* publication of the

directive.[8] Pls.' Mem. Ex. 6, at 1 n.1, n.2 (emphases added). Nothing in the Directive or surrounding context supports Defendants' contention that it was non-binding.

Accordingly, Plaintiffs have shown a likelihood of success on the merits and the Court should deny the Motion to Dismiss as to Count 3.

### III.    Plaintiffs Have Shown a Likelihood of Irreparable Harm.

It has been four weeks since Defendants abruptly terminated the Nationwide NQRP on April 25, 2025. In that short time, the termination has irreparably harmed Plaintiffs and their current/future clients, impairing Plaintiffs' core business operations and organizational purposes, subjecting them to ongoing ethical and practical burdens in their relationships with existing clients, and causing unrecoverable financial harms. These injuries are ongoing and worsen with every passing day. Defendants' irreparable harm arguments ignore the significance of these injuries.

***Harm to core work.*** Defendants do not acknowledge binding D.C. Circuit precedent holding that "obstacles" that "unquestionably make it more difficult for [organizations] to accomplish their primary mission . . . provide injury for . . . irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); *see also AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-00400 (AHA), No. 25-00402 (AHA), 2025 WL 752378, at *19–20 (D.D.C. Mar. 10, 2025) (same).

Defendants do not dispute that Plaintiffs have satisfied this standard. Plaintiffs have shown that the termination has "unquestionably made it more" difficult to serve existing Nationwide NQRP clients and take on new ones. *See* Pls.' Mem. 31–36; NIJC Decl. ¶ 18 ("[W]ithout dedicated funding . . . the organization's capacity to accept [NQRP] cases will be limited. . . . [G]iven the

---

[8] The Directive states that EOIR intended to publish a rule on the subject "*as part of* its ongoing commitment to provide such protections." *Id.* at 1 n.2 (emphasis added).

complexity of the cases we will be able to handle far fewer cases involving mentally incompetent clients."); PIRC Decl. ¶ 12; ILCM Decl. ¶ 28; RMIAN Suppl. Decl. ¶ 14 ("RMIAN's attorneys who directly represent NQRP clients are already being forced to make untenable choices regarding resource allocation when forming litigation strategies for clients, such as assessing how many experts are necessary and weighing the importance of outside phone calls for clients' mental health status and ability to assist counsel in the preparation of their cases."); Amica Center Suppl. Decl. ¶ 7. Due to resource constraints, Plaintiff PIRC has already had to furlough two staff members. PIRC Decl. ¶ 13; *see also* Amica Center Decl. ¶ 29. Since the filing of Plaintiffs' Motion, Plaintiff American Gateways has had to decline to continue representing two NQRP clients in their appeals due to the termination of the Nationwide NQRP. American Gateways Suppl. Decl. ¶¶ 5, 6; *see also* NIJC Suppl. Decl. ¶¶ 6–7 (explaining that NIJC cannot provide representation on the merits of former client's application for relief if bond is not ultimately granted in their case and describing a referral for an appeal to the Board of Immigration Appeals from another qualified representative who cannot continue representation). And Plaintiff ILCM is facing serious obstacles related to its representation of two NQRP clients that speak rare languages, as it is a "substantial burden" for the organization to try to shoulder the costs of the necessary interpreters. ILCM Suppl. Decl. ¶ 2 (explaining that for one NQRP client "there are only approximately 8,000 speakers of his language in the world"). These are just some examples of the irreparable harm that Plaintiffs are facing. *See also* RMIAN Suppl. Decl. ¶¶ 3, 12 (trying to replace appointed counsel with *pro se* assistance is "extremely time-consuming, labor intensive, and ineffective").[9]

---

[9] On the day of this filing, Acacia offered to reimburse certain retrospective costs in NQRP cases, excluding staffing and administrative costs, incurred through May 28. This temporary measure does not alter the irreparable harm that would be suffered throughout the litigation as a result of the termination of Nationwide NQRP.

