**SUPPLEMENTAL DECLARATION OF LAURA LUNN**
**DIRECTOR OF ADVOCACY & LITIGATION**
**FOR ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK**

*I, Laura Lunn, make the following statements on behalf of Rocky Mountain Immigrant Advocacy Network. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Laura Lunn. I am the Director of Advocacy & Litigation at Rocky Mountain Immigrant Advocacy Network ("RMIAN"). I write this supplemental declaration to share updates regarding the sudden termination of the NQRP Nationwide Policy and its impact on RMIAN and individuals appearing before the Aurora Immigration Court.

2. RMIAN serves individuals detained by the federal government in the Aurora Contract Detention Facility ("Aurora facility"). The Aurora facility holds up to 1,532 people and as of mid-May, it was reported that about 1400 people were detained within the facility. In 2024, the Colorado Fiscal Institute provided a report that revealed that only 14 percent of people in immigration proceedings in Colorado have access to counsel—that does not even account for the lower rates of representation that people in immigration detention face. In 2023, RMIAN provided Know Your Rights information to 3,011 people detained within the Aurora facility, referred 267 cases to pro bono attorneys, and directly represented 120 people in their immigration proceedings.

3. RMIAN is the sole NQRP provider in the Rocky Mountain region. Since the termination of the Nationwide NQRP policy on April 25, 2025, RMIAN appeared in court in two cases: in one preliminary hearing and one trial to assess eligibility for relief from removal. Three more cases are calendared for trial (called Individual Calendar Hearings, or ICH's) in the upcoming months and one more is pending that will be set for an ICH next week. Evidence related to country conditions and the severity of the individual client's mental health disabilities are essential to presenting legal claims on behalf of people appointed counsel through the NQRP Nationwide Policy. As a result, it is RMIAN's practice to hire at least two experts—one who can opine on how persons with disabilities are treated in the country of origin as well as a psychological expert who can offer an explanation of the person's symptoms and how they lead to formal diagnoses and possible risk factors if untreated. Even so, some cases are particularly complicated, especially where the person has both physical and mental disabilities as well as when a person has multiple countries of citizenship/nationality and under those circumstances, RMIAN might hire upwards of four experts, all of whom are necessary for our clients to meet their burden of proof. The average expert cost is approximately $2,000 for each report and accompanying testimony. Consequently, RMIAN is facing a total out of pocket loss of at least approximately $24,000 in expert fees alone for the organization's six pending NQRP cases.

4. The NQRP Nationwide Policy also provides discrete funding to ensure that clients can return to their support networks after being released from detention. For example, one current client who is detained at the Aurora facility plans to live with his sponsor in Austin, Texas when released from detention. Typically, RMIAN would purchase a temporary-use cellular phone to allow communication during client's travels, a one-way bus ticket from Denver to Austin, and food that the client can eat during the two-day bus

1

Case 1:25-cv-01370-AHA   Document 22-1   Filed 05/23/25   Page 2 of 5

journey. Without funding for these necessities, RMIAN will either be forced to incur the expense or decline to provide this type of assistance, which will mean that our client may never make it to the place he intends to settle.

5. The NQRP Nationwide Policy also helps to cover the cost of personal phone calls for clients who are detained. Placing calls or sending messages on the facility tablets can be very costly. For example, it costs $0.25 to send or receive a message. Although the NQRP funding is minimal, it allows clients to connect with the outside world, which is particularly important when someone is detained far away from their support networks and are unable to benefit from in-person visitations. One RMIAN social worker reported that she recently put money on two NQRP clients' phone accounts so that they could call their mothers. Both clients are struggling to manage their mental health symptoms, including stress, depression, symptoms of psychosis, and trauma. They both report that the intensity around immigrant-targeted violence—which is certainly felt in the Aurora facility—has been making their symptoms worse: decreased ability to sleep, increased symptoms of audio and visual hallucinations, paranoia, increased feelings of isolation and depression, increased fear, hyperarousal, and anxiety. Calling their mothers is one of the only things that feels supportive. However, without access to this funding, RMIAN faces the impossible decision of whether the organization can afford to pay these fees or whether we must inform clients that they will be cut off from outside contact because the cost is prohibitive.

6. One NQRP case was transferred to RMIAN from another provider. Originally, RMIAN did not intend to take the case due to lack of adequate staffing and planned on subcontracting the case with a private attorney. The attorney, who used to work at RMIAN but now runs a small immigration law practice, cannot afford to take on an NQRP client on a pro bono basis. She is very familiar with the complex nature of NQRP cases and is an expert in representing this client population. However, she cannot afford to maintain her practice by providing countless hours of free legal representation. As a result, she rejected the case. The case is incredibly complicated and challenging for seasoned NQRP attorneys and cannot be placed with counsel that is not trained in offering representation for this client population. Given the client's acute need for legal representation, RMIAN is taking on the case despite the lack of funding and internal capacity.

7. In the past nine years I have been working with NQRP clients, I can recall only one instance where RMIAN successfully placed a case with pro bono counsel after the client was released from immigration detention. In that case, the attorney who stepped in had practiced immigration law for at least three decades. Nevertheless, the attorney continued to reach out regularly for technical assistance because the case presented issues he had not encountered in his practice before. Most immigration practitioners do not have any experience representing people with severe mental disabilities that prohibit them from meaningfully engaging in their immigration proceedings. Rather, this is an area of practice that requires specialized skills and is time and resource intensive.

8. RMIAN often places cases with the University of Denver Sturm College of Law's Immigration and Policy Clinic when someone demonstrated indicia of incompetence but was not appointed counsel through the NQRP Nationwide Policy. However, the clinic

2

cannot meet the current need and would be unable to absorb all of the cases for people where a QR (Qualified Representative) would ordinarily be appointed. Moreover, NQRP cases are more complicated than cases where a QR was not appointed and would likely be too challenging for law students to handle, despite having an experienced immigration professor supervising their work.

