# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN GATEWAYS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 1:25-cv-01370 |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.      Plaintiffs' APA Claims Fail For Three Independent Threshold Reasons. ........................ 2

        A.     The Court Lacks Jurisdiction Under The APA To Compel The Government
               To Pay Money Under A Contract ........................................................... 2

        B.     Plaintiffs Have Other Adequate Remedies Available To Them ............................ 7

        C.     Program Funding Decisions Are Committed To Agency Discretion By
               Law.......................................................................................... 8

II.     Plaintiffs' *Accardi* Theory Independently Fails On Its Merits ........................................ 10

III.    Plaintiffs' Rehabilitation Act Arguments Fail For Additional Reasons ............................11

IV.     The Court Should Reject Plaintiffs' Request For Summary Judgment ........................... 14

V.      The Court Should Strike Plaintiffs' Supplemental Declarations. ..................................... 15

CONCLUSION........................................................................................................ 15

# TABLE OF AUTHORITIES

## CASES

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  Civ. A. Nos. 25-00400, 25-00402, 2025 WL 1380421 (D.D.C. May 13, 2025) .................... 5, 6

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*,
  357 F.3d 62 (D.C. Cir. 2004) ................................................................................................ 7

*Alexander v. Choate*,
  469 U.S. 287 (1985) .................................................................................................... 12, 13

*Am. Council of the Blind v. Paulson*,
  525 F.3d 1256 (D.C. Cir. 2008) .................................................................................. 12, 13

*Bennett v. Hurley Med. Ctr.*,
  86 F.4th 314 (6th Cir. 2023) ............................................................................................. 13

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ............................................................................................................ 7

*City of Tempe, Az. v. Federal Aviation Admin.*,
  239 F. Supp. 2d 55 (D.D.C. 2003) .................................................................................... 15

*Clark v. La. Dep't of Pub. Safety*,
  63 F.4th 466 (5th Cir. 2023) ............................................................................................. 13

*Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
  ---F.4th---, 2025 WL 1393876 (9th Cir. May 14, 2025) .................................................... 6

*Cobell v. Norton*,
  391 F.3d 251 (D.C. Cir. 2004) .......................................................................................... 14

*Dep't of Educ. v. California*,
  604 U.S.---, 145 S. Ct. 966 (2025) ................................................................................. 3, 7

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ....................................................................................................... 10, 13

*El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of Health & Hum. Servs.*,
  396 F.3d 1265 (D.C. Cir. 2005) .......................................................................................... 7

*Est. of Martin v. Cal. Dep't of VA*,
  560 F.3d 1042 (9th Cir. 2009), *overruled in part on other grounds*,
  *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019) .................................................. 13

*Franco-Gonzalez v. Holder*,
  No. CV 10-02211, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013) .................................... 14

*Garcia v. Vilsack,*
　563 F.3d 519 (D.C. Cir. 2009) ............................................................................. 7

*Great-West Life & Annuity Ins. Co. v. Knudson,*
　534 U.S. 204 (2002) ............................................................................................. 7

*Haaland v. Brackeen,*
　599 U.S. 255 (2023) ............................................................................................. 4

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.,*
　56 F.3d 279 (D.C. Cir. 1995) ............................................................................ 3-4

*Kowalski v. Tesmer,*
　543 U.S. 125 (2004) ............................................................................................. 4

*Lincoln v. Vigil,*
　508 U.S. 182 (1993) .................................................................................... 8, 9, 10

*Lucas v. VHC Health,*
　128 F.4th 213 (4th Cir. 2025) ............................................................................ 13

*Milk Train, Inc. v. Veneman,*
　310 F.3d 747 (D.C. Cir. 2002) ............................................................................ 8

*Perry Capital LLC v. Mnuchin,*
　864 F.3d 591 (D.C. Cir. 2017) ............................................................................ 3

*Physicians for Soc. Resp. v. Wheeler,*
　956 F.3d 634 (D.C. Cir. 2020) ............................................................................ 9

*Rodriguez v. City of N.Y.,*
　197 F.3d 611 (2d Cir. 1999) ............................................................................. 13

*Sec'y of Lab. v. Twentymile Coal Co.,*
　456 F.3d 151 (D.C. Cir. 2006) ............................................................................ 9

*Spectrum Leasing Corp. v. United States,*
　764 F.2d 891 (D.C. Cir. 1985) ............................................................................ 3

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
　---F. Supp. 3d---, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ............................. 6

*Widakuswara v. Lake*
　Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ....... 7

**STATUTES**

5 U.S.C. § 701 .......................................................................................................... 8

8 U.S.C. § 1232..................................................................................................................... 6

**REGULATIONS**

45 C.F.R. § 410.1309 ............................................................................................................ 6

## INTRODUCTION

Plaintiffs' opposition brief hastily retreats from their motion's initial focus on the termination of a contract under which they previously received work and compensation for that work from the Government. To avoid the jurisdictional defects with that claim, Plaintiffs attempt to reassure the Court that it need not order specific performance of the contract or payment of funds. Instead, they say that it would be meaningful for *someone* to get appointments to represent aliens deemed mentally incompetent in removal proceedings, even if that happens through some other mechanism and even if the appointments go to someone other than them. But Plaintiffs cannot distance themselves from the reality that this is a contract case.

