# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN GATEWAYS, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-01370 (AHA) |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, | |
| *Defendants*. | |

## Memorandum Opinion and Order

Congress requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, Plaintiffs challenge the Acting Director of the Executive Office for Immigration Review's decision to rescind a policy known as the National Qualified Representative Program ("NQRP"), which authorizes and enables immigration courts to appoint a qualified representative to detained, unrepresented people who are adjudicated to be mentally incompetent in detention or deportation proceedings. Defendants do not contest that the Acting Director's elimination of the program was arbitrary and capricious within the meaning of the Administrative Procedure Act ("APA")—they confirm the action was taken without any record of considering the acute reliance interests and consequences for the administration of justice, the vulnerable population affected, or the ongoing representations that will be disrupted. And, at least at this stage, Defendants have not offered a persuasive reason why the Acting Director was free from the APA's proscription of arbitrary and capricious decisions. Accordingly, and given the irreparable harm caused when people found mentally incompetent are stripped of their representation and the threat to the public interest when

immigration courts are denied any mechanism to appoint representation, the Court finds Plaintiffs are entitled to preliminary relief.

At the same time, such relief must be tailored to the particular legal claim and harm shown. Here, Plaintiffs' success would require the Court to "hold unlawful and set aside" the Acting Director's rescission of the policy, but it does not guarantee Defendants will forever carry out the program through identical means. Defendants must reinstate the NQRP's policy authorizing and enabling immigration courts to appoint qualified representatives to detained and unrepresented respondents who are found mentally incompetent to represent themselves in bond and removal proceedings. While Defendants may, in the short or long term, carry out that policy using similar mechanisms as they have in the past, they also may effectuate it in other ways.

The Court accordingly grants Plaintiffs' motion for a preliminary injunction and denies in part Defendants' motion to dismiss.

## I.    Background

In April 2013, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS") announced "a nationwide program to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the [Board of Immigration Appeals ("BIA")] to be mentally incompetent to represent themselves in immigration proceedings." ECF No. 8-2 at 11. This policy, referred to as the National Qualified Representative Program or "NQRP," was part of a broader "Nationwide Policy to provide enhanced procedural protections, including competency inquiries, mental health examinations, and bond hearings to certain unrepresented and detained respondents with serious mental disorders or conditions that may render them incompetent to represent themselves in immigration proceedings." *Id.* In announcing the "new nationwide policy," DOJ specified that its Executive Office for Immigration Review ("EOIR") "will make available a qualified representative to unrepresented detainees who

are deemed mentally incompetent to represent themselves in immigration proceedings." *Id.* at 14–15. The Chief Immigration Judge simultaneously announced the policy to immigration judges across the country in a memorandum that described the "unique challenges" immigration courts face in cases involving deportation or detention of "unrepresented detained aliens with serious mental disorders or conditions." *Id.* at 8. The memorandum reiterated DOJ and DHS's new policy that EOIR would "make available a qualified legal representative" to represent detained noncitizens found by an immigration judge to be mentally incompetent to represent themselves. *Id.* at 9.[1]

Following the announcement, DOJ and EOIR documented the NQRP as official policy. The same year the NQRP was announced, EOIR released its "final guidance for Phase I of its nationwide plan," reflecting the policy to "provide a qualified legal representative to any detained, unrepresented alien in a removal or custody redetermination proceeding found to be incompetent to represent him- or herself." *Id.* at 95 n.1, 97. And in the years since, the NQRP became entrenched in the regular operations of DOJ and DHS. *See, e.g.*, John Morton, *Civil Immigration Detention: Guidance for New Identification and Information-Sharing Procedures Related to Unrepresented Detainees with Serious Mental Disorders or Conditions*, U.S. Immigr. & Customs Enf't (Apr. 22, 2013), https://perma.cc/T7FX-3QNY (providing implementation instructions for the NQRP); Procedures for Asylum and Withholding of Removal, 85 Fed. Reg. 81698, 81735 (Dec. 16, 2020) (referencing the NQRP as part of an "existing agency protocol for ensuring that proceedings involving" individuals with mental competency issues "are fair"). Immigration judges who

---

[1]    In addition to the NQRP, DOJ and DHS's broader nationwide policy addressed several other processes, including competency inquiries, mental health examinations, and bond hearings. This case concerns only termination of the NQRP—that is, the policy of providing qualified representatives to unrepresented and detained respondents who are found by an immigration judge or the BIA to be mentally incompetent to represent themselves.

interacted with or learned about individuals displaying indicia of mental incompetence would conduct competency hearings, make findings that the individuals could not represent themselves, and order the appointment of a qualified representative. ECF No. 8-3 ¶¶ 6, 7. By 2020, the NQRP had provided representation to over 2,000 detained noncitizens whose serious mental illnesses rendered them incapable of representing themselves. *See* ECF No. 8-1 at 16 (citing Mike Corradini, *National Qualified Representative Program*, Vera Inst. of Just., https://perma.cc/AE4B-9U6A (last visited July 20, 2025)). In 2021, EOIR undertook a process "to comprehensively collect, organize, and publish all then-effective policies related to adjudications in a central, public, and accessible location," resulting in a policy manual. ECF No. 27-1 ¶ 6. The manual reflected that the NQRP was agency policy, recognizing it as "a program that provides Qualified Representatives to certain unrepresented and detained respondents who are found by an immigration judge or the BIA to be incompetent to represent themselves in immigration proceedings." *Id.* ¶ 8.

