**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| American Gateways, et al., | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No. 1:25-cv-01370-AHA |
| U.S. Department of Justice, et al., | ) ) | |
| *Defendants*. | ) ) ) | |

---

***AMICUS CURIAE* BRIEF OF FORMER IMMIGRATION JUDGES &
FORMER MEMBERS OF THE BOARD OF IMMIGRATION APPEALS
<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

John R. Jacob
D.C. Bar No. 444412
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 887-4000
Fax: (202) 887-4288
Email: jjacob@akingump.com

*Counsel to Amici Former Immigration
Judges & Former Members of the Board of
Immigration Appeals*

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*Amici curiae* are former Immigration Judges and former members of the Board of Immigration Appeals ("BIA" or the "Board"), listed in Appendix A, with substantial, combined years of service and intimate knowledge of the U.S. immigration system. *Amici* submit this brief to illuminate for this Court how the immigration court system operates and the essential role that legal representation plays in proceedings involving mentally incompetent respondents. In particular, the funding for legal representation through the National Qualified Representative Program ("NQRP") and the unique ability it provides for immigration judges to appoint counsel is essential to the fair and efficient adjudication of proceedings involving those individuals. Terminating the legal representation provided through the NQRP will result in fewer lawyers for mentally incompetent individuals and will inevitably make the immigration courts less fair and efficient.

*Amici* are invested in the issues presented by Plaintiffs because *amici* have dedicated their careers to improving the fairness and efficiency of the U.S. immigration system, even after departing from the bench. Given *amici*'s familiarity with the procedures and realities of the immigration adjudication system, *amici* respectfully submit that this Court should enjoin the actions taken by Defendants to abruptly terminate the legal representation provided through the NQRP without understanding its importance and efficacy.

## INTRODUCTION

As former Immigration Judges and former members of the Board of Immigration Appeals, *amici* have centuries of collective experience impartially administering justice in removal hearings

---

[1] No party's counsel authored this brief in whole or in part, and no person other than *amici* and their counsel contributed money that was intended to fund the preparation or submission of this brief.

and on appeal. One of our primary responsibilities in court and on appeal was to ensure that unrepresented respondents—many of whom suffer from serious mental illness or cognitive impairments—are treated fairly in the immigration court system. Through the funding of legal representation via the NQRP, the Executive Office for Immigration Review ("EOIR") provided a nationwide mechanism to ensure that counsel could be appointed to represent detained respondents found mentally incompetent to represent themselves.

We thus submit this *amicus* brief to ask this Court to enjoin EOIR's termination of the NQRP, which provided mentally incompetent respondents with a meaningful opportunity to understand and participate in their immigration court proceedings. NQRP was not only a matter of fairness – it was an invaluable tool for Immigration Judges, who would otherwise be burdened with the sole responsibility of safeguarding due process in the absence of representation. As explained below, when a respondent with serious mental impairments is provided counsel to prepare for and represent them in immigration court, the respondent is able to have a basic understanding of the proceedings and of their rights within that system. Appointed representatives help develop the record, secure psychological evaluations, identify potential relief, and articulate claims that the respondent could not present alone.

*Amici*'s experience predates the implementation of the NQRP, and we vividly recall the barriers that existed before its creation. Immigration Judges were often left without any meaningful way to proceed in cases involving incompetent respondents. They were forced to delay, administratively close, or even terminate proceedings in the absence of safeguards. The NQRP was a transformative reform. It converted what had long been an unaddressed gap in the system into a consistent, nationwide framework that protected the rights of vulnerable respondents and allowed Immigration Judges to fulfill their legal obligations.

In our experience, mentally incompetent respondents who appear in immigration court without representation require far more judicial intervention, are more likely to need lengthy continuances, and, in the end, often cannot meaningfully participate or appropriately articulate any claims for relief from removal. Even a brief interruption in the availability of qualified legal representation disrupts the fair and efficient functioning of the immigration courts. Indeed, EOIR's implementing memorandum from 2013 states that the NQRP was created "in order to enable Immigration Judges to more efficiently and effectively carry out their adjudicatory duties . . . ."[2]

This *amicus* brief explains the role that the NQRP played in maintaining the fairness and integrity of immigration court proceedings—particularly in cases where respondents face removal without the cognitive ability to defend themselves. In those proceedings, respondents must navigate a complex legal system in an adversarial posture against a sophisticated opponent, a lawyer representing the Department of Homeland Security ("DHS"). Judges are tasked with ensuring that this unlevel playing field does not violate due process by educating unrepresented respondents and allowing valid claims to be adequately presented. The legal representation provided through the NQRP played a vital role in ensuring that these fundamental objectives could be achieved.