Without the NQRP appointment process, Plaintiffs are also significantly hampered in their ability to represent those mentally incompetent noncitizens they are mission-bound to serve. *See* GHIRP Suppl. Decl. ¶¶ 7, 9. It will be financially and logistically onerous (and in some cases impossible) to identify and take on new NQRP representations without the Nationwide NQRP. *See, e.g.*, ISLA Decl. ¶ 12 ("Without this program, it would be much more difficult for ISLA to identify and represent many individuals who would otherwise be appointed qualified representatives. Louisiana has multiple detention centers spread across remote areas, making it logistically and economically complicated for our team to be regularly present at all locations."); PIRC Decl. ¶ 12; American Gateways Suppl. Decl. ¶ 7; NIJC Suppl. Decl. ¶ 8. Plaintiff RMIAN, the sole NQRP provider in the Rocky Mountain region, is aware of at least one individual who was ordered a qualified representative after the termination but has not received one. RMIAN Suppl. Decl. ¶ 10; *cf.* Amica Center Suppl. Decl. ¶¶ 4–6; NIJC Suppl. Dec. ¶¶ 5–7. These harms plainly suffice to show, at the least, "a likelihood of irreparable injury," which is all that is required. *League of Women Voters*, 838 F.3d at 8–9.

Defendants overstate Plaintiffs' ability to identify and serve individuals with competency concerns in the absence of the Nationwide NQRP, ignoring that Plaintiffs' alternative methods for identification are now limited due to the government's termination of other immigration programs. *See* GHIRP Decl. ¶ 19 ("[T]he LOP was previously a second source of identification . . . yet this program has also been terminated."); American Gateways Decl. ¶ 13 (same). They also do not contest that, even if Plaintiffs can identify some such individuals on an ad hoc basis, there is now no longer any systemic mechanism for doing so, making it likely that many mentally incompetent individuals will slip through the cracks. *See* Amica Center Decl. ¶ 26 (noting that "[w]ithout the in-court identification and appointment process, Amica Center will have no consistent way of

identifying" mentally incompetent individuals); GHIRP Decl. ¶ 19. And contrary to Defendants'

suggestion, Opp'n 28, Plaintiffs do argue that they will have difficulty establishing attorney-client

relationships absent a formal NQRP appointment. *See* Pls.' Mem. 21; Amica Center Decl. ¶ 26

(explaining that, without NQRP, trying to "identify and engage [incompetent noncitizens] for

representation" is "an exceedingly challenging task"); NIJC Decl. ¶ 17 ("[C]ommunicating with

and forming an attorney-client relationship can be difficult for these clients."); Amica Center

Suppl. Decl. ¶ 13 (voicing concern about individuals "whose disabilities and incompetence will

prevent them from consenting to representation"); GHIRP Decl. ¶ 19.

Defendants' reliance on *Food & Drug Administration v. Alliance for Hippocratic

Medicine*, 602 U.S. 367, 394 (2024), is misplaced. The upshot of that case is that an organization

cannot "manufacture" or "spend its way into standing." *Id.* (citing *Havens Realty Corp. v.

Coleman*, 455 U.S. 363, 379 (1982)). The Supreme Court held that the plaintiffs failed to establish

an injury in fact because they had merely "expend[ed] money to gather information and advocate

against the defendant's action," distinguishing the case from *Havens Realty*, where the defendant

had "directly affected and interfered with" plaintiffs' "core business activities." *Id.* at 394–95. This

case is like *Havens Realty* and unlike *Alliance for Hippocratic Medicine*; Defendants' termination

of the Nationwide NQRP has "directly affected and interfered with" Plaintiffs "core business

activities" of representing vulnerable noncitizens in immigration proceedings. *Id.*

Defendants likewise misread *Northwest Immigrant Rights Project v. U.S. Citizenship &

Immigration Services*, 496 F. Supp. 3d 31 (D.D.C. 2020) and *Catholic Legal Immigr. Network,

Inc. v. Exec. Off. for Immigr. Rev.*, 513 F. Supp. 3d 154 (D.D.C. 2021) (*CLINIC*). Defendants

characterize the courts' irreparable harm analyses as turning on unrecoverable financial loss alone.