9. RMIAN cannot place cases that would otherwise require a QR with non-immigration attorneys due to the complexity of the cases. Although RMIAN has a well-established pro bono referral program, RMIAN staff time is expended on providing robust technical assistance to volunteer attorneys. The level of mentorship that attorneys would need to provide on an NQRP case would be akin to the amount of time a staff attorney would likely take to prepare a legal defense without the assistance of volunteer counsel. Moreover, in the past, placing overly complicated cases with pro bono counsel has disincentivized attorneys from taking any RMIAN cases in the future. Attorneys have provided the feedback that when a case it "too hard" it is not realistic to ask people to donate their time on a case that is more complicated than they can handle on a volunteer basis.

10. In my initial declaration, I mentioned that RMIAN filed two Third Party Notifications (TPNs) filed the same day that the funding for NQRP cases was cut. I also mentioned that the Aurora Immigration Court appointed a QR to at least one person after the program's funding was cut. As far as we know, the man who received the QR order from the Aurora Immigration Court did not get an attorney assigned to his case. Of the two people who had TPNs filed on their behalf, one was ordered removed on May 13, 2025. He has serious medical issues, including a traumatic brain injury, and in my estimation, his eligibility for protection from removal to persecution or torture was quite strong.

11. We are aware of a TPN filed by another organization on May 8 on behalf of someone whose medical issues were so severe, they were transferred out of the Aurora facility and hospitalized. Recently, RMIAN identified someone else who raised an indicia of incompetence and plans on submitting a TPN in the upcoming days.

12. Already, RMIAN's sub-program that offers assistance to pro se individuals detained at the Aurora facility is reporting that they have been providing pro se support to people where indicia of incompetence was raised to the immigration court. This program is not a substitution for appointed counsel in these cases. Offering pro se support to people who need a QR is extremely time-consuming, labor intensive, and ineffective. For example, for one of the men where RMIAN recently filed a TPN, a RMIAN staff member on our pro se team helped him with medical advocacy. The man has severe physical and mental diagnoses, requiring immediate treatment. The staff member spent approximately 14 hours over the course of two and a half weeks making sure that the medical unit within the Aurora facility was providing the man with necessary care. This type of advocacy is typically rolled into the legal representation RMIAN provides in NQRP cases but fell on our pro se team because no one else could offer the man support. Other examples of pro se assistance RMIAN offers include helping people gather evidence for their immigration hearings, which would be impossible for most, if not all, of RMIAN's NQRP clients. RMIAN's pro se team also helps people prepare applications for relief from removal,

which usually requires a great deal of personal information and documents related to an individual's past criminal legal contacts, and again, would be essentially impossible to prepare if the person is not oriented to time and place, has severe memory impairments, and/or is responding to external stimuli like auditory and visual hallucinations.

13. RMIAN has represented numerous NQRP clients whose cases were administratively closed based on their competency limitations. RMIAN is concerned that the government's motions to recalendar those cases will result in a dramatic increase in NQRP workload without the possibility of receiving funding for attorneys to represent those people in immigration proceedings. Although under the NQRP Nationwide Policy funding typically lapses for people who are no longer detained, the Policy allows for a funding extension if the immigration court denies a motion to withdraw, typically finding that although the person is no longer detained, they nonetheless cannot meaningfully represent themselves in immigration proceedings. Over the years, RMIAN has had countless motions to withdraw denied on this basis. Here, courts may similarly deny the motion to withdraw because the person is unable to represent themselves in their proceedings, and RMIAN would be on the hook to provide pro bono legal representation.

14. Though RMIAN has not yet sought to withdraw from NQRP cases pending on April 25, 2025, as described above, it is becoming increasingly difficult to provide services that align with our organizational mission. First, RMIAN's attorneys who directly represent NQRP clients are already being forced to make untenable choices regarding resource allocation when forming litigation strategies for clients, such as assessing how many experts are necessary and weighing the importance of outside phone calls for clients' mental health status and ability to assist counsel in the preparation of their cases. Those same attorneys are not receiving any new client appointments, which is already causing mission drift for staff members who specifically chose to work at RMIAN due to our NQRP practice. Second, RMIAN staff members who place cases with pro bono counsel are already saturated given the tremendous need for pro bono counsel at the Aurora facility. Only a tiny fraction of the people who need any attorney will be able to secure pro bono counsel thanks to RMIAN's work placing cases and providing mentorship. Expecting pro bono counsel to offer legal representation to NQRP clients is not a viable alternative to the NQRP Nationwide Policy, this is particularly true if no resources are provided to place those cases or to offer mentorship. Finally, RMIAN cannot provide sufficient pro se assistance to people who would otherwise qualify under the NQRP Nationwide Policy. The cost-benefit analysis tips heavily in favor of providing pro se support to people who can serve as their own self-advocates in court. The point of the NQRP Nationwide Policy is that clients are *unable* to represent themselves in immigration proceedings. As a result, it does not make sense to pour RMIAN's limited resources into offering pro se assistance to this group of people when they cannot absorb the information provided to advocate on their own behalf in court. Further, RMIAN's federal funding for pro se assistance has already been cut through budget attacks on the Legal Orientation Program. Consequently, even fewer resources exist now than ever before to offer this type of support to people without access to counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 19th day of May 2025, in Denver, Colorado.

*Director of Advocacy and Litigation*
ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK
7301 Federal Boulevard, Suite 300
Westminster, Colorado 80030
Tel: 720-370-9100
llunn@rmian.org

5