Plaintiffs' efforts to reframe their claims result in internal contradictions that are fatal to this case. On the one hand, Plaintiffs say they "do not contend that their specific organizations must be funded." Pls.' Opp'n to Def.'s MTD & Reply in Supp. of Pls.' Mot. for Prelim. Inj. or Stay Pursuant to 5 U.S.C. § 705, 18, ECF No. 22 ("Plaintiffs' Opp."). But on the other hand, they say they are being irreparably harmed by having to perform "forced, unfunded labor." *Id.* at 34. They say they would receive meaningful relief even if other qualified representatives received future appointments instead of them. *Id.* at 10. But they counter that they will suffer irreparable "[h]arm to [their] core work" if they cannot continue receiving funding to "serve existing Nationwide NQRP clients" and funding and appointments "to take on new ones." *Id.* at 30. To the extent Plaintiffs seek a restoration of funding to them specifically pursuant to the now-terminated contract, the Court lacks jurisdiction to grant such relief. And to the extent Plaintiffs seek other forms of relief unrelated to restoration of funding, they lack standing to do so.

Contradictions aside, Plaintiffs' own allegations doom their claim that the termination of the NQRP can be challenged via an APA claim in this Court. Plaintiffs fail in their attempts to separate the NQRP from the Acacia Contract, making apparent that this is fundamentally a contract claim that belongs in the Court of Federal Claims. The only final agency action of Defendants that Plaintiffs identify and challenge is the termination of funding for Plaintiffs' representations by descoping the Acacia Contract. Indeed, they say that Defendants "terminated the Nationwide

1

NQRP" "*[b]y terminating this funding*." Compl. ¶ 74 (emphasis added); *see id.* ¶¶ 7, 75 (alleging that this action took place in a Statement of Work provided to Acacia that descoped the Acacia Contract). Plaintiffs likewise allege that "[s]ince its inception," the NQRP has been "implemented . . . through a contractor," *id.* ¶ 64, and that the NQRP has always been "defined" by Defendants' "statements of work" provided to Acacia pursuant to the Contract, *id.* ¶ 66. At bottom, Plaintiffs challenge Defendants' exercise of an express contractual termination right, and they seek specific performance of the contract to redress their injuries. The Court should dismiss for this reason— not to mention two other threshold problems with Plaintiffs' APA claims, plus additional, independent merits deficiencies.

## ARGUMENT

**I.     Plaintiffs' APA Claims Fail For Three Independent Threshold Reasons.**

### A.     The Court Lacks Jurisdiction Under The APA To Compel The Government To Pay Money Under A Contract

Plaintiffs do not quibble with the standards that govern whether a case is essentially contractual. *See* Defs.' MTD & Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. 5-9, ECF No. 14 ("Defendants' Mot."). Instead, they argue that their claims are based on noncontractual rights and that they seek noncontractual remedies. But they fail to square either argument with their own allegations and filings.

Plaintiffs' claims arise from a contract, and they therefore belong in the Court of Federal Claims under the Tucker Act. As Defendants explained, Plaintiffs say they are injured by the loss of contractual funding for current clients they received under the Acacia Contract and the loss of future appointments to represent new clients. *Id.* at 9-10. The only possible source for Plaintiffs to have an entitlement to those funds or appointments is the Acacia Contract and Plaintiffs' related subcontracts. *Id.* They admit as much when they say that their arguments under other authorities, if successful, would not "bar[]" Defendants "from exploring other options to ensure access to counsel for this population." Plaintiffs' Opp. 18. That admission makes even more clear that any

entitlement of *Plaintiffs* in particular to continued government funding and appointments can flow only from the Acacia Contract and subcontracts.