In April 2025, Defendant Sirce Owen, Acting Director of EOIR, sent an email informing all EOIR personnel that "the nationwide NQRP policy announced in the [Chief Immigration Judge's 2013] Memo was no longer in effect." *Id.* ¶ 13. The email informed immigration courts that they "will likely receive motions to withdraw from Qualified Representatives currently handling Nationwide Policy cases." ECF No. 27-6 at 2. In effectuating the rescission of the NQRP, EOIR said the policy was cut "for convenience," without additional explanation. ECF No. 8-2 at 119; *see* ECF No. 8-4 ¶ 24. EOIR has since removed the NQRP from its policy manual and Defendants have confirmed that "[t]here is now not a mechanism to appoint a qualified representative." ECF No. 27-1 ¶¶ 7, 11; ECF No. 25 at 45–46.[2]

---

[2]    Defendants continue to provide qualified representatives in three states under the terms of a court injunction in *Franco-Gonzalez v. Holder*, No. 10-cv-02211, 2013 WL 3674492 (C.D. Cal.

Plaintiffs, nonprofit organizations appointed by immigration courts to represent detained mentally incompetent individuals in their immigration proceedings, filed this action against the relevant agencies, offices, and officials to challenge elimination of the NQRP as arbitrary, capricious, contrary to law, and inconsistent with internal agency policy in violation of the APA. Plaintiffs moved for a preliminary injunction; Defendants opposed and moved to dismiss the case.

## II.  Discussion

The parties consolidated their preliminary injunction and dismissal briefing, addressing the same arguments in both contexts; the Court accordingly considers the motions together, applying their respective legal standards.

To survive dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), a plaintiff must show the court has subject-matter jurisdiction to hear their claim and the complaint states a plausible claim for relief. *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In both contexts, the court must "assume the truth of all material factual allegations in the complaint and 'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)) (addressing motions to dismiss for lack of subject-matter jurisdiction); *see Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (addressing motions to dismiss for failure to state a claim).

To get a preliminary injunction, a plaintiff must go much further than stating a claim. "A preliminary injunction is an extraordinary remedy never awarded as of right" and, to the contrary, "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v.*

---

Apr. 23, 2013); *see also* ECF No. 27-7 at 2 (new policy manual replacing the NQRP with the "Franco Qualified Representative Program").

*Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008). The plaintiff must show that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

As discussed below, the Court concludes Plaintiffs have stated a claim in the first count of their complaint and have shown they are entitled to a preliminary injunction.

### A. Plaintiffs Are Likely To Succeed In Their Claim That The Acting Director's Termination Of The NQRP Was Arbitrary And Capricious Under The APA.

The APA authorizes judicial review of "final agency action" and requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). Here, Plaintiffs challenge the "termination of the [NQRP], a program through which [Defendants] provide qualified legal representation to detained individuals who cannot represent themselves in bond and removal proceedings due to serious mental or cognitive impairments." ECF No. 8-1 at 9; *see also* ECF No. 1 at 3. Plaintiffs argue they are likely to show that the Acting Director's termination of the NQRP violated the APA in three ways: it was (1) arbitrary and capricious; (2) contrary to law; and (3) inconsistent with the agency's own regulations, policies, and procedures in violation of *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In response, Defendants do not dispute the Acting Director's termination of the NQRP was "final agency action" within the meaning of the APA. And, although they make specific arguments in response to Plaintiffs' second and third APA claims, Defendants do not dispute that the Acting Director's abrupt and unexplained termination of the NQRP was arbitrary and capricious within the meaning of the APA. *See* ECF No. 25 at 59.

Plaintiffs have developed a substantial, unrebutted record that termination of the policy was arbitrary and capricious. A court reviewing a plaintiff's claim that agency action is arbitrary and capricious "must confirm that the agency has fulfilled its duty to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43). That said, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

The record before the Court shows the Acting Director terminated the policy of providing representation without considering any of the substantial interests at stake, including those that explicitly motivated the agency policy in the first place. The record shows no consideration of the interests of people found mentally incompetent to represent themselves by immigration courts— that is, people who are unable to appreciate the nature of the proceedings they are in—who will likely lose their current representation and, following the Acting Director's decision, have no representation going forward. *See* ECF No. 8-4 ¶¶ 30, 32; ECF No. 8-6 ¶¶ 29, 30; ECF No. 8-8 ¶¶ 19, 29; ECF No. 8-10 ¶¶ 15, 24, 27, 28. The record also shows no consideration of the integrity of the immigration process and the "unique challenges" immigration judges face in adjudicating the deportation or detention of such people, which the agency recognized in adopting the NQRP.

ECF No. 8-2 at 8; *see also id.* at 15 (explaining that the NQRP "will facilitate the conduct of those proceedings"). And the record shows no consideration of the abrupt termination's impact on organizations that provide services to the affected population, which had organized their operations around the policy and are in the midst of these representations in court proceedings across the country. *See* ECF No. 8-3 ¶¶ 9, 18, 19; ECF No. 8-4 ¶¶ 25, 29, 30; ECF No. 8-5 ¶¶ 12, 13, 15; ECF No. 8-6 ¶¶ 11, 28, 29. That was so despite an internal email from the Acting Director acknowledging that representatives "will likely" try to withdraw. ECF No. 27-6 at 2. The only explanation in the record for terminating the policy appears to be a notification to some organizations that the Acting Director rescinded the policy out of "convenience," without elaboration. ECF No. 8-2 at 119; *see* ECF No. 8-4 ¶ 24; ECF No. 8-5 ¶ 7.