## **BACKGROUND**

The immigration court system is the due process provided to individuals charged with removability from the United States (*i.e.*, deportation) by DHS. Immigration Judges, employees of the Department of Justice appointed by the Attorney General and operating within the EOIR, preside over these proceedings and are responsible for ensuring their fairness and efficiency. As of

---

[2] Memorandum of Brian M. O'Leary, Chief Immigration Judge to All Immigration Judges, U.S. DEP'T OF JUST., EXEC. OFF. FOR IMMIGR. REV. (Apr. 22, 2013), *available at* https://www.hoppocklawfirm.com/wp-content/uploads/2021/09/2013-OLeary-Memo.pdf.

2024, there were approximately 700 Immigration Judges nationwide. Their role is not merely that of a neutral arbiter; rather, Immigration Judges are required to affirmatively develop the record and protect the procedural rights of respondents. *See Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir. 2002) ("[an immigration judge] is not merely the fact finder and adjudicator but also has an obligation to establish the record."); *Quintero v. Garland*, 998 F.3d 612, 624–25, 28 (4th Cir. 2021) (explaining at length the duty of Immigration Judges to develop the record and provide adequate assistance to ensure fair hearings). This is particularly true for those who are seeking asylum or other protections; as the BIA has held, immigration judges and Board members "bear the responsibility of ensuring that refugee protection is provided where such protection is warranted by the circumstances of an asylum applicant's claim." *Matter of S-M-J-*, 21 I. & N. Dec. 722, 723 (B.I.A. 1997). Thus, "a cooperative approach in Immigration Court is particularly appropriate[,]" giving immigration judges "a role in introducing [relevant] evidence into the record." *Id.* at 724, 726. In summary, immigration judges "have an affirmative duty to assist and work with" those who appear before them seeking relief. *Quintero*, 998 F.3d at 626.

These duties apply to all proceedings but require far more judicial intervention when the respondent is unrepresented—and even more so when the respondent is legally incompetent due to mental illness, intellectual disability, or other impairments. As the federal courts have long recognized, immigration law is extremely complicated and often unintelligible to those without specialized legal training. *Castro-O'Ryan v. U.S. Dep't of Immigr. & Naturalization* ("INS"), 847 F.2d 1307, 1312 (9th Cir. 1988) ("With only a small degree of hyperbole, the immigration laws have been termed 'second only to the Internal Revenue Code in complexity.' A lawyer is often the only person who could thread the labyrinth." (citation omitted)). Respondents in immigration proceedings often must navigate the system while detained, without English fluency, and under

the pressure of possible permanent removal from the United States. For individuals with serious mental impairments, this complexity renders the system incomprehensible. While U.S. law guarantees the right to counsel at no expense to the government, *see* 8 U.S.C. § 1229a(b)(4)(A), it does not authorize Immigration Judges to appoint or fund counsel in removal proceedings. NQRP was created to fill that gap—specifically and exclusively for detained respondents found mentally incompetent to represent themselves.

EOIR developed the NQRP in the wake of *Franco-Gonzalez v. Holder*, No. CV 10-02211 DMG, 2013 WL 3674492 (C.D. Cal. Apr. 23, 2013), a class action brought on behalf of detained individuals in removal proceedings with serious mental disorders. That litigation led to a landmark ruling requiring appointed counsel for members of the class, and EOIR ultimately extended the program nationwide. The NQRP served only a narrow population—those detained individuals who had been adjudicated by an Immigration Judge as mentally incompetent under the framework set forth in *Matter of M-A-M-*, 25 I. & N. Dec. 474 (B.I.A. 2011).[3] The program allowed Immigration Judges to request appointment of qualified representatives who were trained to assist respondents with serious mental illness, often in coordination with mental health professionals and family members. In this, NQRP was a unique and invaluable tool, as immigration judges do not otherwise have the authority to appoint counsel.