Opp'n 29. Not so. In both cases, as here, plaintiffs suffered irreparable injury because the

challenged agency action would "interfere with their ability to provide essential services to their clients and/or members—in some cases irretrievably so." *Northwest Immigrant Rights*, 496 F. Supp. 3d at 79. And the "cumulative impact of" the government's actions would be the "decreased representation of" individuals "in immigration proceedings" due in part to increased workloads and the diversion of resources from other client matters. *CLINIC*, 513 F. Supp. 3d at 175–76.

Nor is this case unlike *AIDS Vaccine*, where this Court found the defendants' action irreparably harmed the plaintiffs not simply because of the financial impact but also because it was forcing them to "reduce core operations" (among other things) and threatened the "core missions of businesses and organizations around the country." *AIDS Vaccine*, 2025 WL 752378, at *18, 19– 20 (D.D.C. Mar. 10, 2025). Similarly, Plaintiffs here have "shown that the obstacles created by Defendants' conduct make it more difficult for the plaintiffs to accomplish their primary mission." *Id.* at *19 (citation omitted) (cleaned up).

**Ethical bind.** Defendants also dismiss the serious harm stemming from the ethical bind they have imposed on Plaintiffs. Opp'n 28–29. Defendants presume that harm only stems from withdrawal, ignoring that equal harm results from forced, unfunded labor. Pls.' Mem. 32–33; *see Alexian Bros. Med. Ctr. v. Sebelius*, 63 F. Supp. 3d 105, 109 (D.D.C. 2014) ("[A]n order requiring an attorney to continue representing a client in a civil action without compensation may subject the attorney to irreparable harm and amounts to an order of specific performance."). Moreover, though some Plaintiffs have so far continued their representations (as they must, in many cases), basic economics instruct that they will not be able to do so indefinitely. Defendants' termination will likely force some withdrawals; indeed, it has effectively done so already for some Plaintiffs. *See* American Gateways Suppl. Decl. ¶¶ 5, 6; *cf.* NIJC Suppl. Decl. ¶¶ 5–6.

Adding insult to injury, Defendants suggest that Plaintiffs have a "choice" in how to proceed, either by requesting to withdraw or continuing with unfunded representations. Opp'n 28–29. But Defendants are choosing to ignore the professional obligations that Plaintiffs have to their clients, detailed above and at length in Plaintiffs' opening brief. Pls.' Mem. 8, 11, 34. Plaintiffs are obliged to continue representations in the near term as withdrawal requires judicial approval and is often disallowed where it may prejudice the client. Amica Center Decl. ¶ 30 (organization does not plan to withdraw from NQRP cases with upcoming hearings because it would "be unethical under rules 1.14 and 1.16 of the Model Rules of Professional Conduct to seek to abandon court-appointed representation of clients who have been found to be literally incompetent to perform the functions of self-representation"); NIJC Decl. ¶ 10 (similar); ILCM Suppl. Decl. ¶ 2 (noting that in other circumstances the organization "may be compelled to withdraw from these costly [NQRP] cases" but because of the clients' mental health challenges it "cannot ethically withdraw" (citing Minnesota Rules of Professional Conduct 1.16(b)(1)).

However, a lack of funding over time will likely make it impossible for some Plaintiffs to continue representations. *See* ILCM Suppl. Decl. ¶¶ 2, 6 (explaining that post-termination, cases that relied on NQRP funding are becoming "significant financial burdens"); Amica Center Decl. ¶ 29 (explaining that if the Nationwide NQRP and associated funding is not restored, the organization may consider laying off nearly 10 staff members); GHIRP Suppl. Decl. ¶ 9 ("funding and capacity constraints will continue to limit our ability to provide full-service representation to clients in the absence of the NQRP program"); ISLA Suppl. Decl. ¶ 7. By terminating the Nationwide NQRP, Defendants are forcing Plaintiffs into a "catch-22" scenario where they will be irreparably harmed by either supposed choice. RMIAN Decl. ¶ 19. Plaintiffs' efforts to mitigate

the devastating consequences of Defendants' action using temporary stop-gap measures does not

erase or diminish the harm that they are experiencing.

**Financial harm.** Defendants suggest that any financial harm can be recovered by

retrospective money damages. Opp'n 26–27. But these financial losses "are unrecoverable because

the present suit arises under the APA, which does not allow for recovery of monetary damages."