The remedies Plaintiffs seek for their injuries underscore the contractual nature of their claims. In their complaint, they ask the Court to issue relief invalidating, enjoining, and setting aside Defendants' actions to terminate the NQRP. Compl. at 37-38 (Prayer for Relief); *see id.* ¶ 12 ("Plaintiffs seek declaratory and injunctive relief, enjoining Defendants from terminating the Nationwide NQRP *and associated funding*." (emphasis added)). What are those actions? Plaintiffs allege that Defendants "terminated the Nationwide NQRP" "[b]y terminating this funding"—that is, by descoping the Acacia Contract. Compl. ¶ 74. They elsewhere confirm as much, alleging that it was EOIR's "Amendment and Statement of Work provided to the Acacia Center for Justice" that provided that "the NQRP would no longer be nationwide." *Id.* ¶ 7. Plaintiffs' requested relief is otherwise to compel Defendants to continue expending funds to make appointments—in other words, "the classic contractual remedy of specific performance," *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985). Compl. at 37-38 (Prayer for Relief); *id.* ¶ 12. The only alleged action by Defendants from which Plaintiffs seek relief is the descoping of the Acacia Contract. And the remedies they request would undo that descoping, requiring Defendants to continue performing under the contract. That is a self-evidently contractual claim. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 619 (D.C. Cir. 2017) (observing that "specific performance is an explicitly contractual remedy").

Indeed, the injuries in fact Plaintiffs have asserted for purposes of Article III standing all flow directly from the termination of funds to Plaintiffs specifically, and the relief that would actually redress Plaintiffs' funding-related injuries would require a reinstatement of Plaintiffs' own funding. But by effectively asking the Court to reinstate the now-terminated contractual task orders, Plaintiffs' claims are, in essence, the same sort of contract-based claims for specific performance over which the Court lacks jurisdiction. *See Dep't of Educ. v. California*, 604 U.S.---, 145 S. Ct. 966, 968 (2025); *Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279,

3

284 (D.C. Cir. 1995) ("[W]e have stated that jurisdiction under the Tucker Act cannot be avoided by disguising a money claim as a claim requesting a form of equitable relief." (cleaned up)).

Plaintiffs try to pivot by focusing on the possibility of receiving future appointments in order to claim that they "seek significant non-monetary relief" with value "independent of any future potential for monetary relief," Plaintiffs' Opp. 9 (citation omitted), but their complaint and briefs contradict that claim over and over again. The possibility of appointments without funding is a source of Plaintiffs' claimed irreparable harms, not a form of relief that could alleviate them. *See, e.g.*, *id.* at 34 ("forced, unfunded labor"); Compl. ¶¶ 6, 88, 90-94. Plaintiffs never reconcile their argument that unfunded appointments would provide meaningful relief to them with their argument that unfunded appointments *would irreparably harm them*.

Much the same goes for Plaintiffs' similar claim that "many of [their] injuries would be redressed" if an unfunded NQRP provided for appointment of other attorneys for their current and future clients. Plaintiffs' Opp. 10. Again, Plaintiffs elsewhere say that no one else can represent their clients, that they would be irreparably harmed by laying off staff who work on these representations, and that the representations are core to their missions. *See id.* at 10, 18; Pls.' Mot. for Prelim. Inj. or Stay Pursuant to 5 U.S.C. § 705, at 31-36, ECF No. 8; Compl. ¶¶ 88, 94-96. The relief that *would* redress their identified harms—government-funded court appointments—is reinstatement of the full scope of the Acacia Contract and related subcontracts. Plaintiffs again cannot escape the contractual nature of their claims.

Further, by disclaiming any interest in the restoration of their funding, Plaintiffs have created a fatal standing problem for themselves. Plaintiffs lack standing to seek other non-monetary forms of relief—such as an order requiring Defendants to continue NQRP appointments on an unfunded basis—that would leave their funding-based injuries for current representations wholly unredressed. *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) (plaintiff must show its "injury is likely to be redressed by judicial relief" (citation omitted)). Plaintiffs also cannot establish standing based on the inability to represent future clients, *see Kowalski v. Tesmer*, 543 U.S. 125, 134 (2004), or nonparties' potential interest in receiving future appointments.

Nor can Plaintiffs avoid the contractual nature of their case by teasing apart the termination of the NQRP and the descoping of the Acacia Contract. Their allegations compel the conclusion that there is no NQRP separate from a government contract. Plaintiffs admit that "EOIR 'carries out' the NQRP through a contract," Plaintiffs' Opp. 12, that the NQRP has always been "implemented" through a contract, Compl. ¶ 64, that there is no other way to carry out the NQRP, Plaintiffs' Opp. 10, 12, 18, and that it was the descoping of the Acacia Contract that terminated NQRP, Compl. ¶¶ 7, 74. Again, if all of that is true, the NQRP is merely part of a government contract and was eliminated by a descoping of that contract. Government contractors—let alone subcontractors—cannot pursue extracontractual APA claims based on descoping of a contract simply by attaching a programmatic label to the services formerly provided under the contract.