On this record, the Court can only conclude that the Acting Director "entirely failed to consider an important aspect of the problem" by abruptly ending the NQRP. *State Farm*, 463 U.S. at 43. Defendants openly relinquished any argument to the contrary, instead referring the Court to "three threshold arguments" for why the Acting Director's termination of the program should be upheld irrespective of whether it was done arbitrarily and capriciously: (1) a one-paragraph standing argument in their reply brief; (2) an argument that the Acting Director's elimination of the policy is not subject to APA review because its implementation involved a contract; and (3) an argument that the decision to cut the program is unreviewable because it is "committed to agency discretion." 5 U.S.C. § 701(a)(2); *see* ECF No. 25 at 59. The Court considers each of those arguments in turn.

### 1. *Defendants' Passing Mention Of A Possible Standing Issue Is Not Persuasive.*

To get a preliminary injunction, a plaintiff must show a substantial likelihood they have Article III standing. *See Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019). In their consolidated opposition to a preliminary injunction and motion to dismiss the case,

Defendants did not contest that Plaintiffs pled and will be able to prove standing. *See generally* ECF Nos. 13, 14. In their reply, however, Defendants include one paragraph questioning Plaintiffs' standing. ECF No. 24 at 4. Given that and this Court's "independent obligation to examine [its] own jurisdiction," the Court pauses to ensure Plaintiffs have satisfied their burden as to standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).

"To establish Article III standing, the plaintiff must have 'suffered an injury in fact' that 'is fairly traceable to the challenged action of the defendant' and it must be 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Banner Health v. Price*, 867 F.3d 1323, 1333–34 (D.C. Cir. 2017) (quoting *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180–81 (2000)). Here, Plaintiffs assert that they and their clients have been injured by the Acting Director's rescission of the policy of providing representatives to detained people who are adjudicated mentally incompetent in immigration proceedings. Defendants do not dispute that Plaintiffs have been injured within the meaning of Article III by the decision to cut the NQRP. Those injuries encompass the threat to their documented missions of providing representation to vulnerable populations in immigration proceedings, including mentally incompetent individuals. *See* ECF No. 8-4 ¶ 40; ECF No. 8-5 ¶¶ 18, 23; ECF No. 8-6 ¶¶ 1, 3; ECF No. 8-8 ¶¶ 21, 30. Plaintiffs have adduced evidence that they will not be able to afford to represent mentally incompetent individuals without the NQRP and may be forced to withdraw, which would leave such people without representation because immigration judges are now powerless to appoint representation. *See* ECF No. 8-4 ¶ 30; ECF No. 8-6 ¶¶ 29, 30; ECF No. 8-8 ¶¶ 19, 29, 32. The injuries also include direct impact on Plaintiffs' operations through the loss of critical resources and the dismantling of the system they relied on to identify and reach clients. *See* ECF No. 8-4 ¶¶ 26, 30; ECF No. 8-6 ¶¶ 19, 28; ECF No. 8-10 ¶¶ 13, 15. Defendants also do not

meaningfully dispute that Plaintiffs' clients will now face the very harms that motivated adoption of the NQRP in the first place. *See* ECF No. 14 at 39 (contending that non-NQRP safeguards will protect the clients' interests without addressing record evidence that those safeguards were inadequate).

The passing standing argument in Defendants' reply brief is terse but appears to reason as follows: First, they observe that insofar as Plaintiffs challenge the termination of the NQRP as a policy, Defendants would still maintain flexibility over the specific mechanisms for how to provide such representation. In the past, for example, Defendants have carried out the policy of providing representation by partnering with different organizations. ECF No. 8-9 at 2 n.1. Plaintiffs acknowledge this much—that they challenge rescission of the policy of providing representatives to detained people adjudicated mentally incompetent and "do not contend that Defendants must continue to operate the Nationwide NQRP in the same manner using the same contractors or funding arrangements." ECF No. 22 at 33; *see also id.* at 25 (explaining "Plaintiffs do not contend that their specific organizations must be funded or that Defendants are barred from exploring other options to ensure access to counsel for this population"). According to Defendants, Plaintiffs' acknowledgement that Defendants could carry out the policy of providing counsel "on an unfunded basis" means reinstatement of the NQRP would not redress Plaintiffs' injuries. ECF No. 24 at 4. This argument is unpersuasive.

It is true, of course, that "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). And Defendants are right that Plaintiffs have produced evidence of financial harm resulting from the rescission of the policy. Although the NQRP did not specifically require paid representation, that is how Defendants had implemented

the program in the past. When the program disappeared, so did the money Plaintiffs received from paid representations. *See* ECF No. 8-10 ¶¶ 26, 29. But Defendants' suggesting that this creates a standing issue oversimplifies Plaintiffs' showing in two respects.