For more than a decade, the NQRP was the only effective mechanism available to Immigration Judges to comply with the procedural safeguards mandated in cases involving incompetent respondents. It allowed hearings to proceed efficiently and lawfully by ensuring that respondents had someone to help them understand the proceedings, present relevant evidence, and

---

[3] Amici believe that *Matter of M-A-M-* is an incomplete and insufficient expression of the rights of respondents who are incompetent to represent themselves and provides inadequate protections of those same rights. Our reliance on the decision here is merely an acknowledgement that, at a minimum, the Board has recognized that different rules must apply to such individuals.

articulate their claims. As *amici* experienced firsthand, cases involving mentally incompetent respondents without counsel typically resulted in repeated continuances, prolonged detention, or termination when no safeguard could be implemented. The presence of a qualified representative often made the difference between chaos and resolution.

On April 25, 2025, EOIR abruptly announced the termination of the NQRP. EOIR informed program administrators that going forward, NQRP would only be available in the three states covered by the *Franco-Gonzalez* injunction (Arizona, California, and Washington). No replacement program was offered. Immigration Judges were instead told to rely on informal referral networks or local nonprofit providers, many of which were already overburdened and not equipped to handle detained mental health cases. No new authority was granted to appoint counsel. No updated guidance was issued on how to comply with *M-A-M-*. The result is a system in which Immigration Judges remain legally obligated to provide safeguards but no longer have a functional mechanism to do so effectively.

As described below, the loss of NQRP has placed Immigration Judges in an untenable position—legally responsible for ensuring fairness but structurally barred from fulfilling that responsibility. Proceedings involving incompetent respondents have become increasingly unmanageable. Hearings are delayed, dockets are disrupted, and respondents remain detained without a lawful path forward. The consequences are not theoretical. *Amici* have experienced these failures in real time. And without a program like the NQRP, these failures will only increase.

With that in mind, let us explain how immigration court proceedings work (primarily from the perspective of an unrepresented respondent), and the judge's role in those proceedings, highlighting the important role of the legal representation services funded by NQRP.

### 1. *Commencement of Proceedings via Notice to Appear*

Immigration court removal proceedings are commenced by DHS with the service and filing of a Notice to Appear ("NTA"), a legal document that contains factual allegations supporting the stated legal bases for the charges of removability under the Immigration & Nationality Act ("INA"). The NTA, like a civil or criminal complaint, is not proof of removability; its allegations and charges must be proven by DHS and may be contested by the respondent.

Respondents—including asylum seekers who recently entered the United States, permanent residents with families in the country, and undocumented individuals who have lived in our country for decades—must then prepare to answer the allegations and charges leveled against them in the NTA and assert any claims for relief, *i.e.*, their defenses from removal. For any respondent—but especially those with mental impairments—the NTA can be incomprehensible. It references statutory violations, legal procedures, and eligibility criteria that are not self-explanatory. Without a representative, a respondent who is mentally incompetent is unlikely to comprehend the charges against them or to be able to articulate any defense. Such a respondent is entirely unprepared for the immigration court process, requiring Immigration Judges to balance their obligation to develop the record with the respondent's inability to participate, often resulting in lengthy delays, continuances, or termination of proceedings.

### 2. *The Master Calendar Hearing*

After the NTA is served and lodged with the immigration court, the first hearing for any respondent is the master calendar hearing, where the respondent is asked to plead to the charges in the NTA and state any claims for relief. The court then sets a date for trial (also known as an individual hearing or merits hearing). Any single master calendar hearing session is scheduled to address the cases of many dozens of respondents, one by one. As a practical matter, on average,

no more than a few minutes can be allotted to each case in order to complete the assigned morning or afternoon docket. Nevertheless, the immigration judge must ensure that each respondent fully understands the proceedings—*i.e.,* why they are there and what the process will entail. The immigration judge must also ensure that each respondent understands the contents of the NTA, and all potentially available claims for relief.[4] The immigration judge does this by directly questioning the respondent, often through an interpreter, and gauging whether they understand the proceedings—and, in particular, the NTA. This can be a lengthy colloquy with the respondent; EOIR master calendar hearing guidance for questioning *pro se* respondents runs seven pages.[5] These hearings are particularly complex when the respondent is mentally incompetent.

When a respondent's conduct raises a *bona fide* doubt as to their competence to participate in the hearing, Immigration Judges are obligated under *M-A-M-*, 25 I. & N. Dec. 474, to make a competency determination. That inquiry includes assessing whether the respondent "has a rational and factual understanding of the nature and object of the proceedings, can consult with the attorney or representative if there is one, and has a reasonable opportunity to examine and present evidence and cross-examine witnesses." *Id.* at 479. Where a respondent "lacks sufficient competency to proceed with the hearing," the immigration judge has "discretion to determine which safeguards are appropriate, given the particular circumstances in a case." *Id.* at 481–82.