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F. Supp. 3d 1, 59 (D.D.C.

2020); *see* 5 U.S.C. § 702 (allowing for relief "other than money damages"). And as explained

above, Plaintiffs cannot bring their APA claims in the Court of Federal Claims. *See supra* Sections

I(A), II(B). Hence, there are no "recoverable" financial losses here.

In addition, the termination and withholding of funds is impairing Plaintiffs' ability to serve

its clients in immigration proceedings that will occur imminently. *See* Estrella del Paso Decl. ¶ 26

(loss of NQRP funding "will put a strain on the organization's finances and jeopardize [its] ability

to zealously represent clients"). Plaintiffs are nonprofit organizations and cannot "front" the

necessary funding for these highly time- and resource-intensive NQRP cases for months on end.

*CLINIC*, 513 F. Supp. 3d at 175; *see, e.g.*, Amica Center Decl. ¶ 12 ("NQRP cases are incredibly

resource-intensive, due to the many challenges that our clients' disabilities present."); GHIRP

Decl. ¶¶ 28–30 ("GHIRP will lose a significant amount of funding due to" the termination); ISLA

Decl. ¶ 26 ("Other funding streams do not allow for the scope and volume of services ISLA

currently provides to individuals with QRs."); ILCM Suppl. Decl. ¶¶ 2, 5.

Absent an injunction or stay, Plaintiffs will struggle to procure necessary medical and

country condition experts to investigate facts relevant to their clients' cases, and, in some cases, to

communicate effectively with their clients via interpreters. *See* Compl. ¶ 91; Estrella del Paso Decl.

¶ 15 (explaining that the "funding cut will prevent" the organization from hiring "additional

resources that are critical in NQRP cases" like "private investigators, expert witnesses, and qualified doctors"); *id.* ¶ 25 ("Our organization is not able to pay for" mental health evaluations, interpreters, investigators, and country condition experts, which are "currently funded by NQRP"); Amica Center Decl. ¶ 14; *id.* ¶ 15 ("Amica Center relies on the availability of interpretation and translation services paid for by NQRP" for clients who speak neither English nor Spanish); ILCM Decl. ¶ 15 (organization had forensic evaluations scheduled that it now does not have funding appropriated to cover); *id.* ¶ 17. Many of Plaintiffs' clients' cases are currently being adjudicated in immigration courts, and once they are done "there can be no do over and no redress." *League of Women Voters*, 838 F.3d at 9. Defendants fail to appreciate the immediacy of this harm and the inadequacy of retrospective damages in that respect.

The financial harm here is not merely a "loss of profit" but will require Plaintiffs to reduce their core services to among the most vulnerable noncitizens, as noted above. *Whitman-Walker*, 485 F. Supp. 3d at 59 (finding irreparable harm and noting the "Court also does not turn a blind eye to the reality that here, 'economic loss' is not simply loss of profit; rather, it means reducing health-care services to patients, many of whom are indigent" (cleaned up)); *see* NIJC Decl. ¶ 18; ILCM Decl. ¶ 28; Amica Center Decl. ¶ 38; PIRC Decl. ¶ 12; ISLA Suppl. Decl. ¶ 7. In all of these ways, the financial harms wrought by Defendants' termination of the Nationwide NQRP are certain, imminent, and unrecoverable.

**Harm to Plaintiffs' clients and future clients.** Plaintiffs' Motion also identified harms to their current and future clients. Pls.' Mem. 31, 35. Defendants argue only that Plaintiffs cannot raise these harms. Opp'n 28. But Plaintiffs can assert claims related to current and future NQRP clients—a "limited universe of third parties." *Whitman-Walker*, 485 F. Supp. 3d at 35–36 (distinguishing *Kowalski v. Temer*, 543 U.S. 125 (2004), on the basis that there the "class of

potential third parties could have been literally any person" and holding that "Defendants are wrong to suggest that the health-provider Plaintiffs cannot assert the rights of LGBTQ patients they might treat in the future"); *see* Owen Decl. ¶ 8 (noting that at the time of termination there were 289 noncitizens in the Nationwide NQRP).