Plaintiffs' last effort to create daylight between the NQRP and the Acacia Contract is to argue that it is the NQRP, not the Acacia Contract, that "provide[s] immigration judges" with "the ability to appoint counsel." Plaintiffs' Opp. 11. That is incorrect: As Plaintiffs repeatedly acknowledge, without the Acacia Contract, there is no mechanism for appointment of counsel by immigration judges. Plaintiffs cite no allegation supporting their claim that the NQRP itself provides the ability to appoint counsel, independent of the Acacia Contract, and they never explain how the NQRP could do so. Nor do they offer any way to reconcile that claim with their view that immigration judges lost the authority to appoint counsel when the Acacia Contract was descoped— the only final agency action that they identify. Compl. ¶¶ 7, 74. If the NQRP afforded appointment authority, separate from the Acacia Contract, then descoping the Acacia Contract would not have revoked that supposedly independent authority.

Plaintiffs attempt to distinguish *Department of Education v. California*, but that decision makes clear that the Court lacks jurisdiction over their claims. Plaintiffs say their claims do not depend on "the terms of individual *grants*," but they do depend on the terms of an individual *contract*—specifically, on the Government's express contractual right to partially terminate the Acacia Contract for convenience. Plaintiffs' Opp. 13 (quoting *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, Civ. A. Nos. 25-00400, 25-00402, 2025 WL 1380421, at *3 (D.D.C. May 13, 2025)

("*AIDS Vaccine*") (emphasis added)). And their attempt to distinguish other decisions on the basis that Plaintiffs are *subcontractors*, not prime contractors, is immaterial. *Id.* The case they cite did not discuss subcontractors. *See id.* (citing *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, ---F. Supp. 3d---, 2025 WL 763738, at *6 (D.D.C. Mar. 11, 2025)). And they attempt no response to Defendants' explanation that permitting subcontractors to proceed on claims that would be barred if filed by the prime contractor would create an easily exploitable jurisdictional loophole and undermine the Tucker Act's jurisdictional scheme. Defendants' Mot. 13-14.

Plaintiffs' reliance on this Court's decision in *AIDS Vaccine* and on a Ninth Circuit motions panel's decision in another case is misplaced. In *AIDS Vaccine*, the Court "repeatedly stressed" that the "agency actions" against which its relief ran were "Defendants' blanket directives to suspend congressionally appropriated foreign aid," not any action on any "individual awards." 2025 WL 1380421, at *3. By contrast, here, the only agency action Plaintiffs identify is an individual one: the descoping of a contract funded by a lump-sum appropriation, in reliance on a contractual termination right, which—again—is the action that they say "terminated the Nationwide NQRP." Compl. ¶ 74. The Ninth Circuit case is markedly different, too. There, the court relied on a statute providing that the government "*shall ensure*, to the greatest extent practicable . . . that all unaccompanied alien children . . . have counsel to represent them in legal proceedings," but Plaintiffs identify no remotely comparable statute regarding the NQRP. *Cmty. Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, ---F.4th---, 2025 WL 1393876, at *2 (9th Cir. May 14, 2025) (quoting 8 U.S.C. § 1232(c)(5)). The court likewise relied on a regulation providing that the agency "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children," 45 C.F.R. § 410.1309(a)(4), but again, Plaintiffs identify no similar regulation regarding the NQRP on which they could base their claims. Instead, Plaintiffs admit—correctly—that no statute or regulation compels the NQRP when they disclaim any argument "that Defendants must continue to operate the Nationwide NQRP in the same manner" and could instead operate "*some other program* that provides counsel." Plaintiffs' Opp. 26 (emphasis added); *see also id.* at 18 ("Plaintiffs do not contend … that

Defendants are barred from exploring other options to ensure access to counsel for this population."). Plaintiffs' lack of any comparable authority that could compel the NQRP means that *Community Legal Services*, if anything, undermines their argument.[1]

Because this Court lacks jurisdiction "to enforce" Defendants' "contractual obligation[s] to pay money," *Dep't of Educ.*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)), or to otherwise resolve claims against the federal government that are "essentially" contractual, *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004), the Court should dismiss Plaintiffs' claims.

### B.    Plaintiffs Have Other Adequate Remedies Available To Them

The APA likewise does not permit Plaintiffs' claims because there are "existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). Plaintiffs do not dispute that they could seek a contractual remedy through sponsored or pass-through claims. *See* Plaintiffs' Opp. 19-20 (arguing instead that these pathways would require action by Acacia). Nor do Plaintiffs contend that there is reason to doubt that Acacia would permit or participate in such proceedings. *See id.* Instead, they argue, without authority, that contingent alternative remedies do not suffice. *Id.* at 20. But the D.C. Circuit has held that the alternative remedy need not provide relief identical to that available under the APA, "so long as it offers relief of the 'same genre.'" *Garcia v. Vilsack,* 563 F.3d 519, 522 (D.C. Cir. 2009) (quoting *El Rio Santa Cruz Neighborhood Health Ctr. v. Dep't of Health & Hum. Servs.,* 396 F.3d 1265, 1272 (D.C. Cir. 2005)). Plaintiffs need not be assured of success in order for the adequate-remedy bar to apply.