First, Defendants' argument focuses exclusively on the financial component of Plaintiffs' injuries, even though Plaintiffs have also adduced unrebutted evidence of other injury. Plaintiffs proffer evidence that termination of the NQRP has "thwarted" their "organizational purpose" or mission. *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987). Plaintiffs proffer evidence that "provid[ing] legal representation to help vulnerable individuals vindicate their rights and confront injustice in the immigration system," including individuals with competency concerns, is integral to their missions. ECF No. 8-4 ¶ 40; *accord* ECF No. 8-5 ¶¶ 18, 23; ECF No. 8-6 ¶¶ 1, 3; ECF No. 8-8 ¶¶ 21, 30. Plaintiffs have proffered evidence showing how the abrupt elimination of the NQRP disrupts the systems they rely upon to achieve their missions. Plaintiffs point out that the NQRP was so valuable in part because it acted as a referral system for a population that is otherwise difficult to identify and contact. *See* ECF No. 8-4 ¶ 26; ECF No. 8-6 ¶ 19; ECF No. 8-10 ¶ 13. Without the NQRP, Plaintiffs will struggle to find and serve these individuals. *Id.*; *see Ukrainian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1378 (D.C. Cir. 1990) (finding that harm via "inability to counsel potential asylees" would interfere with "organizational purpose of furthering the beneficial integration of individuals of Ukrainian descent" and concluding organization had shown injury in fact (quotation marks omitted)). This nonfinancial harm to Plaintiffs' core missions would be redressed if Defendants start providing representation again, whether that representation is paid or not. At most, Defendants show that reinstatement of the program will not make Plaintiffs financially whole, but redressability does not

require "that a favorable decision will relieve [a plaintiff's] *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

Second, although Plaintiffs would be satisfied with restoration of the NQRP even if the representations are unfunded and involve different providers, they proffer unrebutted evidence indicating that Defendants would not be able to implement the NQRP on a completely pro bono basis and without any participation by Plaintiffs. Plaintiffs identify representations EOIR has made in other litigation about the difficulty of finding enough pro bono attorneys to serve every individual in this population. *Franco-Gonzalez v. Holder*, No. 10-cv-02211, 2013 WL 3674492, at *6 (C.D. Cal. Apr. 23, 2013). Plaintiffs also submit declarations explaining that this is a population with highly specific needs and that many attorneys who might otherwise take pro bono cases either cannot or will not work with these individuals. *See* ECF No. 8-3 ¶ 17; ECF No. 8-4 ¶ 32; ECF No. 8-5 ¶ 22; ECF No. 8-6 ¶ 27; ECF No. 8-12 ¶ 26. Plaintiffs are some of the only organizations in their respective parts of the country that have the skills or commitment to serve this population. *See* ECF No. 8-3 ¶¶ 4, 17; ECF No. 8-4 ¶ 4; ECF No. 8-9 ¶ 21. So, while Plaintiffs do not seek to compel Defendants to fund their specific organizations, at this early phase of the litigation and on this record, they have shown that Defendants are likely to pay them to carry out the NQRP. Indeed, beyond citing Plaintiffs' acknowledgment that they do not seek reinstatement of any particular contract, Defendants never suggest that they could implement the policy without paying Plaintiffs, let alone support that possibility with evidence. For these two reasons, Defendants' passing doubt as to Plaintiffs' standing is misplaced.

In addition to establishing their own injuries that are redressable through their APA claims, Plaintiffs assert injury on behalf of their clients. Plaintiffs may do so here because they have shown the requisite "close relation to the third party"—the vulnerable population they represent as

clients—and have also shown "some hindrance to the third party's ability to protect his or her own interests"—indeed, the population is, by definition, people who have been found incompetent to represent themselves in legal proceedings. *Powers v. Ohio*, 499 U.S. 400, 411 (1991) (recognizing that a plaintiff who has suffered their own injury in fact giving them a concrete interest in a dispute may in these circumstances assert the rights of third parties); *see also Kowalski v. Tesmer*, 543 U.S. 125, 129–30 (2004) (recognizing that it is sometimes "necessary to grant a third party standing to assert the rights of another"). Plaintiffs have shown that their clients are injured by the Acting Director's decision to cut the NQRP because their attorneys probably will run out of resources to represent them soon. *See* ECF No. 8-4 ¶ 30; ECF No. 8-6 ¶¶ 29, 30; ECF No. 8-8 ¶ 19. And as already stated, without the NQRP, the clients are highly unlikely to secure replacement representation. *See* ECF No. 8-6 ¶ 30; ECF No. 8-8 ¶ 19; ECF No. 8-10 ¶ 27. Without representation, these individuals will face the "insurmountable" task of navigating bond and removal proceedings on their own, with virtually no ability to "examine or present evidence on their own behalf, cross-examine witnesses, or rebut the government's case." ECF No. 8-11 ¶ 18. They "may remain detained for extended periods." ECF No. 19-1 at 10. They will be "denied due process, and are likely to be ordered deported without full or meaningful consideration of the harms that await them upon removal, which are often on account of the disability that prevents them from presenting a claim without assistance." ECF No. 8-11 ¶ 18. That disturbing outcome may befall "asylum seekers with a lawful basis for remaining in the United States," lawful permanent residents, and even citizens. ECF No. 8-1 at 24 n.6 (citing a Human Rights Watch research report from before the NQRP's adoption suggesting that individuals with mental disabilities in these groups were subject to "unfair[]" deportation "because their mental disabilities made it impossible

for them to effectively present their claims in court"). Reinstating the NQRP would plainly redress these harms.