Among the safeguards contemplated in *M-A-M-*, the most critical and effective is the appointment of a qualified legal representative—but *M-A-M-* itself did not provide judges with the

---

[4] *See* 8 C.F.R. § 1240.10(a) (listing requirements of immigration judge to advise respondent); *id.* § 1240.11(a)(2) ("The immigration judge shall inform the alien of his or her apparent eligibility to apply for any of the benefits enumerated in this chapter.").

[5] *See* EOIR, *Master Calendar Checklist for the Immigration Judge/The Pro Se Respondent*, *available                                                                                                          at* https://www.justice.gov/sites/default/files/eoir/legacy/2014/08/15/Script_MC_Checklist.pdf (last accessed Mar. 10, 2025).

authority to do so. Only the NQRP, prior to its abrupt termination, provided a mechanism for Immigration Judges, in appropriate cases, to request appointment of trained counsel who could help the respondent understand the proceedings, identify possible defenses, gather evidence, and maintain communication with the court. NQRP representation—with lawyers and other professionals trained to work with individuals with mental disabilities—was often the only way for Immigration Judges to provide the safeguards mandated under *M-A-M-*.

Without NQRP, some cases involving mentally incompetent respondents may not proceed at all. Immigration regulations prohibit Immigration Judges from accepting admissions of removability from unrepresented respondents who are incompetent. *See* 8 C.F.R. § 1240.10(c). Nor may the court accept a waiver of rights—such as a decision to accept voluntary departure— unless it is knowing, intelligent, and voluntary. *See Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). In the absence of representation, respondents who cannot understand the NTA or communicate with the court may remain detained for extended periods as the court attempts to proceed without any formal structure for evaluating or safeguarding their rights.

In such cases, master calendar hearings can be continued repeatedly, terminated without resolution, or, in some instances, proceed despite the respondent's inability to participate meaningfully. Without NQRP, Immigration Judges are left to navigate this procedural impasse without the safeguards necessary to satisfy due process or to protect the integrity of the proceedings.

### 3.   *The Merits Hearing*

If the case advances beyond the master calendar stage, the Immigration Judge will set a merits hearing. The merits hearing is a multi-hour adversarial hearing in which DHS is represented by an Assistant Chief Counsel ("ACC") working for the Office of Principal Legal Advisor in

Immigration and Customs Enforcement ("ICE"). An interpreter is provided for respondents who do not speak English fluently. The judge, as discussed above, is duty-bound to help develop the record and ensure that the respondent is able to articulate their claims for relief.

This is a full evidentiary hearing in which the respondent bears the burden of proving eligibility for relief from removal—such as asylum, withholding of removal, or protection under the Convention Against Torture ("CAT"). These hearings are adversarial: an ACC represents the government, evidence is submitted, witnesses are examined, and the respondent may be cross-examined. For a respondent with severe mental illness or cognitive limitations, this burden is often impossible to carry without assistance. The respondent may be unable to understand the elements of their claim, gather documents, or testify coherently. Without a qualified representative, the Immigration Judge must attempt to develop the record independently while remaining neutral—a legal and practical contradiction.

Here again, counsel funded by the legal representation services is an invaluable part of the process. *Matter of M-A-M-* instructs Immigration Judges to implement procedural safeguards in these cases. These may include simplified questioning, use of interpreters or intermediaries, or taking testimony in nontraditional formats. But the most effective safeguard—qualified representation—cannot be implemented in the absence of a formal program. As a result, these hearings often cannot proceed, or result in legally inadequate outcomes.

The merits hearing is not necessarily the final step in immigration proceedings. Both the government and the respondent may appeal an immigration judge's decision, including a challenge to the safeguards implemented by the court. *See Matter of M-J-K-*, 26 I. & N. Dec. 773, 776 (B.I.A. 2016) (immigration judges' broad discretion to implement safeguards subject to *de novo* review by BIA). An immigration judge's order is not final until the BIA has ruled (or both parties have

waived appeal), often lengthening detention pending appeal. When the BIA rules, the respondent has the right to appeal to the United States Court of Appeal with jurisdiction over the immigration court. All these appeals are far more complicated when a mentally disabled respondent has had no representation (or unqualified representation), as not only are the substantive issues subject to appellate review, but so are the adequacy of the safeguards implemented by the immigration judge. Accordingly, NQRP not only makes the merits hearing more efficient and fair, but limits appellate issues, saving resources of the BIA and federal courts.