But while the group of affected third parties is relatively limited, the harm imposed by Defendants' action on this group—including prolonged detention and potential deportation to face persecution or torture—are immense and irreparable. Accordingly, the "'denial of equal treatment' *itself* counts as an injury" because a court "cannot undo the discrimination" caused by the lack of meaningful access. *Mathis*, 749 F. Supp. 3d at 25.

## IV.   The Remaining Injunction Factors Favor Plaintiffs and Nationwide Relief

Defendants, relying once more on *California*, assert that the balance of equities and public interest tip in their favor because of the harm they would purportedly experience if the court were to "reinstate the contract." Opp'n 30. Again, Defendants base their arguments on the mistaken premise that this is simply a contract case. But it is not. Plaintiffs ask for the continuation of a national program that is the only mechanism for appointing counsel to noncitizens deemed mentally incompetent to represent themselves in immigration court, as required by law and by the agency's own policies. Compl. 37–38. Defendants also do not attempt to rebut that "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12.

Defendants' discussion of "other considerations" has little basis in reality. *See* Opp'n 30. Plaintiffs have explained at length that their clients and other individuals with competency issues will likely be unable to secure other representation if Plaintiffs are forced to withdraw. *See, e.g.*, RMIAN Decl. ¶¶ 24, 29, ILCM Decl. ¶¶ 13, 24, 27; Estrella del Paso Decl. ¶¶ 15, 21.

It should go without saying that the provision of a mere list of *pro bono* service providers, Opp'n 30, will not be a sufficient safeguard for Plaintiffs' clients and other detained immigrants who suffer from severe mental disabilities.[10] But even if these individuals could consult the *pro bono* list and independently pursue counsel, they would find that the list directs them right back to Plaintiffs. For instance, though the pro bono list for the Annandale Immigration Court in Virginia (which handles all removal proceedings for immigrants detained in Virginia) lists several non-profit legal service providers, Amica Center is the only *pro bono* provider that specifically offers services to detained individuals (the ABA Helpline is also available to detained immigrants, but does not provide legal representation). And, as explained above, the alleged "individualized safeguards" Defendants contend protect incompetent noncitizens are discretionary and wholly insufficient. *Supra* Section II(D); *Franco*, 2013 WL 3674492, at *8.

Defendants' arguments for limited relief also fall flat. The "scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Courts frequently "set aside" or enjoin agency action that violates the APA. *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.").

Defendants' action has had national impact, justifying nationwide relief in the form of an injunction or a stay pursuant to 5 U.S.C. § 705. Where, as here, "the burdens that would fall on the plaintiffs upon the [the agency's action] would also fall on those similarly situated, a nationwide preliminary injunction . . . is justified." *D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 51 (D.D.C.

---

[10]  The current list of pro bono providers kept by the DOJ can be found here: https://perma.cc/QZ6H-ZB87.

2020). The Court should not limit relief to only those NQRP providers named as Plaintiffs here. *Doe 2 v. Mattis*, 344 F. Supp. 3d 16, 24 (D.D.C. 2018) ("[S]ystemwide injunctions," such as the one requested here, "can prevent a 'flood of duplicative litigation' by allowing similarly situated non-party individuals to benefit from an injunction rather than filing separate actions for similar relief." (quoting *Nat'l Mining Assoc.*, 145 F.3d at 1409)). Defendants' argument that the scope of relief is limited by separation of powers, Opp'n 31, does nothing to help them because Plaintiffs seek the continuation of a program, not a contract.

As to bond, requiring more than a nominal bond here "would stifle Plaintiffs' enforcement of their rights under the APA." *Cmty. Legal Servs.*, 2025 WL 1233674, at *13 ("Because this litigation is brought by nonprofit organizations to protect the public interest and ensure compliance with federal law, the Court declines the Government's request."). Federal Rule of Civil Procedure 65(c) should not be applied so as to deprive parties of access to judicial review. *See Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, --- F. Supp. 3d ----, 2025 WL 1303868, at *18 (D.R.I. May 6, 2025) appeal filed *State of Rhode Island v. Trump*, No. 25-1477 (1st Cir. May 20, 2025) ("[R]equiring [the state-plaintiffs] to pay a bond in an amount equal to that loss of federal funding—via withheld grant disbursements—would impose the same imminent harm that this preliminary injunction aims to avoid and thus, would deny the States' right to judicial review here.").[11] As the D.C. Circuit has explained "[c]ourts interpreting this language [in Rule 65(c)] have concluded the district court has power not only to set the amount of security but to dispense with any security requirement whatsoever," including "where the restraint will do the defendant 'no material damage.'" *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C.