---

[1] The en banc D.C. Circuit's recent action in *Widakuswara v. Lake* and similar cases, is not to the contrary. *See* Nos. 25-5144, 25-5145, 25-5150, 25-5151, 2025 WL 1521355 (D.C. Cir. May 28, 2025). The court there applied the stay standard, which asks whether the Government made a "'strong showing' of a likelihood of success" and is distinct from a finding of actual success or a preliminary-injunction-stage finding that a plaintiff is likely to succeed. *Id.* at *1. The court also acknowledged that its order was necessarily preliminary and "of course does not constrain the ability of the panel that hears the government's appeals to reach any conclusion following full merits briefing and argument." *Id.*

Plaintiffs' remaining arguments—that they do not press a contract claim at all, and that the Court of Federal Claims cannot order the prospective relief they seek—are immaterial for the reasons already explained above and in Defendants' previous brief. *See* Defendants' Mot. 16-17. And Plaintiffs never grapple with the problem of permitting *subcontractors* to bring contract claims that *contractors* cannot bring or sue in courts that contractors cannot access. *Id.* at 14-15.

C.      **Program Funding Decisions Are Committed To Agency Discretion By Law.**

Independently, Plaintiffs' APA claims fail because they challenge Defendants' decision about how to allocate and expend a lump-sum appropriation. That decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Plaintiffs agree that the only relevant appropriation is a lump-sum appropriation, and they cannot evade the conclusion that *Lincoln* compels.

Plaintiffs try to work around *Lincoln* by arguing that it contemplates exceptions for circumstances where statutes or regulations require a program or an expenditure. Plaintiffs' Opp. 15. Of course, when funding is specifically allocated to a program, the analysis may be different. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 750-52 (D.C. Cir. 2002). That is because there is no longer a lump-sum appropriation. But—again—Plaintiffs identify no earmarked appropriation here, nor do they identify a statutory mandate for the NQRP. Plaintiffs instead argue only generalities: that "the Rehabilitation Act's and the INA's statutory requirements," regulations implementing the Rehabilitation Act in general terms, and "[d]efendants' own policies" mandate the "continued operation of the NQRP." Plaintiffs' Opp. 15-16. They even argue that EOIR's decision to continue with the Acacia Contract in the *Franco* states is "proof positive" that EOIR must continue funding court-appointed counsel everywhere else, too. *Id.* at 15. But Plaintiffs concede just the opposite, and scuttle any chance of success on this argument, when they concede in the very same section of their brief, just a couple of pages later, that they "*do not contend*" that "Defendants are barred from *exploring other options* to ensure access to counsel for this population." *Id.* at 18 (emphasis added); *see id.* at 26 ("Plaintiffs do not contend that Defendants must continue to operate the Nationwide NQRP in the same manner, … just that Defendants must

continue to operate … some program that provides counsel to individuals who cannot represent themselves."). That concedes that *no* statute or other authority requires EOIR to operate the NQRP. After all, if there were such a mandate, how could EOIR be free to "explor[e] other options"? *Id.*

Even without Plaintiffs' concession, their logic is completely irreconcilable with *Lincoln* itself. Plaintiffs contend *Lincoln* does not apply because they are challenging the termination of the NQRP program, not a discretionary funding decision. Plaintiffs' Opp. 17. But in *Lincoln*, the plaintiffs challenged the Indian Health Service's "decision to terminate the Program" that provided health services to children in the southwest. 508 U.S. at 184, 190. The Supreme Court even framed the issue as whether "the Service's decision to terminate the Program [is] reviewable under the APA." *Id.* at 190. And like Plaintiffs here, the plaintiffs in *Lincoln* argued that terminating the program violated various sources of law, including "the federal trust responsibility to Indians, the Snyder Act, the Improvement Act, the Administrative Procedure Act, various agency regulations, and the Fifth Amendment's Due Process Clause." *Id.* at 189. The Court nonetheless held that the "decision to discontinue the Program" was "unreviewable under § 701(a)(2)." *Id.* at 193. The various legal authorities on which the *Lincoln* plaintiffs relied at most spoke "about Indian health only in general terms" and thus did not require the agency to undertake any particular program. *Id.* at 194. Plaintiffs' efforts to subject a funding allocation decision to APA review based on similarly general provisions should meet the same result.