    2.   *Rescinding The NQRP's Policy Of Providing For The Appointment of Representatives Is Not Insulated From APA Review Simply Because Defendants Used A Contract In Implementing The Policy.*

      In many recent cases, courts have considered claims challenging the termination of grants, presenting questions about whether the claims are properly asserted under the APA in federal district courts or must proceed in the Court of Federal Claims under the Tucker Act. *See Harris County v. Kennedy*, No. 25-cv-1275, 2025 WL 1707665, at *12–14 (D.D.C. June 17, 2025) (collecting cases that "have grappled with whether the Tucker Act divests district courts of jurisdiction in a raft of grant-termination cases"); *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc). Because in those cases the plaintiffs' challenges and claims for relief have entailed the reinstatement of particular grant instruments—contracts—courts have had to consider whether the claim at issue is, in fact, a challenge to agency policy (and therefore properly reviewed under the APA) or is "at its essence contractual" (in which case, the Tucker Act requires that the claim proceed through the Court of Federal Claims). *Crowley Gov't Servs. v. GSA*, 38 F.4th 1099, 1102 (D.C. Cir. 2022) (quotation marks omitted) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)); *see also Dep't of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (granting stay on the grounds that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" (quoting *Great-W. Life Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002))).

      Here, Plaintiffs challenge rescission of the NQRP, i.e., the government's articulated policy "to provide Qualified Representatives (QRs) to certain unrepresented and detained respondents who are found by an Immigration Judge or the BIA to be mentally incompetent to represent themselves in immigration proceedings." ECF No. 8-2 at 11. In contrast to claims to reinstate

particular contractual instruments, Plaintiffs' claims explicitly recognize that reinstatement of the policy of authorizing and providing representatives nationwide does not mandate that the policy be implemented the exact same way. *See* ECF No. 22 at 25, 33 (explaining that Plaintiffs "do not contend that Defendants must continue to operate the Nationwide NQRP in the same manner using the same contractors or funding arrangements" or that "Defendants are barred from exploring other options to ensure access to counsel for this population").

Defendants nonetheless argue that Plaintiffs' claims "belong in the Court of Federal Claims under the Tucker Act." ECF No. 24 at 2. According to Defendants, because they implemented the policy of ensuring representation at least in part using a third-party contract, and because their elimination of the policy led to modification of that contract, it follows that "Plaintiffs' claims arise from a contract." *Id.* And because Plaintiffs "could seek a contractual remedy," their claims run headlong into the APA provision that limits judicial review to agency action for which there are no adequate alternative remedies. *Id.* at 7; *see* 5 U.S.C. § 704. This argument—that a challenge to the rescission of a policy is "at its essence contractual" and insulated from APA review simply because the government used a contract to implement it—is far removed from the dispute in grant-termination cases and too superficial to be persuasive. *Crowley*, 38 F.4th at 1102.

To be sure, it is true that in the past, Defendants implemented the NQRP at least in part using contracts. As Defendants' policy manual put it, "EOIR carries out the NQRP through the effort of federal staff and a contract." ECF No. 27-3 at 2. According to the record, Defendants' most recent implementation of the policy included a contract with a third party that subcontracted with legal service providers across the country. ECF No. 14-1 ¶¶ 11, 13. The record reflects that, before the most recent arrangement, Defendants' implementation of the policy included a different agreement with a third party. ECF No. 8-11 at 2 n.1. But the fact that, upon adopting the policy of

authorizing and providing representatives, Defendants adopted an implementation that included third-party agreements does not remotely convert Plaintiffs' APA claims into a contract claim.

The D.C. Circuit has "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Crowley*, 38 F.4th at 1107 (quoting *Megapulse*, 672 F.2d at 967–68). And "[e]xclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Id.* at 1108 (second alteration in original) (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)). Indeed, it is not clear this case even contemplates the kind of "judicial remedy [that] may require one party to pay money to another" that the Supreme Court has distinguished from the classic contractual remedy of money damages. *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988).

It may well be that Defendants have found contractual arrangements to be an effective or an essential component of carrying out the NQRP. However, that does not transform Plaintiffs' policy challenge—which does not rely on the terms of or seek reinstatement of any particular contractual instrument—into a contract claim, nor their desired relief into a contractual remedy.

### 3. Rescinding The NQRP's Policy Of Providing For The Appointment Of Representatives Is Not An Unreviewable Act Of Agency Discretion.

Defendants' third threshold argument is that rescission of the NQRP's policy of authorizing and ensuring representation in immigration proceedings is not subject to APA review because it is agency action "committed to agency discretion by law." *Dep't of Com. v. New York*, 588 U.S. 752,

771 (2019) (quoting 5 U.S.C. § 701(a)(2)); *see* ECF No. 14 at 26. This threshold argument works no better than the others.

"[T]here is a strong presumption of reviewability under the APA." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 99 (D.C. Cir. 2021) (quotation marks omitted) (quoting *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003)). Review is not available, however, for agency action that is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The Supreme Court has read § 701(a)(2)'s exception "quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Dep't of Com.*, 588 U.S. at 772 (quoting *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018)). The exception "imposes two related, but distinct, barriers to judicial review." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 642 (D.C. Cir. 2020). First, certain agency actions are "presumed immune from judicial review." *Id.* (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). "The paradigmatic example of presumptively *unreviewable* agency action is 'a decision not to institute enforcement proceedings.'" *Id.* (quoting *Dep't of Com.*, 588 U.S. at 772). This also includes certain other administrative decisions, including "allocation of funds from a lump-sum appropriation." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). Second, "even if agency action is presumptively *reviewable*, section 701(a)(2) also applies 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Physicians for Soc. Resp.*, 956 F.3d at 642 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)). As the D.C. Circuit has explained, however, regardless of whether a case falls into one of these two categories, "judicial review is available where there are 'meaningful standards to cabin the agency's otherwise plenary discretion.'" *Id.* at 643 (quoting *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002)).