### 4. *Case Example: Navigating Immigration Court with NQRP Representation*

To illustrate how the NQRP enabled Immigration Judges to lawfully and effectively adjudicate cases involving mentally incompetent respondents, *amici* offer the following composite example, drawn exclusively from their experiences on the bench and in practice.

"Luis" was a 30-year-old man from Central America. He had lived in the United States for most of his life but was placed in removal proceedings following a criminal conviction. Luis had pled guilty in criminal court because he did not understand the process, his rights, or the impact of a conviction on his immigration status. Luis had no legal guardian, no family nearby, and no prior experience in court. He was detained in an ICE facility hundreds of miles from the immigration court, where he was held in solitary confinement for disruptive behavior. When he first appeared in immigration court, he spoke in disjointed phrases and repeatedly attempted to speak to people who were not present. He could not identify his country of origin, explain the nature of his case, or articulate any fear of return. At one hearing, he arrived so disoriented that he could not remain in the courtroom without causing disruption.

The Immigration Judge, after a hearing, determined a *bona fide* question of competency and referred Luis for appointment under the NQRP. Once appointed, this counsel, specifically

trained to represent individuals like Luis, made multiple visits to the detention facility, obtained Luis's consent to a psychological evaluation, and coordinated with family members who confirmed a history of childhood brain injury and developmental delay. The psychological expert—also funded by NQRP—diagnosed Luis with schizophrenia and cognitive impairments that rendered him unable to understand the nature of the proceedings.

With the support of counsel, Luis's case was reopened for a *Matter of M-A-M-* hearing. The Immigration Judge implemented safeguards, accepted testimony from the expert, and allowed counsel to assist Luis in applying for protection under CAT. DHS, after reviewing the medical records and expert opinion, stipulated to CAT relief, sparing Luis from likely torture in his home country. The Immigration Judge granted CAT deferral and ordered Luis released. He now lives with extended family and receives outpatient mental health care.

Luis's case is not unusual. Without the NQRP, the Immigration Judge could not have appointed a representative. The proceedings would likely have stalled indefinitely, been administratively closed, or worse, resulted in a removal order entered against someone who did not understand the proceedings and had no ability to defend himself, but had a legitimate fear of torture.

The NQRP made justice possible—and efficient. Its termination removes the single most effective safeguard available to Immigration Judges and leaves the most vulnerable respondents in the system without meaningful access to relief or the courts. Eliminating NQRP also increases the burden on an already back-logged immigration court system.

## **ARGUMENT**

We are concerned that EOIR, in abruptly terminating the NQRP, did not consider the program's central role in protecting the due process rights of mentally incompetent respondents

12

and supporting the effective functioning of the immigration courts. Even a temporary suspension of this program disrupts proceedings, forces judges to delay or terminate cases, and increases detention times and case backlogs. Terminating NQRP does not make mentally incompetent respondents disappear from the immigration courts, nor does it make these individuals easier to remove from the United States. The result, instead, is chaos and delay as immigration judges struggle to provide the fair hearing that is required by law.

Respondents who are deemed mentally incompetent may still be eligible for relief from removal, including protection under asylum, CAT, or other forms of discretionary relief. But asserting those claims requires the ability to understand the nature of the proceedings, identify relevant facts, submit evidence, and communicate with the court—none of which is possible for someone experiencing psychosis, trauma-related dissociation, or profound cognitive impairment. The qualified representation provided through the NQRP was essential—both to safeguard the rights of vulnerable respondents and to enable Immigration Judges to administer these complex cases in a lawful and efficient manner. Without legal guidance and representation, the result is often one of two extreme outcomes: either a removal order is issued without the due process required by law, or the proceedings are terminated or indefinitely continued because the court lacks the tools necessary to implement appropriate safeguards and fairly adjudicate the case.

### 1. Representation of Mentally Incompetent Respondents Enables Immigration Judges to Fulfill Their Statutory Duties

As discussed above, Immigration Judges are legally obligated to ensure that all respondents in removal proceedings receive a full and fair hearing. *Quintero*, 998 F.3d at 623–24. This duty is particularly acute where respondents appear *pro se*. Federal courts have repeatedly held that Immigration Judges must affirmatively assist unrepresented respondents in developing the record and understanding the proceedings. *See Barragan-Ojeda v. Sessions*, 853 F.3d 374, 381 (7th Cir.