---

[11] Defendants do not specify the amount of bond that would be allegedly necessary, in their estimation, to cover any purported "costs and damages" under Rule 65(c).

Cir. 1980) (citation omitted). And while a footnote in a motions panel decision stated that bond is "generally required," that dicta does not mandate bond here. Order, *Nat'l Treasury Emps. Union v. Trump,* No. 25-5157, at 5 n.4 (D.C. Cir. May 16, 2025).

Finally, the Court should not stay prospective relief pending appeal. Defendants' vague, conclusory statement that they have met the requirements for a stay is facially insufficient. Opp'n 32. Moreover, a stay pending appeal would undermine the purpose of Plaintiffs' requested prospective relief, which is to prevent the ongoing, serious, and irreparable harm resulting from Defendants' termination of the Nationwide NQRP.

## V.    The Court Can Enter a Permanent Injunction on Count 1.

If "the eventual outcome on the merits is plain at the preliminary injunction stage, the judge should, after due notice to the parties, merge the stages and enter a final judgment." *Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994). Because Defendants have filed a dispositive motion, and because "the relief sought in the complaint is the same relief sought in the preliminary injunction, and there will remain no other issues to litigate once the preliminary injunction is resolved," the Court can enter a permanent injunction on Count 1 if it finds for Plaintiffs and denies Defendants' Motion to Dismiss. *Morris v. D.C.*, 38 F. Supp. 3d 57, 63 n.1 (D.D.C. 2014); Fed. R. Civ. P. 65(a). "Summary judgment serves as 'the mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA.'" *O.A. v. Trump*, 404 F. Supp. 3d 109, 125 (D.D.C. 2019) (citation omitted). Defendants have not filed an administrative record as required by Local Rule 7(n) and have not argued that their decision is supported by any record, so the Court need not delay in entering a permanent injunction. Moreover, Defendants attached material outside the Complaint to their Motion to Dismiss—including a declaration from a Defendant opining on the merits of the case. Under Rule 12(d), "[i]f, on a motion under Rule

12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Accordingly, the Court should enter a permanent injunction on Count 1.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss and grant Plaintiffs' Motion for Preliminary Injunction or Stay, or, alternatively, enter a permanent injunction.

Date: May 23, 2025

Respectfully submitted,

s/ *Keren Zwick*
Keren Zwick (D.D.C Bar No. IL0055)
Mark Feldman (C.A. Bar No. 302629)
(admitted *pro hac vice*)
Mary Georgevich (M.N. Bar No. 0399950)
(admitted *pro hac vice*)
Charles Roth (N.Y. Bar No. 2839041)
(admitted *pro hac vice*)
NATIONAL IMMIGRANT JUSTICE CENTER
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
Phone: 312.660.1364
Email: kzwick@immigrantjustice.org
mfeldman@immigrantjustice.org
mgeorgevich@immigrantjustice.org
croth@immigrantjustice.org

*Attorneys for Plaintiffs*

*\*Pro hac vice* pending

s/ *Ivano Ventresca*
Ivano Ventresca (D.C. Bar No. 1045769)
Monica F. Sharma (D.C. Bar No. 90013922)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Phone: 202.778.1842
Email: iventresca@zuckerman.com
msharma@zuckerman.com

s/ *Adina Appelbaum*
Adina Appelbaum (D.C. Bar No. 1026331)
F. Evan Benz (N.C. Bar. No 49077)\*
AMICA CENTER FOR IMMIGRANT RIGHTS
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
Phone: 202.331.3320
Email: adina@amicacenter.org
evan@amicacenter.org