The D.C. Circuit decision Plaintiffs invoke in an attempt to evade *Lincoln* does not support them. Plaintiffs' Opp. 15. It agrees that "allocation of funds from a lump-sum appropriation" is one of the "kinds of administrative determinations [that] evade review." *See Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 643 (D.C. Cir. 2020) (quoting *Sec'y of Lab. v. Twentymile Coal Co.*, 456 F.3d 151, 156 n.6 (D.C. Cir. 2006)). And it did not involve an agency's decision on how to spend a lump-sum appropriation. *See id.* at 638 (reviewing an EPA "directive that now prohibits all grant recipients from serving on any agency advisory committee").

That EOIR previously said in other rulemaking proceedings that the NQRP existed does not support a different result. *See* Plaintiffs' Opp. 16-17. *Lincoln* readily rejected a similar

argument grounded in the agency's representations to Congress. 508 U.S. at 194 ("It is true that the Service repeatedly apprised Congress of the Program's continued operation," but those representations did not create an obligation to continue expending funds on the program).

Last, Plaintiffs argue that the best analogy for their case is the Supreme Court's decision on rescission of the Deferred Action for Childhood Arrivals program. Plaintiffs' Opp. 17 (citing *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)). But *Regents* did not discuss the rule that allocations of lump-sum appropriations are unreviewable—nor did it arise from the termination of a contract. The analogy fails.

## II.    Plaintiffs' *Accardi* Theory Independently Fails On Its Merits

Even setting aside the threshold barriers to all of Plaintiffs' claims, the Court should reject Plaintiffs' *Accardi* argument.[2]

*First*, Plaintiffs still point to no regulations governing EOIR's procedures for making the decision that they challenge and no cases in this circuit taking a similarly broad view of *Accardi*. *See id.* at 28. Indeed, the only in-circuit decision they identify involved an individual adjudication, not a programmatic claim of the kind Plaintiffs raise. *See id.* That their only example of a remotely similar claim is an out-of-circuit decision granting emergency relief last month, if anything, undermines their argument that *Accardi* supports this sort of claim. *See id.*

*Second*, Plaintiffs still identify no similar documents that have given rise to an *Accardi* claim. Plaintiffs rely on a nonspecific 2013 memorandum—which announced that EOIR *planned* to create a new program—and the avowedly preliminary "Phase I of Plan to Provide Enhanced Procedural Protections to Unrepresented Detained Aliens with Serious Mental Disorders" as establishing the agency "rules and regulations" that now bind EOIR. *See id.* at 4, 28-29. The

---

[2] Plaintiffs question whether Defendants moved to dismiss certain portions of Plaintiffs' *Accardi* arguments. Plaintiffs' Opp. 27 n.7. Plaintiffs' identification of two regulations prohibiting discrimination on the basis of disability does not advance their *Accardi* claim. Plaintiffs neither plead nor otherwise identify any independent obligation imposed by those regulations. The Court should reject any argument under them for the reasons explained in the portion of Defendants' briefs addressing the Rehabilitation Act. And, in any event, Defendants' three threshold arguments apply to *all* of Plaintiffs claims.

government's filing in *Franco* of copies of the 2013 memorandum and a memorandum issued by ICE announcing that "new procedural protections" would be implemented is not to the contrary. *See* Notice of Defendants' New Nationwide Policy for Unrepresented Immigration Detainees with Serious Mental Disorders or Conditions at 2, *Franco-Gonzalez v. Holder*, No. 2:10-cv-2211, ECF No. 583 (C.D. Cal. Apr. 22, 2013). Plaintiffs' remaining arguments depend on blurring the line between the documents they identify and the contracts through which representation has been provided to aliens deemed mentally incompetent. For example, they claim that "these policies" have "resulted in the appointment of qualified representatives to over 2,000 detained noncitizens," Plaintiffs' Opp. 29, citing paragraph 84 of their complaint. But that paragraph alleges only that representation was provided "through the NQRP," Compl. ¶ 84, which Plaintiffs allege was terminated by the descoping of the Acacia Contract.

*Third*, descoping the Contract's provision for public funding of qualified representatives would not violate the 2013 memorandum or the "Phase I" preliminary implementation in any event. Those documents provided only that EOIR planned to "make available a qualified legal representative." ECF No. 8-2 at 9 (memorandum); *id.* at 109 ("Phase I"). Neither document specified that EOIR would *publicly fund* a qualified legal representative, let alone that it would do so through the Acacia Contract or that EOIR would additionally publicly fund expert witnesses and other litigation costs. Yet that is the supposed noncompliance that Plaintiffs identify. The Court should reject this claim on the merits, if it reaches the merits at all.