Defendants argue that EOIR's implementation of the NQRP falls in the first category and is therefore presumptively unreviewable because it involves "the allocation of funds from a lump-sum appropriation"—namely, the allocation of EOIR's lump-sum congressional appropriation. *Lincoln*, 508 U.S. at 192. Accordingly, Defendants say, "any decisions regarding how much funding to allocate to the program, or whether to fund the program at all, are committed entirely to EOIR's discretion." ECF No. 14 at 28.

But even accepting that the NQRP is funded through EOIR's lump-sum appropriation, this is just "the sort of claim that federal courts routinely assess," rather than a claim in which "a court would have no meaningful standard against which to judge" agency decisionmaking. *Weyerhaeuser*, 586 U.S. at 25. This case involves an issue that is not only subject to meaningful standards in relevant statutes, but germane to courts, which routinely adjudicate issues related to the appointment of representation to self-represented litigants, including people who are found to be incompetent to represent themselves. *See Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (reasoning that the words "high quality and cost-effective" provided a meaningful standard for courts because they are similar to other standards that "courts and juries must decide"). Both the Rehabilitation Act and the Immigration and Nationality Act ("INA") provide meaningful standards to assess decisions related to the provision of assistance to mentally incompetent people in detention and removal proceedings. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794. And the INA provides that individuals in removal proceedings "shall have a reasonable opportunity to examine the evidence against the

alien, to present evidence on the alien's own behalf, and to cross-examine witnesses presented by the Government." 8 U.S.C. § 1229a(b)(4)(B). Indeed, the notion that there are "no meaningful standards" to constrain such decisionmaking is belied by the fact that the very issue here—the provision of qualified representatives in immigration proceedings—has been litigated in federal court applying these statutes, and Defendants concede they remain subject to a federal court injunction on the topic in three states. ECF No. 8-1 at 12 (discussing *Franco*, 2013 WL 3674492); ECF No. 14-1 ¶ 6. And Defendants concede the issue here is governed by the legal principles articulated by the BIA. ECF No. 14 at 31–32 (discussing *Matter of M-A-M-*, 25 I&N Dec. 474, 481–82 (BIA 2011)).

In this circumstance—an agency decision on an issue germane to courts, addressed by specific statutes, and concededly governed by opinions of law—it would be quite a thing to conclude "a court would have no meaningful standard against which to judge the [Acting Director's] exercise of [her] discretion." *Weyerhaeuser*, 586 U.S. at 25 (quoting *Lincoln*, 508 U.S. at 191). Indeed, the D.C. Circuit has found agency action judicially reviewable where there is far less. *See Shawnee Tribe*, 984 F.3d at 101 (collecting cases); *Cody*, 509 F.3d at 610 (same).[3]

**B. Plaintiffs Have Shown Irreparable Harm.**

On this record, Plaintiffs have shown they and their clients will be irreparably harmed by the decision to rescind the NQRP. The Acting Director's abrupt rescission of the program without

---

[3]    Because the Court concludes that Plaintiffs have stated a claim and are likely to succeed in showing that Defendants violated the APA by arbitrarily and capriciously ending the NQRP, it denies the motion to dismiss in part and need not consider whether Plaintiffs are likely to succeed on the merits of their other APA theories for the purposes of preliminary relief. Although Plaintiffs additionally request that the Court "enter a permanent injunction" on their arbitrary and capricious claim, the Court declines to do so, recognizing that the issues have been briefed on an expedited basis and Defendants should be provided the opportunity to more fully develop their case. *See* ECF No. 22 at 48.

any alternative way to appoint representatives means that people who have been deemed mentally incompetent in immigration proceedings—people who Plaintiffs' organizations are dedicated to serving—will very likely go without representation.

The NQRP ensures representation of individuals with mental limitations so significant that a court has determined they are unable to understand and participate in immigration proceedings on their own. *See* ECF No. 8-4 ¶ 6 ("Incompetent respondents definitionally lack core capacities associated with the functions of self-representation, such as the ability to understand the very nature and object of the proceedings."). As Defendants confirm, without the NQRP, there is "not a mechanism to appoint a qualified representative." ECF No. 25 at 45–46. Some Plaintiffs state that they will try to represent their current clients for as long as possible despite the abrupt recission of the program and the funds used to implement it, but they do not have the resources to keep this up for long. *See* ECF No. 8-4 ¶ 30; ECF No. 8-6 ¶¶ 29, 30; ECF No. 8-8 ¶¶ 19, 32; *see also* ECF No. 22-3 ¶¶ 5, 6 (describing one plaintiff organization that has been forced to tell two clients it cannot represent them before the BIA due to the elimination of the NQRP and the loss of associated funding).[4] And there is strong evidence in the record indicating that these individuals will not be able to find replacements for their appointed representatives. *See* ECF No. 8-9 ¶ 18; ECF No. 8-10 ¶ 19; ECF No. 8-11 ¶¶ 6, 17. In other words, people who have been adjudicated by immigration courts to be mentally incompetent under existing procedures will be left to do precisely what a court has just found they *are not capable of doing*—represent themselves in legal proceedings.

---

[4]    Plaintiffs attached supplemental declarations to their consolidated opposition and reply without a separate motion for leave. *See* ECF No. 22; Local Civil Rule 65.1(c). The Court construes the filing as a motion for leave to file the supplemental declarations. Because Defendants have had an opportunity to respond and the Court finds no prejudice to Defendants from their inclusion, the Court grants leave.