2017). It is not enough for judges to read from a script; rather, they must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (citation omitted). As the Fourth Circuit has emphasized, *pro se* respondents must not be "thrown into removal proceedings and left to sink or swim without adequate assistance from the immigration judge." *Quintero*, 998 F.3d at 628.

For respondents who are mentally incompetent, the reality is even more stark. These individuals do not merely struggle to "swim" in the immigration system—they are, in many instances, wholly incapable of engaging with it at all. Some cannot comprehend the nature of the proceedings or identify the charges against them; others cannot recall basic personal information or communicate coherently. Many are nonverbal, dissociated, or experiencing acute psychiatric symptoms that render participation impossible. The demands of immigration court—adversarial questioning, complex legal standards, and strict procedural deadlines—are not just challenging; they are functionally insurmountable, strapping cinderblocks to the ankles of those already adrift and causing them to "sink."

The BIA recognized this reality in *Matter of M-A-M-*, 25 I. & N. Dec. 474, where it held that Immigration Judges must implement procedural safeguards when a respondent is found mentally incompetent. These safeguards may include docket modifications, simplified instructions, or appointment of a representative. *Id*. at 481–82. But without the NQRP, Immigration Judges have no mechanism to implement the safeguard that is most essential—qualified legal representation. The result is a procedural dead end.

As former Immigration Judges, *amici* know that these duties cannot be fulfilled through good intentions alone. In jurisdictions with large detained dockets, judges face high caseloads and limited time. Even under normal circumstances, they cannot develop the record unaided. And in

14

cases involving incompetent respondents, there is often no viable path forward without counsel. Judges cannot secure psychological evaluations, interview family members, or construct claims for relief on the respondent's behalf. Yet they remain legally responsible for ensuring a fair hearing.

The NQRP allowed Immigration Judges to meet these responsibilities. When a bona fide question of competency arose, judges could refer the matter for evaluation and appointment. Qualified representatives would then step in to develop the case, present evidence, and guide the respondent through the process. This program allowed Immigration Judges to fulfill their statutory duties while preserving the respondent's right to a fair proceeding.

### 2. *Representation of Mentally Incompetent Respondents Promotes Efficiency in the Immigration Courts*

In *amici*'s experience, the NQRP significantly improved the efficiency of immigration court proceedings involving mentally incompetent respondents. With a qualified representative in place, proceedings advanced in a timely, orderly, and legally compliant manner. Counsel coordinated expert evaluations, identified potential relief, and prepared filings in advance of hearings. Judges were presented with well-developed records and respondents who—though still impaired—could participate meaningfully through their representative. Proceedings that would have stalled or required repeated continuances instead advanced to resolution. In many cases, DHS stipulated to relief or waived appeal, allowing for swift resolution.

By contrast, *amici* routinely observed that hearings involving mentally incompetent respondents without counsel consumed far more time and judicial resources than cases in which NQRP-appointed representatives were involved. Judges were left to coordinate evaluations, explain legal standards, develop the factual record, and search for procedural safeguards without institutional support. In one case, an Immigration Judge attempted to proceed with a merits hearing for an unrepresented respondent who refused to participate in the proceeding and began conversing

with imaginary figures in the courtroom. The judge was forced to continue the hearing multiple times while attempting, without success, to coordinate an evaluation. The case ultimately stretched over a year and resulted in termination for failure to implement required safeguards – in other words, all that effort simply resulted in the respondent staying in the United States with no status, subject to future proceedings.

In another case, a respondent had been found incompetent but remained in detention for months because no representative could be located to assist the court in resolving the matter. Even when a case appeared to present meritorious claims, it could not move forward due to the respondent's inability to participate and the court's inability to appoint representation. Cases that might otherwise have been resolved efficiently were instead placed in administrative limbo. *Pro bono* counsel is not a solution to this quandary. While *pro bono* volunteers can be helpful in many circumstances, very few have the specialized training and support to handle the complications presented by a respondent with severe mental disabilities.

These inefficiencies burden not only the courts, but also DHS counsel, detention facilities, and the broader immigration system. When proceedings are delayed or derailed due to lack of representation, the system incurs significant costs—detention days accumulate, dockets are disrupted, and appeals become more likely as legal errors or procedural missteps multiply.