## III.    Plaintiffs' Rehabilitation Act Arguments Fail For Additional Reasons

Last, Plaintiffs argue that the Partial Termination violates section 504 of the Rehabilitation Act because mentally incompetent aliens lack meaningful access to their removal proceedings without the accommodation of court-appointed, government-funded counsel. *See* Compl. ¶¶ 116-23; ECF No. 8-1 at 22-25.

*First*, Plaintiffs still present no persuasive argument that mentally incompetent individuals require the specific accommodation of government-funded, court-appointed counsel in order to have meaningful access to removal proceedings. This argument requires accepting the premise that

11

immigration judges will fail to discharge their responsibility to identify other adequate safeguards. But Plaintiffs never defend that premise.

Instead, Plaintiffs point out that immigration judges have previously appointed counsel for mentally incompetent respondents. True, but that does not mean that specific option—then voluntarily provided by the Government—was required by law. Tennessee previously provided additional days of inpatient Medicaid coverage, but that did not compel the conclusion that that accommodation was required. *See Alexander v. Choate*, 469 U.S. 287, 290 (1985). And Plaintiffs do not identify any reason to think that immigration judges previously appointed counsel only as a last resort, when no other accommodations would suffice. To the contrary, Plaintiffs' view appears to be that immigration judges previously appointed counsel *every time* an alien in detained removal proceedings was determined to be mentally incompetent, indicating that immigration judges used it as a first resort. *See, e.g.*, Compl. ¶¶ 46, 63, 80. So the fact that immigration judges *have* appointed counsel does not, as Plaintiffs assume, compel the conclusion that they *must* do so in order to afford an alien meaningful access to removal proceedings.

Moreover, Plaintiffs' argument (Plaintiffs' Opp. 23) that an accommodation must not require an individual with a disability to rely on third parties ignores that their preferred accommodation—appointment of government-funded counsel—also requires the alien to rely on a third party: appointed counsel. Plaintiffs' argument would thus doom their own claim. In any event, an immigration judge's individualized consideration of appropriate accommodations and the appointment, as needed, of a friend, family member, or non-lawyer representative to assist with the proceedings are entirely unlike the circumstances in *American Council of the Blind*. There, the Court refused to require individuals with vision disabilities "to rely on the honesty and carefulness of sighted individuals who often are on the opposite side of a financial transaction" in order to complete any cash transaction. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1270 (D.C. Cir. 2008). It was that "depend[ence] on the kindness of strangers" as an accommodation that the court rejected—not *any* accommodation that involves a third party's assistance. *Id.* at 1269.

12

*Second*, Plaintiffs misapprehend the law and the argument in their response to Defendants' argument that they did not deny Plaintiffs' specific requested accommodation solely because of anyone's disability. *See* Defendants' Mot. 23-24; Plaintiffs' Opp. 23-24. That is not demand for "proof of discriminatory intent," *Am. Council*, 525 F.3d at 1260, but instead an argument about whether reasons independent of disability, such as unreviewable discretion to allocate lump-sum funding or a decision not to extend a voluntarily created government benefit, figure into the denial of a requested accommodation that results in a plaintiff's alleged lack of program access. Plaintiffs make no effort to square their allegations' silence on this front with the multiple decisions evaluating denials of requested accommodations for reasons unrelated to the individual's disability. *Lucas v. VHC Health*, 128 F.4th 213, 220-21 (4th Cir. 2025); *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 325-26 (6th Cir. 2023); *Clark v. La. Dep't of Pub. Safety*, 63 F.4th 466, 470-71 (5th Cir. 2023); *Est. of Martin v. Cal. Dep't of VA*, 560 F.3d 1042, 1048 (9th Cir. 2009), *overruled in part on other grounds*, *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019).

*Third*, Plaintiffs have no meaningful argument that requiring millions of dollars of government funding for a benefit would not amount to an undue burden or require the Government to fund a particular benefit. They point out only that the Government did not (nonsensically) assert that it was unduly burdened by voluntarily funding a benefit while it voluntarily funded that benefit. Plaintiffs' Opp. 25. But the fact that the government once provided funding voluntarily does not somehow afford a court authority to *order* the government to provide that funding forever.[3] Government funding is not a one-way ratchet. *See, e.g.*, *Alexander*, 469 U.S. at 290, 306. Adopting Plaintiffs' argument could have perverse consequences, too, by discouraging the federal government from providing accommodations that are more generous than necessary based on

---

[3] Indeed, in another section of their brief, Plaintiffs admit that "this case is about the[ir clients'] 'access to . . . *benefits*'" like the immigration-related benefits conferred in the DACA program. Plaintiffs' Opp. 17 (quoting *Regents*, 591 U.S. at 19 (emphasis added)). That should be the end of their Rehabilitation Act argument, since the Rehabilitation Act "does not mandate" that the government provide "benefits," distinct from accommodations. *Am. Council*, 525 F.3d at 1268 (quoting *Rodriguez v. City of N.Y.*, 197 F.3d 611, 619 (2d Cir. 1999)).