Plaintiffs have adduced substantial documentation of the challenges these individuals face in representing themselves in immigration court. These individuals "are unable to examine or present evidence on their own behalf, cross-examine witnesses, or rebut the government's case for removal in any meaningful way." ECF No. 8-5 ¶ 19; *accord* ECF No. 8-6 ¶ 21; ECF No. 8-8 ¶ 25; ECF No. 8-10 ¶ 20; ECF No. 8-11 ¶ 18. Their ability to make basic decisions in the unfamiliar and dynamic context of high-stakes legal proceedings is severely impaired; they are more likely to "freez[e] up" than adjust to the new circumstances. ECF No. 8-12 ¶ 15. Many will appear uncredible because they cannot recall or present factual information in a coherent and complete narrative. ECF No. 8-4 ¶ 12; ECF No. 8-8 ¶ 24; ECF No. 8-11 ¶ 16; ECF No. 8-12 ¶ 21. They sometimes "become suspicious or even combative with the court." ECF No. 8-11 ¶ 16. "Some struggle to testify without significant emotional distress." *Id.*

Moreover, because of the "discrimination and social stigmatization they have experienced as a result of their diminished capacity," members of this population frequently withhold crucial information about their conditions and how they affect their proceeding before the court. ECF No. 8-12 ¶ 22; *see also* ECF No. 8-7 ¶ 17 ("Individuals who are found incompetent by the Court are unable to understand the legal process, communicate their needs or fears, or request help."). Indeed, these individuals are "often inherently unable to articulate or even comprehend both the nature of their disability or the risk of persecution on the basis of their disability," which means they struggle to appreciate and communicate the unique harms they will face if they are removed. ECF No. 8-11 ¶¶ 18, 19; *accord* ECF No. 8-8 ¶ 26; ECF No. 8-9 ¶ 19; ECF No. 8-10 ¶ 21; *see also* ECF No. 8-4 ¶ 9 (describing various forms of persecution and abuse inflicted on clients in their home countries due to their disabilities).

Individuals with competency issues "are more susceptible to influence from, and acquiescing to, law enforcement, judges, or prosecuting attorneys," which can make them especially likely to give false confessions or admissions. ECF No. 8-12 ¶ 23. Some of these individuals are simply "inaccessible for long periods of time due to psychiatric hospitalizations and suicidality," which frustrates their ability "to present their case in accordance with the Immigration Judge's deadlines." ECF No. 8-6 ¶ 16. It also bears repeating that Plaintiffs' clients are detained, and detention can amplify existing competency concerns because "the stressors of detention have a uniquely severe impact on those with mental disabilities," causing them to "decompensate." ECF No. 8-12 ¶ 25.

In short, Plaintiffs' clients are irreparably harmed by the termination of the NQRP because they rely on their appointed representatives to invoke their rights. *See* ECF No. 8-4 ¶¶ 16, 18; ECF No. 8-6 ¶¶ 21, 22; ECF No. 8-11 ¶ 18; ECF No. 8-12 ¶ 19. It is difficult to overstate the risks these individuals face given the nature and stakes of the proceedings against them, which range from continued detention to removal from the country. ECF No. 8-4 ¶¶ 10, 33. Forcing them to navigate these proceedings alone exposes them to harm that is "certain and great," imminent, and "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Plaintiffs have also adduced evidence that the harms caused by rescission of the NQRP, including but not limited to these direct harms to Plaintiffs' clients, "directly conflict with [their] mission[s]." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)). As described, Plaintiffs are dedicated to serving vulnerable individuals in immigration proceedings, including the individuals previously covered by the NQRP. *See* ECF No. 8-4 ¶ 40; ECF No. 8-5 ¶¶ 18, 23;

ECF No. 8-6 ¶¶ 1, 3; ECF No. 8-8 ¶¶ 21, 30. These individuals are, by virtue of their competency issues, among the most vulnerable people in the immigration system. ECF No. 8-5 ¶ 16; ECF No. 8-6 ¶¶ 3, 16; ECF No. 8-8 ¶ 22. The likelihood that these individuals will be left to represent themselves in their proceedings directly undermines Plaintiffs' missions. *See* ECF No. 8-9 ¶¶ 18, 27; ECF No. 8-10 ¶¶ 19, 30; ECF No. 8-11 ¶¶ 17, 23. Even if Plaintiffs manage to continue representing these individuals, some Plaintiffs will be forced to rearrange their limited resources to do so, which will have repercussions on their other priorities. *See* ECF No. 8-4 ¶¶ 25, 30; ECF No. 8-5 ¶ 15; ECF No. 8-6 ¶ 28; ECF No. 22-4 ¶ 5. Compounding the harm, Defendants' elimination of the program simultaneously deprives Plaintiffs of the system used to identify and reach this vulnerable population, which is otherwise extremely difficult. *See* ECF No. 8-4 ¶ 26; ECF No. 8-5 ¶ 13; ECF No. 8-6 ¶ 19; ECF No. 8-7 ¶ 12; ECF No. 8-10 ¶ 13. Plaintiffs have shown these "obstacles" created by Defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *League of Women Voters*, 838 F.3d at 9.

The Court accordingly finds that the evidence of palpable—irreparable—harm to Plaintiffs and their clients supports Plaintiffs' entitlement to relief pending litigation.