The NQRP mitigated these inefficiencies. It enabled Immigration Judges to fulfill their legal obligations under *Matter of M-A-M-*, reduced the need for repeated continuances, and ensured that respondents' cases could be heard on the merits. In *amici*'s view, the program was not only essential to protecting the rights of vulnerable respondents—it was also a model of practical efficiency. Its termination has left a void that no *ad hoc* referrals or informal solutions can fill.

### 3. *Qualified Representation Is Essential to Due Process for Mentally Incompetent Respondents*

The representation provided through the NQRP was not merely helpful—it was essential to ensuring that detained, mentally incompetent respondents received the minimum procedural protections required under the Constitution. Due process requires that respondents in removal proceedings be given a "full and fair hearing." *Quintero*, 998 F.3d at 623–24. That requirement cannot be met when a respondent cannot comprehend the charges against them, respond to questions, or meaningfully present evidence in support of their claims.

Immigration court is a complex, adversarial forum in which DHS is represented by trained counsel. Respondents must navigate a maze of legal standards, filing deadlines, and evidentiary burdens—often while detained and under severe psychological stress. For individuals who suffer from serious mental illness or intellectual disability, these demands are impossible to meet without assistance. As *amici* have seen repeatedly, unrepresented respondents who are mentally incompetent are often unable to even understand that they are in removal proceedings, let alone advocate for themselves.

One of the *amici* recalls a case in which a young respondent appeared to understand the proceedings and initially indicated a desire to accept removal. But the judge, concerned by the respondent's affect, paused the case and arranged for NQRP representation. Once counsel was appointed, it became clear that the respondent suffered from severe mental illness and was being pressured by others in detention to waive his rights. With the support of his specially-trained representative, the respondent applied for protection under CAT. His case was ultimately granted. Without the brief pause and the appointment of counsel, he almost certainly would have been ordered removed.

In *Matter of M-A-M-*, the Board held that Immigration Judges must implement safeguards when a respondent lacks competency to participate fairly. In many cases, representation is the only measure that can meaningfully ensure fairness. The NQRP was designed to provide that safeguard. It connected respondents with trained representatives who could develop the record, identify claims for relief, and serve as a consistent and informed point of contact for the court. Without such representation, proceedings proceed in form only—stripped of substance and legality.

Since the termination of the NQRP, *amici* have seen the return of cases where due process is not just compromised—it is fundamentally absent. Respondents sit silently or speak incoherently. Judges ask questions and receive no answers. Hearings are continued indefinitely, or worse, proceed without any meaningful participation from the respondent. The consequences are grave: some respondents are removed without presenting any evidence, while others languish in detention with no resolution in sight.

The right to a fair hearing is a cornerstone of our immigration system. Immigration Judges are tasked with upholding that right—but they cannot do so without the tools to ensure that respondents understand the process and can present their cases. The NQRP provided that tool. Its elimination leaves the courts without a lawful means to carry out their obligations and leaves the most vulnerable respondents without a voice. Due process demands more.

## **CONCLUSION**

As former Immigration Judges and members of the Board of Immigration Appeals, we are deeply concerned that an already overburdened immigration court system has been stripped of a critical safeguard necessary to its lawful operation. The abrupt termination of the National Qualified Representative Program is a step in the wrong direction—one that burdens Immigration Judges, increases inefficiencies, and gravely undermines due process for mentally incompetent

respondents. Without this program, courts are left without the tools required to administer justice,

and the most vulnerable individuals in removal proceedings are left without a voice.

Dated: May 20, 2025                                   Respectfully submitted,

                                                      */s/ John R. Jacob*

                                                      John R. Jacob
                                                      D.C. Bar No. 444412
                                                      AKIN GUMP STRAUSS HAUER & FELD LLP
                                                      2001 K Street, N.W.
                                                      Washington, D.C. 20006
                                                      Tel: (202) 887-4000
                                                      Fax: (202) 887-4288
                                                      Email: jjacob@akingump.com

                                                      *Counsel to Amici Former Immigration
                                                      Judges & Former Members of the Board of
                                                      Immigration Appeals*

## APPENDIX A

### Former Immigration Judges and
### Members of the Board of Immigration Appeals

Hon. Steven Abrams, Immigration Judge, New York, Varick St., and Queens Wackenhut, 1997-2013

Hon. Terry A. Bain, Immigration Judge, New York, 1994-2019

Hon. Maria Baldini-Potermin, Immigration Judge, Chicago, 2023-2025

Hon. Dayna M. Beamer, Immigration Judge, Honolulu, 1997-2021

Hon. Sarah M. Burr, Assistant Chief Immigration Judge and Immigration Judge, New York, 1994-2012