13

concerns that it will be unable to later reallocate its funds in a different manner. Plaintiffs' reference to *Franco*'s discussion of the costs of funding interpreters, for its part, is irrelevant. Plaintiffs' Opp. 26. *Franco* itself—for all the flaws in its analysis—did not go so far as to require appointment of government-funded attorneys, specifically because it was concerned about the fiscal burdens that accommodation would impose. *Franco-Gonzalez v. Holder*, No. CV 10-02211, 2013 WL 3674492, at *6 (C.D. Cal. Apr. 23, 2013) (declining to order that the government must provide "*paid* legal counsel," or even an attorney representative).

## IV.    The Court Should Reject Plaintiffs' Request For Summary Judgment

Plaintiffs briefly ask the Court to treat these emergency briefs as sufficient to enter final judgment, pointing out that Defendants submitted a declaration with their previous filing and consequently asking the Court to convert Defendants' request to dismiss into a motion for summary judgment and then enter a permanent injunction on Count 1. Plaintiffs' Opp. 41-42. The Court should reject that request. The evidence attached to Defendants' previous filing supported Defendants' opposition to Plaintiffs' preliminary injunction motion; it was not an attempt to rely on evidence outside the complaint in support of a motion to dismiss. Courts routinely rely on declarations when deciding motions for a preliminary injunction without converting those matters into final judgment proceedings. *See Cobell v. Norton*, 391 F.3d 251, 260 (D.C. Cir. 2004) (explaining difference between summary judgment and preliminary injunction procedure, including with respect to use of declarations). And the Court should not enter final judgment against Defendants on the expedited timeline requested by Plaintiffs, without affording Defendants the opportunity to oppose a motion for final judgment against them on an ordinary briefing schedule. By contrast, it would be appropriate to dismiss Plaintiffs' complaint at this stage. Plaintiffs chose when and where to file and how to frame their claims, and they asked the Court to handle the case in an emergency posture. There would be no unfairness in holding Plaintiffs to the expedited approach that they have themselves requested.

V.      **The Court Should Strike Plaintiffs' Supplemental Declarations.**

Plaintiffs attached nine new declarations to their reply in support of their preliminary injunction motion and opposition to Defendants' motion to dismiss. *See* Dkt 23-1–9. The declarations ostensibly go to Plaintiffs' preliminary-injunction arguments, not their arguments in opposition to the motion to dismiss, which is based solely on the allegations in the complaint. The Court should strike the declarations from the preliminary injunction record because their submission is direct contravention of Local Civil Rule 65.1(c).

Local Civil Rule 65.1(c) provides:

> An application for a preliminary injunction shall be made in a document separate from the complaint. *The application shall be supported by all affidavits on which the plaintiff intends to rely*. The opposition shall be served and filed within seven days after service of the application for preliminary injunction, and shall be accompanied by all affidavits on which the defendant intends to rely. *Supplemental affidavits either to the application or the opposition may be filed only with permission of the Court.*

LCvR 65.1(c) (emphasis added); *see also* Comment to LCvR 65.1 ("The Committee believes that a rule is needed to regulate the use of affidavits and live testimony on applications for preliminary injunctions"). The Court's Local Rule clearly reflects a desire to avoid a party surprising the other with additional evidence in their final reply brief, as Plaintiffs have done here. Because Plaintiffs did not move for permission to attach the supplemental declarations to their reply brief, these declarations are not properly before the Court. *See, e.g.*, *City of Tempe, Az. v. Federal Aviation Admin.,* 239 F. Supp. 2d 55, 64, 66-67 (D.D.C. 2003).

## CONCLUSION

For the reasons set forth above, the Court should dismiss Plaintiffs' complaint and enter judgment in Defendants' favor.

DATED: May 30, 2025                    Respectfully submitted,


                                       YAAKOV M. ROTH
                                       Acting Assistant Attorney General

                                       ANDREW I. WARDEN
                                       Assistant Director
                                       Federal Programs Branch

                                       */s/ Sarah Welch*
                                       SARAH WELCH
                                       Ohio Bar No. 99171
                                       Counsel
                                       United States Department of Justice
                                       Civil Division
                                       950 Constitution Ave. NW
                                       Washington, DC 20005
                                       Phone: (202) 514-3180
                                       Email: sarah.e.welch@usdoj.gov

                                       *Counsel for Defendants*