### C.  The Balance Of The Equities And The Public Interest Favor Plaintiffs.

The final two preliminary injunction factors, balancing the equities and the public interest, generally "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Here, they also weigh in Plaintiffs' favor. As the D.C. Circuit has explained, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Id.* (quotation marks omitted) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). Additionally, the harms that Plaintiffs

and their clients will suffer absent preliminary injunctive relief are severe. Although Defendants insist that there are sufficient safeguards in place without the NQRP to mitigate the harm to individuals deemed mentally incompetent, the record provides substantial reason to conclude otherwise. *See, e.g.*, ECF No. 8-5 ¶¶ 15, 16; ECF No. 19-1 at 3–4. Indeed, Defendants created the NQRP to address the "many unique challenges" that existing safeguards could not resolve on their own. ECF No. 8-2 at 8. Immigration courts have come to depend on the program to move complicated cases forward fairly and efficiently. *See* ECF No. 8-4 ¶¶ 6, 7, 18; ECF No. 19-1 at 3–4. Defendants have not provided any persuasive reason to conclude that the balance of the equities and the public interest tip in their favor—especially given that, by their own account, their action was motivated by mere "convenience" and nothing more.

### D.  The Court Will Not Require Bond In This Instance.

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Injunction bonds "are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025). However, the D.C. Circuit has also recognized that Rule 65(c) "vest[s] broad discretion in the district court to determine the appropriate amount of an injunction bond." *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999). This includes discretion to "dispense with any security requirement whatsoever where the restraint will do the defendant 'no material damage.'" *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980).

The Court concludes no bond is warranted here. Defendants claim bond is appropriate in the event the Court orders them "to continue to pay [their prior third-party contractor] and its subcontractors millions of dollars under the Contract." ECF No. 14 at 41. But the Court has

considered Plaintiffs' claim as it was articulated—challenging rescission of the NQRP's policy and not seeking the reinstatement of any particular contractual instrument.

The Court also finds that bond would be inappropriate because it "would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025) (quoting *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971)). Requiring resource-strapped nonprofits to post bond before they can obtain preliminary relief from likely unlawful government action that imposed financial strain on them would frustrate the goals of judicial review. Multiple courts in this district have declined to require security for similar reasons. *See id.*; *Widakuswara v. Lake*, No. 25-cv-01015, 2025 WL 1166400, at *17 (D.D.C. Apr. 22, 2025); *Climate United Fund v. Citibank, N.A.*, No. 25-cv-00698, 2025 WL 1131412, at *21 (D.D.C. Apr. 16, 2025).

### E.  Scope Of Relief.

Defendants ask that the Court limit any injunctive relief "to Plaintiffs alone, and even then, only to those Plaintiffs that have clearly shown that they face imminent irreparable harm in the absence of such relief." ECF No. 14 at 40. But the APA requires this Court to "hold unlawful and set aside" arbitrary and capricious agency action. 5 U.S.C. § 706(2)(A); *see Trump v. CASA, Inc.*, No. 24A884, 2025 WL 1773631, at *19 (U.S. June 27, 2025) (Kavanaugh, J., concurring) ("And in cases under the Administrative Procedure Act, plaintiffs may ask a court to preliminarily 'set aside' a new agency rule."). That the invalidated agency action was a nationwide policy does not mean Plaintiffs are "seek[ing] relief on behalf of legal aid organizations who are not parties to this suit." ECF No. 14 at 40. Rather, they are seeking the very relief mandated by Congress in the APA.

Defendants also ask that the Court "leave decisions as to how, when, and to whom" to disburse any funds they are ordered to spend to their discretion. *Id.* As discussed, the Court agrees. Defendants must reinstate the NQRP's policy guaranteeing qualified representatives and enabling

immigration courts to appoint such qualified representatives to detained and unrepresented respondents who are found mentally incompetent to represent themselves in bond and removal proceedings. While Defendants may, in the short or long term, effectuate that program using similar mechanisms as they have in the past, they also may effectuate it in other ways.[5]

## III.    Conclusion

For these reasons, Plaintiffs' motion for a preliminary injunction, ECF No. 8, is granted, and Defendants' motion to dismiss, ECF No. 14, is denied as to count one. Defendants' motion to dismiss is held in abeyance as to counts two and three.

- Defendants Pamela Bondi, Sirce Owen, Kristi Noem, the U.S. Department of Justice, the U.S. Department of Homeland Security, and the Executive Office for Immigration Review and their agents are enjoined from taking any action to terminate or pause the National Qualified Representative Program, which is defined as a program that provides Qualified Representatives to certain unrepresented and detained respondents who are found by an immigration judge or the Board of Immigration Appeals to be incompetent to represent themselves in immigration proceedings.

- Defendants shall take all steps necessary to effectuate this order. This includes promptly reinstating the National Qualified Representative Program policy in the Executive Office for Immigration Review policy manual and reimplementing the program consistent with this order.

---

[5]    In their briefing, Defendants request that the Court stay any preliminary injunction pending appeal. ECF No. 14 at 41. That request is denied as premature. If, after reviewing this opinion and order, Defendants decide to pursue an appeal, they may move for a stay pending appeal and the Court will consider it in the ordinary course.

- Defendants shall provide written notice of this order to all relevant agency staff and immigration judges within 48 hours. Defendants shall file a status report by July 28, 2025, that apprises the Court of Defendants' compliance with this order.


_____

AMIR H. ALI
United States District Judge

Date:   July 21, 2025