Hon. Esmerelda Cabrera, Immigration Judge, New York, Newark and Elizabeth, NJ, 1994-2005

Hon. Sarah Cade, Immigration Judge, Boston, 2021-2025

Hon. Jeffrey S. Chase, Immigration Judge, New York, 1995-2007

Hon. George T. Chew, Immigration Judge, New York, 1995 - 2017

Hon. Joan V. Churchill, Immigration Judge, Washington, D.C. and Arlington, VA, 1980-2005

Hon. Raisa Cohen, Immigration Judge, New York, 2016-2024

Hon. Bruce J. Einhorn, Immigration Judge, Los Angeles, 1990-2007

Hon. Noel A. Ferris, Immigration Judge, New York, 1994-2013

Hon. James R. Fujimoto, Immigration Judge, Chicago, 1990-2019

Hon. Gilbert Gembacz, Immigration Judge, Los Angeles, 1996-2008

Hon. Jennie Giambastiani, Immigration Judge, Chicago, 2002-2019

Hon. John F. Gossart, Jr., Immigration Judge, Baltimore, 1982-2013

Hon. Paul Grussendorf, Immigration Judge, Philadelphia and San Francisco, 1997-2004

Hon. Miriam Hayward, Immigration Judge, San Francisco, 1997-2018

Hon. Megan Herndon, Assistant Chief Immigration Judge, Richmond, VA, 2021-2025

Hon. Charles M. Honeyman, Immigration Judge, New York and Philadelphia, 1995-2020

Hon. Rebecca Jamil, Immigration Judge, San Francisco, 2016-2018

Hon. William P. Joyce, Immigration Judge, Boston, 1996-2002

Hon. Edward F. Kelly, Appellate Immigration Judge, Board of Immigration Appeals, 2017-2021;

Deputy Chief Immigration Judge, 2013-2017; Assistant Chief Immigration Judge, EOIR Headquarters, 2011-2013

Hon. Carol King, Immigration Judge, San Francisco, 1995-2017; temporary member of the Board of Immigration Appeals 2010-2011

Hon. Eliza C. Klein, Immigration Judge, Miami, Boston, Chicago, 1994-2015; Senior Immigration Judge, Chicago, 2019-2023

Hon. Elizabeth A. Lamb, Immigration Judge, New York, 1995 – 2018

Hon. Dana Leigh Marks, Immigration Judge, San Francisco, 1987-2021

Hon. Margaret McManus, Immigration Judge, New York, 1991-2018

Hon. Steven Morley, Immigration Judge, Philadelphia, 2010-2022

Hon. Charles Pazar, Immigration Judge, Memphis, 1998-2017

Hon. George Proctor, Immigration Judge, Los Angeles, San Francisco, 2003-2008

Hon. Laura L. Ramirez, Immigration Judge, San Francisco, 1997-2018

Hon. Lory D. Rosenberg, Appellate Immigration Judge, Board of Immigration Appeals, 1995-2002

Hon. Susan G. Roy, Immigration Judge, Newark, 2008-2010

Hon. Andrea Saenz, Appellate Immigration Judge, Board of Immigration Appeals, 2021-2025

Hon. Paul W. Schmidt, Chairperson and Appellate Immigration Judge, Board of Immigration Appeals, 1995-2003; Immigration Judge, Arlington, VA, 2003-2016

Hon. Douglas B. Schoppert, Immigration Judge, New York, 1997-2024

Hon. Noelle Sharp, Assistant Chief Immigration Judge, Houston, 2021-2025

Hon. Patricia M. B. Sheppard, Immigration Judge, Boston, 1993-2006

Hon. Ilyce S. Shugall, Immigration Judge, San Francisco, 2017-2019

Hon. Helen Sichel, Immigration Judge, New York, 1997-2020

Hon. Denise Slavin, Immigration Judge, Miami, Krome, Baltimore, 1995-2019; Senior Immigration Judge, Orlando, 2023-2024

Hon. Andrea Hawkins Sloan, Immigration Judge, Portland, 2010-2017

Hon. A. Ashley Tabaddor, Immigration Judge, Los Angeles, 2005-2021

Hon. Gita Vahid, Immigration Judge, Los Angeles, 2002-2024

Hon. Robert D. Vinikoor, Immigration Judge, Chicago, 1984-2017

Hon. Polly A. Webber, Immigration Judge, San Francisco, 1995-2016